# 17-3258(L)

## 17-3304(CON), 17-3342, 17-3658

*To Be Argued By*:
MICHAEL D. LOCKARD

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket Nos. 17-3258(L), 17-3304(CON), 17-3342, 17-3658

◄━━◆━━►

IN RE: 650 FIFTH AVENUE
AND RELATED PROPERTIES

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

GEOFFREY S. BERMAN,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

MICHAEL D. LOCKARD,
DANIEL M. TRACER,
DANIEL B. TEHRANI,
    *Assistant United States Attorneys,*
        *Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    A.  The Government's Case . . . . . . . . . . . . . . . .  5

        1.  The Origins of the Alavi Foundation and Takeover by the Government of Iran . .  9

        2.  Bank Melli Partners with Alavi to Rescue Alavi from Financial Ruin. . . . . . . . . .  13

        3.  Bank Melli Takes Further Steps to Conceal Its Ownership of Assa . . . . . .  18

        4.  Iran's Transfer of Control over Alavi from the Bonyad Mostazafan to the Iranian Mission to the United Nations . . . . . .  20

        5.  The Iran Sanctions and Bank Melli's Transfer of Assa to New Straw Owners . . . . . . . . . . . . . . . . . . . . . . . . . .  24

        6.  Alavi's and Bank Melli's Efforts to Transfer Bank Melli's Interest in the Partnership . . . . . . . . . . . . . . . . . . . . . .  26

            a.  Alavi's Efforts to Buy Assa's Interest in the Late 1990s. . . . . . . . . . . . . .  26

            b.  Bank Melli's Attempt to Sell to the Hanif Partnership. . . . . . . . . . . . .  27

            c.  Alavi's Continued Efforts to Buy the Assa Interest . . . . . . . . . . . . . . . . .  32

PAGE

      d.  Alavi's and Assa's Correspondence about Assa Shareholders . . . . . . . 34

    7.  Civil Lawsuits Against Alavi and Bank Melli's Response. . . . . . . . . . . . . . . . . . 35

    8.  The Iranian Ambassador's Continued Supervision of Alavi. . . . . . . . . . . . . . 37

    9.  Alavi's President Destroys Documents . . . . . . . . . . . . . . . . . . . . . . 40

   10.  Proceeds from the Building and Transactions Involving Proceeds . . . . 41

  B.  Claimants' Case . . . . . . . . . . . . . . . . . . . . . . 42

  C.  Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

  D.  This Court's Prior Decision . . . . . . . . . . . . 43

ARGUMENT:

Section I—Alavi & Partnership Issues

POINT I—The Court Properly Denied Claimants' Untimely Requests for Discovery and Granted the Government's Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

  A.  The District Court Acted Well Within Its Discretion in Declining to Reopen Discovery for New Discovery Requests. . . . . . . . . . . . 46

    1.  Relevant Facts . . . . . . . . . . . . . . . . . . . 46

iii

2. Applicable Law. . . . . . . . . . . . . . . . . . .  49

3. Discussion. . . . . . . . . . . . . . . . . . . . . .  51

    a. The District Court Complied with this Court's Opinion . . . . . . . . . . .  51

    b. Claimants' Requests for Discovery on Statute of Limitations Were Untimely . . . . . . . . . . . . . . . . . . . . .  54

B. The District Court Correctly Granted the Government's Motion for Summary Judgment as to Claimants' Statute-of-Limitations Defense . . . . . . . . . . . . . . . . . .  64

1. Relevant Facts . . . . . . . . . . . . . . . . . . .  65

2. Applicable Law. . . . . . . . . . . . . . . . . . .  66

    a. Statute of Limitations. . . . . . . . . .  66

    b. Summary Judgment . . . . . . . . . . .  67

3. Discussion. . . . . . . . . . . . . . . . . . . . . .  69

    a. The District Court Properly Found that There Was No Genuine Issue of Fact that the Government Had Not Discovered the Offenses Giving Rise to Forfeiture Prior to 2004 . . . . . .  69

PAGE

        b.   The Forfeiture Action Was Also
              Timely Because Independent
              Criminal Violations Giving Rise to
              Forfeiture Continued After 2004 .  77

        c.   The District Court Correctly
              Determined that Forfeiture Based
              on Pre-2004 Conduct Was
              Appropriate . . . . . . . . . . . . . . . . .  82

POINT II—The District Court Properly Denied Alavi's
    Motion to Suppress . . . . . . . . . . . . . . . . . . . . . . .  85

   A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  85

       1.   The Search and Prior Appeal . . . . . . .  85

       2.   The Suppression Hearing and the
           District Court's Opinion . . . . . . . . . . .  88

   B.   The District Court Correctly Determined that
      the Search Evidence Would Inevitably Have
      Been Discovered . . . . . . . . . . . . . . . . . . . . . .  91

       1.   Applicable Law. . . . . . . . . . . . . . . . . . .  92

       2.   Discussion. . . . . . . . . . . . . . . . . . . . . . .  94

   C.   The District Court Correctly Found that the
      Searching Agents Relied in Good Faith on a
      Judicially Authorized Warrant . . . . . . . .  103

       1.   Applicable Law. . . . . . . . . . . . . . . . . .  103

       2.   Discussion. . . . . . . . . . . . . . . . . . . . . . .  106

PAGE

        a.  Agents Reasonably Relied on the Judicially Authorized Warrant . 106

        b.  The District Court Properly Found that the Government Had Not Engaged in Deliberate Conduct that Justified Suppression . . . . . . . . 115

D.  Any Error Was Harmless . . . . . . . . . . . . . 118

   1.  Applicable Law . . . . . . . . . . . . . . . . . . 118

   2.  Discussion . . . . . . . . . . . . . . . . . . . . . . 118

POINT III—The District Court Properly Admitted Evidence that Members of Alavi's Board of Directors Invoked the Fifth Amendment . . . . 120

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 120

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 123

   1.  Fifth Amendment Invocations During Discovery . . . . . . . . . . . . . . . . . . . . . . . 123

   2.  Adverse Inferences in Civil Actions . 124

   3.  Rule 403 . . . . . . . . . . . . . . . . . . . . . . . 126

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 127

   1.  The District Court Correctly Declined to Permit Alavi Board Members to Uninvoke Following the Close of Discovery . . . . . . . . . . . . . . . . . . . . . . . 127

2. The District Court Properly Admitted Alavi's Board Members' Fifth Amendment Invocations . . . . . . . . . . 132

    a. The Evidence Was Highly Probative . . . . . . . . . . . . . . . . . . . 133

    b. The Evidence Was Not Unfairly Prejudicial . . . . . . . . . . . . . . . . . . 139

    c. Any Error Was Harmless . . . . . . 144

3. The District Court Allowed Claimants to Introduce Evidence to Explain the Fifth Amendment Invocations . . . . . . . . . . 147

4. There Is No Basis to Exclude the Fifth Amendment Invocations Based on Alleged Prosecutorial Misconduct . . 150

POINT IV—The Jury Properly Found that Alavi's Entire Interest in the Partnership Was Retained as a Result of Criminal IEEPA Violations. . . 152

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 152

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 153

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 155

1. The Evidence Demonstrated that Claimants Retained the Defendant Property Through Criminal Acts . . . 156

PAGE

2. The District Court Properly Introduced Undisputed Facts Concerning Aspects of Prior Lawsuits Against Alavi . . . . . .  164

3. The Evidence Independently Demonstrated that the Building and Partnership Were Properties Involved in Money Laundering. . . . . . . . . . . . . .  168

POINT V—Claimants Received a Fair Trial . . . . .  172

A. The District Court Did Not Abuse Its Discretion in Evidentiary Rulings. . . . . .  173

1. Applicable Law. . . . . . . . . . . . . . . . .  173

2. Discussion. . . . . . . . . . . . . . . . . . . .  174

a. The District Court Properly Limited Testimony Concerning Alavi's Charitable Giving at Trial . . . . .  174

b. The District Court Properly Instructed the Jury that the 1989 Transaction Was Not Illegal  . . .  182

c. The District Court Properly Excluded Irrelevant Testimony from the Officer of a French Foundation .  185

d. The Court Properly Precluded Claimants from Introducing Irrelevant Evidence about Agents' Investigative Techniques . . . . . .  188

PAGE

e.   The District Court Did Not Interfere
     with Alavi's Presentation of
     Evidence. . . . . . . . . . . . . . . . . . . . .   191

f.   The District Court Properly Admitted
     Out-of-Court Statements Against
     Claimants . . . . . . . . . . . . . . . . . . .   194

     i.    The District Court Did Not
           Abuse Its Discretion in
           Admitting Statements by
           Badr. . . . . . . . . . . . . . . . . . . .   197

     ii.   The District Court Did Not
           Abuse Its Discretion in
           Admitting Statements by
           Tafti. . . . . . . . . . . . . . . . . . . .   201

     iii.  The District Court Did
           Not Abuse Its Discretion in
           Admitting Statements of
           Alavi Accountant Hamid
           Firooznia . . . . . . . . . . . . . . . .   204

g.   The District Court Properly Admitted
     Evidence that Alavi was Instructed
     by the Iranian Ambassador to the
     United States . . . . . . . . . . . . . .   208

B.   The District Court Did Not Unfairly Treat
     Claimants at Trial . . . . . . . . . . . . . . . . . .   212

     1.   The District Court Did Not
          Misunderstand Claimants' Defense .   213

PAGE

    2.  The District Court Did Not Close the
Courtroom. . . . . . . . . . . . . . . . . . . . .  214

    3.  The District Court Properly Posed
Questions to Witnesses . . . . . . . . . . .  215

    4.  The District Court Did Not Disparage
Alavi's Lawyers . . . . . . . . . . . . . . . . .  218

POINT VI—The Forfeiture Is Not Constitutionally
Excessive . . . . . . . . . . . . . . . . . . . . . . . . . . . .  222

  A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  223

  B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  225

    1.  The Forfeiture of Offense Proceeds Was
Not Punitive. . . . . . . . . . . . . . . . . . . .  226

    2.  The Forfeiture of the Building and Other
Involved-In Property Was Not
Constitutionally Excessive . . . . . . . .  229

POINT VII—The Interests of Justice Would Not Be
Served by Reassignment to a Different Judge in
the Event of a Remand . . . . . . . . . . . . . . . . . . .  236

  A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  237

  B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  237

PAGE

Section II—Assa Issues

POINT I—Assa Was Not Prejudiced by the District
Court's Failure to Provide Assa Notice Prior to
Entering Summary Judgment Against Assa's
Affirmative Defense. . . . . . . . . . . . . . . . . . . . .  241

   A.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  241

   B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  242

POINT II—The District Court Had Subject Matter
Jurisdiction over this Action. . . . . . . . . . . . . .  245

   A.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  246

   B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  248

POINT III—The District Court's Discovery Orders
Were Within Its Discretion. . . . . . . . . . . . . . .  253

   A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  253

   B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  255

   C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  256

       1.  The District Court Appropriately
Disregarded Shakeri's Declaration. .  257

       2.  The District Court Did Not Rely on Any
Adverse Inferences. . . . . . . . . . . . . . .  258

3. The District Court Did Not Err In Not
Imposing Sanctions Against the
Government . . . . . . . . . . . . . . . . . . . . 260

4. The District Court Correctly Denied
Assa's Request for Additional OFAC
Discovery . . . . . . . . . . . . . . . . . . . . . . 261

POINT IV—Summary Judgment Against Assa Was
Correctly Entered . . . . . . . . . . . . . . . . . . . . . . 264

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 264

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 265

1. Bank Melli's Continued Control of
Assa. . . . . . . . . . . . . . . . . . . . . . . . . . . 265

2. Forfeitability of Assa's Interests in the
Defendant Properties. . . . . . . . . . . . . 272

a. Assa's Interest in the Partnership
Constitutes IEEPA Proceeds . . . 273

b. The Funds in Assa's Bank Accounts
Constitute IEEPA Proceeds . . . . 275

c. Assa's Property Was Involved in
Money Laundering . . . . . . . . . . . 275

POINT V—The District Court Did Not Abuse Its
Discretion in Declining to Stay the Forfeiture
Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . 278

PAGE

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  279

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  282

Section III—Maryland IEC Issues

POINT I—The District Court Properly Dismissed the
  IEC's Ownership Claims as Time-Barred . . .  284

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  284

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  286

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  289

  1.  There Was No Court Order Extending
      the Time to File Claims . . . . . . . . . . .  289

  2.  The IEC's Supplemental Claim Does Not
      Relate Back to Its Original Claim  . .  290

  3.  The IEC Should Not Have Been
      Permitted to Depart from Strict
      Compliance with  Rule G . . . . . . . . . .  292

POINT II—The District Court Properly Denied the
  IEC's Claim Based on Constructive Trust . . .  294

A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  295

B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  296

PAGE

Section IV—Levin Creditors Issues

The District Court Properly Dismissed the Levin
    Creditors' Claim. . . . . . . . . . . . . . . . . . . . . . . . .  298

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  298

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  300

    1.  Forfeiture Claims and Statutory
        Standing . . . . . . . . . . . . . . . . . . . . . . . .  300

    2.  The Terrorism Risk Insurance Act . .  302

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  304

    1.  The Levin Creditors Lack Statutory
        Standing Based on Their Failure to
        File a Claim . . . . . . . . . . . . . . . . . . . . .  304

    2.  The TRIA Does Not Preempt Compliance
        with Rule G . . . . . . . . . . . . . . . . . . . . .  306

    3.  There Is No Equitable Basis to Prevent
        the Government from Moving to
        Dismiss . . . . . . . . . . . . . . . . . . . . . . . . 310re

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  313

# TABLE OF AUTHORITIES

*Cases*:

*Abascal v. Fleckenstein*,
820 F.3d 561 (2d Cir. 2016) . . . . . . . . . . . . . . . 145

*Abbas v. Dixon*,
480 F.3d 636 (2d Cir. 2007) . . . . . . . . . . . . . . . 301

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . 67

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989). . . . . . . . . . . . . . . . . . 246, 250

*Artis v. Bernanke*,
161 F. Supp. 3d 97 (D.D.C. 2013) . . . . . . . . . 52, 53

*Austin v. United States*,
509 U.S. 602 (1993). . . . . . . . . . . . . . . . . . . . . . 226

*Autotech Techs. LP v. Integral Research & Dev. Corp.*,
499 F.3d 737 (7th Cir. 2007) . . . . . . 253, 254, 255

*Bailey v. Pataki*,
952 F. Supp. 2d 626 (S.D.N.Y. 2013) . . . . . . . . . 63

*Baxter v. Palmigiano*,
425 U.S. 308 (1976). . . . . . . . . . . . . . . . . . . . . . 125

*Baylis v. Marriott Corp.*,
906 F.2d 874 (2d Cir. 1990) . . . . . . . . . . . . . . . . 63

*Bellis v. United States*,
417 U.S. 85 (1974). . . . . . . . . . . . . . . . . . . . . . . 280

*Brady v. Wal–Mart Stores, Inc.*,
   531 F.3d 127 (2d Cir. 2008) . . . . . . . . . . . . . . . 154

*Bridgeway v. Citibank*,
   201 F.3d 134 (2d Cir. 2000) . . . . . . . . . . .   242, 243

*Brink's Inc. v. City of New York*,
   717 F.2d 700 (2d Cir. 1983) . . . . . . . . . . . . *passim*

*Browning-Ferris Indus. of Vermont, Inc. v. Kelco
   Disposal, Inc.*,
   492 U.S. 257 (1989). . . . . . . . . . . . . . . . . . . . . . . 225

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986). . . . . . . . . . . . . . . .   67, 69, 242

*CFTC v. A.S. Templeton Group*,
   297 F. Supp. 2d 531 (E.D.N.Y. 2003). . . . . . . . . 281

*Cisneros v. Alpine Ridge Grp.*,
   508 U.S. 10 (1993). . . . . . . . . . . . . . . . . . . . . . . . 307

*Citizen's Bank Account L7N01967*,
   731 F.3d 189 (2d Cir. 2013) . . . . . . .   224, 226, 228

*Colon v. City of New York*,
   No. 12-CV-9205 JMF, 2014 WL 4100607 (S.D.N.Y.
   Aug. 20, 2014) . . . . . . . . . . . . . . . . . . . . . . . . 50, 63

*Cross v. N.Y.C. Transit Auth.*,
   417 F.3d 241 (2d Cir. 2005) . . . . . . . . . . . . . . . 154

*Davis v. United States*,
   564 U.S. 229 (2011). . . . . . . . . . . . . . . . . . . . . . 117

*Davis v. Velez*,
   797 F.3d 192 (2d Cir. 2015) . . . . . . .   199, 200, 202

PAGE

*DiCola v. SwissRe Holding (North America), Inc.*,
   996 F.2d 30 (2d Cir. 1993) . . . . . . . . . . . . . . 68, 69

*DSI Assocs. LLC v. United States*,
   496 F.3d 175 (2d Cir. 2007) . . . . . . . . . . . . . . . 302

*Ellul v. Congregation of Christian Bros.*,
   774 F.3d 791 (2d Cir. 2014) . . . . . . . . . . . . . . . 301

*Evans v. Michigan*,
   568 U.S. 313 (2013) . . . . . . . . . .  184, 185, 188, 189

*FDIC v. Giammettei*,
   34 F.3d 51 (2d Cir. 1994) . . . . . . . . . . . . .  68, 266

*Fendi Adele S.R.L. v. Ashley Reed Trading*, 06 Civ.
   0243 (JES) (MHD),
   2006 WL 2585612 (S.D.N.Y. Sept. 8, 2006) . . . . 281

*First Nat'l City Bank v. Banco Para El Comercio
   Exterior de Cuba*,
   462 U.S. 611 (1983) . . . . . . . . . . . . . . . . . . . . . . 162

*Flatow v. Islamic Republic of Iran*,
   67 F. Supp. 2d 535 (D. Md. 1998) . . . . . . . . *passim*

*Gabay v. Mostazafan Found. of New York*,
   968 F. Supp. 895 (S.D.N.Y. 1997) . . . . . . . . . . . 163

*Geveke & Co. Int'l v. Kompania Di Awa I Elektrisidat
   Di Korsou N.V.*,
   482 F. Supp. 660 (S.D.N.Y. 1979) . . . . . . . . . . . 249

*Gray v. Town of Darien*,
   927 F.2d 69 (2d Cir. 1991) . . . . . . . . . . . . .  49, 123

PAGE

*Grimes v. Grimes,*
 184 Md. 59, 40 A.2d 58 (1944) . . . . . . . . .  296, 297

*Gutierrez-Rodriguez v. Cartagena,*
 882 F.2d 553 (1st Cir. 1989). . . . . . . . . . . . . . . 123

*Hausler v. JP Morgan Chase Bank, N.A.,*
 770 F.3d 207 (2d Cir. 2014) . . . . . . . . . . . . . . . 303

*Herring v. United States,*
 555 U.S. 135 (2009). . . . . . . . . . . . . . . . .  105, 115

*Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Co.,*
 542 U.S. 177 (2004). . . . . . . . . . . . . . . . . . . . . . 280

*Hofe v. United States,*
 492 F.3d 175 (2d Cir. 2007) . . .  224, 225, 229, 232

*Hudson v. Michigan,*
 547 U.S. 586 (2006). . . . . . . . . . . . . . . . . . . . . . 105

*Hyland v. Homeservices of America,*
 No. 3:05CV612, 2012 WL 1680109 (W.D. Ky. May 14, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*In re 650 Fifth Ave. & Related Properties,*
 777 F. Supp. 2d 529 (S.D.N.Y. 2011). . . . . . . . . 170

*In re 650 Fifth Ave. & Related Properties,*
 No. 08 Civ. 10934 (KBF), 2013 WL 5178677 (S.D.N.Y. Sept. 16, 2013) . . . . . . . . . . . . . . *passim*

*In re 650 Fifth Ave. & Related Properties,*
 830 F.3d 66 (2d Cir. 2016) . . . . . . . . . . . . . *passim*

PAGE

*In re Agent Orange Prod. Liab. Litig.*,
517 F.3d 76 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 49

*In re Grand Jury Subpoena Issued June 18, 2009*,
593 F.3d 155 (2d Cir. 2010) . . . . . . . . . . . . . . . 280

*In re J.P. Linahan, Inc.*,
138 F.2d 650 (2d Cir. 1943) . . . . . . . . . . . . . . . 238

*In re Martin-Trigona*,
760 F.2d 1334 (2d Cir. 1985) . . . . . . . . . . . . . . 174

*In re Par Pharm., Inc. Sec. Litig.*,
133 F.R.D. 12 (S.D.N.Y. 1990) . . . . . 281, 282, 283

*In re Terrorist Attacks on September 11, 2001*,
714 F.3d 109 (2d Cir. 2013) . . . . . . . . . . . . . . . 230

*In re the City of New York*,
607 F.3d 923 (2d Cir. 2010) . . . . . 58, 61, 262, 263

*Jeffreys v. City of New York*,
426 F.3d 549 (2d Cir. 2005) . . . . . . . . . 67, 68, 266

*Jones v. Niagara Frontier Transp. Auth.*,
836 F.2d 731 (2d Cir. 1987) . . . . . . . . . . . . . . . 258

*Joseph v. Sikorsky Aircraft Corp*,
No. 3:14CV00424 (AWT), 2015 WL 5304177 (D.
Conn. Sept. 9, 2015) . . . . . . . . . . . . . . . . . . . . . . 49

*Kashi v. Gratsos*,
790 F.2d 1050 (2d Cir. 1986) . . 280, 282, 285, 286

*Kastigar v. United States*,
406 U.S. 441 (1972). . . . . . . . . . . . . . . . . . . . . . . 280

PAGE

*Kirschenbaum v. 650 Fifth Ave. & Related Properties*,
  830 F.3d 107 (2d Cir. 2016) . . . . . . . . . . . . . . . . 162

*Kokesh v. S.E.C.*,
  137 S. Ct. 1635 (2017). . . . . . . . . . . . . . . .   227, 228

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
  274 F.3d 706 (2d Cir. 2001) . . . . . . . . . . . . . . . . 301

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998) . . . . . . .   66, 72, 73, 74

*LiButti v. United States*,
  107 F.3d 110 (2d Cir. 1997) . . . . . . . . . . . . . . . . 125

*Liteky v. United States*,
  510 U.S. 540 (1994). . . . . . . . . . . . . . . . . . . . . . 238

*Lyons v. Lancer Ins. Co.*,
  681 F.3d 50 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 71

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) . . . . . . . . . . . . . . . . 71

*May Dept. Stores v. Int'l Leasing Corp.*,
  1995 WL 656986 (S.D.N.Y. Nov. 8, 1995) . . . 52, 53

*McIntyre v. United States*,
  367 F.3d 38 (1st Cir. 2004). . . . . . . . . . .   76, 77, 92

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985) . . . . . . . . . . . . . . . 277

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*,
  556 U.S. 366 (2009). . . . . . . . . . . . . . . . . .   307, 308

*Morse v. Fusto,*
    804 F.3d 538 (2d Cir. 2015) . . .   154, 155, 164, 165

*Morton v. Mancari,*
    417 U.S. 535 (1974). . . . . . . . . . . . . . . . . . . . . . . 252

*Namet v. United States,*
    373 U.S. 179 (1963). . . . . . . . . . . . . . . . . . . . . . . 150

*Outley v. City of New York,*
    837 F.2d 587 (2d Cir. 1988) . . . . . . . . . . . . . . . . 261

*Overall v. Estate of Klotz,*
    52 F.3d 398 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 68

*Pennsylvania Bd. of Prob. & Parole v. Scott,*
    524 U.S. 357 (1998). . . . . . . . . . . . . . . . . . . . . . . 105

*Permanent Mission of India to the United Nations v.
    City of New York,*
    561 U.S. 193 (2007). . . . . . . . . . . . . . . . . . . . . . . 246

*Perry v. Ethan Allen, Inc.,*
    115 F.3d 143 (2d Cir. 1997) . . . . . . . . . . . . . . . . 174

*Poole v. Coakley & Williams Const., Inc.,*
    423 Md. 91 (2011) . . . . . . . . . . . . . . . . . . . .   297, 300

*Rado v. Connecticut,*
    607 F.2d 572 (2d Cir. 1979) . . . . . . . . . . . . . . . . 150

*Rakas v. Illinois,*
    439 U.S. 128 (1978). . . . . . . . . . . . . . . . . . . . . . . 91

*Republic Nat. Bank of N.Y. v. Delta Air Lines,*
    263 F.3d 42 (2d Cir. 2001) . . . . . . . . . . . . . . . 69, 74

PAGE

*Richardson v. Marsh*,
481 U.S. 200 (1987). . . . . . . . . . . . . . . . . 127, 135

*Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Servs.*
*N. Am. L.L.C.*, No.,
03CV760, 2004 WL 3021842 (N.D. Ill. Dec. 30,
2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Roberts v. Ground Handling, Inc.*,
No. 04 CIV. 4955 (WCC), 2007 WL 2753862
(S.D.N.Y. Sept. 20, 2007) . . . . . . . . . . . . . . . 64, 65

*Rosenberg v. Martin*,
478 F.2d 520 (2d Cir. 1973) . . . . . . . . . . . . . . 291

*Salem v. United States Lines Co.*,
370 U.S. 31 (1962). . . . . . . . . . . 174, 266, 276, 277

*Saudi Arabia v. Nelson*,
507 U.S. 349 (1993). . . . . . . . . . . . . . . . . . . . . 246

*Schoenefeld v. Schneiderman*,
821 F.3d 273 (2d Cir. 2016) . . . . . . . . . . . . . . . 52

*Schwabenbauer v. Board of Educ.*,
777 F.2d 837 (2d Cir. 1985) . . . . . . . . . . . . . . . 52

*SEC v. Benson*,
657 F. Supp. 1122 (S.D.N.Y. 1987) . . . . . . . . . 123

*SEC v. Dresser Indus.*,
628 F.2d 1368 (D.C. Cir. 1980). . . . . . . . . . . . . 281

*SEC v. Graystone Nash, Inc.*,
25 F.3d 187 (3d Cir. 1994) . . . . . . . . . . . . . . . . 123

PAGE

*SEC v. Rajaratnam,*
    622 F.3d 159 (2d Cir. 2010) . . . . . . . . . . . . . . . . 49

*Small v. New York,*
    No. 12 Civ. 01236 (WMS) (JJM), 2015 WL
    1405375 (W.D.N.Y. Mar. 26, 2015) . . . . . . . . . . 140

*Smith ex rel. Estate of Smith v. Fed. Reserve Bank of
    N.Y.,*
    346 F.3d 264 (2d Cir. 2003) . . . . . . . . . . .   303, 308

*Sniado v. Bank Austria AG,*
    378 F.3d 210 (2d Cir. 2004) . . . . . . .   150, 256, 272

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
    547 F.3d 406 (2d Cir. 2008) . . . . . . . . . . . . . . . . 166

*Sterling Nat'l. Bank v. A-1 Hotels Int'l, Inc.,* No. 00
    Civ. 7352, 2004 WL 1418201 (S.D.N.Y. June 23,
    2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   142, 143

*Strategic Lien Acquisitions LLC v. Republic of Zaire,*
    344 F. Supp. 2d 145 (D.D.C. 2004) . . . . . . . . . . 250

*Travelers Cas. & Sur. Co. v. Vanderbilt Group,*
    01 Civ. 7927 (DLC), 01 Civ. 10695 (DLC),
    2002 WL 844345 (S.D.N.Y. May 2, 2002) . . . . . 281

*Trustees of Plumbers & Pipefitters Nat. Pension Fund
    v. Transworld Mech., Inc.,*
    886 F. Supp. 1134 (S.D.N.Y. 1995) . . . . . . . . . . 281

*United States v. $63,530.00 in U.S. Currency,*
    781 F.3d 949 (8th Cir. 2015) . . . . . . . . . . . . . . . 224

*United States v. $125,938.62,*
    370 F.3d 1325 (11th Cir. 2004) . . . . . . . . . . . . . 288

*United States v. $417,143.48, Four Hundred Seventeen Thousand, One Hundred Forty-Three Dollars & Forty-Eight Cents,*
682 F. App'x 17 (2d Cir. 2017) . 287, 288, 291, 312

*United States v. $487,825.00 in U.S. Currency,*
484 F.3d 662 (3d Cir. 2007) . . . . . . . . . . . . . . . 287

*United States v. $515,060.42 in U.S. Currency,* 152
F.3d 491 (6th Cir. 1998) . . . . . . . . . . . . . . . . 79, 81

*United States v. $557,933.89, More or Less, in U.S. Funds,*
287 F.3d 66 (2d Cir. 2002) . . . . . . . . . . . . . . . . 227

*United States v. $8,221,877.16 in U.S. Currency,*
330 F.3d 141 (3d Cir. 2003) . . . . . . . . . . . . . . . 244

*United States v. 5443 Suffield Terrace, Skokie, Ill.,*
607 F.3d 504 (7th Cir. 2010) . . . . . . . . . 67, 79, 81

*United States v. Abu-Jihaad,*
630 F.3d 102 (2d Cir. 2010) . . . . . . . . . . . . . . . 126

*United States v. Aguiar,*
737 F.3d 251 (2d Cir. 2013) . . . . . . . . . . . 174, 212

*United States v. Alexander,*
32 F.3d 1231 (8th Cir. 1994) . . . . . . . . . . . . . . 224

*United States v. All Assets of G.P.S. Auto. Corp.,*
66 F.3d 483 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 83

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.,*
783 F.3d 607 (7th Cir. 2015) . . . . . . . . . . 309, 310

PAGE

*United States v. Amiel*,
  995 F.2d 367 (2d Cir. 1993) . . . . . . .  287, 288, 300

*United States v. Awadallah*,
  349 F.3d 42 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 104

*United States v. Awadallah*,
  436 F.3d 125 (2d Cir. 2006) . . . . . . . . . . . . . . . 237

*United States v. Bajakajian*,
  524 U.S. 321 (1998) . . . . . . . . . . . . . . . . . . . . . . . 232

*United States v. Banki*,
  685 F.3d 99 (2d Cir. 2012) . . . . . . . . . . . . .  80, 230

*United States v. Barret*,
  848 F.3d 524 (2d Cir. 2017) . . . . . . . . . . . . . . . . 173

*United States v. Bershchansky*,
  788 F.3d 102 (2d Cir. 2015) . . . . . . . . . . . . . . . . 94

*United States v. Borromeo*,
  945 F.2d 750 (4th Cir. 1991) . . . . . . . . . . . . . . . 293

*United States v. Brennan*,
  395 F.3d 59 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 237

*United States v. Buck*,
  813 F.2d 588 (2d Cir. 1987) . . . . . . . . . . . . . . . . 103

*United States v. Cacace*,
  796 F.3d 176 (2d Cir. 2015) . . . . . . . . . . . . . . . . 118

*United States v. Cambio Exacto, S.A.*,
  166 F.3d 522 (2d Cir. 1999) . . . . . . . . . . . . . *passim*

*United States v. Campo*,
  140 F.3d 415 (2d Cir. 1998) . . . . . . . . . . . . . . . . 239

PAGE

*United States v. Certain Real Prop. & Premises*
  *Known as 4003-4005 5th Ave., Brooklyn, N.Y.*,
  55 F.3d 78 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 124

*United States v. Chaplin's, Inc.*,
  646 F.3d 846 (11th Cir. 2011) . . . . . . . . . . . . . . 225

*United States v. Clark*,
  638 F.3d 89 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 103

*United States v. Coppola*,
  671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . . . 126

*United States v. Cotton*,
  535 U.S. 625 (2002). . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Cuti*,
  720 F.3d 453 (2d Cir. 2013) . . . . . . . . . . . . . . . . 174

*United States v. Daugerdas*,
  892 F.3d 545 (2d Cir. 2018) . . . . . . . . . . . . . . . . 302

*United States v. Desena*,
  260 F.3d 150 (2d Cir. 2001) . . . . . . . . . . . . . . . . 206

*United States v. Dhinsa*,
  243 F.3d 635 (2d Cir. 2001) . . . . . . . . . . . . . . . . 118

*United States v. Eng*,
  971 F.2d 854 (2d Cir. 1992) . . . . . . . . . . . . . 93, 94

*United States v. Eng*,
  997 F.2d 987 (2d Cir. 1993) . . . . . . . . . . . . . . . . 100

*United States v. Falso*,
  544 F.3d 110 (2d Cir. 2008) . . . . . . . . . . . . . . . . 104

*United States v. Four Hundred Seventeen Thousand,*
  *One Hundred Forty-Three Dollars & Forty-Eight*
  *Cents ($417,143.48)*, No. 13-CV-5567 MKB,
  2015 WL 5178121 (E.D.N.Y. Sept. 2, 2015) . . . 293

*United States v. Gagnon,*
  373 F.3d 230 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 94

*United States v. Gen. Dynamics Corp.,*
  19 F.3d 770 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 252

*United States v. Grant,*
  No. 05 Cr. 1192, 2008 WL 4376365 (S.D.N.Y. Sept.
  25, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*United States v. Gupta,*
  747 F.3d 111 (2d Cir. 2014) . . .  175, 179, 198, 203

*United States v. Helmsley,*
  760 F. Supp. 338 (S.D.N.Y. 1991) . . . . . . . . . . . 239

*United States v. Hernandez,*
  No. 09 Cr. 625, 2010 WL 26544 (S.D.N.Y. Jan. 6,
  2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

*United States v. Holmes,*
  44 F.3d 1150 (2d Cir. 1995) . . . . . . . . . . . . . . . . 180

*United States v. Holy Land Found. for Relief & Dev.,*
  493 F.3d 469 (5th Cir. 2007) . . . . . . . . . . . . . . . 307

*United States v. Holy Land Found. for Relief & Dev.,*
  722 F.3d 677 (5th Cir. 2013) . . . . . . . . . .  308, 309

*United States v. Ianniello,*
  824 F.2d 203 (2d Cir. 1987) . . . . . . . . . . . . . . . . 125

PAGE

*United States v. Inc. Vill. of Island Park*,
    888 F. Supp. 419 (E.D.N.Y. 1995) . . . . . . . . . . . 123

*United States v. Kalish*,
    626 F.3d 165 (2d Cir. 2010) . . . . . . . . . . . . . . . . 82

*United States v. Kivanc*,
    714 F.3d 782 (4th Cir. 2013) . . . . . . 66, 67, 78, 79

*United States v. Lasanta*,
    978 F.2d 1300 (2d Cir. 1992) . . . . . . . . . . . . . . 118

*United States v. Leon*,
    468 U.S. 897 (1984). . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Mandell*,
    752 F.3d 544 (2d Cir. 2014) . . . . . . . . . . . . . . . 206

*United States v. McDermott*,
    245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . 173, 174

*United States v. Moloney*,
    287 F.3d 236 (2d Cir. 2002) . . . . . . . . . . . . . 78, 80

*United States v. Moore*,
    968 F.2d 216 (2d Cir. 1992) . . . . . . . . . . . . . . . 104

*United States v. Nazzaro*,
    472 F.2d 302 (2d Cir. 1973) . . . . . . . . . . . 221, 222

*United States v. Nicolo*,
    597 F. Supp. 2d 342 (W.D.N.Y. 2009) . . . 168, 169

*United States v. Pescatore*,
    637 F.3d 128 (2d Cir. 2011) . . . . . . . . . . . . . . . 302

PAGE

*United States v. Premises Known as 318 S. Third St., Minneapolis, Minn., Hennepin Cty.,*
988 F.2d 822 (8th Cir. 1993) . . . . . . . . . . . . . . . 76

*United States v. Quinones,*
511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . . 211

*United States v. Real Prop. Located at 5208 Los Franciscos Way, Los Angeles, Cal.,*
385 F.3d 1187 (9th Cir. 2004) . . . . . . . . . . . . . 301

*United States v. Robin,*
553 F.2d 8 (2d Cir. 1977) . . . . . . . . .   237, 279, 282

*United States v. Robinson,*
560 F.2d 507 (2d Cir. 1977) . . . . . . . . . . . . . . . 126

*United States v. Romain,*
678 F. App'x 23 (2d Cir. 2017) .   104, 112, 113, 115

*United States v. Rosa,*
626 F.3d 56 (2d Cir. 2010) . . . . . . . . . . . . . . *passim*

*United States v. Salameh,*
152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . .   205, 219

*United States v. Schaffer,*
851 F.3d 166 (2d Cir. 2017) . . . . . . . . . . . . . . . 126

*United States v. Schwimmer,*
968 F.2d 1570 (2d Cir. 1992) . .   301, 302, 305, 306

*United States v. Seabrook,*
661 F. App'x 84 (2d Cir. 2016) . . . . . . . . .   154, 177

*United States v. Singh,*
877 F.3d 107 (2d Cir. 2017) . . . . . . . . . . . . . . . 237

PAGE

*United States v. Smith*,
   9 F.3d 1007 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 105

*United States v. Stokes*,
   733 F.3d 438 (2d Cir. 2013) . . . . . . . . . . . . . . . . 94

*United States v. Technodyne LLC*,
   753 F.3d 368 (2d Cir. 2014) . . . . . . . . . . . . . . . 295

*United States v. Thomas*,
   508 F.2d 1200 (8th Cir. 1975) . . . . . . . . . . . . . . 79

*United States v. Tillem*,
   906 F.2d 814 (2d Cir. 1990) . . . . . . . . . . .   193, 196

*United States v. Tilley*,
   18 F.3d 295 (5th Cir. 1994) . . . . . . . . . . . . . . . 228

*United States v. Torres*,
   703 F.3d 194 (2d Cir. 2012) . . .   155, 159, 162, 274

*United States v. Tutino*,
   883 F.2d 1125 (2d Cir. 1989) . . . . . . . . . . . . . . . 78

*United States v. Ulbricht*,
   858 F.3d 71 (2d Cir. 2017) . . . . . . . . . . .   108, 109

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013) . . . . . . . . . .   92, 93, 100

*United States v. Viloski*,
   814 F.3d 104 (2d Cir. 2016) . . . . . . . . . . .   227, 235

*United States v. Wuagneux*,
   683 F.2d 1343 (11th Cir. 1982) . . . . . . . . . . . . . 108

*United States v. Yousef*,
   327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . 124

*United States v. Zarrab,*
  No. 15 Cr. 867, 2016 WL 6820737 (S.D.N.Y. Oct.
  17, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

*Valenti v. Penn Mut. Life Ins. Co.,*
  511 F. App'x 57 (2d Cir. 2013) . . . . . . . . . . . . . . 256

*Verlinden B.V. v. Central Bank of Nigeria,*
  461 U.S. 480 (1983). . . . . . . . . . . . .  246, 247, 248

*Villarreal v. Glacken,*
  63 Md. App. 114 (1985). . . . . . . . . . . . . . . . . . . 296

*Weaver v. United States,*
  374 F.2d 878 (5th Cir. 1967) . . . . . . . . . . . . . . 192

*West v. Miller,*
  No. 05C4977, 2006 WL 2349988 (N.D. Ill. Aug. 11,
  2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Williamson v. United States,*
  512 U.S. 594 (1994). . . . . . . . . . . . . . . . .  203, 205

*Wimmer v. Wimmer,*
  287 Md. 663 (1980) . . . . . . . . . . . . . . . . . . . . . . . 295

*Woods v. START Treatment & Recovery Centers, Inc.,*
  864 F.3d 158 (2d Cir. 2017) . . . . . . . . . . . . . . . . 145

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 981(a)(1)(C) . . . . . . . . . . . . . . . . . . 154,170

18 U.S.C. § 981(a)(1)(A) . . . . . . . . . . . . . . . . .  168, 171

18 U.S.C. § 981(e) . . . . . . . . . . . . . . . . . . . . . . .  302, 312

PAGE

18 U.S.C. § 981(e)(6). . . . . . . . . . . . . . . . . . . . . . . . 302

18 U.S.C. § 981(f) . . . . . . . . . . . . . . . . . . . . . 302, 306

18 U.S.C. § 981(g)(1) . . . . . . . . . . . . . . . . . . . . . . . 280

18 U.S.C. § 981(g)(2) . . . . . . . . . . . . . . . . . 279, 280

18 U.S.C. § 983(a)(4) . . . . . . . . . . . . . . . . . 285, 287

18 U.S.C. § 983(d). . . . . . . . . . . . . . . . . . . . . . . . . 312

18 U.S.C. § 983(g). . . . . . . . . . . . . . . . . . . . 223, 225

18 U.S.C. § 983(g)(2) . . . . . . . . . . . . . . . . . . . . . . 224

18 U.S.C. § 984. . . . . . . . . . . . . . . . . . . 243, 244, 275

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . . . . 278

18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . 278

18 U.S.C. § 1344. . . . . . . . . . . . . . . . . . . . . . . . . . 278

18 U.S.C. § 1955. . . . . . . . . . . . . . . . . . . . . . . . . . . 79

18 U.S.C. § 1956. . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18 U.S.C. § 1956(a)(1) . . . . . . . . . . . . . . . . . . . . . 232

18 U.S.C. § 3292(2). . . . . . . . . . . . . . . . . . . . . . . . 278

19 U.S.C. § 1621. . . . . . . . . . . . . . . . . . . . . . 66, 243

19 U.S.C. § 1921. . . . . . . . . . . . . . . . . . . . . . . . . . 244

21 U.S.C. § 853(n). . . . . . . . . . . . . . . . . . . . . . . . . 309

28 U.S.C. § 1330(a). . . . . . . . . . . . . . . . . . . 248, 249

28 U.S.C. § 1345. . . . . . . . . . . . . . . . . . . . . 248, 251

PAGE

28 U.S.C. § 1355 . . . . . . . . . . . . . . . . . . . 248, 249, 251

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

28 U.S.C. § 1605A(a)(1) . . . . . . . . . . . . . . . . . . . . . . 303

28 U.S.C. § 1610 . . . . . . . . . . . . . . . . . . . . . . 298, 303

28 U.S.C. § 2462 . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . 246, 248

28 U.S.C. § 1609 . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

50 U.S.C. § 1705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

50 U.S.C. § 4315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

International Emergency Economic Powers Act
("IEEPA"), 50 U.S.C. §§ 1701-1705 . . . . . . . *passim*

Terrorism Risk Insurance Act ("TRIA"), Pub. L. No.
107–297, 116 Stat. 2322 (2002), codified at 28
U.S.C. § 1610 note. . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 15(c)(1)(B) . . . . . . . . . . . . . . . . . . . . 291

Fed. R. Civ. P. 26(c)(1) . . . . . . . . . . . . . . . . . . . . . . 263

Fed. R. Civ. P. 30(d)(3)(B) . . . . . . . . . . . . . . . . . . . 263

Fed. R. Civ. P. 37(b)(2)(A) . . . . . . . . . . . . . . . . . . . 255

Fed. R. Civ. P. 37(d)(1)(A)(i) . . . . . . . . . . . . . . . . . 255

Fed. R. Civ. P. 37(d)(3) . . . . . . . . . . . . . . . . . . . . . . 256

Fed. R. Civ. P. 50(a)(1) . . . . . . . . . . . . . . . . . . . . . . 153

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . 67

PAGE

Fed. R. Civ. P. 56(f) . . . . . . . . . . . . . . . . . . 51, 154, 242

Fed. R. Civ. P. 56(g) . . . . . . . . . . . . . . . . . . . . . . . . 165

Federal Rules of Civil Procedure, Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions ("Rule G") . . . . . . . . . . . *passim*

Fed. R. Evid. 103(d) . . . . . . . . . . . . . . . . . . . . . . . . 192

Fed. R. Evid. 103(e) . . . . . . . . . . . . . . . . . . . . . . . . 193

Fed. R. Evid. 201(b)(2) . . . . . . . . . . . . . . . . . . . . . . 165

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Fed. R. Evid. 611(a) . . . . . . . . . . . . . . . . . . . . . . . . 191

Fed. R. Evid. 614 . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Fed. R. Evid. 614(b) . . . . . . . . . . . . . . . . . . . . . . . . 215

Fed. R. Evid. 614(c) . . . . . . . . . . . . . . . . . . . . . . . . 217

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Fed. R. Evid. 801(d)(2)(E) . . . . . . . . . . . . . . . . . . . . 207

Fed. R. Evid. 804(a) . . . . . . . . . . . . . . . . . . . . . . . . 195

Fed. R. Evid. 804(b)(3) . . . . . . . . . . . . . . . . . . . . . . 198

Fed. R. Evid. 804(b)(3)(B) . . . . . . . . . . . . . . . . . . . . 199

U.S.S.G. § 8C1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 233

U.S.S.G. § 8C2.4(a)(2) . . . . . . . . . . . . . . . . . . . . . . 233

PAGE

U.S.S.G. § 8C2.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

U.S.S.G. § 8C2.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

U.S.S.G. § 8C2.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

U.S.S.G. § 8C2.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

31 C.F.R. § 544.201 . . . . . . . . . . . . . . . . . . . . . . . . 274

31 C.F.R. § 560.24 . . . . . . . . . . . . . . . . . . . . . . . . . 268

31 C.F.R. § 560.410(b) . . . . . . . . . . . . . . . . . . . . . 267

31 C.F.R. 560.204 . . . . . . . . . . . . . . . . . . 80, 265, 267

31 C.F.R. Part 560 . . . . . . . . . . . . . . . . . . . . . . . 2, 251

Exec. Order 12,613, 52 Fed. Reg. 41,940 (Oct. 30,
    1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

Exec. Order 12,957, 60 Fed. Reg. 14,615 (Mar. 17,
    1995) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 229, 251

Exec. Order 12,959, 60 Fed. Reg. 24,757 (May 9,
    1995) . . . . . . . . . . . . . . . . . . . . . . . . . 25, 229, 251

Exec. Order 13,059, 62 Fed. Reg. 44,531 (Aug. 21,
    1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 229, 251

Exec. Order 13,382, 70 Fed. Reg. 38,267 (June 28,
    2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 274

Notice, Continuation of the National Emergency with
    Respect to Iran, 83 Fed. Reg. 11393 (Mar. 12,
    2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

H.R. Rep. No. 94-1487 (1976), reprinted in 1976 U.S.
    Code Cong. & Ad. News 6604 . . . . . . . . . . . *passim*

Implementation of Executive Order No. 12959 with Respect to Iran, 60 Fed. Reg. 40,881 (Aug. 10, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Additional Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 62,520 (Nov. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

8B Wright & Miller, *Fed. Prac. & Proc. Civ.* § 2285 (3d ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Ceasing U.S. Participation in the JCPOA and Taking Additional Action to Counter Iran's Malign Influence and Deny Iran All Paths to a Nuclear Weapon, 2018 WL 2112428 (May 8, 2018) . . . . 230

Paul Blustein, *Dutch Bank Fined for Iran, Libya Transactions*, Washington Post (Dec. 20, 2005) . 33

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 17-3258 (L), 17-3304 (CON), 17-3342, 17-3658

———————

IN RE 650 FIFTH AVENUE & RELATED PROPERTIES

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

## Preliminary Statement

The Alavi Foundation ("Alavi" or the "Foundation"), 650 Fifth Avenue Company (the "650 Company" or the "Partnership"), Assa Corp., and Assa Co. Ltd. (together, "Assa"), appeal from a judgment entered on October 4, 2017 (the "forfeiture judgment"), in the United States District Court for the Southern District of New York, by the Honorable Katherine B. Forrest, United States District Judge, forfeiting Assa's, Alavi's and the Partnership's interests in a 36-story office building located on 650 Fifth Avenue, New York, New York (the "Building"), along with related assets and real properties. The Islamic Education Center of Maryland ("Maryland IEC" or "IEC"), and Jeremy and Dr. Lucille Levin (the "Levin Creditors") appeal from related orders entered by Judge Forrest.[1]

———————

[1]    Alavi and the Partnership's appeal (17-3258), is consolidated with Maryland IEC's appeal (17-3304),

On December 17, 2008, the Government filed an initial complaint in this matter seeking the forfeiture of assets owned by Assa Corporation, Assa Co. Ltd., and Bank Melli, including the Building (the "Complaint"). On November 12, 2009, the Government filed an amended complaint (the "Amended Complaint") seeking the forfeiture of the interests of Assa, Alavi, and the Partnership in the Building as well as in properties located in New York, Virginia, Maryland, Texas, and California (the "Alavi Real Properties"), and the contents of certain bank accounts (collectively, the "Defendant Properties"). The Amended Complaint alleged that the Defendant Properties are forfeitable to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C), as proceeds of violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1705, and the Iranian Transactions and Sanctions Regulations ("ITSRs"), 31 C.F.R. Part 560, and also as property involved in, and proceeds traceable to property involved in, money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

On December 17, 2009, Alavi and the Partnership filed claims (the "Alavi Claims") contesting the forfeiture of the Defendant Properties on the ground that the Defendant Properties were neither the proceeds of IEEPA violations nor property involved in, or proceeds traceable to property involved in, money laundering offenses. On April 1, 2010, Assa filed claims (the "Assa

――――――――

and is being heard in tandem with Assa's appeal (17-3658) and the Levin Creditors' appeal (17-3342).

Claims") contesting the forfeiture of the Defendant Properties.[2]

Alavi and the Partnership moved for partial summary judgment on August 16, 2013, seeking an order dismissing any claim that either Alavi or the Partnership was controlled by the government of Iran. One day later, the Government moved for partial summary judgment, seeking an order that Assa's, Alavi's, and the Partnership's interests in the Defendant Properties were subject to forfeiture as proceeds of IEEPA violations and as property involved in, and proceeds traceable to property involved in, money laundering.

On September 16, 2013, Judge Forrest entered an opinion and order granting the Government's summary judgment motion and holding that Assa's, Alavi's, and the Partnership's interests in the Building were subject to forfeiture. On September 25, 2013, Judge Forrest entered an order directing the Government to provide corrected copies of certain summary judgment exhibits and, accordingly, the Government provided a supplemental declaration and corrected statement of undisputed facts on October 15, 2013 (the "SUF"). Judge Forrest entered a further summary judgment order dated April 18, 2014, as to Alavi and the Partnership's interests in additional Defendant Properties, including the Alavi Real Properties.

---

[2] On February 8, 2012 the case was reassigned from the Honorable Richard J. Holwell to Judge Forrest.

On May 27, 2014, Judge Forrest granted Alavi's and the Partnership's uncontested motion for a final judgment pursuant to Federal Rule of Civil Procedure 54(b) as to their interests in the Defendant Properties, and judgment was entered on May 28, 2014. Assa did not seek a Rule 54(b) judgment. On appeal, this Court vacated the September 16, 2013 and April 18, 2014 summary judgment orders as to Alavi and the Partnership and remanded for further proceedings. *See In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66 (2d Cir. 2016) ("*In re 650 Fifth Ave.*").

On April 12, 2017, Alavi and the Partnership moved for summary judgment on their affirmative statute-of-limitations defense, and on April 13, 2017, the Government cross-moved for summary judgment. By order dated May 10, 2017, Judge Forrest denied Alavi and the Partnership's motion and granted the Government's motion.

Trial commenced on May 30, 2017 and concluded on June 29, 2017, when the jury returned a verdict finding the Building and Alavi's interests in the Partnership forfeitable, and finding the remaining Defendant Properties forfeitable in part. On September 1, 2017, Judge Forrest entered an order denying Alavi's and the Partnership's post-trial motions, including a motion to dismiss the action for lack of subject matter jurisdiction and to enter judgment as a matter of law.

Judge Forrest's September 1, 2017 order also dismissed the claim of the Maryland IEC asserting an interest in Alavi's Real Properties in Maryland, and the claim of the Levin Creditors asserting an interest in the distribution of forfeited property.

On October 4, 2017, final judgment was entered. Alavi, the Partnership, Assa, the Maryland IEC, and the Levin Creditors filed timely appeals.

## Statement of Facts

### A. The Government's Case

The evidence at trial conclusively established that from 1995 through 2008, Alavi and the Partnership unlawfully conspired to provide, and did provide, money and services to Bank Melli Iran and the government of Iran in violation of the ITSRs and IEEPA. Alavi and the Partnership also conspired to launder, and laundered, the proceeds of these offenses.[3]

As described below, this sanctions-violation and money-laundering conspiracy arose out of the Islamic Revolutionary Government's takeover of the Building following the 1979 revolution in Iran. The Building was originally constructed in the 1970s by the Pahlavi Foundation of New York, a private foundation created and controlled by the Shah of Iran, with funding from

---

[3] This statement of facts is drawn from the trial evidence. Many of the documents introduced at trial also served as the evidentiary record in connection with the Government's motion for summary judgment as to the forfeitability of Assa's interests. The summary judgment record is described in detail in the District Court's prior decision granting summary judgment. *See In re 650 Fifth Ave. & Related Properties*, No. 08 Civ. 10934 (KBF), 2013 WL 5178677, at *6-16 (S.D.N.Y. Sept. 16, 2013).

an Iranian state-owned bank, Bank Melli Iran. Following the overthrow of the Shah and the return of the Ayatollah Khomeini from exile, the new Revolutionary Government appropriated the Shah's properties, including the Building, and continued to control the Building through the Pahlavi Foundation—renamed the Mostazafan Foundation of New York and, later, Alavi. In the late 1980s, in the face of catastrophic financial distress, the government of Iran caused Alavi and Bank Melli to convert Bank Melli's mortgage loan interest in the Building into a partnership with Alavi, with Bank Melli's ownership concealed through Assa and layers of intermediate corporate shells and straw owners.

This arrangement persisted for nearly 20 years, including after the ITSRs were implemented in 1995 in response to the government of Iran's continued hostile and malign activities threatening the United States' national security, and even after Bank Melli Iran was designated in 2007 by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") for supporting proliferators of weapons of mass destruction. The government of Iran continued clandestinely to exercise control over Alavi and the Building through various government intermediaries; and Alavi, Assa, and the Partnership continued to conceal Bank Melli's ownership interest and to transfer tens of millions of dollars in rental income from the Building overseas to Bank Melli through Assa. The scheme was only interrupted when, as a result of an investigation by the Federal Bureau of Investigation's ("FBI") Joint Terrorism Task Force, the Complaint was filed against Assa's interests in December 2008.

This scheme was proven at trial through over-whelming and largely uncontroverted evidence. The evidence at trial included, among other things:

- Voluminous documentary evidence, including correspondence with the Iranian Supreme Leader, the Ayatollah Khamenei (GX601-T, 605-T); classified Iranian government records (*e.g.*, GX604-T, 621-T, 623-T); internal Bank Melli communications and memoranda (*e.g.*, GX161-T, 164-T, 68); and Alavi's own notes and memoranda of its internal discussions and its meetings with Iranian officials (*e.g.*, GX232-T, 235-T, 500-T—505-T, 207-T).[4]

---

[4] "Alavi Br." refers to the brief of the Alavi and Partnership Claimants; "Alavi JA" refers to the joint appendix filed by Alavi in Docket No. 17-3278; "Prior Alavi Br." refers to the brief of Alavi in Docket No. 14-2027; "Prior Government Br." refers to the Government's brief in Docket No. 14-2027; "Assa Br." refers to the brief of Assa; "IEC Br." refers to the brief of the Maryland IEC; "IEC A." refers to the appendix filed with that brief; "Levin Br." refers to the brief of the Levin Creditors; "Levin A." refers to the appendix filed with that brief; "Tr." refers to the trial transcript; "Mirakhor Tr." refers to the transcript of Abbas Mirakhor's deposition testimony admitted on June 24, 2017; "Modarres Tr." refers to the trial transcript of Masoud Modarres' deposition testimony admitted on June 27, 2017; "GX" refers to the Government's trial

- Insider testimony from former government of Iran, Alavi, and Bank Melli officials such as Manoucher Shafie, who was President of Alavi from 1979-1983 (Tr. 756-1020); Seyed Mojtaba Hesami-Kiche, an officer with the Iranian government-controlled Bonyad Mostazafan from 1980-1995 and an Alavi board member from 1983-1991 (Tr. 1703-2277); deposition testimony by Abbas Mirakhor, Iran's former delegate to the International Monetary Fund and an Alavi board member from 1991-2005 (GX3210-V; Mirakhor Tr. 1-108); Golamreza Rahi, a Bank Melli officer from 1979-2003 (Tr. 1023-1145); and Mohammad Karjooravary, a Bank Melli officer from 1967-1997 (Tr. 1148-1294, 1456-70, 1582-1695).

---

exhibits; "DX" refers to the Alavi and Partnership Claimants' trial exhibits; "Supp. Tr." refers to the transcript of the suppression hearing held beginning March 17, 2017; "Supp. GX" refers to the Government's exhibits from the suppression hearing; "Supp. DX" refers to the Alavi and Partnership Claimants' exhibits from the suppression hearing; "SA" refers to the Government's supplemental appendix filed with this brief, which contains trial and suppression hearing exhibits not otherwise included in filed appendices; and "Dkt. No." refers to a docket entry in the District Court docket, 08 Civ. 10934 (KBF).

- Law enforcement testimony concerning interviews and admissions-against-interest by additional former Alavi and Assa officials who were unavailable as witnesses, and about Alavi's president destroying documents about Assa after receiving a grand jury subpoena in December 2008. (Tr. 134-44; 174-82, 353-80, 507-16, 529-38; GX19, 23, 28I, F, J, K, L, M).

The remaining available former Alavi officers invoked their Fifth Amendment privileges during their pre-trial depositions, and some of these invocations were also introduced at trial.

### 1. The Origins of the Alavi Foundation and Takeover by the Government of Iran

Alavi was established in 1973 as the Pahlavi Foundation of New York by the Shah of Iran, Mohammad Reza Pahlavi.[5] (GX75, 100). At the Shah's instruction, Bank Markazi—the central bank of Iran—loaned Alavi approximately $42 million through Bank Melli, an Iranian government-owned bank, to acquire the land at 650 Fifth Avenue in Manhattan and to construct a 36-story office tower on the property (namely, the Building). (GX77, 127).

---

[5] For simplicity, "Alavi" is used in this brief to refer to the Alavi Foundation of New York under its current and prior names.

In 1979, the country of Iran underwent a revolution and the Shah was overthrown. (GX76). A new government assumed power and the leader of that government was the religious figure Ayatollah Ruhollah Khomeini. (*Id.*). The new government took steps to nationalize foreign businesses operating within Iran and to confiscate all property of the former Shah. To do this, the Ayatollah directed the creation of the Bonyad Mostazafan va Janbazan ("Bonyad Mostazafan"), a state-run foundation under the authority of the Supreme Leader, the Ayatollah. (Tr. 772-74, 1709, 1713-17, 2019, 2030). Among the properties confiscated and managed by the Bonyad Mostazafan were Alavi and the Building. (Tr. 771-72, 774, 1719-21). All of the Pahlavi Foundation's files on Alavi and the Building were centralized in the Bonyad Mostazafan's headquarters. (Tr. 1721-25).

Manoucher Shafie, an Iranian-American businessman and early supporter of the revolution, traveled to Iran to consult with members of the new revolutionary government about Iranian interests and assets in the United States, including Alavi and the Building. (Tr. 778-79). Shafie was offered, but declined, an official position in the new government; instead, with the permission of the new government, he returned to the United States to manage Alavi and was swiftly named its president. (Tr. 774-79; GX131). While in Iran, Shafie also met with numerous revolutionary government officials, including a revolutionary judge, to obtain permission for the Pahlavi Foundation's treasurer, Majid Montakheb, to return to the United States to help Shafie organize Alavi's affairs. (Tr. 774-76). All other board members previously appointed by the

Shah abruptly resigned. (Tr. 779-83, 794-97; GX120, 121, 123, 124, 129, 131). A new slate of board members sympathetic to the revolutionary government, including some who would go on to hold official positions in the new government, replaced them.[6] (Tr. 784-85, 791-93; GX196).

In 1980, Alavi's name was changed to the Mostazafan Foundation of New York (Tr. 800-02; GX100), mirroring the name of the parent organization in Iran, the Bonyad Mostazafan. In approximately 1983, the Bonyad Mostazafan began stacking Alavi's board with employees and officers from the Bonyad. (Tr. 842-45, 1716-17, 1729-34; GX607). These individuals included: Mohammad Pirayandeh from the Bonyad Mostazafan's cultural section; Mohsen Tabatabaeipour, head of the Bonyad Mostazafan's cultural section and also the brother of the head of the Bonyad; Abdollah Poosti from the Bonyad Mostazafan's legal affairs department; and Seyed Mojtaba Hesami-Kiche from the Bonyad Mostazafan's international affairs department. (Tr. 1731-34; GX607). Thus, at that time, Bonyad Mostazafan officers in Iran made up a majority of Alavi's board. There were additional changes to Alavi's board membership in succeeding years, with the Bonyad Mostazafan maintaining its majority until 1991 (GX608-10; Tr. 1737-42), when, as discussed further below, supervision of Alavi passed from the Bonyad

---

[6] Shafie himself would be forced out of Alavi in 1983 for being insufficiently pro-Ayatollah (Tr. 821, 837-39), and failing to involve the Bonyad Mostazafan in decision-making (Tr. 1734-36).

Mostazafan to the Iranian Ambassador to the United Nations on the instructions of the Ayatollah. As part of his duties with Alavi and the Bonyad Mostazafan, Hesami-Kiche sent quarterly or annual reports about Alavi to the Iranian Prime Minister's office. (Tr. 1742-44).

During the 1980s, the Bonyad Mostazafan and other components of the Iranian government turned to Alavi to finance the interests of the government of Iran in the United States and Canada, including funding a Shiite Persian studies program at a Canadian university on the instructions of the Iranian Prime Minister. (*E.g.*, GX641-T, 643-T, 643C-T, 640-T). The evidence at trial also established that the head of the Iranian Interest Section (Iran's diplomatic conduit to the United States after formal diplomatic ties were severed as a result of the Iranian hostage crisis) and the Iranian Prime Minister exchanged correspondence about Alavi's funding of pro-regime educational and religious programs. (GX650-T, 650A-T, 651-T). Moreover, the Bonyad Mostazafan instructed Alavi to provide $150,000 to the Iranian Mission to the United Nations (the "Mission" or "IMUN") (GX647, 629, 636, 637, 638, 652-T, 635-T; Tr. 2008-09, 2013-17), and the Bonyad Mostazafan and the Mission instructed Alavi to assist in buying residences for Iranian diplomatic personnel

assigned to the Mission,[7] and to acquire property in New York to be used for a Persian school. (GX650-T).[8]

## 2. Bank Melli Partners with Alavi to Rescue Alavi from Financial Ruin

In the 1980s, Alavi's income from the Building was not enough to operate the Building, make payments on the Bank Melli loan, and pay its federal tax obligation. Alavi fell behind on its taxes and routinely failed to make payments to Bank Melli; at the instruction of the Central Bank of Iran, Bank Melli was forced repeatedly to extend Alavi's payment deadlines. (Tr. 1156-61, 1203-13, 1623-24; GX154H-T, 159, 160, 1028). The Bank Melli mortgage created a double financial hammer: Alavi owed millions each year in mortgage payments, while at the same time, because of the mortgage, Alavi's income from the Building was considered "unrelated business debt-financed income" and subject to sizeable income taxes. (Tr. 1756; GX130).

Between approximately 1987 and 1989, the government of Iran explored various options to alleviate this U.S. tax burden and save Alavi from calamity. In July

---

[7] This proposal was later carried out through another Iranian-government-controlled shell company, Melon Properties Inc. (Modarres Tr. 14-23).

[8] In 1991 and 1997, Alavi bought properties in Queens, New York, that were used to establish an Islamic educational and religious center. (GX78; DX1152, 1153).

1987, the Bonyad Mostazafan's deputy of finance prepared a draft letter from the then-head of the Bonyad Mostazafan (and Deputy Prime Minister of Iran), Tahmasb Mazaheri, to the Prime Minister of Iran summarizing Alavi's condition and solutions being contemplated by the Bonyad. (Tr. 1742, 1752-59, 1795-99; GX626-T). The Bonyad Mostazafan was concerned that Alavi's insolvency would result in U.S. authorities replacing the board, thus causing Iran to lose control of the Building. (*Id.*). One proposed solution was to transfer the Building to a holding company, with a part of the company's stock retained by Alavi and the remainder sold to a "European legal entity" so the sale proceeds could be used to pay off the Bank Melli loan.[9] (*Id.*). The European entity would be funded by the Bonyad Mostazafan, and the draft letter included a discussion of different ways for the Bonyad Mostazafan to finance the transaction, including with a new loan. (Tr. 1801-02; GX626-T). In February 1987, Alavi incorporated a holding company named 650 Fifth Avenue Management Company to allow it to explore this proposal. (GX612).

On November 26, 1987, Mazaheri asked Prime Minister Mousavi for his approval for a plan "to improve the financial problems of the New York Founda-

---

[9] At the time, Hesami-Kiche, Zobeidi, and Mazaheri controlled a Bonyad Mostazafan front company in Germany that conducted procurement for companies in Iran managed by the Bonyad. (Tr. 369, 1751-52).

tion." (Tr. 1807-11; GX623). The Prime Minister's office responded on December 2, 1987, confirming that the Prime Minster was "agreeable" to the suggestions. (*Id.*). Mazaheri forwarded Mousavi's letter to the head of the Central Bank of Iran, Majid Ghasemi, noting the Prime Minister's "order and his agreement with reference to the plan regarding the New York foundation." (GX621-T). Mazaheri emphasized that "in all stages of allocation, executive, payment, as well as in all correspondence and discussions, confidentiality is of the utmost importance." (*Id.*).

Though Alavi's board also formulated various proposals to resolve the financial distress caused by the Bank Melli mortgage, those proposals were essentially vetoed by the Iranian government. (Tr. 370-71). By 1989, the government of Iran had finalized its solution to Alavi's difficulties. Rather than the Bonyad Mostazafan providing the funds to satisfy the Bank Melli mortgage and partnering with its New York branch through a European shell company, Bank Melli would instead convert its mortgage interest into a partnership interest using shell companies. (GX161-T, 603-T, 604-T; Tr. 1814-28). After "ample study at the New York Foundation [Alavi], the Central Office of the Foundation [the Bonyad Mostazafan], and Bank Melli in Tehran," this was considered the "last practical plan." (GX161-T). Officials from Alavi, the Bonyad Mostazafan, and Bank Melli accordingly met at the Bonyad Mostazafan's offices in Tehran in May 1989 to memorialize their agreement: the attendees included Alavi's then-President, Seyed Mohammad Badr-Taleh ("Badr"); the Bonyad Mostazafan's deputy director for commerce and international affairs, Eisa Khojasteh;

and Bank Melli director Mohammad Behdadfar. (GX603-T). It was agreed that "Bank Melli Iran will partner with the New York Foundation"; that Bank Melli would create "two partnerships in Jersey Island"; that Bank Melli would "cooperate with the New York Foundation"; and that a Bank Melli representative would "supervise the plan." (*Id.*).

On August 19, 1989, Khojasteh wrote to Mohammad Bagherian, who was then the head of the Bonyad Mostazafan, summarizing the "partnership agreement between the Mostazafan Foundation of New York [Alavi] and Bank Melli Iran." (GX604-T; Tr. 1831-34). Khojasteh asked Bagherian to "endorse the partnership and notify the members of the board of trustees [of Alavi] so they can take action accordingly." (GX604-T). Khojasteh recapped that "the partnership seems to be based on prior agreements between the Ministry of Finance and Bank Melli Iran, on one side, and the Islamic Republic of Iran Janbazan [the Bonyad Mostazafan]." (*Id.*). Bagherian hand-endorsed this letter with the instruction: "[c]onsidering the partnership with Bank Melli . . . please continue based on the current agreement. Please note that after several years of efforts put forward by the foundation [the Bonyad Mostazafan], this agreement would be very beneficial, and as a result of not paying taxes it would be possible to provide more services to the wounded warriors, as well as the cultural and educational system." (*Id.*). Khojasteh then forwarded the letter with Bagherian's approval to Badr, Alavi's President. (*Id.*).

Alavi's board approved the partnership in July 1989 (GX616), and a partnership agreement dated

July 31, 1989, between Alavi and Assa Corp. was prepared (GX125). After Bagherian's approval, the partnership agreement was executed and filed with the New York State Supreme Court for approval in October 1989. (GX130, 618, 1025). Pursuant to the agreement, Assa Corp. would contribute $44.8 million to the Partnership and Alavi's and Assa Corp.'s partnership interests would be 65 percent and 35 percent, respectively. (GX125). Assa Corp. and its Jersey Islands parent company, Assa Co. Ltd., were financed by Bank Melli and their directors were two Bank Melli directors, Mohammed Behdadfar (who attended the May meeting at Bonyad Mostazafan's office) and the regional manager of Bank Melli's London office. (GX618, 122, 78, 130, 161-T; Tr. 1246-52). Behdadfar traveled to New York under the cover of a Kuwaiti company to consummate the transaction. (Tr. 1243-44).

In the petition filed in New York Supreme Court, Alavi falsely asserted that the "formation of the Partnership represents an arms-length transaction between the Foundation and Assa Corp" and failed to identify Bank Melli as the beneficial owner of Assa. (GX618; Tr. 1839-41, 1844-46, 3175). Over the next few years, Alavi continued to lie to outsiders, including its lawyers and New York state regulators about the true nature of Assa and the Partnership. For example, in response to inquiries by the New York Attorney General's Office in September 1995, Alavi's lawyers falsely represented that Alavi had located its partner Assa "after placing a series of world-wide advertisements seeking co-investors . . . to form the Partnership for the purpose of acquiring the Building. (DX324). Alavi's lawyers added that "[n]either the Foundation

nor we have any other documentation or information concerning Assa." (*Id.*).

While the Partnership transaction helped Alavi avoid significant U.S. income taxes and mortgage payments, it did not resolve Alavi's financial distress. In 1992, Alavi was still insolvent: its monthly income was $375,000, but its monthly expenses totaled $425,000; Alavi needed a $1.7 million loan to pay past-due real estate taxes; and Alavi owed Bank Melli more than $2 million in unpaid partnership distributions. (GX206-T, 445-T, 166-T, 154B-T). At a meeting in Bank Melli's Tehran headquarters in August 1992, Alavi's then-President, Mohammad Geramian, committed to several senior Bank Melli officers that he would discuss Bank Melli's interests in repayment with the rest of the Alavi board. (Tr. 1459-60, 1462-64, 1674-75; GX206-T). Alavi was not able to pay Bank Melli, however, and, in August 1994, settled its debt to Bank Melli by transferring an additional five percent interest in the Partnership to Assa. (DX123). Since that time, Alavi has held a 60 percent interest in the Partnership and Assa has held a 40 percent interest.

### 3. Bank Melli Takes Further Steps to Conceal Its Ownership of Assa

Though at the time the Partnership was formed there was some discussion that it would be a temporary, stop-gap measure to rescue Alavi (Tr. 1155), Bank Melli's partnership with Alavi in fact turned out to be permanent. Bank Melli's ownership and control underwent several evolutions in response to changes in Bank Melli personnel and in response to Bank

Melli's and Alavi's concerns about the legal ramifications of the Iranian bank's involvement, with both partners taking care to conceal Bank Melli's ultimate ownership of Assa. (GX78); *see also In re 650 Fifth Ave.*, 830 F.3d at 89-93.

In 1990, Behdadfar, the Bank Melli director and Assa's initial straw owner, left the bank. (Tr. 1267, 1277). Bank Melli accordingly transferred legal ownership of Assa from its officers to Bank Melli itself; the bank also appointed a new Bank Melli officer, Siavesh Nagshineh, as Assa's director and as director for Harter Holdings, another Jersey Islands company that held Bank Melli's interests in Assa Co. Ltd. (GX167-T, 1216-23, 425, 425-T; Tr. 1267, 1277, 1281-86). Bank Melli relied on the fact that "accessing the ownership backgrounds of the companies behind [Assa] is not an easy task for investigators" because of their Jersey Islands registration. (GX167-T). Bank Melli also took care that its role was concealed from Assa's American attorneys. (GX163-T; Tr. 1263-67). Bank Melli's New York agency confirmed that Alavi had no problem with the transfer, namely that Badr, Alavi's President, "doesn't see any problem regarding the transfer of the mother company's ownership . . . his understanding has always been that the ownership of the mother company was with Bank Melli." (Tr. 1277-80, GX164-T).

To manage Assa's affairs in New York, Bank Melli appointed Seyed Mohammad Shafa'at, a former bank employee who was then working for a Dubai-based Bank Melli company known as Al Makaaseb, as Assa's authorized representative. (GX425, 1223-25, 1227; Tr. 1052-53, 1286-87). Shafa'at fulfilled this role until

1998, when it was assumed by Mohammad Deghani Tafti. (GX3505). Tafti was instructed by the General Manager of Bank Melli to manage Assa's affairs on Bank Melli's behalf and to keep Bank Melli's interests concealed from U.S. authorities. (Tr. 532-33).

In the early 1990s, Bank Melli worried that Nagshineh's affiliation with Bank Melli might be too easily discoverable and set about finding a way to further conceal its ownership of Assa. (GX167-T). In December 1993, Bank Melli asked the head of Bank Melli's New York agency, to research "whether Mr. Nagshineh—the Assa Corp New York Director whose affiliation with the Bank could be easily proven—could be replaced with another individual whose affiliation with the Bank could not be easily proven," and further asked, "Would this make it possible to maintain the ownership of the building's shares?" (*Id.*). In June 1994, Bank Melli asked Karjooravary about the risk of Assa's assets being seized as a result of their Iranian ownership, noting that "Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies." (GX151-T).

### 4. Iran's Transfer of Control over Alavi from the Bonyad Mostazafan to the Iranian Mission to the United Nations

In the early 1990s, control over Alavi shifted from the Bonyad Mostazafan to the Iranian Ambassador to the United Nations—at that time, Kamal Kharazi—at the direction of the Ayatollah Khamenei. (Tr. 379, 867,

2039-57). After assuming his duties as Ambassador, Kharazi informed Alavi's president, Badr, that Kharazi was the representative of the Ayatollah and that all Iranian entities in the United States were under his control. (*Id.*; GX628-T).

The Ambassador eventually demanded Badr's resignation, which was ordered by the Ayatollah and also communicated through the head of the Bonyad Mostazafan. (GX628-T). In a letter dated May 7, 1991, three board members, Badr, Hesami-Kiche, and Houshang Ahmadi Javadi ("Ahmadi"), who had been invited to join the board in approximately 1979 by Shafie (Tr. 799), wrote to the Ayatollah that they would resign pursuant to his instructions (GX601-T). The board members wrote that, despite the "sensitive" political conditions between the United States and Iran, they had succeeded in "protecting and expanding the Foundation's interests which in truth belongs to the people of Iran." (*Id.*). They further wrote that they were "also able to successfully carry out cultural and Islamic activities in the country of the Great Satan which faced an excessive void in the area of Islamic teachings due to the non-representation[ ] of the Islamic Republic of Iran." (*Id.*).

On or about May 17, 1991, Alavi and government of Iran officials held a meeting in Zurich, Switzerland, to discuss the composition of Alavi's board. (Tr. 2030-32; GX602-T). Mohsen Rafighdoost, the then-head of the Bonyad Mostazafan in Iran, attended the meeting with his advisor and the head of Bonyad's international affairs. (Tr. 2030-31). Rafighdoost further confirmed that the changes in board composition were

"per the orders given by the Supreme Leader [the Aya-tollah]," and instructed several board members to re-sign. (GX602-T). The Farsi minutes (unlike those in English) show that the attendees also discussed Alavi's charitable activities and payment of partner-ship distributions to Assa. (*Compare* GX602-T *with* GX205). The English minutes do not reflect that Rafighdoost was present or that the board resigna-tions had been directed by the Ayatollah. (*Id.*).

Following the Zurich meeting, Badr described how Ambassador Kharazi summoned him and Shafie to his office. (GX624-T). The Ambassador said that "[Alavi] is from here is under the oversight of [the Ayatollah], not Mister Rafighdoost . . . [F]rom now on, the role of the Managing Director and the role of the Board of Di-rectors will be just a formality and he [the Ambassa-dor] will be conducting all of [Alavi's] affairs." (*Id.*). In conveying this information to a member of the Bonyad Mostazafan in Iran, Badr lamented that "Mister Khar-razi's involvement poses a great danger to [Alavi]." (*Id.*). Badr reiterated these concerns in another letter to the Ayatollah on or about May 30, cautioning that, although the Ambassador's "appointment to a position of responsibility connected to [Alavi]'s affairs presents enormous political, security, and economic dangers, we feel assured that the Supreme Leader has made this decision with discernment, unique insight, and a thor-ough knowledge of all pertaining aspects." (GX605-T; *see generally* Tr. 2039-57).

In or about July 1991, Badr formally resigned his position "based on the order of his Excellency, Su-preme Leader." (GX625-T). An English version of the

minutes of the same July 1991 meeting omit any reference to the Supreme Leader, Rafighdoost, or any other involvement of the Iranian government. (*Compare* GX625-T *with* GX606). Following Badr's resignation, along with the simultaneous resignations of Bonyad Mostazafan officers Hesami-Kiche and Pirayandeh, Geramian took over as Alavi's president. (GX606-T). Geramian was put into consideration by Ambassador Kharazi, despite Geramian's having no relevant background. (Tr. 875-77). Geramian's wife had a significant familial connection to a high-level ayatollah in Iran. (*Id.*). After his nomination, Geramian was Kharazi's "puppet." (Tr. 922). While transitioning his position over to Geramian, Badr handed over documents about Assa and Bank Melli, and had a conversation with Geramian about Bank Melli and its role with Assa Corporation. (Tr. 1356).

Other members of the new board under Kharazi's supervision were similarly selected by Iranian government personnel and associated with the Iranian government. For example, Kharazi asked the Governor of the Central Bank of Iran to approach Mirakhor, an Iranian delegate to the International Monetary Fund, about joining the board to apply his financial expertise to Alavi's persistent insolvency. (Tr. 2034; Mirakhor Tr. 5, 9-11). New board member Mehdi Hodjat was the head of an Iranian government organization for cultural heritage. (Tr. 2032, 2034). Ali Reza Ebrahimi was a representative of an Iranian government newspaper. (Tr. 2035). Seyed Sadr Hanini was a member of the clergy and cousin of the leader of the Iranian revolution. (Tr. 2034).

In 1992, as control was transferred from the Bonyad Mostazafan to the IMUN Ambassador, Alavi changed its name from the Mostazafan Foundation of New York to the Alavi Foundation. (GX75). And, as discussed above, in August 1992, Alavi President Geramian met senior Bank Melli officials in Bank Melli's headquarters in Tehran to discuss the Partnership's need for a $1.7 million loan and its debt to Assa Corporation of $2.2 million. (GX206-T). Following this meeting, on August 25, 1992, Bank Melli's chairman of the board, Asadollah Amir Aslani, reported on the meeting to the head of the Bonyad Mostazafan, Rafighdoost. (Tr. 166-T). Aslani stated that Alavi was "in partnership" with Bank Melli in their ownership of the Building and reviewed the Partnership's financial troubles; he concluded by stating that he hoped that Rafighdoost's "firm instructions" and the extra attention of Alavi would resolve the Partnership's problems and "help strengthen this partnership for years to come." (*Id*.).

### 5. The Iran Sanctions and Bank Melli's Transfer of Assa to New Straw Owners

On March 15, 1995, the President of the United States found that the actions and policies of the government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States; declared a national emergency to deal with that threat; and prohibited certain petroleum-related transactions involving Iran. *See* Exec. Order 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995). On May 6, 1995, the President further prohibited, among other things, the exportation from the

United States or by a United States person of any goods, technology, or services to Iran or to the government of Iran, and prohibited any transaction having the purpose of evading or avoiding that prohibition. *See* Exec. Order 12,959, 60 Fed. Reg. 24,757 (May 6, 1995). On June 1, 1995, Bank Melli was identified as part of the government of Iran. *See* Implementation of Executive Order No. 12959 with Respect to Iran, 60 Fed. Reg. 40,881 (Aug. 10, 1995).

On June 5, 1995, Bank Melli began transferring nominal ownership of Assa and Harter Holdings to two Iranian nationals with a shared address in Tehran: Davood Shakeri and Fatemeh Aghamiri. (GX78, 3503, 3506, 3507). On December 18, 1995, Shakeri and Aghamiri were named directors of Assa in place of Nagshineh. (GX3502, 3505). Shakeri and Aghamiri purportedly bought their shares of Assa for £1 each. (GX3503, 3506, 3507); *see also In re 650 Fifth Ave.*, 830 F.3d at 90. In late 1995, Alavi was applying for a $5 million loan from Chemical Bank, and the bank required the identities of Assa's equity holders. Accordingly, on November 7, 1995, Alavi sent Shafa'at a letter, addressed to Assa's P.O. Box in Dubai, asking for the owners of Assa's shares to provide to the bank. (DX325). Shafa'at provided the names of Shakeri and Aghamiri, along with same Dubai P.O. Box that Assa maintained. (*Id.*). The record contains no indication that Alavi had any concerns or even curiosity about this nominal transfer of equity ownership.[10]

---

[10] Alavi's indifference to this change in Assa's straw ownership stands in stark contrast to its deep

Following Shakeri's and Aghamiri's appointment as Assa's straw owners, Tafti, Bank Melli's local representative for Assa, continued to communicate directly with Bank Melli about managing Assa's affairs. (*See, e.g.*, GX34, 35-T, 36-T, 37-T, 38-T, 39-T, 60-T, 61-T). As late as July 2005, Tafti emailed Bank Melli director Mohsen Ghadimipour about concerns arising from Shakeri and Aghamiri's Iranian nationality and proposals to replace them. (GX37-T, 38-T, 39-T); *see also In re 650 Fifth Ave.*, 830 F.3d at 89-93.

On October 25, 2007, Bank Melli was designated by OFAC pursuant to Executive Order 13,382. *See* Additional Designation of Entities Pursuant to Executive Order 13,382, 72 Fed. Reg. 62,520 (Nov. 5, 2007); *see also* http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20071120.aspx). On that same day, Bank Melli and all of its offices worldwide were added to the Specially Designated Nationals ("SDN") list, blocking its property in the U.S. and prohibiting U.S. citizens and residents from dealing in that property. (Tr. 296).

### 6. Alavi's and Bank Melli's Efforts to Transfer Bank Melli's Interest in the Partnership

#### a. Alavi's Efforts to Buy Assa's Interest in the Late 1990s

After the 1995 adoption of the sanctions, Bank Melli approached Ambassador Kharazi for permission

———————

anxiety about a proposed real transfer of Assa's ownership in 2003, as discussed further below.

to sell its interest in the Partnership. Kharazi gave his permission but instructed the bank to wait because the real estate market was not good. (Tr. 1093-95, 1141-45).

Alavi also wanted to try to buy Assa's interest. (Mirakhor Tr. 35-37). Mirakhor, an Alavi board member, admitted that he understood that Assa was owned by a UK bank that in turn was owned and capitalized by Bank Melli. (Mirakhor Tr. 37, 39). In the late 1990s, Mirakhor approached the head of that Bank Melli-owned bank—a "well-known" Iranian banker named Azizi—about facilitating sale discussions. (Mirakhor Tr. 38). Azizi told Mirakhor that they should let the lawyers handle the matter. (*Id.*). Azizi was, in fact, the head of Bank Melli's London branch. (Tr. 1101-02; GX34, 146).

The principal reason for Alavi's interest in buying Assa from Bank Melli was to eliminate the risk of losing any ownership benefit of the Building if U.S. authorities learned that Bank Melli owned an interest in the partnership. For example, in notes found in journals written by Alavi board member Alireza Ebrahimi dated June 17, 2001, Ebrahimi wrote: "Bank Melli = Conspiracy" and "Problem—*Government separate—Foundation* 'Sure death'" (GX505-T); and "Assa dangerous → Get rid of it → Who is going to buy it," (GX503-T).

### b.    Bank Melli's Attempt to Sell to the Hanif Partnership

In 2002, an entity organized by Alavi's former president, Hossein Mahallati (1983-1988), named the

Hanif Partnership, tried to buy Assa's 40 percent interest in the Partnership. (Tr. 508-09; GX234). The proposed purchase price of $40 million was substantially below market value (*id.*), but was approximately the same amount as the Bank Melli mortgage at the time the partnership was formed in 1989, allowing Bank Melli to dispose of the interest without incurring a loss. In the summer of 2003, Bank Melli's London branch manager, Azizi, was reviewing proposed sale contracts forwarded by Tafti, Assa's representative in New York. (GX34). One of Azizi's concerns was securing payment from a U.S. dollar account held outside the United States, to reduce the risk that the payment would be blocked by U.S. sanctions. (*Id.*).

Under the partnership agreement, Alavi had a right of first refusal, and it attempted to exercise this right to buy out Assa. (GX235-T). In memos to the Alavi board dated November and December 2003, Alavi President Geramian laid out the reasons Assa wanted to sell, using oblique phrasing to convey his unmistakable meaning: "The chiefs of this corporation [Assa] have always shown interest in selling their share due to unacceptable income derived from this investment." (*Id.*). There was nothing wrong with the income generated by the Building, but Bank Melli's ownership of Assa rendered the investment unacceptable under the U.S. sanctions laws. Geramian also unmistakably contrasted Alavi's comfort and familiarity with Assa with the dangers in permitting a sale to a third party, enumerating the benefits of exercising the right-of-first refusal to include:

- "Reducing the risk of ASSA dealing with an unknown and strange buyer whose real intentions or the intentions of their successors are unclear to us";

- "Preventing strangers and unknown persons becoming partners who can easily alter the foundation's control over the building, and ultimately shake up its ownership"; and

- "Conducting a low-risk business between the foundation and ASSA, which have had a relation continuously for many years and have previously dealt five percent of the building between them without any problem."[11]

(*Id.*). Alavi worried of "unforeseen dangers if [Alavi] does not succeed in this transaction and others enter the scene." (*Id.*). Geramian repeated this deep fear of outsiders in memos to the rest of the board dated December 10, 2003 (GX232-T ("Hanif Corporation has . . . gravely threatened and endangered the interests of both institutions [Alavi and Assa]. . . [Alavi] is in no way willing to accept the interference of invisible or

---

[11] Geramian's statement that Alavi had dealt five percent of the building to Assa referred to the 1994 transaction discussed above. Thus, as Geramian acknowledges, the "continuous[]" "relation," which had lasted "many years" pre-dated, but continued through the 1995 sanctions and the transfer to straw owners Shakeri and Aghamiri.

unknown partners."")), and January 22, 2004 (GX233-T ("Hanif Corp has imperiled from outside the interests of the foundation. . . ."")).

Contemporaneous notes from Alavi board member Ebrahimi's journals similarly reflect Alavi's knowledge that Bank Melli owned Assa and its fear of exposure. Notes of a meeting on July 25, 2003 include: "Assa share → Sell it"; "Assa dangerous → Get rid of it → Who is going to buy it"; "To tell the truth → Lie → Risk"; "You can't → It is illegal → Don't borrow → it is illegal → urgent situation → talk → Everything → *Mafia* → Duty . . . ." (GX503-T). Alavi's board met again on July 27, 2003, at the residence of Javad Zarif, Kharazi's successor as the Iranian Ambassador to the United Nations. (*Id.*). The board later met on August 10, 2003, and Ebrahimi's notes continue to reflect considerable concern and anxiety about the risk of Bank Melli's interest in the Partnership: "I lied"; "The issue of danger for the Board of Trustees"; "Assa → 40% share → August 8 → The amount of 42 million → Reputable company → Half of the real price"; "Collusion and illegal arrangement"; "Assa Corp → Sale → To take out Assa"; "Everything is revealed"; "Possibility of danger"; "Maneuvering → Assa Corp → selling shares → Share → Rights of asset → 'Freez' [sic]"; "Mr. Zarif → Assa → Bank Melli 40% share → I cannot sleep at night . . . ." (*Id.*).

In order to exercise its right of first refusal and buy the Assa interest for $40 million, however, Alavi needed a loan and, accordingly, applied to "several American and non-American banks." (GX235-T). One

of these, Wachovia, received an email from an unidentified sender alleging that "ASSA is under investigation by international financial institutions for alleged connection with an Iranian government bank." (GX138). Wachovia then asked Alavi to provide "the intermediate and ultimate owners and principals of Assa Corp. as well as their countries of origin" (*id.*), and ultimately declined the loan (GX235-T).

Though Alavi knew its partner was Bank Melli, the two partners kept this knowledge from their American attorneys. (*See, e.g.*, GX163-T; DX324). Alerted to Wachovia's concerns, Alavi's New York law firm exchanged several letters with Assa's New York attorneys, with Alavi's attorneys asking for additional information about Assa's ultimate owners and Assa's attorneys resisting. (GX138, 762; DX339). In response to one such request, Assa's attorneys retorted: "I am surprised you are asking for this information since the parties have been engaged in a partnership enterprise for almost 15 years, and I am sure your clients know the names of the individuals." (GX762). Assa's attorneys referred Alavi's attorneys to corporate resolutions for the names of Assa's principals, but declined to identify their national origin. (*Id.*).

Despite Alavi's financing falling through, Assa was reluctant to complete the sale to Hanif in light of the ongoing dispute, and Hanif ultimately sued. (GX134; DX5006). Hanif had previously threatened Alavi with suit, and the "risks, costs, and perils that it will entail," unless Alavi agreed to pay $3.5 million to buy Hanif out. (GX232-T). As threatened, the suit risked exposing Alavi's and Assa's relationships with the Iranian

government. Notes from Ebrahimi's journals in 2004 reflect strategizing about how to answer questions about Assa under oath: "Did you know that Assa is Melli Bank's?"; "I didn't know until last Friday—contact—The best way"; "ofac contact"; "depose." (GX501, 501-T). Accordingly, the then-Iranian Ambassador to the United Nations, Javad Zarif, directed Alavi to settle the suit by paying Hanif $4 million.[12] (Tr. 515; *see also* Tr. 2837-38; DX778). At Zarif's instructions, a substantial portion of the settlement funds were then delivered to personnel at Iranian embassies in Europe. (Modarres Tr. 20-24; GX16A, 16B, 16C, 16E, 3212D, 3212E).

### c.      Alavi's Continued Efforts to Buy the Assa Interest

The Hanif Partnership debacle did not quench Alavi's or the Iranian government's desire to eliminate the threat Bank Melli's interest posed to Iran's continued control of the Building. In a December 2008 interview with law enforcement, then-President Farshid Jahedi acknowledged Alavi's continued interest in buying Assa's interest. (Tr. 180). The issue had also been raised during an October 2007 meeting between the Alavi board and the new Iranian Ambassador to the United Nations, Mohammad Khazaee. (GX207-T).

In a consensually recorded conversation in December 2008 between Hamid Firoozonia, Alavi's and Assa's accountant from 1984 to 2004, and Hesami-Kiche,

---

[12] Zarif is currently Iran's Minister of Foreign Affairs.

Firooznia described his efforts in 2006 to facilitate a sale of Assa's interests to Alavi. (GX5014-T). Hesami-Kiche referred to the questions Tafti, Assa's representative, could be asked by U.S. officials: "if you are the owner of 30-40% of a building this huge, what are you doing with the money?" (*Id*. at 4). Firooznia described his conversations with Bank Melli officials—"those that are higher than him"—prior to a 2006 warning that they could lose the interest, and comparing Assa to a recent action against a French bank. (*Id*. at 5-7, 9, 10).[13] Firooznia also described having been summoned to Iran on short notice in 2006, where again he warned that "they [U.S. authorities] are going to take your positions. They even carried out a court order against them in France, which is their friend." He was asked to prepare a report, but no action was taken. (*Id*. at 9-10). The report summarized, among other things, what the problems were and solutions Firooznia proposed, which included how to "sell it to the sixty percent [Alavi]." (*Id*. at 12-13).

In consensually recorded conversations in October 2008, Geramian and Alavi board member Hassan Hassani (2005-2013) discussed the fact that an agreement had been reached on the price of Assa's interest, but that the parties had not solved how to transfer funds

---

[13]   This may have been a mistaken reference to the $80 million fine imposed on Dutch bank ABN Amro in 2005. *See* Paul Blustein, *Dutch Bank Fined for Iran, Libya Transactions*, Washington Post (Dec. 20, 2005), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2005/12/19/AR2005121901804.html.

from Alavi in the United States to make the payment. (GX5008-T). This conversation echoed Bank Melli manager Azizi's concern about how to evade sanctions in order to transfer purchase funds. (GX34). Geramian compared the difficulty with his own efforts to transfer a small amount of money to his sick mother in Iran, and extrapolated to the magnitude of the proposed Assa purchase: "Now, you want it with 40%?". (*Id.*). Mazaheri, the former head of the Bonyad Mostazafan, and at this time the Iranian Minister of Finance, had become involved to work out the payment mechanism. (*Id.*; Tr. 1862-63).

### d.     Alavi's and Assa's Correspondence about Assa Shareholders

After the dust had settled from the Hanif Partnership episode and Alavi's continued efforts to attempt to buy out the Assa interest, Alavi and Assa exchanged several letters about Alavi meeting with Assa's principals. (DX331, 332-36, 339, 341, 602). In a January 17, 2006 letter, Alavi's then-President Geramian explained why: "Our general counsel has advised that in order to protect our legal interests such a meeting is necessary." (DX331). In other words, Alavi was not genuinely investigating Assa's beneficial ownership, it was following its unwitting American attorneys' advice. After Tafti, Bank Melli's representative operating Assa in New York, made several offers for the Assa board to meet Alavi in New York (DX332, 334, 336), these letters resulted in a two or three-hour a meeting between Tafti and the Alavi board at the Islamic Education Center operating out of Alavi's Queens property (DX602, 646). Alavi's notes of the meeting reference

that Shakeri and Aghamiri were the partners in Assa, but little else. (DX646).

### 7. Civil Lawsuits Against Alavi and Bank Melli's Response

Throughout their history, Alavi, Assa, and the Partnership faced a number of lawsuits by judgment creditors of the government of Iran seeking to enforce their judgments against the Building. (Tr. 2630).

The first such lawsuit was filed in 1992 seeking to enforce damages arising from the Iranian government's alleged expropriation of assets owned by Norman Gabay located in Iran. (Tr. 2630). In opposition, Alavi board member Ahmadi, who had previously agreed to resign from Alavi at the Ayatollah's direction, testified that he never received any instructions from any person or entity in Iran. (Tr. 2630-31; GX601-T). In an affidavit and at a deposition—just months after meeting with high level Bank Melli officials in Tehran—Alavi's president Geramian denied that Alavi had any business with the government of Iran or the Bonyad Mostazafan, and that there was no relationship between Alavi and the Bonyad Mostazafan. (Tr. 2603; GX1403, 1409).

Geramian, however, was simultaneously corresponding with the Bonyad Mostazafan legal office regarding the litigation and his concerns about the relationship between Alavi and the Bonyad Mostazafan. (GX204-T). Similarly, on or about December 17, 1992, Geramian wrote to the legal office of the Bonyad Mostazafan to provide an update about the litigation and to request that they "cooperate" with Alavi's office in

Tehran. (GX1406-T; *see also* GX1408-T ("Obviously, the Alavi Foundation (New York) will not withhold from any consultation and intellectual assistance in this matter.")). The Bonyad Mostazafan responded with instructions about how to proceed with the litigation. (GX1407-T). Also during this time, the Iranian Prime Minister's office was giving instructions, through the Bonyad Mostazafan, for Alavi's donations. (*See, e.g.*, GX643-T).

The *Gabay* case was dismissed in 1997 when the district court determined that Gabay had failed to show that the Bonyad Mostazafan exercised day-to-day control over Alavi. (Tr. 2631; GX1004).

In 1998, Steven M. Flatow filed suit seeking to attach assets to satisfy a judgment against Iran. (Tr. 2631). Alavi submitted, among other things: (1) an affidavit that it hires its own employees and that none of these employees are agents, officers, or employees of the Iranian government; and (2) an affidavit that Alavi has rejected requests for funding from entities affiliated with the Iranian government. (*Id.*). The *Flatow* action was dismissed when the court concluded that Flatow had failed to prove that the government of Iran exercised day-to-day control over Alavi's activities. (*Id.*); *see also Flatow v. Islamic Republic of Iran*, 67 F. Supp. 2d 535 (D. Md. 1998)).

Bank Melli took note of these lawsuits, and adjusted its operations to further insulate itself from detection. In a letter dated July 21, 1994, the head of Bank Melli's New York agency, Karjooravary, noted that prior to the *Gabay* lawsuit, Bank Melli's New York agency "had been taking care of [Assa's] affairs,"

but that precautions had been taken by the bank in the wake of the lawsuit. (GX168-T). "Since last year, following a complaint registered by a person named Morad Gaby [sic] against the partnership's partner [Alavi] and one in which the partnership's building had been mentioned, it seems that management has declared that all the partnership's affairs be handled by a different entity other than this Agency." (*Id.*). Bank Melli transferred primary responsibility for managing Assa from New York to London and Tehran.

Similarly, on or about June 25, 1994, Bank Melli's Overseas Network Supervisory Department (the "ONSD") wrote to Karjooravary about the risk associated with the Iranian ownership of Assa. (GX151-T). In the letter, Bank Melli Iran acknowledged that "Bank Melli Iran, which belongs to the Islamic Republic of Iran and is naturally not subject to current U.S. laws, is the owner of Assa Corporation through two other companies." (*Id.*). Bank Melli then asked the New York office to "estimate the percentage of risk of the seizure of these properties in case of the revelation of the ownership by Assa Corporation." (*Id.*).

### 8. The Iranian Ambassador's Continued Supervision of Alavi

In 1991, in connection with Iran's transfer of control over Alavi from the Bonyad Mostazafan to the Iranian Ambassador to the United Nations, then-Ambassador Kharazi had asserted that "the role of the Managing Director and the role of the Board of Directors will be just a formality and he [the Ambassador] will be conducting all of [Alavi's] affairs." (GX624-T; *see*

*also* GX601-T, 605-T, 628-T). Subsequent Iranian Ambassadors continued to exercise supervisory authority over Alavi. (*See, e.g.*, Tr. 515, 911-13). As an initial matter, the board that Kharazi hand-picked in 1991 remained in place, unchanged for nearly 15 years, until Mirakhor and Hodjat left the board in 2005. (DX583, 587; Mirakhor Tr. 15). Kharazi's "puppet," Geramian, was forced out by Kharazi's successor, Ambassador Zarif. (Tr. 516, 529). Geramian's replacement, Jahedi, immediately met with Ambassador Khazaee and received direction about Alavi's and the Building's operations and about resolving the Assa problem. (GX207-T). And, of course, Ayatollah Khamenei—who directed the transfer of Alavi from the Bonyad Mostazafan to the Iranian Ambassador to the United Nations in 1991—is still the Supreme Leader of Iran.

The ambassadors regularly emphasized their control over the composition of Alavi's board. (GX502-T ("I agree with anyone that is recommended by Doctor [Ambassador] Zarif for membership in the Board of Trustees"); *id.* ("Amendment and extension of the Board of Trustees should be decided by you [Ambassador Zarif] in relation with present members"); GX207-T ("The composition of the Board of Trustees = Whatever I [Ambassador Khazaee] decide should be approved and it should not be otherwise")). And the ambassadors' ability to exercise control was facilitated by their routine participation in Alavi board meetings. As Ebrahimi's notes from 2004 reflect, "Information—Zarif—should always be in meetings." (GX500-T). Khazaee, similarly, emphasized that "we [Khazaee

and the Mission staff] have to be kept informed regarding the general on goings and allocations [of expenditures] because we will be held responsible." (GX207-T).

The ambassadors exercised this control to direct Alavi's actions as well as its board membership, just as the Bonyad Mostazafan had done. In 1997, Shafie proposed entering into a net lease of the Building to improve its net income; Shafie met with Geramian, Alavi's attorney, and then-Iranian Ambassador to the United Nations and former Alavi board member Nejad Hosseinian at the mosque on Alavi's Queens property. Hosseinian vehemently opposed the net lease, and Alavi did not go forward with the proposal. (Tr. 886, 893-96).

Alavi board member Ahmadi (1980-2013) claimed in an FBI interview that Alavi was "independent" of the government of Iran, but admitted that "indirectly there was pressure from Zarif"; that Zarif "always wanted to provide guidance," and that at Alavi board meetings, "Geramian would come in and say this is the way Zarif wants it." (Tr. 515). Ahmadi admitted that he personally opposed the Hanif lawsuit settlement, but that the entire Alavi board followed Zarif's instructions on the settlement terms. (Tr. 515-16). Ahmadi admitted that, when Geramian was not sufficiently responsive to Zarif's wishes, he was replaced as Alavi's President. (Tr. 516, 529).

Zarif's replacement, Khazaee, was similarly influential. Shortly after replacing Zarif, Khazaee led an Alavi board meeting along with the former Iranian cultural ambassador to the U.N., Mehdi Faridzadeh. (GX207-T, 504-T; Tr. 1346-49). Khazaee gave detailed

instructions on all aspects of Alavi's finances, its spending, and its managing of the Building. Khazaee was the conduit for communications between Alavi and the Iranian government in Tehran. (GX207-T). He insisted, "I have to *definitely* see the proposed [financial] allocations before a final decision is reached." (*Id.*). Khazaee wanted the Building to be made more profitable and instructed that a study be prepared, with a business plan and a comparative analysis. (*Id.*). He asserted his authority over the board's membership, but did not see a need to change the current board "despite the fact that the gentlemen are taking a risk and it is not an easy thing to do." (*Id.*). He instructed Alavi to shift its charitable donations towards Shia endeavors, and several times referred to "our goals" and "our own goals"—referring to the goals of the government of Iran. (*Id.*). Khazaee insisted, "I have to be kept informed and I have to be able to state my opinion in order for you to make a decision," and that contact with him be made more frequent. (*Id.*). Khazaee concluded with instructions about Assa, because he "was worried about the 40% share": "A legal format for ASSA has to be thought of. Morgage [sic] is acceptable." (*Id.*). In other words, Khazaee gave permission for Alavi to borrow money to buy Assa if necessary, in order to make the arrangement legal.

### 9.  Alavi's President Destroys Documents

On December 17, 2008, the Government filed the Complaint in this matter. (Dkt. No. 1). That same day, Alavi's president Jahedi was served with a grand jury subpoena for testimony and documents in a grand jury investigation. (Tr. 244; GX27). After being served,

Jahedi indicated that he understood the subpoena and its attendant obligation not to destroy evidence. (Tr. 244-45). The grand jury subpoena required that Alavi provide any and all documents relating to Alavi, Assa, and the Partnership from 1989 onward. (GX27).

The next day, on December 18, 2008, FBI surveillance saw Jahedi ripping up papers and throwing them in a public trash receptacle. (Tr. 140-142; GX23). The FBI retrieved those documents and brought them to an FBI forensic facility for reconstruction. (Tr. 142-44, 161-63; GX28A-28T). Some of the reconstructed documents were responsive to the grand jury subpoena, including diagrammatic representations of Assa's ownership structure and relationship to Alavi. (GX28I, 28F). On December 19, 2008, Jahedi was charged in a criminal complaint. He was subsequently indicted for obstruction of justice, and on December 30, 2009, he pleaded guilty to this charge. (GX22).

## 10. Proceeds from the Building and Transactions Involving Proceeds

Between 1996 and 2008, the Partnership received more than $228 million in gross rents from the Building. (GX15A). During this time period, the Partnership spent more than $143 million in operating expenses, including the costs of operating, maintaining, and improving the Building. (GX15B). Between 2000 and 2008, Alavi received more than $36.9 million in income from the Partnership. (GX15M). Between 1997 and 2008, Assa received more than $26.9 from the Partnership. (*Id.*).

Neither the Partnership, nor Alavi, nor Assa had any significant sources of income other than the Building. (GX15A-15U). Alavi used its income from the Partnership to pay for expenses, repairs, and improvements for its other properties. (GX15N-15R).

## B. Claimants' Case

At trial, Alavi and the Partnership extensively cross-examined each of the Government's witnesses and introduced hundreds of exhibits. They also designated portions of the depositions of Mirakhor and Masoud Modarres, and called five additional witnesses. Specifically, Alavi and the Partnership called: Hanieh Safakamal, a former Alavi employee who helped with bookkeeping (Tr. 2655); Misriya Chatoo, a secretary and receptionist for Alavi (Tr. 2762); two witnesses employed by organizations that received funds from Alavi, namely, Faheem Kazimi, who runs the Islamic Education Center in Houston, Texas and operates out of Alavi-owned property, and Alison Van Dyk of the Temple of Understanding, which received a $5,000 donation from Alavi and funding for a program on Islam and the Media (Tr. 2827, 2490); and John Duross O'Bryan, a forensic accountant who introduced a number of summary charts about Alavi's finances and expenditures. (Tr. 2846; DX14-19). Alavi and the Partnership's primary defense at trial was that they were not controlled by the government of Iran and were unaware that Assa was owned and controlled by the government of Iran.

## C. Verdict

Following approximately a day of deliberations, the jury returned its verdict. (Dkt. No. 1896). First, the jury concluded that the Government had proven an IEEPA violation. (*Id.* at 4). Based on that finding, the jury found the following property forfeitable as proceeds of the IEEPA violation: (a) the entirety of Alavi's interest in the Partnership; (b) 11.4 percent of the Building; (c) 15 percent of the Texas property; (d) 44 percent of the Queens property; (e) seven percent of the California property; (f) 17 percent of the Maryland property; and (g) the entire contents of three bank accounts held by Alavi. (*Id.* at 6-7).

Second, the jury found that the Government had proven a money laundering violation. (*Id.* at 8). The jury also found that the Partnership and the Building were involved in that violation. (*Id.* at 9). The jury further found that the following property was forfeitable as property traceable to property involved in the money laundering violation: (a) the entirety of Alavi's interest in the Partnership; (b) the entirety of Alavi's interest in the Building; (c) 15 percent of the Texas property; (d) 44 percent of the Queens property; (e) seven percent of the California property; (f) 17 percent of the Maryland property; and (g) the entire contents of three bank accounts held by Alavi. (*Id.* at 10-11).

The jury rejected all claims that Alavi or the Partnership were innocent owners. (*Id.* at 14-15).

## D. This Court's Prior Decision

On or about July 20, 2016, following an appeal by Alavi and the Partnership, this Court reversed in part

the District Court's grant of partial summary judgment to the Government, and remanded for further proceedings. *See In re 650 Fifth Ave.*, 830 F.3d 66. With respect to the argument that Assa was not owned or controlled by the government of Iran, this Court concluded that the District Court had correctly found that there was "no genuine issue of triable fact" that "Bank Melli, and therefore the government of Iran, controlled Assa, and continued to do so after 1995." *Id.* at 93. However, this Court held that, although the evidence clearly showed that Alavi knew of this prior to 1995, there was a "genuine dispute of fact" as to whether Alavi continued to know that fact after 1995. *Id.* In particular, this Court held that some of the post-1995 correspondence between Alavi and Assa and some of the comments by Mirakhor could lead a reasonable juror to find otherwise. *Id.* at 93-94.

In addition, this Court remanded for further analysis with respect to the District Court's denial of Alavi's motion to suppress evidence obtained pursuant to a search of its offices, *id.* at 98-99, and the District Court's *sua sponte* ruling on Alavi's statute-of-limitations affirmative defense, *id.* at 97. With respect to suppression, this Court remanded for further factual findings on whether the doctrines of inevitable discovery and good-faith reliance applied, and noted that the Government had argued "with some force" that the good-faith exception applied. *Id* at 106. With respect to the statute of limitations, this Court held that summary judgment had been inappropriate because Alavi had not been afforded "a reasonable opportunity to respond" before the District Court dismissed the defense. *Id.* at 97.

# ARGUMENT

## Section I—Alavi & Partnership Issues

### POINT I

### The Court Properly Denied Claimants' Untimely Requests for Discovery and Granted the Government's Motion for Summary Judgment

Although Claimants[14] included an affirmative statute-of-limitations defense in their answer to the Amended Complaint, they did not pursue any discovery related to this defense during over two years of discovery, raising the issue only in August 2013 after document discovery had already closed—and then only with respect to the deposition questioning of an Internal Revenue Service ("IRS") and an OFAC representative. When Claimants sought additional discovery relating to this affirmative defense in 2017 following remand, the District Court accurately recognized those requests as untimely, as well as extremely broad and onerous, and, in a proper exercise of its discretion, declined to reopen discovery.

Moreover, based on the voluminous discovery provided in this case, Claimants obtained records relating to prior government agency investigations into Alavi to the extent that such records referring to or reflecting those investigations existed in the FBI's New York Field Office ("FBI-NY"), and had independent access

---

[14] In this section, Alavi and the Partnership are referred to collectively as "Claimants."

to any publicly available reports or records. This record formed the basis of Claimants' cross-motion for summary judgment on its statute-of-limitations defense in 2017, with over 40 exhibits. (Dkt. No. 1560). With all parties having had a full and fair opportunity to be heard, the District Court correctly determined that there were no genuine issues of material fact with respect to Claimants' affirmative defense and that the forfeiture action was timely filed.

## A. The District Court Acted Well Within Its Discretion in Declining to Reopen Discovery for New Discovery Requests

Claimants argue that the District Court erred in not reopening discovery following remand in 2017. (Alavi Br. 37-38). Following this Court's prior decision, Claimants sought new extensive discovery in connection with its statute-of-limitations defense. The District Court did not abuse its discretion in concluding that this represented a significant expansion of the discovery conducted from 2011 through 2013, and related to records that Claimants had never previously sought to compel in connection with their statute-of-limitations defense. Nothing about this Court's prior decision compelled this kind of wide-ranging, burdensome, post-discovery-period fishing expedition.

### 1. Relevant Facts

Following remand from this Court, the District Court set schedules for the parties to address the various discovery and substantive issues to be addressed prior to trial. (Alavi JA 1155). For instance, the District Court considered and rejected the parties' cross-

motions for summary judgment based on the imputa-
tion of Assa's knowledge to Alavi under principles of
partnership agency. (Dkt. No. 1461). The District
Court made clear, however, that discovery—which had
gone on for over two years prior to the first appeal and
had closed prior to the original summary judgment or-
ders—would not be reopened wholesale. (Alavi
JA 1158-59 ("I deem the discovery in this case to be
closed.")).

Claimants nevertheless sought to reopen discovery
on many issues. For one, Claimants sought to reopen
discovery on matters related to its suppression motion.
(Dkt. No. 1425). Finding that such requests, or similar
ones, had been properly made before summary judg-
ment and related to matters that were at issue in the
motion to suppress, the District Court ordered the
Government to produce discovery. (Dkt. No. 1438).

Claimants also sought to reopen discovery to seek
documents related to their statute-of-limitations de-
fense. (Dkt. No. 1439). The Claimants sought extraor-
dinarily burdensome disclosure of records going back
to the early 1980's from at least eight FBI offices other
than New York (which handled this case), as well as
the U.S. Department of the Treasury, and the Internal
Revenue Service. (Dkt. No. 1439, 1445). Claimants
also sought records from any federal agency relating to
various news articles dating back to 1980; records from
any federal agency relating to a 45-year-old civil liti-
gation concerning the New York City Police Depart-
ment's ("NYPD") surveillance practices with respect to
political organizations; and records from any federal

agency concerning various investigations by non-federal agencies such as the New York Attorney General's Office, the New York County District Attorney's Office, and the NYPD. These requests went well beyond anything that Alavi had ever asked for during the discovery period beginning in 2011. (Dkt. No. 1439).[15]

In an opinion dated February 28, 2017, the District Court, after extensively surveying the discovery record, denied Claimants' request. (Alavi JA 1290). In particular, the District Court concluded that Claimants had not requested discovery related to their statute-of-limitations defense in their detailed, 51-section first requests for discovery dated May 2011, nor did they make such a request at any time until the eve of trial and after the close of discovery. (Alavi JA 1297). Indeed, as late as July and August of 2013, Claimants were still seeking production of documents from other federal agencies based, not on the theory that they would demonstrate that the Government knew or should have known of the offenses alleged in the

---

[15] With respect to all of Claimants' requests, the Government already had produced all relevant, non-privileged records from the FBI New York Field Office investigation that led to the filing of the forfeiture complaints, and there were no further responsive, non-privileged records in those files. With respect to Claimants' requests for documents relating to particular OFAC or IRS matters concerning Claimants from decades ago, the Government asked those agencies to search for those records during the discovery period and they located none. (Dkt. No. 546, Ex. C at 2; 784).

Amended Complaint, but rather that such documents might show "that the Foundation is *not* controlled by the [government of Iran]" and that they "might be *exculpatory*." (Alavi JA 1323 (first emphasis added)). Only in litigating the scope of an OFAC representative's deposition on August 30, 2013—10 days before trial was set to begin—did Claimants first advance the theory that their proposed questions were relevant to a statute-of-limitations defense. (Alavi JA 1325-26). A motion by Claimants for reconsideration was also denied. (Alavi JA 1331).

## 2. Applicable Law

"A district court has wide latitude to determine the scope of discovery," and this Court "ordinarily defer[s] to the discretion of district courts regarding discovery matters." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008). Discovery rulings are reviewed for abuse of discretion. *SEC v. Rajaratnam*, 622 F.3d 159, 180 (2d Cir. 2010). "A district court abuses its discretion only when the discovery is so limited as to affect a party's substantial rights." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d at 103.

A district court does not abuse its discretion in denying a request to reopen discovery without a showing of good cause. *Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir. 1991). "The broad discretion afforded courts over discovery matters includes the discretion to determine whether a movant's tardiness constitutes undue delay." *Joseph v. Sikorsky Aircraft Corp*, No. 3:14CV00424 (AWT), 2015 WL 5304177, at *3 (D.

Conn. Sept. 9, 2015) (internal quotation marks omitted) (quoting *West v. Miller*, No. 05C4977, 2006 WL 2349988, at *5 (N.D. Ill. Aug. 11, 2006)); *see id.* (denying motion to compel based on "plaintiff's failure to pursue this discovery during the period set by the Court, and, in particular, the plaintiff's failure to bring any concerns to the Court's attention at the July 2, 2015, hearing, or in any manner in a timely fashion"); *Colon v. City of New York*, No. 12-CV-9205 JMF, 2014 WL 4100607, at *2–3 (S.D.N.Y. Aug. 20, 2014) ("Plaintiff fails to show good cause for failure to raise these issues in a more timely fashion that would have enabled the Court to have addressed them prior to August 15, 2014 deadline. . . . In light of this history, and the Court's repeated warnings that discovery-related issues had to be raised in timely fashion, Plaintiff's requests are denied."); *Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Servs. N. Am. L.L.C.*, No. 03CV760, 2004 WL 3021842, at *4 (N.D. Ill. Dec. 30, 2004) (finding a motion to compel filed four days before the discovery cutoff "a clear case of too little, too late"); *Hyland v. Homeservices of America*, No. 3:05CV612, 2012 WL 1680109, at *6 (W.D. Ky. May 14, 2012) (denying motion to compel filed "ten days before the close of discovery" where plaintiff had "failed to raise the issue during" prior conferences with the court and "failed to file a motion to compel in a timely manner that would have allowed sufficient time for the production of the requested documents[ ]" (alteration in original)); 8B Wright & Miller, *Fed. Prac. & Proc. Civ.* § 2285 (3d ed.) ("[T]he moving party must seek a Rule 37(a) order in a timely fashion. . . . Given the considerable discretion district judges exercise in deciding disputed discovery

issues, and the district court's responsibility to impose a discovery cutoff under Rule 16(b), it is apparent that timeliness is an important consideration." (footnotes omitted)).

### 3. Discussion

#### a. The District Court Complied with this Court's Opinion

Claimants first contend that the District Court's denial of their request to reopen discovery was inconsistent with this Court's decision in the prior appeal. (Alavi Br. 37-38). Contrary to Claimants' assertions, however, the District Court did not violate this Court's direction.

In its prior decision, this Court reversed the District Court's grant of summary judgment dismissing Claimants' statute-of-limitations defense, because the District Court raised the issue *sua sponte* and without giving notice to the parties, in violation of Federal Rule of Civil Procedure 56(f). *See In re 650 Fifth Ave.*, 830 F.3d at 96. This Court found that error particularly problematic in light of the fact that the Government's summary judgment motion requested permission to address the issue of statute of limitations at a later time, thereby taking it out of the ambit of the motion. *See id.* This meant that the parties would not have been on notice to fully present their arguments and positions before having the issue disposed of by the District Court. *See id.* Accordingly, this Court held that the District Court "procedurally erred" in granting

summary judgment at that stage. *Id.* This Court expressed no opinion on the merits of the underlying statute-of-limitations defense. *Id.*

In a footnote, this Court noted that the "district court had repeatedly denied Claimants' attempts to obtain discovery that might show when the Government learned of Claimants' alleged forfeitable offenses." *Id.* n.28. But because Claimants did not appeal those discovery rulings, and because this Court held that the summary judgment decision was procedurally improper, the observation was *dicta* and the discovery orders were not within the scope of the Court's mandate. *See, e.g.*, *Schoenefeld v. Schneiderman*, 821 F.3d 273, 284 n.11 (2d Cir. 2016) ("our observation [in a prior panel decision] . . . is at most *dictum* that does not bind us here"); *Artis v. Bernanke*, 161 F. Supp. 3d 97, 99 (D.D.C. 2013) (circuit court's *dicta* concerning discovery was not part of the mandate where the issue of electronic discovery was not before the court) (citing *Schwabenbauer v. Board of Educ.*, 777 F.2d 837, 842 (2d Cir. 1985)); *May Dept. Stores v. Int'l Leasing Corp.*, 1995 WL 656986, at *2 (S.D.N.Y. Nov. 8, 1995) ("[T]he law of the case doctrine does not apply to dicta from prior holdings . . . ."). Furthermore, the Court's observation in the footnote was necessarily based on the record before it.

Importantly, and because of these factors, this Court did not have the benefit either of the complete record relevant to the discovery proceedings, or of attentive argument from the parties. In their prior appeal, Claimants levied numerous incidental complaints about statute-of-limitations-related discovery

(Prior Alavi Br. 127), but argued that they should have been permitted to present the issue to the jury based on the discovery they had, not that they should have had an opportunity to take additional discovery. (*Id.* at 5; *see also id.* at 128-29). Because Claimants did not appeal the discovery orders, the Government did not address Claimants' various discovery complaints. In fact, as the District Court subsequently observed, Claimants' description of discovery to this Court was incomplete, inaccurate, and misleading (*see* Alavi JA 1329), just as its description of those proceedings in this appeal is incomplete, inaccurate, and misleading.

On remand, Claimants' motion to compel additional discovery was briefed extensively and analyzed at length by the District Court. (Dkt. No. 1439, 1445, 1447, 1448, 1470, 1491, 1515, 1546). The District Court conducted a "comprehensive review of the previous discovery in this case"—a review this Court had not had an opportunity to conduct—and found that Claimants had failed to timely pursue discovery on its statute-of-limitations defense during the discovery period. (Alavi JA 1290-1330). The District Court extensively surveyed the conferences, hearings, letters and motions that had been submitted over the course of two years, and found that Claimants had failed to raise these requests in a timely fashion. (*Id.*). The District Court thus properly concluded that, although Claimants were "entitled to be heard on their statute of limitations defense," they were "not entitled to new discovery." (*Id.*). This holding, based upon the District Court's long and intimate familiarity with the discovery proceedings, as well as its thorough review of the record, contravened no holding by this Court.

### b.    Claimants' Requests for Discovery on Statute of Limitations Were Untimely

Furthermore, the District Court's acted well within its discretion in rejecting Claimants' belated efforts to reopen discovery. After remand, Claimants sought new, broad discovery. During the discovery period, however, Claimants *never* based any motions to compel documents on the ground that it was relevant to a statute-of-limitations defense; the Government never consented to Claimants' extraordinarily expansive initial discovery requests; and Claimants never challenged the scope of agency discovery to which the Government consented (though the parties did raise, and the District Court properly resolved, disagreements about the applicability of various privileges to records from certain agencies that the Government had agreed to review for discovery).

Discovery in this matter was already extraordinarily extensive. The Government produced hundreds-of-thousands of pages from the files of the U.S. Attorney's Office and the FBI's New York Field Office relating to the investigation that led to the filing of the Complaint and Amended Complaint, which commenced in 2006. Discovery included voluminous declassified records resulting from one of the largest litigation-related declassification projects the Government has ever undertaken. (*See, e.g.*, Alavi JA 741, 883, 622 (classification review in this case exhausted the FBI's fiscal year 2012 overtime budget and was projected to exhaust the 2013 budget)). Discovery included reports and notes of witness and confidential source interviews beginning in 2006; documents and records provided voluntarily

by witnesses; the results of search warrants executed in 2008 (on a residence in Queens, New York, controlled by Bank Melli's New York agency and on Alavi's offices) and 2009 (on the residence of Alavi board member Ebrahimi); the results of searches and subpoenas served on email service providers, banks, accountants, and telephone service providers; travel records; surveillance reports; and numerous other investigative materials. It further included electronically stored information ("ESI") from the U.S. Attorney's Office and the FBI, relating to Assistant United States Attorneys and Special Agents involved in the investigation or supervising the investigation. The Government further produced records relating to Alavi and Assa from the IRS, from OFAC, from the U.S. Marshals Service, from the Department of State concerning proceedings before the U.S.-Iran Claims Tribunal, and from the Customs and Border Patrol. Claimants deposed six law enforcement witnesses, a non-law enforcement representative from the IRS, and two OFAC representatives.

Even to the extent Claimants' post-remand requests could be considered within the scope of Claimants' initial discovery requests—which, for the reasons explained in detail by the District Court, they were not (Alavi JA 1294-97)—the Government never consented to that discovery, and Claimants never moved to compel that discovery prior to the close of the discovery period. Claimants' contentions to the contrary (Alavi Br. 38-39), grossly mischaracterize the proceedings below. In 2011, Alavi propounded 51 discovery requests that were extraordinarily broad and burdensome, in-

cluding requests for records from an endless list of federal and state agencies: the entire Department of Justice, including both Main Justice components and all U.S. Attorney's Offices; all FBI Field offices; the Treasury Department, including the IRS and OFAC; the entire Department of Homeland Services; the Department of Defense; the Department of State; the Central Intelligence Agency; all other federal agencies or administrative bodies; and any joint task force or investigative entity. (Alavi JA 1230). The Government objected to the breadth of this request, and only consented to respond on behalf of the U.S. Attorney's Office for the Southern District of New York and the FBI's New York Field Office. (Alavi JA 1248; *see also* 821-24 (describing agreements during March 15, 2013 conference for the production of certain identified, limited other-agency records)). Claimants' astonishing contention that "the Government agreed to produce non-privileged documents responsive to [its] requests" (Alavi Br. 38), completely ignores these and many other objections by the Government.[16] (*See, e.g.*, Dkt.

---

[16] Claimants curiously argue that the Government did not produce documents "from its own files" until January 2013. (Alavi Br. 38). As Claimants well know, this is false. The Government made extensive document productions from its files in the course of the year prior to that date, including voluminous records obtained in the course of the investigation that led to the filing of the Amended Complaint from searches, subpoenas, requests to foreign governments, and other in-

No. 1445, Ex. 3 at 4). There is no serious contention that the Government failed to produce all responsive, non-privileged documents that it possessed and that it actually agreed to produce.

Claimants' failure to seek to compel statute-of-limitations-related discovery is even more notable given the amount of discovery-related litigation in this case. Numerous discovery disputes were raised throughout the course of the pretrial proceedings, which the District Court resolved with a remarkable degree of efficiency, fairness, and practicality. The docket sheet is replete with the parties' numerous discovery filings—by the time of the District Court's initial merits summary judgment decision in September 2013, there were more than 800 entries in the docket, many of which related to discovery matters. Nonetheless, Claimants never moved to compel any discovery on the basis that the requested discovery could support its statute-of-limitations defense.

In support of its contention that they timely sought the discovery requested on remand, Claimants rely on four letters, three of which were filed before the discovery period ended and one that was filed after discovery was closed.[17] (Alavi Br. 38-39). None of them actually sought the discovery Claimants attempted to

———————

vestigative steps. Claimants' attempt to create the illusion of discovery dilatoriness is irrelevant to its appeal and contradicted by the record.

[17] Fact discovery closed on June 28, 2013—a deadline proposed by Claimants when they consented to a

obtain after remand. In the first of these four, Claimants' April 15, 2013 letter, Claimants alleged—in a now-familiar stratagem—a kitchen-sink full of supposed discovery inadequacies, including Claimants' contention of inadequate document production from the IRS, OFAC, the Department of State, and the FBI. (Alavi JA 842-47). But the relief Claimants *actually sought* was limited to the Government's invocation of the law enforcement privilege with respect to materials from the FBI. (Alavi JA 848-53; *see also* Dkt. No. 433 at 8). After further briefing on the scope and invocation of the law enforcement privilege, the District Court granted the Government's motion to withhold privileged materials from discovery. (Dkt. No. 547). In doing so, the District Court necessarily found that Claimants had not, on the record and arguments before it, demonstrated a "compelling need" for the materials that would overcome the privilege. (*Id.* at 1-2); *see also In re the City of New York*, 607 F.3d 923, 950 (2d Cir. 2010) (noting that, in order to rebut the "strong presumption" against lifting the law enforcement privilege, a party seeking disclosure must demonstrate "a '*compelling* need'"). Claimants never relied on their statute-of-limitations defense as a ground for such a compelling need, and Claimants have not challenged the District Court's law-enforcement-privilege decision on appeal. Their April 15, 2013

—————————

discovery extension request by other parties. (Dkt. No. 407). Certain previously noticed depositions were conducted after that deadline, with the permission of the District Court.

letter concerning law enforcement privilege proce-
dures, accordingly, provides no support for Claimants'
belated discovery efforts.

Claimants' next two letters, dated July 9, 2013, and
August 8, 2013, sought to compel the production of rec-
ords from OFAC, the IRS, and the Department of
State, premised on the theory that various agencies
had investigated Alavi over time and had failed to dis-
cover any evidence of wrongdoing, and that these fail-
ures amounted to exculpatory admissions by the Gov-
ernment. (*See, e.g.*, Alavi JA 858 ("[W]e believe the De-
partment of State filed documents concerning its view
that the Foundation was not controlled by the Govern-
ment of Iran."), 872-73 ("FBI records produced in dis-
covery have revealed that OFAC has been investigat-
ing the Foundation for decades and has not found suf-
ficient evidence of control by the Iranian government
to warrant Claimants' inclusion on the SDN List. . . .
OFAC's documents regarding the Foundation and the
Fifth Avenue Company, at least those relating to the
investigation in the 1990s, clearly constitute exculpa-
tory information.")). Claimants made similar argu-
ments in other submissions. (*See, e.g.*, Dkt. No. 549 at
4 ("Claimants will seek to elicit testimony from an
OFAC witness about the absence of the Foundation
and the [Partnership] on the SDN List."); 552 at 35-37
("They concluded there was no criminal violations at
that time."); 674 at 1 ("the documents being sought
would be party admissions that could reasonably lead
to the discovery of exculpatory evidence"). Claimants
*never* argued that the records they sought were rele-
vant to establishing the commencement of the statute

of limitations. In fact, the stated purpose of the requests was to find evidence undercutting any such defense.

In connection with the Claimants' letters, the Government produced all records located by the State Department relating to the U.S.-Iran Claims Tribunal matter. (Alavi JA 821, 824). The IRS located no additional materials relating to Claimants. (Dkt. No. 546, Ex. C at 2; 784). The Government opposed Alavi's motion to compel additional materials from OFAC as precluded by applicable privileges and irrelevant, among other grounds: the forfeiture claims were based on evidence gathered in the course of the FBI's investigation, that this evidence was not available to any agency conducting prior investigations (including, for example, internal Iranian government documents provided by witnesses, internal Bank Melli communications obtained from searches, and internal Alavi memos and notes obtained from searches), and any prior investigations and their findings, if any, were irrelevant and inadmissible. (Dkt. No. 639 at 2-3).

In that regard, Claimants' July 9, 2013 letter was part of several letters briefing the Government's requests for a protective order concerning privileged testimony or records within the FBI's or OFAC's possession (*see, e.g.*, Dkt. No. 412, 433, 434, 441, 514, 515, 524, 534, 547, 549, 571, 596, 629, 639, 640, 641, 644, 757); Claimants never argued that the records that were the subject of the protective order motion were necessary to explore their statute-of-limitations defense. The District Court, on the record and arguments

before it, granted the Government's motion for a protective order with respect to additional OFAC document discovery on the grounds of both privilege and relevance. (Dkt. No. 757). The District Court did not evaluate the relevance of the requested discovery to Claimants' statute-of-limitations defense, however, because Claimants never raised that argument in their letters.

Claimants' final motion, filed on August 30, 2013, two months after the close of fact discovery, sought to compel deposition testimony rather than records, and was limited to Rule 30(b)(6) questioning of an IRS representative and an OFAC representative. (Alavi JA 892). In a complete reversal of all of their prior arguments—namely, that any prior agency investigations of Claimants had revealed no wrongdoing and thus were exculpatory—Claimants suddenly contended that their proposed questioning of the OFAC witness was relevant to a statute-of-limitations defense. (Alavi JA 892-93). In other words, Claimants contended that the *very same records* that they previously argued showed that the Government had *not* found any evidence of criminal violations, instead showed that OFAC and the IRS "were aware or should have been aware of Claimants' alleged violations of the [IEEPA] as early as the mid-1990s." (*Id.*). The District Court, however, justifiably adhered to its prior privilege decision concerning document discovery and precluded deposition questions concerning matters it already had determined were privileged. (Alavi JA 899-901).

As this record makes clear, Claimants never moved to compel the discovery sought in their post-remand discovery requests, including records from at least 12 nationwide FBI counterintelligence and counterterrorism case files, records relating to various news articles, records relating to civil litigation over the NYPD's investigative practices, or records relating to separate state or local investigations concerning Claimants. Claimants never offered the statute of limitations as a basis for the relevance of discovery they sought until after document discovery was closed and less than two weeks before the original trial date, and even then did so only with respect to OFAC deposition testimony and only in reliance on the very same documents that Claimants had repeatedly argued showed that OFAC had been unable to discover any evidence of criminality. In light of the extensive history and discovery-related litigation that occurred prior to remand, to claim that Claimants' new sweeping requests were an effort to "refine[ ]" and "tailor[ ]" their prior requests to "target a narrower subset of materials" (Alavi Br. 37, 41), is preposterous.

Accordingly, the District Court was well within its discretion to reject Claimants' post-remand efforts to reopen discovery in order to greatly expand it. The District Court's order was based on an extraordinarily thorough review of the record, and on its unparalleled familiarity with the complex and voluminous prior proceedings. (Alavi JA 1292-1327). Claimants' inability to show good cause for their failure to timely seek the materials—all of which were based on information included in documents the Government produced prior

to the close of discovery and on publicly available in-
formation—was alone a sufficient basis for the District
Court's decision. *See, e.g.*, *Colon*, 2014 WL 4100607, at
*3 (denying as untimely a motion to compel served one
day before the close of discovery, and collecting similar
cases); *cf. Baylis v. Marriott Corp.*, 906 F.2d 874, 878
(2d Cir. 1990) ("[W]e reject plaintiffs' contention that
the district court should not have dismissed their com-
plaint without allowing them to conduct discovery into
the possibility that Marriott may have induced the
contract termination by wrongful means. This action
has been pending since 1985; presumably plaintiffs
have had ample time to conduct discovery. Further,
though their voidable-contract theory appears to have
been proffered only belatedly in a May 25, 1989 letter
sent to the court some months after Marriott's motion
for dismissal had been argued, that letter did not con-
tain any request for discovery to substantiate the new
theory. Nor have plaintiffs pointed to any discovery re-
quest that, at the time of the district court's decision,
had been denied or was outstanding. The district
court's granting of the motion to dismiss without *sua
sponte* ordering discovery was not an abuse of discre-
tion."); *Bailey v. Pataki*, 952 F. Supp. 2d 626, 628-29
(S.D.N.Y. 2013) (precluding defendant from raising
new advice-of-counsel defense and noting that "[d]es-
pite the fact that discovery closed approximately three
years ago, all parties acknowledge that allowing [de-
fendant] to raise this defense would require further
discovery. Such discovery would, at the very least, en-
tail depositions of the individual lawyers and advisers
upon whom [defendant] relied, and perhaps even ex-
tensive document discovery of the documents upon

which those attorneys relied and the documents, if any, that [defendant] reviewed. Plaintiffs would also be obliged to adjust their trial strategy in significant respects"); *Roberts v. Ground Handling, Inc.*, No. 04 CIV. 4955 (WCC), 2007 WL 2753862, at *5 (S.D.N.Y. Sept. 20, 2007) ("To require defendant to incur additional costs and to change its strategy on the eve of trial because plaintiff has concocted a new theory three years into the litigation is simply not fair and would, in a real sense, unduly prejudice defendant.").

In sum, the District Court acted well within its broad discretion in declining to reopen discovery in order to allow Claimants to seek voluminous, time-consuming discovery based on nothing more than speculation and a complete, past-the-last-minute reversal of their prior litigating position. The order denying reopening discovery should therefore be affirmed.

## B. The District Court Correctly Granted the Government's Motion for Summary Judgment as to Claimants' Statute-of-Limitations Defense

Claimants also argue that the District Court incorrectly granted the Government's motion for summary judgment on their statute-of-limitations defense and denied their cross-motion for summary judgment. (Alavi Br. 43-53). The District Court correctly found, however, that there was no genuine issue of material fact that the Government's case was timely filed for two independent reasons. First, Claimants had failed to meet their burden of establishing facts showing that the Government knew or should have known of the

crimes giving rise to forfeiture prior to 2004. Second, in any event, the statute of limitations could not have run on Claimants' continued commission of crimes after 2004.

### 1. Relevant Facts

Following the denial of Claimants' statute-of-limitations related discovery motion, the Government and Claimants each moved for summary judgment on the statute-of-limitations defense. (Dkt. No. 1557, 1562). The Government argued that there was no genuine issue of material fact supporting a statute-of-limitations defense because the record demonstrated that the investigation leading to this action began in 2006 and there was no non-speculative basis to believe the Government could have had notice of the crimes prior to 2004, five years prior to the filing of the Amended Complaint. (Dkt. No. 1563). Moreover, the Government argued that even if it could possibly have learned of such violations prior to 2004, the limitations period began anew with each offense, including management and concealment services that continued right up until the filing of the Complaint. (*Id.*). Claimants opposed and argued for summary judgment in their favor based on prior governmental investigations and prior reporting in the press about Alavi's control by the government of Iran. (Dkt. No. 1558).

On or about May 10, 2017, the District Court granted summary judgment in favor of the Government on two separate grounds. (Alavi JA 2603-23). First, the District Court found that there was no support for the proposition that the Government could or

should have brought the forfeiture action earlier. (Alavi JA 2617-20). Instead, the record showed a few Government investigations that "were not of the offenses that form the basis of the forfeiture complaint," and that, in any event, "went nowhere," and that the prior civil lawsuits brought on the Government's theory were dismissed. (Alavi JA 2619-20). The District Court also found that summary judgment for the Government was independently warranted because Alavi continued to violate the law up until the date of the filing of the Complaint. (Alavi JA 2621-23). Specifically, the District Court found that "Claimants have committed numerous, independent violations and thus the five year limitations period commenced anew with each separate violation." (Alavi JA 2621).

## 2. Applicable Law

### a. Statute of Limitations

A civil forfeiture action must be commenced within five years from the time the Government "discovers or possesses the means to discover the alleged wrong" giving rise to forfeiture. *United States v. Kivanc*, 714 F.3d 782, 789 (4th Cir. 2013); 19 U.S.C. § 1621. "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998). Such suspicions do, however, give rise to a duty to inquire. *Id.*

"When there is a continuing course of conduct with multiple, distinct underlying crimes that independently could support forfeiture of the same property, the limitations period starts afresh with each

new offense." *Kivanc*, 714 F.3d at 790; *see United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 508-09 (7th Cir. 2010) ("When there are multiple, distinct underlying crimes that independently could support forfeiture of the same property, nothing in the plain language of § 1621 bars a court from adjudicating a forfeiture action as long as at least one alleged offense is not time-barred, even if the statute of limitations has run on the remainder of the underlying crimes."). "Thus, a court may adjudicate a forfeiture action as long as one underlying offense is not time-barred, even if the statute of limitations has run on the remaining offenses." *Kivanc*, 714 F.3d at 790.

### b. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "A fact is material . . . when it might affect the outcome of the suit under the governing law. . . . An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks omitted).

In determining whether summary judgment is appropriate, a district court must "construe the evidence in the light most favorable to the nonmoving party,

drawing all inferences in that party's favor." *Id.* "However, the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could *reasonably* find for the [nonmoving party]." *Id.* at 554 (alterations and internal quotation marks omitted). "To defeat summary judgment, therefore, nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts . . . and they may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks omitted). Rather, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (internal quotation marks omitted).

"Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued." *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995). "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'" *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30 (2d Cir. 1993)) (alterations in original). "While whatever evidence *there is* to support an essential element of an affirmative defense will

be construed in a light most favorable to the non-moving defendant, 'there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 323).

This Court reviews a grant of summary judgment *de novo. Republic Nat. Bank of N.Y. v. Delta Air Lines*, 263 F.3d 42, 46 (2d Cir. 2001).

## 3. Discussion

### a. The District Court Properly Found that There Was No Genuine Issue of Fact that the Government Had Not Discovered the Offenses Giving Rise to Forfeiture Prior to 2004

The parties cross-moved for summary judgment with respect to the statute of limitations on April 12, 2017. (Dkt. No. 1557, 1562). Despite failing to seek timely discovery on its statute-of-limitations defense, Claimants had already amassed documents related to prior governmental investigations of Alavi from the extensive production from the investigative case file. Yet, in both their affirmative motion and their opposition to the Government's motion, Claimants failed to put forth any admissible evidence to show that the Government knew or should have known of Alavi's offenses at any time prior to 2004. Indeed, Claimants made this motion after uniformly arguing, in connection with motion practice, discovery, and pretrial proceedings, that there is no evidence that they ever engaged in criminal activity. (Dkt. No. 1664 at 15-16). In

particular, Alavi consistently took the position that it was independent from Iran and that it—a financial partner of Assa's for nearly two decades—had been defrauded by Assa as to Assa's true ownership, and therefore *Alavi* did not know that Assa was an agency of Iran. (Dkt. No. 1434 at 10-15). Accordingly, the District Court correctly granted summary judgment in the Government's favor.

First, it is undisputed that the Government first actually learned about the conduct giving rise to the forfeiture proceedings in connection with the FBI's investigation that began in 2006. Indeed, the evidence used to bring this forfeiture action and to establish the claims at trial was obtained by the Government after 2006 including, primarily: (a) documents and information provided Hesami-Kiche beginning in 2006; (b) documents obtained from search warrants in 2008 and 2009 of a Bank Melli-owned residence, Alavi, and Ebrahimi's home; (c) emails obtained from an account used by Assa representative Tafti; and (d) interviews of relevant individuals such as Alavi presidents Geramian, Badr, and Shafie, and Assa and Bank Melli officers Tafti, Rahi, and Karjooravary, all of whom were first interviewed by the FBI in or after 2006. (*See generally* Dkt. No. 1567). The investigative conclusions that the FBI reached were based on the investigative tools and techniques employed in the investigation from approximately 2006 onward, beginning with interviews and documents provided by Hesami-Kiche and verified and corroborated by further investigative steps. (Supp. Tr. 48). Thus, the record—including testimony at the suppression hearing that was conducted

prior to the District Court's ruling on summary judg-
ment—undisputedly shows that the FBI-NY investi-
gation that uncovered the crimes giving rise to this for-
feiture action was initiated in 2006. (Supp. Tr. 25); *Ly-
ons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012)
("In ruling on a motion for summary judgment, the dis-
trict court may rely on 'any material that would be ad-
missible' at a trial." (quoting *Major League Baseball
Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d
Cir. 2008)). Accordingly, the offenses giving rise to for-
feiture in this action were not known to the Govern-
ment prior to 2004.

Claimants nonetheless argue that the Government
*should have* known about their unlawful conduct—
which both Claimants and Assa had taken extensive
steps to conceal and which Claimants continue to deny
to this day—before 2004, well before the investigation
that led to the filing of the Amended Complaint was
even opened and before any of the evidence developed
through that investigation was available to the Gov-
ernment. In particular, Claimants rely on previous,
unrelated governmental investigations by other agen-
cies under other regulatory regimes, together with a
scattering of news articles, to claim that the Govern-
ment should have investigated and learned earlier
about the conduct on which the forfeiture claims are
based. This argument is baseless. As an initial matter,
although Claimants focus on pre-1995 events to claim
that the Government "should have known" about the
forfeitable offenses (Alavi Br. 43-44), as the District
Court found, it is self-evident that the Government
could not have known of the relevant crimes prior to

1995, because the criminal sanctions only went into effect in that year. (Alavi JA 2619 ("Logically, those prior investigations could not have been directed at discovering evidence of violations of laws that had not even been passed yet.")).

Claimants also rely on instances where the Government acted on information that was either unrelated to the criminal conduct at issue, or failed to uncover any wrongdoing, or both. For instance, Claimants argue that information was provided to the Department of Treasury and the IRS in the 1980's that Alavi "may" have been controlled by Iran, and the FBI had information about Alavi "possibly" partnering with Bank Melli. (Alavi Br. 44). Aside from the fact that this information predated the 1995 sanctions, the suspicion or possibility of a claim does not equate to knowledge or provide a basis that the Government should have known the suspicions were true. *See Kronisch*, 150 F.3d at 121. To the contrary, the fact that the FBI had initiated investigations, but failed to produce evidence of criminality, certainly satisfies any duty to inquire, *see id.*, and is a testament to how effectively, as set forth above, Alavi and Bank Melli hid their criminality through shell companies, straw owners, and lies to the New York Supreme Court and in depositions despite Government efforts at inquiry.

Indeed, in the post-1995 period, when public accusations were leveled against Alavi for its connections to the government of Iran, Alavi strenuously and successfully defended against such claims. Specifically, civil lawsuits that were premised, in part, on the same

types of allegations set forth in the forfeiture complaint, such as the *Gabay* and *Flatow* suits seeking to attach assets in satisfaction of judgment against Iran, were routinely dismissed by district courts for failing to establish Iranian control over Alavi. (Alavi JA 2620). As the District Court observed, "Claimants specifically denied certain facts in those suits now at issue in this forfeiture suit; it makes no sense to charge the Government with a failure to discover the very facts that Claimants were actively denying under oath." (*Id.*).[18]

Claimants also refer to documents indicating the sharing of information among law enforcement in the mid-1990s. (Alavi Br. 44). Claimants, however, fail to quote the very next sentence of the memorandum upon which they rely, which concluded: "Both IRS and OFAC determined that no criminal evidence could be found at that time." (Alavi JA 1503). Alavi then lists other investigative efforts that do not relate to the crimes giving rise to forfeiture, such as OFAC's inquiry into Alavi "acting outside the scope its non-profit charter" (*id.*), and a Senate Finance Committee investigation into charitable organizations that "finance and

---

[18] Putting aside the irony of Claimants suggesting that the Government should previously have discovered a fact they currently deny—namely that they are an instrument of Iran—there is an additional irony in Claimants suggestion that the Government should have discovered that, post-1995, Assa was an agency of Iran when it still maintains that, as a financial partner of Assa, it was unable to discover that fact.

perpetuate violence" (*id.* at 46). As Alavi repeatedly stressed at trial, and as the Government agreed, the claims in this forfeiture action were not about tax fraud, nor financing terrorist organizations. The District Court therefore correctly found that these unrelated, unsuccessful investigations were insufficient to create a triable fact about whether the Government should have learned about the offenses at issue here before 2004. (Alavi JA 2619 ("The uncontested fact that other investigations existed does not provide the support for Alavi's instant motion that they claim. To do so, those investigations needed to have been directed at, or uncovered, the facts that form the basis for the allegations of unlawful conduct at issue in the forfeiture complaint. There is no evidence that they did."); *id.* ("The record indicates a series of investigations that went nowhere. Far from providing facts that enabled the Government to 'discover' the violations alleged herein, the investigations suggested the opposite —that there was no actionable conduct.")).

Claimants' reference to stray press reports that occurred sporadically every five-to-ten years fares no better. Those articles largely reported unrelated conduct, and were based on reported suspicions or unsourced allegations, but not actionable evidence, and on aged information with no specificity and of unknown reliability. For example, under the vague heading "[d]uring the same time period" (Alavi Br. 46), Claimants string together a series of dated, unrelated press reports. (*See, e.g.*, Alavi JA 1339 (1980 article regarding the alleged receipt of $2.4 million by Alavi from Iran), 1426 (1989 article), 1430 (May 1995 article

about Alavi avoiding paying income taxes and employing individuals investigated for smuggling arms and technology to Iran), 1518 (1997 article noting that Alavi officials have been investigated for trying to ship prohibited materials, including "germ warfare toxins" to Iran); 1523 (1999 article about dismissal of *Flatow* lawsuit), 1526 (same)).

To the extent there is any factual overlap between these sporadic and isolated articles and the Government's extensive post-2006 investigation, it is that certain of them suggested that Alavi may have been controlled by the government of Iran (a fact Alavi continues to dispute, but which was nonetheless proven to the jury). (Alavi Br. 45-46). These articles, however, do not set forth anywhere near the level of detail necessary to substantiate the claims, a fact obvious when compared with the voluminous, detailed, and comprehensive evidence gathered from many different witnesses and sources over the course of the painstaking and multi-year investigation that led to the forfeiture claims.

These articles also focus on issues other than those alleged in this case. For example, a 1996 article focuses on allegations regarding Alavi providing material support to Iran, noting, for example, that "Alavi directors have been caught by U.S. government agents in illegal attempts to purchase sophisticated technology for export to Iran [in 1993]," and an attempt "to deliver a lie-detector machine to Iran's Permanent Mission to the United Nations." (Alavi JA 1513-16). Again, not only does this conduct pre-date the 1995 sanctions, but this case was not about such things as the provision of

arms to Iran or electronics to the IMUN. By contrast, there is no mention in these articles of the straw owners who controlled Assa to hide Bank Melli in order to secretly funnel money from real estate in New York to the government of Iran, no mention of the trove of documents maintained at the Bank Melli residence in Queens, no mention of the journals maintained by Ebrahimi, and no mention of the letters from the Ayatollah that instructed Alavi's actions. In other words, this article and the other articles on which Claimants rely contain no mention of the evidentiary facts necessary to support the forfeiture allegations here. Such articles that do not focus on, or provide factual support for, the particular allegations giving rise to forfeiture, are insufficient to impute knowledge to the Government. *See United States v. Premises Known as 318 S. Third St., Minneapolis, Minn., Hennepin Cty.*, 988 F.2d 822, 826 (8th Cir. 1993).

In that regard, the facts here are also easily distinguishable from cases cited by Claimants, where a plaintiff can be put on notice of a claim through detailed and repeated media reporting over a short period of time on detailed and specific facts. *See, e.g., McIntyre v. United States*, 367 F.3d 38, 60 (1st Cir. 2004) (considering accrual of the "strictly construed" Federal Tort Claims Act statute of limitations where over 10 articles in a two-year period had reported on the subject murder and the relationship between the murders and the FBI that would give rise to liability). Indeed, in *McIntyre*, the court found that following the press coverage, "[a] reasonable person in [plaintiff's] situation would have been provoked to inquire further; had she done so, she would have filed a claim earlier."

*Id.* at 60-61. Here, as the failed governmental inquiries demonstrated, due to the complex nature of the unlawful conduct, and Claimants' calculated efforts to deny and disguise it, this is not a situation where press articles could possibly lead to any inference that the unlawful conduct could or should have been discovered at an earlier date.

Accordingly, as the District Court found, neither the unrelated, unsuccessful governmental investigations nor the scattered news articles were sufficient to create a trial issue of fact as to whether "the Government discovered, or should have discovered, the facts giving rise to its claims prior to November 2004." (Alavi JA 2620). A reasonable jury could not have concluded that the disparate collection of miscellany Claimants have cobbled together render claims based on the FBI's investigation untimely. The District Court therefore properly granted summary judgment for the Government based on the lack of any genuine issue of material fact with respect to Claimants' statute-of-limitations defense.

### b. The Forfeiture Action Was Also Timely Because Independent Criminal Violations Giving Rise to Forfeiture Continued After 2004

The Government's forfeiture action was also timely for the independent reason that Claimants continued to commit crimes giving rise to forfeiture after 2004. Claimants do not appear to contest the fact that criminal violations after 2004 could hold the statute of limitations open during that period. They argue, however,

that the forfeiture complaint treats the IEEPA and money laundering violations as a continuing course of conduct, and therefore they must be considered a single crime, with the statute running from the date the course of conduct first commenced. (Alavi Br. 49-50). This is not the law.

The Government is permitted to characterize criminal violations, including money laundering offenses, either as freestanding counts or, where "a relationship between the various offenses can be shown," to charge it within a single count. *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir. 2002), *abrogated in part on other grounds by United States v. Cotton*, 535 U.S. 625 (2002). Crucially, however, the fact that the Government is *permitted* to charge a continuing violation of the money laundering statute does not change the fundamental nature of the crime, i.e., a financial transaction. Instead, charging repeated criminal violations as a continuing course of conduct simply "eliminates the cumbersome and largely pointless need" to charge multiple individual counts of money laundering in cases involving continuing schemes. *Moloney*, 287 F.3d at 241. The decision whether a statute of limitations applies to forfeiture, however, does not turn on how the Government decides to characterize the conduct, but rather, on whether crimes that "independently could support forfeiture" occurred within the limitations period. *Kivanc*, 714 F. 3d at 790. Here, the evidence showed that the particular IEEPA-violating services and money laundering transactions alleged by the Government occurred right up until the filing of the Complaint. (*See, e.g.*, GX15C, 15D, 15I-5M,

207T). Moreover, the Amended Complaint in fact alleged discrete financial transactions that were for the benefit of the government of Iran and that concealed the proceeds of IEEPA offenses and promoted the IEEPA conspiracy. (*See* Am. Compl. ¶¶ 99, 121-122, 125). Accordingly, violations of IEEPA and money laundering that occurred within the limitations period give rise to timely forfeiture claims.

In trying to overcome this straightforward legal application, Alavi relies principally on *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491 (6th Cir. 1998) ("*$515,060.42*"), to argue that the statute of limitations runs from the time a course of conduct is discovered by the Government. (Alavi Br. 47-48). As both the Fourth and Seventh Circuits have recognized, however, in distinguishing that case, *$515,060.42* is unique because the crime giving rise to forfeiture in *$515,060.42* was "the operation of an illegal gambling business," an indivisible, continuing offense. *United States v. Kivanc*, 714 F.3d 782, 790 (4th Cir. 2013); *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 508-09 (7th Cir. 2010) (noting that the offense in *$515,060*.42 was a "single, continuing offense"). The act of illegal gambling is only federally criminalized where it is operated as a "business"; there must be a pattern of sustained activity "similar to a single firm engaged in any other field of commerce." *United States v. Thomas*, 508 F.2d 1200, 1204 (8th Cir. 1975); *see id.* (noting that 18 U.S.C. § 1955 was "designed to bring the federal power to bear only against illegal gambling activities of major proportions"). The statute simply does not target isolated instances of gambling. This is unlike the IEEPA and the money

laundering statutes. IEEPA criminalizes the willful provision of even single or isolated services to the government or Iran. 50 U.S.C. § 1705 ("It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause *a violation* of any license, order, regulation, or prohibition issued under this chapter." (emphasis added)); 31 C.F.R. 560.204 (prohibiting the unlicensed export, sale or supply, "directly or indirectly, from the United States, or by a United States person" to Iran or the government of Iran of "*any . . .* services" (emphasis added)); *United States v. Banki*, 685 F.3d 99, 108 (2d Cir. 2012) ("[T]he execution of money transfers from the United States to Iran on behalf of another, whether or not performed for a fee, constitutes the exportation of a service."). Similarly, 18 U.S.C. § 1956 makes it a crime to conduct "a financial transaction" when the transaction meets certain other statutory requirements. *Moloney*, 287 F.3d at 241.

The facts in this case are similar in material respects to those in *5443 Suffield Terrace*. There, the Seventh Circuit considered the timeliness of a civil forfeiture action against the proceeds of the importation of illegal contraband in violation of the Trading with the Enemy Act, a statute similar to IEEPA. *See* 50 U.S.C. § 4315 (subjecting to criminal liability "[w]hoever shall willfully violate any of the provisions of this chapter or of any license, rule, or regulation issued thereunder."). In ruling on a statute-of-limitations defense to forfeiture there, the Seventh Circuit rejected the claimant's contention that "the 'alleged offense' is the operation of a cigar smuggling business in general, which the government first discovered on April 7,

1996." *5443 Suffield Terrance*, 607 F.3d at 507. Instead, the court found that each illegal importation "was a new 'alleged offense' for purposes of § 1621" and reset the applicable statute of limitations. Accordingly, the court noted that the defendant "forfeited his house not because he operated a cigar smuggling business in general," but because he had smuggled cigars into the country within the limitations period. *Id.* at 508. "Whether the government could or should have discovered after [the initial, untimely smuggling offense but before the subsequent timely smuggling offense], that [the defendant] was using his house to facilitate his smuggling business . . . is quite beside the point." *Id.* Rather, the defendant "put his home at risk of being forfeited anew" with each offense. *Id.* The Seventh Circuit reached this conclusion, despite the fact that the complaint in that case alleged a continuous course of conduct, including both acts that took place inside and outside the limitations period. (Dkt. No. 1607-4). The same analysis applies here, where the Government alleged and proved IEEPA and money laundering violations spanning the period both before and after 2004, and compels the conclusion that the forfeiture complaint was timely based upon new illegal acts continuing well into the limitations period.[19]

---

[19] Alavi's brief inexplicably asserts that the *5443 Suffield Terrace* applied the "same reasoning" as *$515,060.42*, despite the Seventh Circuit's clear statement to the contrary: "*$515,060* is neither binding on this court nor applicable to this case," *5443 Suffield Terrace*, 607 F.3d at 509. (Alavi Br. 53).

In short, Claimants would have this Court hold that even where crimes continue to be committed over a period of years, the Government is forever barred from pursing unequivocally timely cliams where it fails to pursue earlier ones. Such a strained and dangerous interpretation of forfeiture law should not be, and is not, the law. The District Court thus rightly concluded that notwithstanding what the Government knew or should have known prior to 2004, the Government's action was timely based on independent criminal violations up until the filing of the Complaint.

### c. The District Court Correctly Determined that Forfeiture Based on Pre-2004 Conduct Was Appropriate

Finally, Claimants argue that, to the extent the District Court relied on discrete offenses occurring after 2004 to hold open the statute of limitations, the Government should have been limited to forfeiture of IEEPA proceeds generated, and property involved in money laundering, after 2004. (Alavi Br. 53-54). This argument lacks merit.

First, the argument is legally incorrect. This Court has held that criminal forfeiture may be "applied to conduct occurring before enactment of a statutory provision as long as the conduct continued after enactment." *United States v. Kalish*, 626 F.3d 165, 168 (2d Cir. 2010). By the same token, forfeiture in this case can be appropriately applied to earlier conduct that continued in and after 2004. Here, the evidence at trial clearly showed that Alavi had been providing the same management, concealment, and other services to Iran

all the way back to 1995. Accordingly, the forfeiture of interests obtained throughout that entire time period is appropriate.

In any event, the jury's verdict makes clear that forfeiture is appropriate even on the basis solely of post-2004 violations. In addition to constituting criminal proceeds, the jury specifically found that Alavi's interest in the Partnership as well as the Building itself (among other of the Defendant Properties) were property "involved in" money laundering. (Alavi JA 4179). While Alavi focuses on the reduction in the amount of proceeds traceable to the period after 2004 (Alavi Br. 54-55), the jury's finding about what constituted property involved in money laundering was broader. As the District Court properly instructed the jury, property is forfeitable where it has "been used to commit or facilitate a money laundering offense." (Tr. 3428, 3433-34); *see also United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 487 (2d Cir. 1995). Also, as the parties jointly agreed, "even when only a part of the property is involved in money laundering, the law calls for forfeiture of the entire property." (Tr. 3435; Dkt. No. 1695-2 at 76). Here, the Government alleged money laundering violations that were the same types of financial transactions—transactions to conceal and promote continued illegal services to Iran—that occurred repeatedly up until the filing of the Complaint. In particular, the Government relied on repeated transactions whereby "the building generates income and that income is then reinvested into the building to promote the management and the generation of funds for and on behalf of Bank Melli Iran

or the government of Iran, [ ] and that property be-
comes involved in that promotional money laundering
transaction." (Tr. 3140). Moreover, the evidence
showed that the nature of these transactions did not
change between 1995 and 2008. Therefore, having
found the Partnership and the Building to be property
involved in money laundering, it is clear that the jury
at least found that both the Partnership and the Build-
ing were used to facilitate this money laundering pat-
tern, and thus both were subject to forfeiture, in full,
based on, these transactions, including those that fol-
lowed 2004.

Furthermore, as a separate and independent basis
of forfeiture, and as discussed more fully below, the
Claimants also "retained" interests in the Defendant
Properties as a result of their post-2004 crimes. As the
evidence at trial demonstrated, the Claimants' con-
cealment services enabled Alavi to avoid losing its in-
terest in the Partnership to judgment creditors or gov-
ernmental agencies. The need to conceal the govern-
ment of Iran's ownership and control over the proper-
ties and Partnership was no less necessary after 2004
than before. Accordingly, even based solely on post-
2004 IEEPA violations, forfeiture of Alavi's entire in-
terest in the Partnership was appropriate.

In sum, even if the Government's action was only
timely based on post-2004 transactions—which, as the
District Court found, is not the case—the District
Court's forfeiture order was appropriate, based on the
involvement of the Defendant Properties in and/or
their retention by post-2004 criminal transactions.

## POINT II

### The District Court Properly Denied Alavi's Motion to Suppress

Claimants argue that the District Court erred in denying their motion to suppress evidence that was seized from Alavi's offices in the course of a search conducted pursuant to a judicially authorized search warrant. (Alavi Br. 55-76). Because the District Court did not clearly err in any of its factual findings, it correctly determined that (a) the seized materials would inevitably have been discovered, and (b) law enforcement relied in good faith on the judicially authorized warrant. Moreover, inasmuch as the evidence at trial was overwhelming even apart from the seized records, any error in admitting those records would have been harmless.

### A. Relevant Facts

#### 1. The Search and Prior Appeal

On December 17, 2008, the initial Complaint was filed against Assa and Bank Melli's interests in the Building and certain bank account funds that had previously been seized in October 2008, and OFAC simultaneously designated Assa as an SDN because of its ownership and control by Bank Melli. (Alavi JA 2637-39). A protective order was entered by Judge Holwell requiring the preservation of records relating to the Partnership, the Pahlavi Foundation, the Mostazafan Foundation, the Alavi Foundation, Assa, or Bank Melli. (Alavi JA 2639-40; Supp. GX2). That same day, Alavi's then-President, Jahedi, was interviewed by the

FBI and served with a grand jury subpoena for records relating to Assa, Bank Melli, and the Partnership. (Alavi JA 2640-41; Supp. GX3). The following day, December 18, 2008, Jahedi was surveilled discarding torn-up documents relating to Assa and the Partnership in a public trash can near his home. (Alavi JA 2642-43; Supp. GX4, 5).

On December 19, 2008, FBI agents searched Alavi's offices for evidence of IEEPA and money laundering violations pursuant to a warrant that, among other things, was prepared and reviewed within the U.S. Attorney's Office; was based upon an affidavit that incorporated the detailed allegations of the original Complaint; was approved by an experienced United States Magistrate Judge; and was conducted by agents who were either involved in or familiar with the underlying criminal investigation.

On November 12, 2009, the Amended Complaint was filed against the interests of Alavi and the Partnership. (Alavi JA 2665; Supp. GX9). The Amended Complaint referenced some documents obtained in the search of Alavi's offices, but the majority of the lengthy and detailed allegations were based on documents and evidence obtained prior to the search and the filing of the Complaint.[20] (Alavi JA 2666-68).

---

[20] All but eight of the 150 paragraphs of the Amended Complaint relied exclusively on materials obtained independently of the search. Five of those eight paragraphs relate to notes obtained from the search concerning a meeting between Jahedi and the

On appeal, this Court found that the warrant was facially defective because it did not list the crimes for which evidence was sought. *See In re 650 Fifth Ave.*, 830 F.3d at 100. The Court also observed that the warrant failed to "particularize categories of computerized information for which there was probable cause to seize, or the temporal scope of the materials that could be seized." *Id.* Accordingly, the Court remanded to the District Court to determine whether the inevitable discovery exception to suppression was applicable. *See id.* at 102-06. While the Court held that the District Court had not previously made the requisite factual findings to support application of the inevitable discovery exception, the Court observed:

> This is not to say that the Government lacked sufficient evidence to commence a forfeiture action against Alavi and 650 Fifth Ave. Co. before the challenged search. Indeed, based on facts alleged in

––––––––––

Iranian Ambassador. (Alavi JA 332 at ¶¶ 69-74). Prior to the search, the investigation already had developed evidence of Jahedi's meetings with the Ambassador. (Alavi JA 382 at ¶ 77; 2666-67 ("[Former AUSA Levin] confirmed . . . that much of the information discussed in [allegations in the Amended Complaint that referenced seized documents] (for example, a meeting between Jahedi and the Iranian Ambassador to the United Nations) was also contained in documents . . . that the investigative team possessed prior to the search of Alavi's offices.")).

the initial forfeiture complaint and issu-
ance of the December 17, 2008 subpoena,
the Government's investigation may well
have been sufficiently advanced prior to
the December 19, 2008 search to make
both Claimants' addition to the forfeiture
complaint even without the unlawfully
seized evidence and, therefore, their dis-
closure obligations, inevitable.

*Id.* at 105. Accordingly, the Court remanded for fur-
ther factual findings.

In addition, this Court noted that "the Government
argues, with some force, that, whether or not the inev-
itable discovery exception applies, no suppression of
evidence is warranted in this case because the execut-
ing agents relied in good faith on the December 19,
2008 search warrant." *Id.* Because the District Court
had not initially addressed that issue, however, the
Court declined to consider it on appeal.

### 2. The Suppression Hearing and the District Court's Opinion

On remand, the District Court conducted a four-
day suppression hearing during which it heard testi-
mony from eight witnesses and received dozens of ex-
hibits. The Government called four witnesses: three
FBI agents who participated in preparing the warrant
and conducting the search, and a former AUSA who
was the head of the Asset Forfeiture Unit during the
time of the investigation and the initiation of forfeiture
proceedings.

Special Agent in Charge George Ennis from the New York Field Office, the prior case agent for the investigation and the affiant on the search warrant affidavit, testified about the background of the investigation, and how FBI agents and AUSAs——both typically and in connection with this case—work on gathering probable cause for a warrant, drafting the warrant, and presenting the warrant to a judge to authorize the search. (Supp. Tr. 38). FBI Special Agent Nicolet (nee Clark), the search team lead, testified about the manner in which the search was conducted, including how the search team ensured that seized documents fell within the scope of the warrant. (Supp. Tr. 421-22). FBI Special Agent George Alexander, the prior co-case agent, also testified about his involvement in executing the search, including looking for documents that "fell within the rider" to the warrant within Alavi President Jahedi's office. (Supp. Tr. 519-20). Former AUSA Sharon Cohen Levin, who supervised this forfeiture matter at the time of the search and Complaint and through the filing of the Amended Complaint, testified about the timing of the filing of the initial Complaint against Assa's interests and the later filing of the Amended Complaint including Alavi's interests; the Government's plan, formulated prior to the search, to later amend the Complaint to include Alavi's interests; and steps the Government and the FBI took towards executing that plan. (Supp. Tr. 709, 712-13, 715, 735, 750, 760).

Alavi also called four witnesses at the hearing: an employee who was present for part of the search; an expert witness; and two additional AUSAs, one of whom drafted the search warrant, and the second of

whom participated in the forfeiture proceedings. Ha-
nieh Safakamal, an employee of Alavi, testified that
she was present during part of the search and observed
agents take "everything" from Alavi. (Supp. Tr. 297-
302). Retired FBI Special Agent Charlotte Braziel, for-
merly from the Clearwater, Florida Resident Agency
(Supp. Tr. 625), testified about her review of the pro-
tocols employed by the FBI in the Alavi search, includ-
ing her belief that it was preferable to have a statute
cited in a search warrant, though she admittedly exe-
cuted warrants that lacked such a citation. (Supp.
Tr. 686-88). Alavi also called AUSAs Harry Chernoff
and Anna Arreola, who had worked on the Alavi inves-
tigation. (Supp. Tr. 353, 822). The parties stipulated to
the testimony of Patterson Belknap associate Ryan
Nanni concerning his review of five boxes of materials
seized from the search (Supp. GX71), and also to the
documents seized from the search that were later pro-
duced by Alavi in response to discovery requests
(Supp. GX70, 40-48).

On or about May 15, 2017, the District Court de-
nied Alavi's motion, in a careful 80-page opinion.
(Alavi JA 2624-2703). After making detailed findings
of fact (Alavi JA 2628-72), the District Court held that
suppression was not warranted on two independent
grounds: the good-faith exception and the doctrine of
inevitable discovery (Alavi JA 2690-2702). First, the
District Court found that suppression was not war-
ranted because the searching agents "acted in good-
faith reliance on a judicially authorized warrant."
(Alavi JA 2690). Moreover, the District Court found
that, far from conducting a general search, the search-

ing agents took care to limit their search to the contents of the warrant and, in fact, not everything was taken. (Alavi JA 2695). The District Court further concluded that no significant salutary purpose would be served by suppression. (Alavi JA 2697).

The District Court also found that, at the time of the Alavi search, "it was inevitable that the Forfeiture Unit of the U.S. Attorney's Office would seek to forfeit Alavi's interest," that the documents recovered during the search would have been maintained pending that action, and that the Government would have requested them in civil discovery. (Alavi JA 2700-01). Accordingly, the District Court concluded that the documents seized during the search would inevitably have been provided to the Government in civil discovery—as indeed they were. (Alavi JA 2702; Supp. GX40-48).

## B. The District Court Correctly Determined that the Search Evidence Would Inevitably Have Been Discovered

Alavi first argues that the District Court erred in applying the inevitable discovery exception to suppression. (Alavi Br. 55).[21] Alavi faults the District Court for

---

[21] Alavi and the Partnership both appeal the District Court's suppression decision, but the search was of Alavi's offices, not the Partnership's (*see, e.g.*, Supp. GX7 at 6-9; GX82), and only Alavi has standing to contest the search. *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging

failing to conduct a proper analysis of inevitable discovery and for failing to identify particularly how each document would inevitably have been discovered. (*Id.* 55-63). This argument, however, completely overlooks the substantial record developed on remand concerning Alavi's motion to suppress. In assessing the applicability of inevitable discovery, the District Court considered substantial evidence and made detailed findings of facts concerning the state of the Government's investigation prior to the search and what inevitably would have occurred absent the search. Based on those findings, the District Court properly found that the Government would have sought document discovery from Alavi and obtained the production that Alavi in fact ultimately made. These findings were amply supported in the record—indeed, they were uncontradicted—and should be affirmed.

## 1. Applicable Law

"[E]vidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Vilar*, 729 F.3d 62,

—————

evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."). However, because the challenge to the District Court's suppression decision fails on substantive grounds—for both Alavi and the Partnership—this brief will not further address the Partnership's lack of standing.

84 (2d Cir. 2013) (internal quotations omitted). "To show that the inevitable discovery exception to the exclusionary rule applies, the burden is on the Government to 'prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered.'" *In re 650 Fifth Ave.*, 830 F.3d at 102 (quoting *Vilar*, 729 F.3d at 84).

The relevant analysis proceeds in two steps. "First, the court must evaluate 'the progress of the investigation at the time of the government misconduct' to determine whether 'an active and ongoing investigation . . . was in progress at the time of unlawful search.'" *Id.* at 103 (quoting *United States v. Eng*, 971 F.2d 854, 861-62 (2d Cir. 1992) ("*Eng I*")). "At this step, the government must establish that the investigation was not 'triggered or catalyzed by the information unlawfully gained' by the illegal search but, rather, that 'the alternate means of obtaining the [challenged] evidence' was, 'at least to some degree, imminent, if yet unrealized' at the time of the unlawful search." *Id.* (quoting *Eng I*, 971 F.2d at 861). "Second, the 'court must, *for each particular piece of evidence*, specifically analyze and explain how, if at all, discovery of that piece of evidence would have been more likely than not inevitable absent the [unlawful] search.'" *Id.* (quoting *Eng I*, 971 F.2d at 862). Thus, a district court must "'view[ ] affairs as they existed at the instant before the unlawful search,' and mak[e] particularized findings as to 'what *would have happened* had the unlawful search never

occurred.'" *Id.* at 103-04 (quoting *Eng I*, 971 F.2d at 861).

On appeal from a district court's ruling on a motion to suppress evidence, this Court "review[s] legal conclusions *de novo* and findings of fact for clear error." *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015); *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004). Mixed questions of law and fact, including application of the inevitable discovery doctrine, are reviewed *de novo. United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013). This Court "pay[s] special deference to the district court's factual determinations going to witness credibility." *Bershchansky*, 788 F.3d at 108 (internal quotation marks omitted).

## 2. Discussion

The District Court, after an extensive factual hearing and comprehensive pre- and post-hearing briefing, concluded, in a detailed written opinion, that the inevitable discovery exception applied. First, the District Court, "viewing affairs as they existed at the instant before the unlawful search," *In re 650 Fifth Ave.*, 830 F.3d at 103 (internal quotation marks omitted), concluded that the Government's investigation was sufficiently advanced prior to the search that the alternate means of obtaining evidence, i.e., civil discovery, was imminent, if yet unrealized. Thus, "the evidentiary record in this case allow[ed] the Court to conclude with a very high degree of confidence that the challenged evidence would inevitably have been disclosed in the absence of the search." (Alavi JA 2702).

This conclusion was amply supported by the evidentiary record, including testimony from the forfeiture unit supervisor and the case agent. Former AUSA Levin, whom the District Court found "highly credible," became chief of the forfeiture unit in 1996 and had over 15 years of experience as an AUSA at the time the investigation commenced. (Alavi JA 2632). Before any action in this case was brought "she believed there was a basis to seize the . . . Building itself." (*Id.*). Though "there was sufficient evidence at the time of the filing of the complaint to also file a forfeiture action with respect to Alavi," former AUSA Levin decided to split the action "into a second litigation and later 'phase' " for a number of reasons. (Alavi JA 2635-36). First, there was an urgency in commencing the action with respect to Assa's interests, because seizure warrants already had been executed on bank accounts owned by Assa, and there was therefore a deadline to commence forfeiture proceedings. (Alavi JA 2632, 2637). There was also a concern about a potential sale of the Building or interest in the Building. (Supp. Tr. 710). On the other hand, there was an interest in delaying action against Alavi's interests into a separate phase for several reasons: to permit efforts to coordinate with OFAC about a possible designation of Alavi; to permit efforts to coordinate with private judgment creditors, who would be alerted to the availability of potential Terrorism Risk Insurance Act ("TRIA") actions by the filing of the Complaint; to explore the viability of a tax-fraud-based theory of forfeiture in addition to the already-established IEEPA and money laundering bases; and a desire to allow sufficient time to prepare a factually detailed complaint in

light of sensitivities about bringing a forfeiture action against the assets of a purported charitable organization. (Alavi JA 2636; Supp. Tr. 706-13, 747, 815).

In other words, not only was the Government's investigation of Alavi "very active" before the execution of the search, and not catalyzed by it—as demonstrated by, among other things, the grand jury subpoena served on Alavi, the protective order requiring the preservation of records for discovery, and ongoing witness interviews—the Government believed it already had sufficient evidence to bring an action against Alavi's interests based on money laundering and IEEPA violations, but chose to delay for strategic considerations. (Alavi JA 2699-2701). Prior to remand, this Court observed that, "[o]n this record, we cannot confidently conclude that a request for production in the amended forfeiture action was not tainted by the challenged search so as to admit a finding of inevitable discovery." *In re 650 Fifth Ave.*, 830 F.3d at 105. Now, however, after a fully developed record, the District Court had an ample evidentiary basis to conclude— and certainly did not clearly err in finding—that the investigation was "at an advanced stage before the search occurred"; that "prior to the search, a majority of the facts that were later included in the [Amended Complaint] had already been developed"; and that "it was inevitable that the Forfeiture Unit of the U.S. Attorney's Office would seek to forfeit Alavi's interest." (Alavi JA 2699-70); *see In re 650 Fifth Ave.*, 830 F.3d at 105 ("[T]he Government's investigation may well have been sufficiently advanced prior to the December 19, 2008 search to make both Claimants' addition to the forfeiture complaint even without the unlawfully

seized evidence and, therefore, their disclosure obligations, inevitable.").

Thus, the District Court properly concluded that the Government would have pursued forfeiture of Alavi's interests irrespective of the search, and furthermore, that the Government would have requested in discovery the documents from the search. The undisputed evidence at the suppression hearing demonstrated that the Government was aware prior to bringing suit that documents going back over 30 years were held by Alavi at its offices. (Alavi JA 2641). The undisputed evidence shows that events and records dating to Alavi's inception in the 1970s already were within the scope of the investigation, and that the Government obtained a protective order in December 2008 specifically in order to preserve the availability of these documents for later discovery. (Alavi JA 2701; Supp. Tr. 715-16, 748-50; Supp. GX1 at 7-8, Supp. GX7 at 7). Thus, it was inevitable that, once the Government filed its forfeiture action against Alavi's interests, it would have sought discovery and made demands concerning those records. (Alavi JA 2669, 2700). In fact, evidence at the suppression hearing—corroborated by observable practice and common sense—demonstrates that the Government usually seeks discovery of all relevant records from opposing parties in civil forfeiture actions. (*Id.*; Supp. Tr. 734). Moreover, even if Alavi had not been a claimant, the Government would in any event have taken discovery from it as a third party. (Supp. Tr. 749-750). Accordingly, the Government would have sought the seized documents from Alavi irrespective of the search.

Similarly, there is no evidence that the allegations in the Amended Complaint themselves were based on materials obtained in the search. To the contrary, as discussed above, of the few paragraphs in the Amended Complaint (eight out of 150) that reference material obtained in the search, the majority relate to notes of a meeting between Jahedi and the Iranian Ambassador, about which the Government had independent knowledge. (Alavi JA 2666-67). The Government therefore undoubtedly would have sought any notes of such meetings in discovery. In sum, the record demonstrates, with a high degree of certitude, that the Government would have sought comprehensive discovery from Alavi, and obtained the records gathered from its offices during the search. As the District Court found, this is, in fact, exactly what happened. (Alavi JA 2701-02) ("The Court's confidence that the documents would inevitably have been disclosed is also confirmed, as in *Vilar*, by the fact that that is precisely what happened.")).

In the face of this painstakingly detailed record, Alavi's arguments wholly lack merit. First, Alavi argues that the "district court here spent minimal time analyzing the inevitable discovery exception—less than four pages." (Alavi Br. 57). This claim mischaracterizes the substantial record following remand. Consistent with this Court's instructions in the prior appeal, the District Court devoted 20 pages of detailed factual findings—distilling a voluminous record and days of testimony—to assessing "what would have happened had the unlawful search never occurred" and "viewing affairs as they existed at the instant before the unlawful search." (Alavi JA 2628-40, 2665-72,

2699-2702); *In re 650 Fifth Ave.*, 830 F.3d at 103-04. After those exhaustive and careful factual findings, the District Court was able to "relatively easily" conclude that the seized documents inevitably would have been disclosed in the forfeiture action even absent the search. (Alavi JA 2702). This does not reflect a conclusory assertion based on "minimal" analysis (Alavi Br. at 57-58), but rather reflects the overwhelming and essentially uncontradicted factual record.

In addition, contrary to Alavi's arguments, the District Court also followed this Court's instruction to consider the specific documents that inevitably would have been discovered. *In re 650 Fifth Ave.*, 830 F.3d at 75-76. After considering the potential factual contingencies that would have resulted in the documents' inevitable discovery, the District Court found that Alavi would inevitably have produced the documents it in fact produced in response to the Government's discovery requests, and identified those documents specifically. (Alavi JA 2702; Supp. GX40-48). Alavi faults the District Court, however, for not considering evidence Alavi believes was required to support this analysis, for example a draft complaint or contemplated discovery requests. (Alavi Br. 62-63). In making this argument, however, Alavi ignores the evidence the District Court *did* consider and the factual findings it *did* make. As discussed, the District Court specifically found that the Government intended to bring a forfeiture complaint against Alavi before the search, and that the allegations it actually filed in the Amended Complaint were based on information in the Government's possession prior to the search. (Alavi JA 2666-67, 2700). Given the District Court's finding that the

filing and scope of the Amended Complaint were not based on the search, the District Court did not clearly err in determining that the Government's actual document requests in support of the allegations in the Amended Complaint were also not based on the search. That Alavi believes different evidence would have been preferable does not undermine that conclusion.

Furthermore, while the District Court was required to, and did, evaluate the seized evidence, the District Court was not required to formalistically discuss each individual page of evidence. Instead, having concluded that the Government would inevitably have requested the documents it did in fact request, that Alavi did in fact produce the documents pursuant to those requests, and that those documents were the same documents recovered during the search, the District Court "relatively easily" could assess whether the seized documents were the same documents as the produced documents. (Alavi JA 2702); *Vilar*, 729 F.3d at 84 ("[W]e can be confident that this sequence is what would have happened, because it *did* happen."). Nothing more was required. *See, e.g.*, *United States v. Eng*, 997 F.2d 987 (2d Cir. 1993) ("*Eng II*") (affirming inevitable discovery determination based on categories of documents, not document-by-document review). The District Court therefore properly concluded that the Government would have acquired discovery from Alavi, including the seized documents, independent of any search. And because the District Court could easily identify documents that were in fact produced based on the parties' stipulation (Supp. GX70), it could determine with the requisite particularity that specific

documents would have been inevitably discovered.[22] (Alavi JA 2702).

Next, Alavi takes a number of out-of-context state-ments from the record to suggest that the District Court clearly erred in concluding that the Government believed it had enough evidence of criminal activity to proceed against Alavi in December 2008.[23] (Alavi Br. 60 & n.24). When placed in context, however, these statements do not support Alavi's arguments. With re-spect to former AUSA Levin's November 17, 2008 email stating that "we will obtain sufficient probable cause" (Supp. GX23), former AUSA Levin explained that she did not mean that she lacked evidence, but rather that her team had not "marshaled" its evidence to put together a complaint yet, and more importantly, she was "reporting to another office that wanted to join in the on the case" and trying to dissuade them from doing so. (Supp. Tr. 735-36). Likewise, AUSA Harry Chernoff explained that when he wrote about "legal and evidentiary hurdles" in the case, he was referring to "seizures in 25 different districts," which was what the agencies were proposing. (Supp. DX-N; Supp. Tr. 365-66). The District Court—the trier-of-fact with more than (at the time) five years in-depth familiarity with the record in this case—credited this testimony

---

[22] The Government did not use at trial any seized document that was not also produced by Claimants.

[23] Alavi does not acknowledge the inconsistency between this argument and Claimants' argument that the statute of limitations had already run by 2008.

(Alavi A. 2636 n.10), an assessment that merits significant deference on appeal. Similarly, the District Court recognized that the FBI agents working on the case always believed they had sufficient evidence to pursue Assa and Alavi's interests, though the AUSAs were responsible for filing decisions in any civil forfeiture action. (Alavi JA 2633-34, 2636). In short, Alavi's attempts to create ambiguity about the state of the investigation are insufficient to establish that the District Court's findings were clearly erroneous.

For these reasons, the District Court properly found that the materials produced by Alavi would inevitably have been discovered by the Government. Alavi's claim that, despite a four-day hearing, extensive supplemental discovery, the introduction of dozens of exhibits, and multiple rounds of briefing, "the record on this issue was not supplemented at the hearing" is incredible. (Alavi Br. 63). The record was thoroughly developed, and it unambiguously shows that the Government would have obtained Alavi's production in discovery.[24] Accordingly, the District Court correctly determined that the inevitable discovery exception applied.

---

[24] While the District Court's determination that all of the evidence would inevitably have been discovered through civil discovery is amply supported, it is also the case that documents would have been produced pursuant to the grand jury subpoena served on December 17, 2008—which, the District Court found "materially covers the relevant documents seized two

### C. The District Court Correctly Found that the Searching Agents Relied in Good Faith on a Judicially Authorized Warrant

Alavi also argues that the District Court erred in finding that the agents executing the search acted in good-faith reliance on the warrant. (Alavi Br. 64). As the record demonstrates, however, the law enforcement officers who executed the search reasonably relied on a judicially authorized warrant, and did so in an objectively reasonable manner. (Alavi JA 2697). Furthermore, as the District Court found, in the circumstances of this case, the exclusionary rule serves no salutary purpose. The District Court's determinations should be affirmed.

#### 1. Applicable Law

Evidence is generally not subject to suppression where it is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). As this Court has recognized, "most searches conducted pursuant to a warrant would likely fall within [*Leon*'s] protection," *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011), because a law enforcement agent is not "required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested," *United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987) (internal quotation marks omitted). Thus, searches

––––––––––

days later" (Alavi JA 2642)—at least with respect to documents from 1989 forward.

conducted "pursuant to a warrant [are] presumed valid," *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003), and "will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer acted in good faith in conducting the search," *Leon*, 468 U.S. at 922.

There are four exceptions to this rule, namely: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992); *accord United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008). With respect to the fourth circumstance, involving facially deficient warrants, this Court has explained that although "unincorporated, unattached supporting documents"—such as an affidavit in support of a warrant—cannot "cure a constitutionally defective warrant, those documents are still relevant to [the] determination of whether the officers acted in good faith, because they contribute to [the] assessment of the officers' conduct in a particular case." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010). Thus, if the affidavit identifies the crimes investigated and the team conducting the search is "intimately familiar with the contemplated limits of the search" and acts "as though" those limitations are present in the warrant itself, reasonably well-trained agents cannot be charged with knowledge that the search was illegal. *Id.* at 64-66; *see United States v. Romain*, 678 F. App'x

23, 25-26 (2d Cir. 2017) (applying good-faith exception where warrant failed "to cite the relevant criminal statutes or timeframe" but where "the supporting documents . . . detailed the relevant criminal offenses being investigated" and the agents limited their search accordingly).

Furthermore, even when a search is found to be illegal, suppressing evidence is a court's "last resort," not its "first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). The exclusionary rule is also "not an individual right," and instead "applies only where it "result[s] in appreciable deterrence." *Id.* at 141 (internal quotation marks omitted) (quoting *Leon*, 468 U.S. at 909). In order to exclude evidence, a reviewing court must find that the benefits outweigh the costs, taking into account the fact that even a small measure of deterrence may be outweighed by the "substantial social costs." *Id.* "'[T]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application.'" *Id.* (quoting *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65 (1998)). Proponents of exclusion must demonstrate that it will "alter the behavior of individual law enforcement officers or the policies of their departments." *Leon*, 468 U.S. at 918.

In reviewing a district court's determination of good faith, this Court reviews the district court's findings of historical fact for clear error, but analyzes *de novo* the ultimate determination of good faith. *See United States v. Smith*, 9 F.3d 1007, 1011 (2d Cir. 1993).

## 2. Discussion

### a. Agents Reasonably Relied on the Judicially Authorized Warrant

After hearing testimony from numerous witnesses and making detailed findings of fact, the District Court properly concluded that the agents executing the judicially authorized search warrant acted in good-faith reliance on the warrant and that seized evidence should not be suppressed. Alavi argues that this was error, because, it claims, the warrant was "so facially deficient" that the executing agents could not reasonably rely upon it. (Alavi Br. 65 (internal quotation marks omitted)). In pressing this argument, Alavi dismisses all of the District Court's factual findings, viewing them in isolation, as efforts to minimize the constitutional defects in the warrant. To the contrary, the District Court's detailed findings, viewed as whole, focus properly on whether the agents acted reasonably under the circumstances in executing the warrant. The District Court's findings fully support its conclusion that they did.

To begin, Alavi argues that the District Court never analyzed whether the executing agents could reasonably have relied on a facially invalid warrant. (Alavi Br. 65). This argument, however, conflates "facially invalid" (which the warrant was), with "so facially deficient," *Leon*, 468 U.S. at 923, as to preclude reasonable reliance. As Alavi would have it, any facially deficient warrant could not reasonably be relied upon. As this Court has made clear, however, that is not the case. *See In re 650 Fifth Ave.*, 830 F.3d at 106 (observing,

after finding the warrant facially invalid that "[o]n appeal, the Government argues, with some force, that . . . the executing agents relied in good faith on the December 19, 2008 search warrant"); *Rosa*, 626 F.3d at 66 ("Not every facially deficient warrant, however, will be so defective that an officer will lack a reasonable basis for relying upon it."). On remand, the District Court carefully analyzed the factual circumstances of this investigation and search, and concluded that those circumstances—which did not cure the warrant's deficiencies—nonetheless established that the agents' reliance on the judicially authorized warrant was objectively reasonable.

In advancing this argument, Alavi complains that the District Court's assessment of the relevance in this case of broad categories of documents constitutes an effort to relitigate this Court's finding that the warrant was invalid. (Alavi Br. 65). For example, Alavi wrongly contends that the District Court ignored this Court's observations that the warrant was invalid, in part because it did not include a temporal limitation. *See In re 650 Fifth Ave.* 830 F.3d at 100. Rather, the District Court found that, because law enforcement reasonably understood that documents dating back to the 1970s would be probative of whether a crime had occurred, it would be reasonable to rely on a warrant that did not have a temporal limitation. (Alavi JA 2652-53). Indeed, when an investigation encompasses facts that go back to the founding of an organization, it is legitimate to seek records relating back to that time. *See United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010) ("The complexity and duration of the alleged criminal activities render

a time frame less significant than in a case that re-
quired a search for a small set of discrete items related
to one or only a few dates."). This Court has also rec-
ognized that the breadth of a warrant may be commen-
surate with the scope of the underlying investigation.
*See United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir.
2017) ("[T]he volume of records properly subject to sei-
zure because of their evidentiary value may be vast.");
*see also United States v. Wuagneux*, 683 F.2d 1343,
1349 (11th Cir. 1982)). This case involved evidence of
the government of Iran's formation and control of
Alavi since the 1970s, Alavi's relationship with Bank
Melli since the 1970s, the formation of Assa for the sole
purpose of concealing Bank Melli's partnership with
Alavi, the operation of corporate entities in the United
States as fronts for Iranian government agencies for
decades, and the concealment of these facts from gov-
ernment officials and private entities alike. (Alavi
JA 2652-53; Supp. GX1). Both the case agent and the
supervising AUSA testified that the history between
Bank Melli and Alavi was highly relevant evidence
about the nature to their continuing relationship.
(Supp. Tr. 78-79, 798-99). Likewise, Special Agent Ni-
colet, who worked with the case agent and had "in-
creased knowledge" about the investigation, under-
stood that the warrant called for records from prior to
the date the sanctions regime was adopted in 1995.
(Supp. Tr. 413-17). Indeed, evidence of the formation
and operation of Alavi in the 1970s and 1980s, evi-
dence of its mortgage payment and other financial his-
tory from the 1970s and 1980s, and communications
among Alavi, Bank Melli, and the government of Iran
in the 1970s and 1980s were introduced at trial and

were clearly relevant to the claims at issue. Accordingly, it was objectively reasonable for the agents executing the warrant to rely on the warrant notwithstanding the absence of a temporal limitation.

With respect to the categories of documents identified in the warrant—in particular, categories of documents relating to Assa, Bank Melli, and the Partnership and their financial transactions—as the District Court explained, agents, who were familiar with the scope of this investigation and the types of records relevant to it, could reasonably have relied on a warrant specifying such broad categories. (Alavi JA 2696-97). Given the complexity and scope of the investigation, it was reasonable for agents to rely on a broad warrant, *see Ulbricht*, 858 F.3d at 100, even if the breadth, combined with other characteristics, ultimately rendered the warrant invalid. The evidence adduced at the suppression hearing showed that the well-trained agents executing the search understood this principle. Special Agent Nicolet testified that searches for financial records "can often be voluminous" and in fact she expected the Alavi search to yield a lot of documents. (Supp. Tr. 417-18). Likewise, Alavi's proposed expert explained that legitimate search warrants, including ones she executed around the time of the Alavi search, may target "pretty much all the records that [a] company has during [a] time period." (Supp. Tr. 678-79). Thus, the record demonstrated that reasonable agents in the FBI would and did routinely rely on warrants that included broad categories of records, where the scope of the investigation and the nature of the underlying offenses justified that breadth. (Supp. Tr. 84, 416, 676-79). Accordingly, the District Court properly

found that the fact that a warrant calls for a broad collection of documents does not make it is so facially deficient as to render the agents' reliance on the warrant unreasonable.[25]

Alavi also suggests that the District Court incorrectly took the warrant's supporting affidavit into account in considering the good-faith reliance of the executing agents. (Alavi Br. 66-67). Contrary to Alavi's assertions, however, the District Court did not treat the "failure to incorporate the affidavit as a procedural blemish." (Alavi Br. 66). The District Court squarely recognized that "the Second Circuit found that the warrant underlying the December 18, 2008 search was constitutionally defective." (Alavi JA 2688). Nevertheless, the District Court properly considered the content of the affidavit as part of its analysis of whether law enforcement acted in an objectively reasonable manner under the circumstances. (Alavi JA 2697 ("[T]he preparation for and execution of the search itself demonstrate that the agents acted in an objectively reasonable manner.")). The District Court also properly considered, as part of the good-faith analysis, whether the agents' understanding of the facts—based on their familiarity with the investigation—reasonably informed their view of the search. (Alavi JA 2692-94). Here, the record demonstrates that the searching

---

[25] This Court also found the warrant's description of electronic records overbroad. *See In re 650 Fifth Ave.*, 830 F.3d at 100. No seized electronic records were introduced at trial, and Alavi does not direct its suppression efforts at any seized electronic records.

agents were in fact familiar with the investigation. The search team leader, Special Agent Nicolet, understood, based on her participation in the investigation, that the search was undertaken to find evidence of IEEPA and money laundering violations, despite the omission of those statutes from the warrant. (Supp. Tr. 410). More broadly, the search was conducted by a team of agents from the same or related squads, most of whom were quite familiar with the nature of the investigation. (Alavi JA 2655). Furthermore, the case agent who swore out the affidavit prepared an "ops plan" for the search and provided an "ops briefing" for the search team, which included a "review of the search warrant as well as an explanation of the evidence that the team will be looking for at the location." (Alavi JA 2656). Thus, the search was not akin to a general search, but was instead rooted in the agents' good faith understanding of what the investigation entailed and what the warrant authorized.

In sum, as the District Court found, this was not a warrant that was so facially deficient—for example, by omitting the location to be searched or the items to be seized, *see Leon*, 468 U.S. at 899—that it lacked the basic details necessary to guide the search. To the contrary, in the context of this investigation, the deficiencies in the warrant were not so glaring as to preclude good-faith reliance. As the District Court observed, the Government's efforts to prepare for the search, limit the search as it was occurring, and ensure that seized documents were within the scope of the warrant, demonstrate that good-faith reliance. (Alavi JA 2694 ("The team reviewed the warrant and made sure that they all understood what they would be searching for.

Far from being prepared to conduct an exploratory, general search, the team was prepared to specifically execute the warrant."), 2695 ("[Special Agent] Clark (Nicolet) ensured that she canvassed the premises, answering questions as needed regarding the scope of the search. The fact that she was asked questions regarding responsiveness corroborates that selections were being made.")); *see Romain*, 678 F. App'x at 25-26.

This Court's decision in *Rosa* supports the District Court's conclusions, notwithstanding Alavi's efforts to distinguish it from this case. (Alavi Br. 67-74). In *Rosa*, this Court held that agents relied in good faith upon a judicially issued warrant even where the warrant itself was facially invalid for lack of particularity. *Rosa*, 626 F.3d at 64-65. Alavi wrongly asserts that *Rosa* "demonstrates the extraordinary circumstances that are needed" to find that agents reasonably relied on a facially deficient warrant. (Alavi Br. 67). The Court in *Rosa*, however, certainly never characterized the circumstances justifying the good-faith reliance exception as "extraordinary"; to the contrary, the court recognized that "exclusion has always been our last resort, not our first impulse." *Rosa*, 626 F.3d at 64. Thus, *Rosa* did not establish some sort of minimum requirements for the good-faith doctrine to apply, and this Court has not treated it that way in subsequent decisions. *See, e.g.*, *Romain*, 678 F. App'x at 24-26s

Alavi next appears to argue that one of the factors supporting a finding of good faith in *Rosa* was that the search in that case "occurred before this Court had clearly established that unincorporated affidavit cannot cure insufficiently particularized warrants." (Alavi

Br. 70). This argument, in fact, supports application of the good-faith exception here. As Alavi observes, *Rosa* itself is the case that made that requirement clear. (*Id.*). The search in this case, however, occurred nearly two years before *Rosa* was decided. This Court's holding in October 2010 cannot be imputed to a reasonable agent executing a search in December 2008.

Alavi's third and fourth arguments concerning *Rosa* ignore the factual record in this case. Alavi suggests that *Rosa* requires exigent circumstances and that none were present here. (Alavi Br. 70-71). *Rosa*, however, does not establish an exigent-circumstances requirement. *See, e.g.*, *Romain*, 678 F. App'x at 25-26. In any event, there were exigent circumstances here, which support the application of the good-faith doctrine. Though it is true that the FBI had already decided to obtain a search warrant prior to learning of Jahedi's destruction of documents, the District Court rightly found that once the Government learned of the document destruction there was some exigency—even if less than the type at issue in *Rosa*—and properly considered that as a factor that further supports a finding of good faith. (Alavi JA 2644-45 & n.14; Supp. Tr. 249-50, 516-17). Indeed, it defies reason for Alavi to argue that the willful destruction of documents by Alavi's president in response to receiving a grand jury subpoena did not accelerate concerns about executing the warrant as promptly as reasonably possible.

Alavi also attempts to distinguish *Rosa* based on the fact that the affiant here did not lead the search. (Alavi Br. 72-73). Though having the affiant lead the search may help establish good faith, that is certainly

not *required*. Especially here, where the affiant was unavailable to lead the search because he was attending to the arrest of Jahedi for destroying evidence, but nonetheless helped to prepare the search team by participating in the ops plan and briefing. (Alavi JA 2656). Furthermore, the record shows, and the District Court was entitled to find, that most of the search team had assisted the affiant in the investigation and were familiar with the nature of the investigation and the purpose of the search. (Alavi JA 2655-56, 2660, 2692; Supp. Tr. 414).

Alavi's final argument about the breadth of the search in *Rosa* fares no better. While this Court in *Rosa* noted that agents did not seize evidence unrelated to the crimes, 626 F.3d at 65, the nature of the investigation and the offense investigated in *Rosa*, are starkly different from the investigation and offenses in his case. *Rosa* involved a child pornography investigation. Here, the complex nature of investigation—a complicated sanctions-violation and money-laundering investigation spanning decades of events and involving, among other things, corporate entities, shell companies, international transactions, a Manhattan Midtown office tower, and clandestine activities by a foreign government—warranted an expectation that voluminous records would be relevant and responsive to the warrant. Indeed, the search team leader, Special Agent Nicolet, testified that large volumes of records are the norm in complex financial investigations. (Supp. Tr. 417). Former Special Agent Braziel likewise recounted seizing over 700 boxes during a healthcare fraud search that were subsequently reviewed in over

160 sessions over approximately a two-year period. (Supp. Tr. 680-81).

Ultimately, despite the pains Alavi has taken to distinguish it, *Rosa* supports the District Court's analysis here. After a multi-day hearing involving numerous witnesses, the District Court carefully explained why, in the circumstances presented here, based on the nature of the investigation, and based on the experience, expertise and conduct of the agents, law enforcement acted reasonably in good-faith reliance on the judicially authorized warrant. That assessment should be affirmed.

### b. The District Court Properly Found that the Government Had Not Engaged in Deliberate Conduct that Justified Suppression

The District Court also correctly found that, because law enforcement acted in an objectively reasonable manner, and that the circumstances indicate that any deficiencies were the result of mere oversight, suppression was not an appropriate remedy. (Alavi JA 2690, 2698-99); *see Romain*, 678 F. App'x at 25-26 (holding that even in 2013, law enforcement's failure to insert the statute or time frame into a warrant was not "sufficiently deliberate that exclusion can meaningfully deter [such a failure], and sufficiently culpable that such deterrence is worth the price paid by the justice system") (internal quotation marks omitted) (quoting *Herring*, 555 U.S. at 144). The record established that the warrant was reviewed by AUSAs, supervisors, and signed by a United States Magistrate Judge.

(Supp. Tr. 392; Supp. GX7; Supp. DX-AB). The affidavit itself, which included the requisite particularity as to the relevant crimes being investigated, was drafted by an AUSA and sworn to by the case agent with intimate knowledge of the investigation. *See Rosa*, 626 F.3d at 64 ("[U]nincorporated, unattached supporting documents . . . are still relevant to our determination of whether the officers acted in good faith, because they contribute to our assessment of the officers' conduct in a particular case."); *Leon*, 468 U.S. at 923 n.24 ("It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination."). The case agent, who, for legitimate logistical reasons, was unable to participate in the search, debriefed the search team, including reviewing the warrant and explaining the nature of the evidence the team would be looking to seize. The search team included agents with knowledge about the investigation, including the supervisory special agent in charge of the executing agents' squad. (Supp. Tr. 100). The Court would be hard pressed to ask for anything further of diligent agents seeking to conduct a search.

Alavi's only argument to the contrary is that deterrence can be achieved here because the warrant was drafted through typical and routine procedures (a decade ago) by highly experienced prosecutors and agents. (Alavi Br. 74-75). But, reviewing that evidence, the District Court concluded the deficiencies in the warrant "by all accounts" was "an oversight." (Alavi JA 2697). Indeed, it is one that occurred in a specific

circumstance where the case agent and attorneys were simultaneously preparing a criminal complaint against Jahedi, thus "requir[ing] quick work by the Government's attorneys on multiple fronts." (Alavi JA 2644-45). While Alavi may wish to use the exclusionary rule to punish any oversight by experienced prosecutors and agents, that is simply not the law. To the contrary, "[t]he extent to which the exclusionary rule is justified by . . . deterrence principles varies with the culpability of the law enforcement conduct. *Rosa*, 626 F.3d at 64 (internal quotation marks omitted). Accordingly, suppression is warranted only where "police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* (internal quotation marks omitted) (alteration in original); *see Davis v. United States*, 564 U.S. 229 (2011) ("[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrent value of suppression is diminished, and exclusion cannot 'pay its way.'" (quoting *Leon*, 468 U.S. at 907 n. 6)). Here, the District Court specifically found that there was no "intentional misconduct or deliberate action to violate the law." (Alavi JA 2690). Accordingly, as the District Court found, suppression is not appropriate in this case.

## D. Any Error Was Harmless

### 1. Applicable Law

This Court also "review[s] the erroneous admission of evidence obtained in violation of a defendant's constitutional right for harmless error, affirming the judgment if [it] 'conclude[s] beyond a reasonable doubt that a rational jury would have rendered a verdict of guilty absent the alleged error.'" *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015) (quoting *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001)). Thus, even if a court erroneously admits evidence at trial, a reviewing court will affirm where the "admission of the evidence was harmless error." *United States v. Lasanta*, 978 F.2d 1300, 1306 (2d Cir. 1992), *abrogated on other grounds by Florida v. White*, 526 U.S. 559 (1999).

### 2. Discussion

Even assuming the District Court improperly admitted evidence obtained from an unlawful search, any such error was clearly harmless in the context of the overwhelming independent evidence presented at trial.

While evidence from the search was admitted at trial, only a minority of these documents were not duplicative of other trial evidence. Indeed, the significant documentary records that accompanied the testimony of most of the Government's witnesses came from other sources. For example, many of the documents introduced through Hesami-Kiche were records that he had provided to the Government. (*See, e.g.*, GX213,

214, 601-06, 612, 617, 621, 623-26, 628, 629, 631-33, 633B, 635-647, 649-52). Similarly, many of the records shown to Bank Melli employees Rahi and Karjooravary came from Bank Melli. (*See, e.g.*, GX141-52, 154-154J, 161, 163-66, 191, 206, 241, 242, 408, 425, 445, 714, 1207, 1211, 1221; *see generally* GX82). Most of the evidence introduced through law enforcement agents came from statements by Badr, Tafti, and Ahmadi. (*See, e.g.*, Tr. 353-80, 395-99, 506-16, 529-35, 1352-56). Similarly, the seized documents had no bearing on other devastating evidence including Ebrahimi's journals (GX500-05); Tafti's emails (GX68); Hesami-Kiche's recordings (GX5008, 5014, 5015); and the Fifth Amendment invocations of Alavi board members. The most notable exception was Jahedi's notes— found in his office—that captured his interactions with the Iranian Ambassador, and were admitted into evidence. (Tr. 2641, GX207-T). Nevertheless, the jury had ample other evidence of the fact that Alavi board members took direction from the Iranian Ambassador, and of Jahedi's complicity in the criminal conduct, namely that he had obstructed justice and destroyed documents pertinent to the relationship between Assa and Alavi.

Faced with all of this evidence, any reasonable jury would have found that the Government had met its burden of demonstrating, by a preponderance of the evidence, that IEEPA and money laundering violations had been committed and could give rise to forfeiture. For this reason, any error in not suppressing the evidence, was harmless.

## POINT III

### The District Court Properly Admitted Evidence that Members of Alavi's Board of Directors Invoked the Fifth Amendment

Claimants next fault the District Court for its handling of Alavi's board members' invocations of their Fifth Amendment rights against self-incrimination. (Alavi Br. 76). The District Court acted well within its discretion in admitting the evidence and permitting the jury to draw an adverse inference against Claimants. Furthermore, the District Court did not abuse its substantial discretion in declining to reopen discovery post-remand to allow for the uncertain possibility that two former directors might withdraw their previous invocations and testify at depositions. In addition, because Alavi sought, and was permitted, to present arguments to the jury about alternative explanations for the invocations—i.e., that the witnesses were frightened by the Government into asserting their Fifth Amendment rights despite the supposed innocence of their withheld testimony—the District Court also did not abuse its discretion in permitting the depositions to be played at trial to allow the jury to assess the invoking witnesses' demeanors.

The Claimants' arguments should therefore be rejected.

### A.  Relevant Facts

In 2013, the Government and other parties noticed the depositions of numerous Alavi board members.

Two former Alavi directors provided deposition testimony. Hesami-Kiche, the former Bonyad Mostazafan officer, provided testimony about the Bonyad's supervision of Alavi's affairs during his tenure in the 1980s that was consistent with his trial testimony. (SUF ¶¶ 15-17). Mirakhor, a board member from approximately 1991 to 2005, was deposed by Alavi. Mirakhor, portions of whose deposition were played at trial, testified that he personally was not aware of Assa's ownership or control by Bank Melli. (Mirakhor Tr. 84). However, Mirakhor also repeatedly emphasized that he did not pay much attention to Alavi during his tenure at Alavi (Mirakhor Tr. 41, 57, 58, 70, 103, 203, 218), and admitted that "toward the late '90s," he was under the impression that Assa was owned by a branch of Bank Melli in London and that he discussed resolving the "situation" concerning Assa with Dr. Azizi, a London-based Bank Melli executive. (Mirakhor Tr. 84-85; *see also* GX34, GX146).

Every other member of Alavi's board invoked the Fifth Amendment in response to every question posed to them about Alavi, Assa, Bank Melli, and the government of Iran. (GX3014, 3200, 3202, 3204, 3208). These included Geramian, Alavi's president from 1991 until 2007 who attended the 1992 meetings with Bank Melli officials in Tehran (GX3204); Geramian's successor, Jahedi, who attended meetings at the IMUN Ambassador's residence, received instructions from the Ambassador concerning Alavi, and destroyed Assa-related documents (GX3207); Ebrahimi, Alavi's corporate secretary and a board member from approximately 1991 through 2013 who took notes of board meetings, in-

cluding the IMUN Ambassador's instructions and concerns about Assa and Bank Melli (GX3200); Ahmadi, a member of Alavi's board from approximately 1980 until 2013 (GX3206); Ali Dabiran, a board member from approximately 2005 until 2013; and Hassani, a board member from approximately 2005 until 2013, who was recorded speaking with Hesami-Kiche in 2008 about Mazaheri's role in the attempted buyout of Assa and the difficulty of making payments to Iran do so (GX3202).

Shortly before their noticed depositions, Alavi replaced its entire then-sitting board: Dabiran, Ebrahimi, Ahmadi, and Hassani. (Dkt. No. 520, 523; GX3021). No explanation was given for this wholesale replacement of the board, but it appeared to represent an effort to avoid the witnesses' refusals to testify giving rise to an adverse inference against Alavi. (*See, e.g.*, Dkt. No. 523).

Both before and after the case was remanded, the District Court carefully considered, both orally and in written opinions, numerous applications by Alavi to preclude or limit the admission of these invocations at trial. Under well-established legal principles, the District Court admitted those invocations for the purpose of permitting the jury to draw a negative inference against Alavi. In so doing, the District Court both cabined the scope of the Government's presentation of the invocations and provided appropriate instructions to the jury to eliminate any undue prejudice arising from the introduction of the invocations.

## B. Applicable Law

### 1. Fifth Amendment Invocations During Discovery

A district court has wide latitude over discovery and does not abuse its discretion for refusing to reopen discovery absent "good cause." *Gray*, 927 F.2d at 74.

"A defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 577 (1st Cir. 1989). "Thus, a decision to assert the privilege during pre-trial depositions may be valid grounds for precluding a defendant from testifying at trial." *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 431 (E.D.N.Y. 1995) (collecting cases). Put simply, "when one party invokes the Fifth Amendment during discovery, but on the eve of trial changes his mind and decides to waive the privilege . . . the adverse party—having conducted discovery and prepared the case without the benefit of knowing the content of the privileged matter—would be placed at a disadvantage. The opportunity to combat the newly available testimony might no longer exist, a new investigation could be required, and orderly trial preparation could be disrupted. In such circumstances, the belated waiver of the privilege could be unfair." *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994); *accord SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987).

As this Court has held, while district courts "should seek out those ways that further the goal of permitting

as much testimony as possible to be presented in the civil litigation, despite the assertion of the privilege . . . [i]f it appears that a litigant has sought to use the Fifth Amendment to abuse or obstruct the discovery process, trial courts, to prevent prejudice to opposing parties, may adopt remedial procedures or impose sanctions." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 84–85 (2d Cir. 1995). In particular, "if the litigant's request to waive comes only at the 'eleventh hour' and appears to be part of a manipulative, 'cat-and-mouse approach' to the litigation, a trial court may be fully entitled, for example, to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege." *Id.* at 85. Thus, "[i]n the end, exactly how a trial court should respond to a request to withdraw the privilege—or indeed, more generally, how it should react to any motion precipitated by a litigant's assertion of the Fifth Amendment in a civil proceeding—necessarily depends on the precise facts and circumstances of each case," and will only be reviewed for abuse of discretion. *Id.*

"[E]ven if the district court errs in admitting or excluding evidence, harmless error analysis applies in determining whether reversal is required." *United States v. Yousef*, 327 F.3d 56, 156 (2d Cir. 2003).

## 2. Adverse Inferences in Civil Actions

Witnesses' invocation of the Fifth Amendment are "admissible and competent evidence" in a civil proceeding. *Brink's Inc. v. City of New York*, 717 F.2d 700,

710 (2d Cir. 1983). The finder of fact may draw an adverse inference against the invoking party, including against a party whose former employees refuse to testify. *Id.*; *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *United States v. Ianniello*, 824 F.2d 203, 208 (2d Cir. 1987) ("[T]he court permissibly drew a negative inference from the refusal of any of the defendants to answer questions."). For example, "ex-employees' refusals to testify [may] appropriately be conceptualized 'as vicarious admissions of their former employer.'" *LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) (quoting *Brink's Inc.*, 717 F.2d at 710).

This Court has laid out four factors to guide the district court's determination of whether the admission of a nonparty's Fifth Amendment invocation should be admitted: (a) the nature of the relevant relationships; (b) the degree of control of the party over the non-party witness; (c) the compatibility of the interests of the party and the non-party witness; and (d) the role of the non-party witness in the litigation." *See LiButti*, 107 F.3d at 123-23. "[T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Id.*

### 3. Rule 403

In assessing the admissibility of Fifth Amendment invocations, the district court must also conduct a Rule 403 analysis. *Brink's Inc.*, 717 F.2d at 710.

Under Federal Rule of Evidence 403, the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. In conducting a Rule 403 analysis, "the trial judge must weigh the probative value of the evidence against its tendency to create unfair prejudice and his determination will rarely be disturbed on appeal." *United States v. Robinson*, 560 F.2d 507, 514 (2d Cir. 1977); *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012) ("The standard of review applicable to [a] Rule 401/403 challenge is highly deferential."). "Broad discretion must be accorded to the trial judge in such matters for the reason that he is in a superior position to evaluate the impact of the evidence, since he sees the witnesses, defendant, jurors, and counsel, and their mannerisms and reactions." *Robinson*, 560 F.2d at 514. Accordingly, when this Court reviews a district court's findings under Rule 403, it "generally maximize[s] its probative value and minimize[s] its prejudicial effect." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) (internal quotations omitted); *United States v. Schaffer*, 851 F.3d 166, 182 (2d Cir. 2017).

This Court has recognized that evidence of a witness's invocation of the Fifth Amendment is probative and not unfairly prejudicial: "the evidence is not prejudicial in the sense of being inflammatory, [rather] it is prejudicial in the sense of giving support to a party's

position, i.e., it is 'damning.'" *Brink's Inc.*, 717 F.2d at 710 (citation omitted). Moreover, any risk of unfair prejudice can be "properly minimized" with a limiting instruction. *Id.* It is an "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

## C. Discussion

### 1. The District Court Correctly Declined to Permit Alavi Board Members to Uninvoke Following the Close of Discovery

The District Court did not abuse its discretion in refusing to permit Claimants to introduce testimony of Hassani or Dabiran, two Alavi board members who had refused to testify in 2013, but who, according to Claimants' counsel, may have been willing to testify and be re-deposed. Given their invocation of the Fifth Amendment in 2013, the District Court properly declined to reopen discovery prior to trial.

Following remand, the District Court consistently held that discovery had been closed and was not subject to being reopened wholesale. (Alavi JA 1158-59). Instead, with the limited exception for discovery that was pertinent to Alavi's suppression motion, discovery remained closed, as it had been on the eve of trial when summary judgment was granted. Accordingly, when Alavi first advised the parties, less than three months before trial, that Hassani and Dabiran might be willing to testify (Dkt. No. 1620-1), the District Court did not abuse its discretion in declining to let them do so. Having comprehensively invoked their Fifth Amendment privileges in 2013, the Government was deprived

of any discovery regarding their potential testimony. In these circumstances, it was appropriate to preclude their trial testimony, and permit (but not require) the jury to draw a negative inference concerning the withheld testimony. The District Court was thus under no obligation to bow to Alavi's requests to reopen discovery upon their belief that some witnesses might, years later and on the eve of trial, sit for depositions. The District's Court ability and discretion to set firm deadlines for the orderly administration of litigation, especially a lengthy and complex one such as this, should not be disturbed. (Alavi JA 2713 ("Discovery closed in this case long ago. Following the return of this case from the Second Circuit, the Court allowed a very limited reopening of discovery. The parties did not raise depositions of these two witnesses with the Court at that time. Claimants cannot now seek what is really a unilateral reopening of fact discovery by arguing that the Government could have taken the witnesses' depositions over the past two months.")).

Claimants' argument that they were prejudiced by the District Court's refusal to reopen discovery should also be denied as speculative. The record does not actually show that Hassani or Dabiran were in fact willing to testify. This representation came from Claimants alone. (Dkt. No. 1620-1). Hassan and Dabiran's counsel never confirmed this supposed willingness to waive their Fifth Amendment privileges to the Government or the District Court. Accordingly, there is no basis in the record to conclude that Hassani and Dabiran would actually have waived their Fifth Amendment rights and testified. Nor, as discussed below, is there any basis to conclude that their testimony

would have been favorable to Alavi. Indeed, the fact that Hassani and Dabiran *did* invoke their Fifth Amendment privileges in 2013 indicates that they were unlikely to waive in 2017, and that their testimony likely would not have been favorable to Alavi.

Claimants are also wrong to suggest that when the possibility of Hassani or Dabiran testifying or being deposed was raised, the Government "had ample opportunity to depose these witnesses." (Alavi Br. 78). To the contrary, from March until the trial in June of 2017, the Government, along with all other parties, devoted significant resources to the many other ongoing pre-trial aspects of this case that were handled on an expeditious timeline, including the suppression motion, with its accompanying voluminous additional discovery, four-day hearing, and pre- and post-briefing; the parties' cross motions for summary judgment on the statute of limitations; over 20 pretrial motions *in limine*; deposing Claimants' substitute expert witness, J. Duross O'Bryan; the preparation of the joint pretrial order, including voir dire, jury instructions, and other trial documents; obtaining and reviewing Farsi translations; and preparing for the testimony of dozens of witnesses and the introduction of hundreds of exhibits at trial. (Alavi JA 2714 (recounting ways in which the parties had relied on discovery being closed subsequent to remand)). Put simply, there were compelling reasons why the parties and the District Court should not have been forced to deal with new fact discovery in the immediate run up to trial and following the close of discovery. The District Court did not abuse its discretion in holding the line.

Finally, even if the District Court improperly declined to let Hassani and Dabiran uninvoke, any such error was harmless. Hassani and Dabiran were the most junior and uninvolved Alavi board members, by far. Their names hardly arose during the course of trial. It was never suggested, by contrast, that board members who actually held leadership offices, had been on the board for more than a few years prior to 2008, and who participated in meetings with Iranian officials would have asked to uninvoke. This includes Alavi president Jahedi, who destroyed documents in response to a grand jury subpoena, former President Geramian, who attended high-level meetings with Bank Melli in 1992, Ahmadi, who had been on the board for nearly 30 years and whose name appears on correspondence with the Ayatollah, and Ebrahimi, who documented that "Bank Melli = conspiracy" in his journals as recently as 2004. By contrast, Hassani and Dabiran never led the board, did not participate in meetings with Iranian officials and only joined in or about 2005. (DX587).

The record also does not show that Hassani and Dabiran would have testified favorably to Claimants if they had testified. With respect to Hassani, for example, the record showed his knowledge of Assa's control by Bank Melli. In a recorded conversation in 2008, Hassani participated actively in a discussion about Alavi's desire to buy Assa's partnership interest. Hassani's statements show his knowledge that U.S. sanctions made Alavi's ability to transfer the purchase funds very difficult (reflecting knowledge that Assa was owned by a sanctioned Iranian bank), and his

knowledge that a high-level Iranian government offi-
cial—Thamasb Mazaheri, the former Deputy Prime
Minister of Iran and former head of the Bonyad Mo-
stazafan, and, at the time of the recording, the Iranian
Minister of Finance—was intervening to help with the
payment mechanism (further corroborating Hassani's
knowledge that an Iranian bank was the proposed
seller). (GX5008-T at 2-3; Tr. 1862-68, 1872-75). These
discussions about the effect of sanctions on transfer-
ring large sums of U.S. dollars to Bank Melli are the
same that Bank Melli itself expressed in response to
the Hanif Partnership's purchase offer. (GX34). Claim-
ants take a single line out of context from this conver-
sation to suggest otherwise (Alavi Br. 79), but the full
context makes clear that Hassani had criminal
knowledge. Thus, the only evidence in the record re-
garding Hassani's knowledge shows his clear aware-
ness of Bank Melli's ownership and control of Assa and
the need to evade U.S. sanctions in order for Alavi to
buy that interest. Nor is there any evidence that
Dabiran's testimony would have been favorable to
Claimants. Indeed, there is hardly any evidence re-
garding him at all, including from Claimants' wit-
nesses, and his Fifth Amendment invocation was not
offered into evidence.

Thus, there is no indication that Hassani or
Dabiran would have, or could have, contradicted the
voluminous testimony and documents admitted at
trial overwhelmingly demonstrating Alavi's knowing
partnership with Bank Melli through Assa or Alavi's
supervision and control by the government of Iran.
The absence of Hassani's and Dabiran's testimony
therefore did not meaningfully prejudice Claimants'

case, and certainly could have had no effect on the trial in light of the overwhelming evidence against Claimants.

In sum, the District Court properly declined to let Hassani or Dabiran testify at trial after invoking their Fifth Amendment privileges during the discovery period.

## 2. The District Court Properly Admitted Alavi's Board Members' Fifth Amendment Invocations

Claimants next argue that the District Court should have excluded evidence of Alavi's former board members' Fifth Amendment invocations at trial. (Alavi Br. 80). This argument goes against clearly established law, distorts the factual record, and ignores the District Court's careful consideration of the issue and its assessment of relevant legal principles, including its balancing of probative value and potential prejudice under Rule 403. The District Court acted well within its substantial discretion in admitting the evidence, and Claimants' arguments should be rejected.

Prior to, and during trial, the parties disputed the admissibility of the Fifth Amendment invocations. (*See, e.g.*, Dkt. No. 1616, 1619, 1718, 1719, 1720). The District Court took up the propriety of these admissions in numerous oral colloquies and in written decisions. (*See, e.g.*, Alavi JA 2715-18, 2766-78, 3895-3908, 3976-81; Tr. 19-34, 1005-12, 1472-78). Notwithstanding the careful analysis that went into the admission of this evidence, Claimants argue that that the District

Court abused its discretion in admitting the invocations and erred in every prong of the analysis. In doing so, Claimants effectively ask this Court to engage in the rare act of overruling a District Court's Rule 403 analysis without the benefit of being present at a lengthy trial. This Court should decline that invitation.

### a.    The Evidence Was Highly Probative

Claimants first attack the District Court's evidentiary determinations by arguing that the Fifth Amendment invocations lacked probative value, because, they claim, the usual inference that the withheld information would have been unfavorable to Claimants did not apply. Claimants advance two primary reasons: First, Claimants argue that there is evidence in the record suggesting that they did not commit a crime. (Alavi Br. 81, 88). Second, Claimants argue that the invocations were unreliable because they were the culmination of Government scare tactics and coercion by both FBI agents and individual prosecutors in 2013 and 2017. (Alavi Br. 81-86). Neither of Claimants' arguments has any merit.

Claimants first argue that other evidence offered at trial demonstrated that they were unaware that Bank Melli continued to own Assa, and that the Fifth Amendment invocations had no probative value (and also were unduly prejudicial). This argument fails, however, because it is not supported by the facts, and, at most, goes to the weight of the evidence, not whether the evidence "has *any* tendency to make a fact [of consequence] more or less probable." Fed. R. Evid.

401 (emphasis added).[26] For example, while Claimants rely on their well-worn arguments that some letters between 2004 and 2006 suggest that Alavi was unsure of Assa's true owner, the letters can also (more persuasively) be read to show that Alavi lied to its lawyers, always knew who owned Assa, and that Alavi engaged in a paper-trail cover-up. Accordingly, while Claimants were free to argue to the jury the inferences to draw from those letters, as was the Government, they do not render the Fifth Amendment invocations irrelevant. Indeed, the very fact that Jahedi (one of the witnesses who invoked) destroyed documents (evidence that was also before the jury) further supports the conclusion that the other witnesses' invocation was probative of the inference that the withheld information would have been unfavorable to Claimants. Accordingly, the District Court did not abuse its discretion in concluding that the evidence was relevant. Furthermore, the District Court's limiting instruction that the jury could decide to draw an adverse inference from the invocations based on "all the facts and circumstances in the case as you find them" (*see, e.g.*, Tr. 2648), was correct, and permitted the jury to consider Claimants' contrary arguments.

Claimants also attempt to undermine the probative value of the invocations based on the conduct of agents and prosecutors handling the case. (Alavi Br. 81-85). As the District Court recognized, however, Alavi, in

---

[26] This argument also ignores the relevance of the invocations to *Alavi*'s control by the government of Iran.

making these arguments, "cherry pick[ed] comments taken out of context from emails" and misconstrued the factual record in order to build its false narrative of bullying and coercion. (Alavi JA 2716). With respect to the FBI emails, these were exchanged internally approximately five years before the invocations took place and reflect, at most, a permissibly aggressive investigation and confidence in the evidence of Alavi's guilt. As the District Court noted, moreover, "it is neither unusual nor nefarious for FBI agents and others working on an investigation to develop views about the investigation and to state such views candidly in emails between themselves." (*Id.*). For example, when agents wrote that they would not listen to "denials," it simply meant that they had confidence in their evidence and were looking to aggressively pursue the crime. This interpretation, and similar other commonsense explanations of internal communications, was also borne out in detail at the suppression hearing. (*See, e.g.*, Supp. Tr. 568-70 (explaining that the intention was never to "threaten" witnesses and that it is "standard practice" to inform subjects "that they may face criminal prosecution")). The fact that agents took such a tone in emails among themselves also has no bearing on witnesses' decisions to invoke five years later.[27] There is also no evidence that the agents actu-

---

[27] The fact that one agent sent a single email containing a crass joke about Hezbollah also does not bear on the probative value of the Fifth Amendment invocations of Alavi board members in 2013. There is no

ally conducted themselves in an aggressive or threating manner. To the contrary, Claimants had ample opportunity to examine witnesses at trial about their interactions with agents, and the testimony was uniformly complimentary: the agents were described as "very objective" and "very respectful[ ]." (Tr. 922-23).

Nor was there any misconduct by the prosecutors handling this case. Claimants take issue with prosecutors providing witnesses' counsel with the Government's view on potential criminal exposure and potential criminal statutes of limitations (Alavi Br. 83-84), but there is nothing coercive about such discussions. As an initial matter, Claimants cannot claim those views were false—the Government's views were honestly held and grounded firmly in both the readily provable facts and the applicable law. As the District Court found, based on years of litigation and extensive testimony before and during trial, "[i]t is absolutely clear that for a number of years, Claimants were the subject of several serious criminal investigations." (Alavi JA 2768). Nor is it in any way improper or even unusual for a prosecutor to discuss with an individual's counsel the Government's views regarding potential criminal exposure. Doing so promotes fairness by assisting an attorney in providing legal advice to his

––––––––––––

evidence that this or any other FBI agent was demeaning or threatening toward any witness, or that the Alavi board members' invocation of their Fifth Amendment privileges years later and on the advice of highly qualified criminal counsel, was anything but considered and independent.

or her client. In some circumstances prosecutors may even be ethically obligated to inform individuals directly of potential criminal exposure. (Dkt. No. 1720 (citing American Bar Association, *Criminal Justice Standards for the Prosecution Function*, Standard 3-3.4(g) (4th ed.))). Accordingly, there was nothing untoward about 2013 conversations where prosecutors advised the invoking witnesses' lawyers about potential criminal exposure. These competent and experienced lawyers—including Frank Wohl, Esq., Joshua Dratel, Esq., Barry Burke, Esq., and Douglas Jensen, Esq.—were more than capable of giving their clients dispassionate and unbiased legal advice about the best course of action to undertake.

Claimants also argue that the Government's cancelling of certain depositions suggests that it was interested only in privilege invocations and not testimony. (Alavi Br. 95). The fact that a few depositions were cancelled, however, is unremarkable in the least. Both sides cancelled depositions at times. Moreover, with respect to the only two potential deponents cited by Alavi—Hanieh Safakamal and Ali Aliabadi—neither was an Alavi board member or significant witness. (Tr. 2744-45, 2773). Safakamal in fact testified at trial, despite not having been deposed. And in any event, Claimants were free to take their depositions, or any others they believed to be important or helpful.

Claimants' attempt to ascribe impropriety to communications with individuals' counsel in 2017 fares no better. As an initial matter, communications in 2017 cannot possibly have affected witnesses' decision to in-

voke in 2013. Moreover, as discussed above, the District Court was well within its discretion to decline to reopen discovery in 2017. Thus, nothing the Government did or could do at that point could possibly affect the probative nature of the 2013 invocations by Hassani or Dabiran, the only board members who Claimants claim may have been willing to uninvoke.

Nor were any 2017 communications coercive. Claimants claim that the Government had "no interest" in deposing Hassani or Dabiran, and point to the fact that the Government "went directly" to the witnesses' lawyer. (Alavi Br. at 84).[28] This argument is bizarre. Claimants' counsel did not represent the individuals, and the Government was not required to employ Claimants as a go-between for represented witnesses. And discussions with the individuals' counsel were appropriate to ascertain whether they would in fact be willing to waive their Fifth Amendment privileges and potentially arrange for depositions. Nor was there anything improper about the content of those discussions with counsel. For the same reasons discussed above, it was appropriate for counsel to know the Government's views, grounded in readily provable facts and applicable law, concerning their clients' ongoing potential criminal exposure. Finally, the fact

---

[28] It is certainly true that, in light of the District Court's ruling precluding Hassani and Dabiran's trial testimony, the Government had no interest in their pretrial depositions. Had the District Court permitted their trial testimony, however, the Government may well have requested permission to depose them.

that a Government attorney left a voicemail to one of these lawyers—after the trial concluded and nearly four years after the invocation itself—simply cannot bear the burden that Claimants attempt to assign it. The content of the voicemail may reflect an injudicious expression of vindication immediately following a lengthy and hotly contested trial. It should not be taken, however, to distort the hard work and good faith of each and every FBI agent and prosecutor who built and prosecuted this case.

In sum, contrary to Claimants' assertions, Alavi board members invoked their Fifth Amendment rights years after they had interacted directly with any Government personnel and while represented by some of the most able and esteemed members of the defense bar. They did so in the face of a bona fide criminal investigation and readily apparent potential criminal exposure. Their calm and relaxed demeanor in invoking their rights was recorded and displayed to the jury. Accordingly, the jury was properly permitted to hear their testimony and draw an adverse inference from it, if they believed it was appropriate to do so.

### b.  The Evidence Was Not Unfairly Prejudicial

Claimants also argue that the presentation of the invocation evidence was unfairly prejudicial. In particular, Claimants argue that the Government should have been required to offer the evidence by stipulation, and not by video. (Alavi Br. 89-90). Claimants also fault the District Court for permitting the Government

to present to the jury certain of the deposition questions that the witnesses declined to answer. (Alavi Br. 87-89). Neither of these features of the Government's presentation, however, constituted unfair prejudice that "substantially outweighed" the highly probative value of the invocation evidence.

First, the District Court did not abuse its discretion in allowing the Government to offer videos of the depositions rather than require stipulations. The recordings were brief—just a few minutes each in the context of a five-week trial—and the majority of the questions included on the videos were related to introductions and the witnesses' understanding of what was taking place, and confirming that they were invoking the Fifth Amendment. (*See, e,g.*, GX3208). Especially in light of Claimants' arguments that the witnesses' invocations were coerced, the jury was entitled to evaluate that argument by observing the witnesses' demeanor. *See Small v. New York*, No. 12 Civ. 01236 (WMS) (JJM), 2015 WL 1405375, at *2 (W.D.N.Y. Mar. 26, 2015) ("A video deposition, unlike a typed transcript, allows a trial jury to consider the demeanor of a witness while testifying . . . . [I]t is a superior method of conveying to the fact finder the full message of the witness in a manner that assists the fact finder in assessing credibility."). The fact that the District Court allowed the jury to take this into account, while also providing, as discussed below, ample opportunity for the Claimants to attempt to demonstrate "how the witnesses were treated by the FBI and the prosecutors" (Alavi Br. 90), was not an abuse of discretion.

Claimants argue, however, without citation to any authority, that the witnesses' demeanor in the depositions sheds no light on whether they were coerced into invoking. (Alavi Br. 90). That, of course, is a relevance argument, not a prejudice argument. And while it was certainly permissible for Claimants to argue that features of the deposition could cause the witnesses to appear calm despite having been coerced by the Government, it does not, as Claimants baldly assert, render their demeanors irrelevant. The District Court carefully considered Claimants' arguments and determined that, in light of their intent to argue that the Fifth Amendment invocations were obtained by scare tactics and coercion, the videos were relevant to rebut that argument and admissible under Rule 403; accordingly, the District Court did not mandate that the parties enter into a stipulation. (Alavi JA, 2773-74, 3901). This assessment was not abuse of the District Court's discretion.[29]

Furthermore, the District Court did not abuse its discretion in permitting the Government to read a limited number of questions to which the witnesses had invoked their Fifth Amendment rights. As an initial matter, had the witnesses been called to testify in court—a practice this Court has sanctioned, *see*

---

[29] Another alternative method of offering the evidence was through live testimony. Videos, however, rather than live testimony, were utilized precisely to maximize efficiency and avoid the creation of any spectacle at trial. (Dkt. No. 1718 at 2-3).

*Brink's Inc.*, 717 F.2d at 710—the jury would necessarily have heard the questions to which the witnesses invoked. It cannot be unfairly prejudicial to provide the same context for video depositions. More fundamentally, the videos were offered to permit the jury to draw an adverse inference that the answers to questions would be unfavorable to Claimants. Such an adverse inference—and the scope of any such inference—would be impossible to draw, however, without any knowledge of the questions asked. This is particularly true given that Fifth Amendments rights can only validly be asserted on a question-by-question basis. *See Sterling Nat'l. Bank v. A-1 Hotels Int'l, Inc.*, No. 00 Civ. 7352 (Lynch, J.), 2004 WL 1418201, at *2 (S.D.N.Y. June 23, 2004) (noting that courts do not recognize a "blanket" assertion of the privilege, but rather it is considered on a "on a document-by-document or question-by-question basis"). Here, the number of questions read to the jury was limited to five for each of the invoking witnesses (of the dozens and in some cases hundreds of questions to which the witnesses had actually invoked the privilege). Before each deposition was played, Claimants were given an opportunity to ensure that each featured question had a proper foundation and to lodge any objections. (*See, e.g.*, Tr. 1007-08). In addition, the District Court instructed the jury that, as in every case, attorney's questions are not evidence. (Tr. 3381). There was nothing improper about this presentation.

Indeed, this method of presenting the evidence worked to reduce Rule 403 concerns, namely unfair prejudice, undue delay, and the presentation of cumulative evidence. The introduction of a limited set of

questions for each witness shortened the presentation and minimized the potential prejudice of this evidence at trial. In this manner, the Government introduced video of five invocations at trial, each lasting no more than a few minutes. (Tr. 1020 (Geramian), 1454 (Ebrahimi), 1699 (Ahmadi), 2277 (Hassani), 2648 (Jahedi)). Each of these videos was also accompanied by a limiting instruction by the District Court explaining, among other things, that the "Fifth Amendment of the United States affords every person the right to decline to answer any question if he believes that the answer may tend to incriminate him"; that in "civil cases such as this one you are permitted, but are not required, to draw the inference that the withheld information would have been unfavorable to claimants"; and that any such inference, "as with any inference you draw in this case, should be based upon all the facts and circumstances in the case as you find them." (*Id.*).[30] In these circumstances, the District did not

---

[30] Claimants' argument about their proposed jury instruction is incomprehensible, as Claimants in fact received the instructions they requested. (Alavi Br. 88). As noted, the District Court instructed the jury that the Government's questions were not evidence. Furthermore, as Claimants requested, the jury was instructed that any adverse inference should be based on all the facts and circumstances in the case. Alavi's reference to "selective waiver," both at trial and in their brief (*id.*), is equally incomprehensible. Selective waiver applies where a witness begins to provide "incriminating" evidence—something Alavi claims the

abuse its discretion in admitting the evidence or permitting the manner of presentation.

In sum, as this Court held in *Brink's Inc.*, the admission of Fifth Amendment invocations is "prejudicial in the sense that it gives support" to the Government's case. 717 F.2d at 710. It "is not prejudicial in the sense of being inflammatory." *Id.* The District Court carefully weighed the probative and prejudicial value of the evidence before trial and properly found that it was probative evidence of Claimants' commission of the offenses giving rise to forfeiture. The evidence was admitted in a way that minimized prejudice and avoided calling live witnesses to the courtroom. Claimants' arguments should therefore be rejected.

### c.    Any Error Was Harmless

Although the District Court did not abuse its discretion in admitting the fact that Alavi's entire board of directors refused to testify, any such error was harmless. "The following factors are relevant in determining whether an evidentiary ruling is harmless: (1) whether the evidence bore on the most important issues in the case; (2) whether the evidence was simply cumulative or corroborative; (3) whether the evidence was used in summation; and (4) whether the appellee's

––––––––––

invoking witnesses would not have done. (Dkt. No. 1829).

case was particularly strong." *Abascal v. Fleckenstein*, 820 F.3d 561, 567 (2d Cir. 2016).[31]

Here, while the evidence did relate to an important matter in the case, and was discussed, though not emphasized, in summation (Tr. 3044, 3050-52, 3126), these factors are greatly outweighed by the second and fourth factors. The invocation evidence was cumulative, corroborated, and the Government's case was particularly strong. For each invoking witness there was strong independent evidence of his knowing participation in the offenses giving rise to forfeiture. Ebrahimi kept journals where he documented a conspiracy with Bank Melli (GX503-T), and proposed false answers to deposition questions (GX501-T). Geramian was told of Bank Melli's ownership of Assa by president Badr and had attended meetings with high-level Bank Melli officials about Assa. (Tr. 1356; GX206-T). He later warned the other Alavi board members about the dangers of an outsider buying Assa's interest (GX232-T, 233-T), and admitted, in a recorded 2008 conversation, that he believed Bank Melli continued to own Assa

---

[31] Claimants incorrectly argue, citing to *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 170 (2d Cir. 2017), that these four factors are used to assess whether privilege invocations were properly admitted in the first instance. (Alavi Br. 91). To the contrary, as is clear from the nature of the factors themselves, as well as the case cited by *Woods* to articulate the factors, they are used to assess whether any error in admitting such evidence was harmless, which it would be here. *See Abascal*, 820 F.3d at 567.

through straw owners (GX5015-T ("My assumption was that they had an independent organization. That is, even if the Bank Melli owned it, it had split it and had established a Committee.")). Ahmadi was on the board for decades and had been prepared to resign his position at Alavi at the Ayatollah's direction (GX601-T), and admitted to FBI agents that the board took certain actions on the instructions of the Iranian Ambassador (Tr. 515-16). Jahedi took instruction from the Iranian ambassador and destroyed Assa-related documents. (GX207-T, 504-T). And even Hassani, who had only been on the board for approximately three years by the time the initial Complaint was filed, understood that Assa was owned by Bank Melli and that it was illegal for Alavi to transfer the money to buy Assa. (GX5008-T). In other words, their Fifth Amendment invocations were strongly aligned with independent evidence.

Similarly, the Government's case was strong. First, even Alavi admits that it knew who owned Assa prior to 1995. Alavi's arguments that it believed that two overseas strangers took control of a multi-hundred million dollar asset—all while having no input into its management—is both facially implausible and inconsistent with the evidence. Moreover, as the jury was instructed, even if Alavi was unsure of this fact, the undisputed, continuing knowledge of its partner Assa of its Iranian ownership could be imputed to it. (Tr. 3419-23). More importantly, however, the post-1995 evidence continued to be overwhelming, including journals that confessed to the crime, Alavi board meetings with the IMUN ambassador at which Assa issues were discussed, the Hanif settlement that was

directed by Ambassador Zarif, Jahedi's destruction of documents, and more. Even the evidence relied upon by Claimants tends to show guilty knowledge after 1995. For instance, former board member Mirakhor admitted that he knew that Bank Melli owned Assa continuing into the late 1990s. (Mirakhor Tr. at 86-87 (admitting that he "heard from other people" that a UK bank owned by Bank Melli owned Assa); 191 (reluctantly admitting knowing that "there was an indirect relationship" between Bank Melli and Assa)). Accordingly, even if the Fifth Amendment invocations should not have been admitted, the error was harmless.

### 3. The District Court Allowed Claimants to Introduce Evidence to Explain the Fifth Amendment Invocations

Claimants also contend that the District Court erred in refusing to permit them to introduce evidence from FBI agents and the invoking witnesses' attorneys that would have placed the witnesses' Fifth Amendment invocations "in context." (Alavi Br. 93). The District Court, however, permitted Claimants to offer evidence from which it could argue that an adverse inference from the invocations was not appropriate. The District Court did not abuse its discretion in limiting that evidence to that which was relevant and permissible under Rules 401 and 403.

Claimants were given significant latitude at trial to press their narrative of a bullying and coercive Government investigation at all phases of the trial, including reading many of their cherry-picked emails into

the record. (*See, e.g.*, Tr. 114-16 (opening statement), 267-69 (cross-examination of Detective Esposito), 565-73 (cross-examination of Agent Ennis, including content of internal FBI emails relating to interview techniques and the ability to ask witnesses questions confrontationally), 1418-20 (cross-examination of Agent McWilliams), 3292-95 (summation describing FBI agents' supposedly aggressive and confrontational techniques), 3299-3300 (same)). Accordingly, contrary to Claimants' assertion that "[t]he District Court largely precluded that evidence because of its erroneous belief that the jury should determine whether coercion occurred only by assessing the demeanor of the invoking witnesses" (Alavi Br. 94), Claimants were permitted to elicit and present evidence to support their defense. From that evidence they were able to present and argue their story that the invoking witnesses were coerced.

While Claimants were permitted to offer such evidence, the District Court properly limited the evidence to that which was relevant and not unduly prejudicial or confusing. The District Court determined that it would not permit "Claimants to make the Government's investigation the centerpiece of this trial," as "[s]uch evidence is either irrelevant under Rule 401, or would be precluded . . . under Rule 403." (Alavi JA 2775). Thus, the District Court precluded purely internal FBI communications, testimony from non-testifying individuals' counsel (selective testimony unaccompanied by any waiver of attorney-client privilege), and evidence offered to suggest that the criminal investigation was not serious or that the witnesses did not face real criminal exposure. (Alavi JA 2775-77).

Among other things, the District Court found that, to the extent relevant, such evidence created a substantial risk of confusing and misleading the jury. (Alavi JA 2775-2776).

These limitations were plainly correct and certainly did not constitute an abuse of the District Court's discretion. Internal FBI emails from 2008, for example, are not probative of whether witnesses decided to invoke the Fifth Amendment in 2013. (Alavi Br. 83, 93). Similarly, communications by attorneys in 2017 are not probative of individuals' motivations four years earlier. (Alavi Br. 94). They also, as the District Court noted, posed a danger of taking the jury away from the matters at issue in this case and requiring the Government to introduce additional rebuttal evidence about the bona fides of the criminal investigation. (Alavi JA 2775 ("This case will not devolve into a mini-trial on the Government's investigation style.")).

Accordingly, after carefully considering the arguments and factual proffers of the parties, the District Court struck a proper balance in allowing Claimants to introduce evidence to rebut the adverse inference and precluding other evidence under Rules 401 and 403. Nothing about that considered decision constitutes an abuse of discretion. And because Claimants were able to adduce sufficient evidence to support its defense, any error in precluding other, similar evidence would necessarily be harmless. Accordingly, Claimants' argument should be rejected.

### 4. There Is No Basis to Exclude the Fifth Amendment Invocations Based on Alleged Prosecutorial Misconduct

Rehashing the same arguments, Claimants next separately argue that the Fifth Amendment invocations should have been excluded due to Government misconduct. (Alavi Br. 95-96). This argument is improper for several reasons. As an initial matter, Claimants never sought to exclude the evidence as a "sanction" for prosecutorial misconduct in the District Court—a claim, as Claimants' recognize, that involves a distinct analysis from Claimants' other bases for exclusion. (*Compare* Alavi Br. 95 (citing *Namet v. United States*, 373 U.S. 179 (1963) & *Rado v. Connecticut*, 607 F.2d 572, 581 (2d Cir. 1979) *with* Dkt. No. 1617 at 2-9). This Court should therefore decline to review this unpreserved claim. *See Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004).

Second, there is no legal basis for Alavi's position. Both of the cases Claimants cite stand for the proposition that the Government, in a *criminal* prosecution, cannot make "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Namet*, 373 U.S. at 186; *see also Rado*, 607 F.2d at 581. This case, however, is not a criminal case. *See Brink's Inc.*, 717 F.2d at 709 ("Previous decisions of this court lend logical support to different treatment of claims of privilege in criminal and

civil cases.").[32] The invocations here occurred as part of civil discovery, and their use at trial is governed squarely by *Brink's Inc.* and *LiButti*, as set forth above. This alone should dispose of Alavi's arguments.

More fundamentally, even if this Court were to consider the Claimants' argument, the near unanimous Fifth Amendment invocations by Alavi's board members was not fairly traceable to any misconduct by the Government. These witnesses had all been party to an illegal arrangement to provide services to the government of Iran for decades, with some—for example, Geramian and Ahmadi—having personally attended meetings with Iranian and Bank Melli officials about this arrangement. There is also no serious question that the Government had a lengthy and serious criminal investigation into them concerning this conduct. (Alavi JA 2629-31, 2699). Accordingly, it is not surprising that under these circumstances, they invoked their Fifth Amendment rights and refused to testify.

Claimants' efforts to show governmental misconduct also fall flat. For all of the reason set forth above, there is no basis to conclude that the Government attempted to coerce witnesses into invoking, let alone engaged in any misconduct.

---

[32] This, of course, is a relevant distinction for numerous reasons, including the implications of witnesses' invocations for a criminal defendant's constitutional right to confront the witnesses against him.

In sum, the Fifth Amendment invocations were not the result of any Governmental interference or misconduct. They were, to the contrary, the natural and predictable reactions of the members of an organization that had been in over a decade-long illegal partnership with the government of Iran. No sanction was appropriate.

## POINT IV

### The Jury Properly Found that Alavi's Entire Interest in the Partnership Was Retained as a Result of Criminal IEEPA Violations

Claimants next argue that the District Court erroneously permitted the Government to forfeit properties that Claimants retained through criminal IEEPA violations. (Alavi Br. 96). In making this argument, Claimants principally renew arguments, made to the District Court following trial, that there was insufficient evidence to allow this theory of forfeiture to be presented to the jury. Relatedly, Claimants argue that the District Court erred in presenting a short recitation of undisputed, relevant facts to the jury. Neither argument has any merit.

### A. Relevant Facts

Following trial, the District Court denied Alavi and the Partnership's motions for a new trial pursuant to Federal Rules of Civil Procedure 50 and 59, and its motion to reduce the forfeiture amount. (Alavi JA 4190). Among other things, Alavi argued that its interest in the Partnership was not retained as a result of IEEPA violations. (Alavi JA 4195). The District Court rejected

this argument, finding abundant evidence that the IEEPA violations were the "primary way in which long-term and multi-layered concealment was accomplished." (Alavi JA 4197). Without that concealment, Alavi would have lost its property to a wave of lawsuits "to satisfy various judgments far in excess of their value long ago." (*Id.*; *see also* Tr. 2630; GX1122). Indeed, Alavi board members and Assa directors themselves routinely recognized that revealing the Iranian interest in the Building would result in sure loss of the Building. (*See, e.g.*, GX505-T, GX151-T, GX605-T).

Claimants also argued that there was insufficient evidence of the Defendant Properties' involvement in money laundering. (Alavi JA 4195-96). The District Court rejected this argument as well, finding abundant evidence that "income from the Building was used to sustain its operations and for improvements—in short, it was laundered" through the Building. (Alavi JA 4197-98). In other words, income generated from IEEPA violations (i.e., managing the Building and concealing Iran's interest) was routinely used to fund the Partnership and the Building, and these transactions were designed both to conceal and to promote the whole criminal nature of the enterprise, and thus were "concealed and laundered." (Alavi JA 4198).

## B. Applicable Law

Under Federal Rule of Civil Procedure 50, judgment as a matter of law is warranted against a party on a particular issue where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

"The standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed. R. Civ. P. 56 [and a] court must deny a motion for judgment as a matter of law unless, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached." *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015) (internal quotations omitted). "That standard places a 'particularly heavy' burden on the movant where, as here, 'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant." *Id.* (quoting *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)). "In such circumstances, a court may set aside the verdict only 'if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it.'" *Morse*, 804 F.3d at 546 (quoting *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).

Under 18 U.S.C. § 981, "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" IEEPA "is subject to forfeiture to the United States." 18 U.S.C. § 981(a)(1)(C), 1956(c)(7)(D). The statute thus contains a "broad definition of 'proceeds'" including "property of *any kind* obtained directly or indirectly." *United States v. Seabrook*, 661 F. App'x 84, 86 (2d Cir. 2016) (quoting 18

U.S.C. 981(a)(2)(A)). Proceeds are not limited to property that a defendant initially obtains as a result of the crime, but also includes property that a party "retains" or "maintains" as a result of the offense. *United States v. Torres*, 703 F.3d 194, 200 (2d Cir. 2012); *see also United States v. Grant,* No. 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 (S.D.N.Y. Sept. 25, 2008) ("Proceeds are property that a person would not have but for the criminal offense."). This is a direct result of the broad nature of forfeiture and statutory language that "evinces an intent to reach all manner of property in the defendant's possession and fairly considered as derived from the crime of conviction." *Torres*, 703 F.3d at 199. "Stated otherwise, so long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense." *Id.*

This Court reviews a district court's ruling on a motion for judgment as a matter of law *de novo*, "applying the same standard as the district court." *Morse*, 804 F.3d at 546.

## C. Discussion

The Government argued and proved that Claimants retained and maintained property as a result of their criminal violations. Alavi's criminal violations included providing management and concealment services to the government of Iran—namely, lying and hiding the fact that its partner in the Partnership and the Building was Bank Melli, and hiding Alavi's own

control by the government of Iran. These actions enabled Alavi to continue in that Partnership. Indeed, retaining and maintaining its property interests in the Partnership and the Building were the primary motivation for many of Alavi's actions and lies both before and after 1995 and a constant worry of both partners.

## 1. The Evidence Demonstrated that Claimants Retained the Defendant Property Through Criminal Acts

The evidence at trial was sufficient for the jury to find that Alavi's interest in the Partnership was retained and maintained as a result of its concealment services for the government of Iran.[33] As an initial

---

[33] The jury verdict made clear that the IEEPA-based forfeiture of the various real properties was based solely on the relative value of proceeds of the IEEPA violations that had been reinvested in those properties. This is because the specific percentages of each real property that the jury found subject to forfeiture correlated exactly with the amount of funds that had been spent to improve each property after 1995. (*Compare* Alavi JA 4174 *with* DX15N, 15O, 15P, 15Q, 15R, 18A, 18B, 19 (allowing a conclusion that 11.4 percent of the Building was acquired and improved through IEEPA proceeds by multiplying the total percent, 19, by the amount of Alavi's interest, 60 percent)). Accordingly, the jury forfeited only the interests in these real properties that had actually been obtained through acquisition and expenditure costs after 1995. Thus, those aspects of the jury's verdict are not

matter, there is no dispute about the purpose of the Partnership. As Claimants conceded at trial, the Partnership was formed to conceal Iran's interests in the Partnership in order to, at a minimum, maximize rents; and Alavi lied to the Government about at least Bank Melli's involvement. (Tr. 3175, 3178). Over the next 20 years, Alavi and Assa both continued to use the Partnership to create the appearance of a legitimate commercial enterprise that controlled the generation of income from the Building and to hide the fact of Bank Melli's secret 40-percent ownership. The reason Alavi did this was because, had Alavi's and Assa's true relationships with Iran been discovered, Alavi would have lost substantially all of its assets, including its interest in the Partnership. This is so for at least two reasons.

First, but for Alavi's concealment services, Alavi's interests would have been taken by private judgment creditors with judgments against Iran and/or government agencies charged with blocking or confiscating Iranian property years earlier. This was indisputably Alavi's own belief for over a decade. Evidence at trial showed that Alavi repeatedly expressed its awareness that it would lose its assets if its relationship with Iran were revealed. Even as the Partnership was being formed in 1989, the Iranian officials involved in that process believed that "confidentiality is of the utmost importance." (GX621-T). Then, as early as May 1,

---

affected by Claimants' challenge to the retention theory of forfeiture. The only asset that was forfeited on that basis was Alavi's interest in the Partnership.

1991, Alavi president Badr wrote in a letter that "it could cause difficulties" if Iran's ownership interest were publically known. (GX646-T; *see also* GX151-T (same concerns expressed by Bank Melli); GX605-T ("[Ambassador Kharazi's] appointment to a position of responsibility connected to the Foundation's affairs presents enormous political, security, and economic dangers . . . ."); GX624-T ("[Ambassador Kharazi's] involvement poses a great danger to the Foundation. . . . It, however, is my concern for the protection and the survival of the Foundation that forces me to write this and other letters."); GX628-T ("[B]oth the Foundation and the capital of Bank Melli will face the risk of destruction.")). During the pendency of the *Gabay* and *Flatow* litigations in 1992 (lawsuits by judgment creditors of the government of Iran seeking to enforce their judgments), Alavi officers also expressed the same concerns. (GX204-T (letter from Alavi in New York to Iran explaining that the defense to the lawsuits involved "the denial of any relationship as well as any financial and administrative relations between the government of Iran")). Likewise, in or about 2001, Alavi board member Ebrahimi wrote in his journal that Alavi would face "sure death" if it was discovered that Alavi was not "separate" from Iran. (GX505-T). Notes from the 2007 Alavi board meeting with the Iranian ambassadors Faridzadeh and Khazaee also reflect the need to find a "legal format" for "ASSA," because "[p]rotecting the foundation is the main objective," in order to "to safeguard the interests of the regime and Islam." (GX207-T). Simply put, Alavi had no trouble recognizing the threats that would materialize if its relationship with Iran was known, and nor did the jury. These

constant threats that loomed over Alavi, and which were only staved off by Alavi's continued concealment, amply demonstrate a real and reasonable likelihood that Alavi could not have maintained its interest in the Partnership absent the concealment services provided in violation of IEEPA. At a minimum, these facts demonstrate a "causal nexus" between Alavi's IEEPA violations and its continued ability to participate in the Partnership. *Torres*, 703 F.3d at 199.

Second, the evidence showed that, but for Alavi's concealment services in maintaining a partnership with the government of Iran, Alavi would not have been able to afford to maintain its interest in the Partnership and would have lost that asset as a financial matter. (Tr. 3129-31). The undisputed evidence at trial demonstrated that prior to entering into the Partnership, Alavi was in dire financial straits and likely to lose the Building. At the time, Alavi was unable to pay its mortgage, fund its own charitable programs, or even pay property taxes on the Building. (*See, e.g.*, GX154H-T, 159, 160). The government of Iran worried that Alavi's insolvency would cause American government officials to install a new board, independent of Iran, which would cause the government of Iran to lose control of the property. (GX626-T). Entering into the Partnership with Bank Melli thus had the effect of preventing Alavi from losing the Building or shutting its doors. Even so, Alavi continued to struggle financially after entering the Partnership. The undisputed evidence at trial showed that, aside from income from the Building, Alavi had no other significant sources of cash prior to 1995. (Mirakhor Tr. 55-56). The evidence at trial showed that Alavi's income from donations was

always de minimis. (Tr. 2892). In 1992, three years after the Partnership transaction, Alavi *still* needed a $1.7 million loan to pay back-real-estate taxes and owed Bank Melli over $2 million (GX206-T), and could only pay Bank Melli by transferring an additional partnership interest, not with cash (DX123). Mirakhor, a longtime Alavi board member with financial expertise, testified that, before 1995, Alavi was "in the red," "had financial problems," and had no "other sources of income," and that they only developed "surplus funds" by in or around 2003, when they sought to buy out Assa. (Mirakhor Tr. 30, 33, 55, 103; *see also* GX1042A (Alavi 1999 tax return reporting no revenue from "dividends and interest from securities" and listing no corporate stock ownership)). Therefore, absent its secret relationship with Iran, Alavi would have run out of money and been forced to shut its doors. At a minimum, Alavi would no longer be able to pay taxes and upkeep on the Building, and it would have become run-down and lost its value.[34] The jury thus had a firm, non-speculative basis on which to conclude that absent continuing IEEPA violations, Alavi would not have had the funds to maintain its property interest in the Partnership after 1995 and would have lost it.

There was also ample evidence for the jury to conclude that Alavi and the Partnership concealed their and Assa's relationships with the government of Iran

---

[34] Indeed even after the Partnership transaction and into the 1990's, the Building was run "really poorly." (Tr. 886).

in order to retain the economic benefit of their owner-
ship in the face of the Iranian sanctions. There was
sufficient evidence for the jury to find that, had those
relationships been disclosed, the force of the sanctions
would have deprived Alavi and the Partnership of any
benefits of ownership and the Building would have
been valueless to them. For example, the evidence and
testimony established that, from 1995 onward, it was
unlawful to provide any money or services to the gov-
ernment of Iran from the United States without a li-
cense; the evidence also showed that Alavi and the
Partnership never had a license to manage or operate
the Building for the benefit of the government of Iran.
(Tr. 288-98; *see also* Tr. 3416-18). Thus, not only were
Alavi's and the Partnership's management and opera-
tion of the Building for the benefit of Iran unlawful—
services without which the Building would have been
a wasting and valueless asset—but any tenant of the
Building, any contractor for the Building, any provider
of any money or services to the Building would have
been participating in sanctions violations. The Part-
nership and the Building would have been completely
valueless to Alavi and the Partnership.

Despite the well-supported record on these issues,
Alavi focuses narrowly on the *Gabay* and *Flatow* cases
and argues that Alavi's concealment services did not
help Alavi win those cases and preserve its assets be-
cause the courts in those cases did not rely on the tes-
timony of Geramian or Ahmadi. (Alavi Br. 99). That
argument both ignores the other evidence discussed
above and misses the point. During the *Gabay* lawsuit,
Alavi president Geramian filed an affidavit stating
that Alavi conducted no business with Iran. (Tr. 2630).

Likewise, at a deposition, Geramian denied any relationship between Alavi and Iran. (*Id.* at 2630-31). At another deposition, Alavi board member Ahmadi denied ever receiving instructions from Iran. (*Id.*). Thus, when the district court found that there was "*insufficient evidence* of day-to-day control" by the Bonyad Mostazafan over Alavi (GX1004 at 10 (emphasis added)), that lack of evidence included the false denials by Geramian and Ahmadi. In other words, as the District Court here found, Alavi defended against these lawsuits by concealing Iran's true interest in the Building and that played a role in its continued ability to maintain its assets. (Alavi JA 4197).

This analysis is in no way altered by the holding in *Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 118 (2d Cir. 2016), which found that Iran did not exercise day-to-day control over Alavi so as to render it an agency or instrumentality of Iran under certain sections of the Foreign Sovereign Immunities Act ("FSIA"). Claimants argue that under *Kirschenbaum*, the *Gabay* or *Flatow* plaintiffs could never have succeeded even absent Geramian's and Ahmadi's lies. (Alavi Br. 100). *Kirschenbaum*, however, did not eliminate the viability of suits like *Gabay* and *Flatow*. *Kirschenbaum* did not address, and therefore did not preclude, claims asserting that Alavi's separate legal status would work a fraud or injustice under *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983), thus permitting execution against the property of legally separate entities that nonetheless are alter egos of the government of Iran. *See Kirschenbaum*, 830 F.3d at 130 n.15; *see also, e.g., Flatow*, 67 F. Supp. at 538 (recognizing

that the corporate veil could be pierced based on a showing of fraud or injustice); *Gabay v. Mostazafan Found. of New York*, 968 F. Supp. 895, 898 (S.D.N.Y. 1997) (same). Claimants' argument, moreover, ignores the more fundamental point that Alavi's concealment services helped to hide the decades' long extensive connections between Alavi, Assa and Iran, and thereby prevented an avalanche of additional judgment creditors and government agencies from bringing lawsuits over the next years and under different statutes, including sections of the FSIA and TRIA that were left open by *Kirschenbaum* as potential bases for meritorious turnover claims against Alavi.

These are not mere hypothetical possibilities. As the record in this case bears out, when some of the key facts underlying the Government's forfeiture claims were first publicized through the filing of this action—dozens of judgment creditors stepped forward and filed claims seeking to attach Alavi's assets. Those judgment creditors litigated for years alongside this civil forfeiture action and, based on the same facts as those underlying the forfeiture claim, obtained judgments against Alavi based on both the FSIA and the TRIA. (Dkt. No. 1895). Thus, even if Alavi is right about whether the *Gabay* or *Flatow* plaintiffs could have succeeded at the time, that has no bearing on Alavi's continued ability to retain its property interests in the face of the constant litigation that would have ensued had it not concealed its relationship with Iran in the course of that litigation.

In sum, Alavi's concealment of its relationship with the government of Iran prevented private plaintiffs

and governmental agencies from seizing Alavi's assets years earlier. In addition, absent Alavi's secret partnership with Iran, Alavi would have lost its ability to manage and maintain the Building due to its utter lack of solvency and inability to pay basic costs including its mortgage and taxes. Alavi's illegal concealment services to the government of Iran and its secret partnership with Bank Melli thus allowed it to retain and maintain its property from 1995 until the filing of this action. Accordingly, far from "a complete absence of evidence," *Morse*, 804 F.3d at 546, the evidence amply supported the jury's verdict forfeiting Alavi's interest in the Partnership on this basis.

### 2. The District Court Properly Introduced Undisputed Facts Concerning Aspects of Prior Lawsuits Against Alavi

Alavi next argues that the District Court compounded its error by giving an "instruction" that supposedly placed its imprimatur on the Government's case. (Alavi Br. 101). This argument has no merit. First, as explained above, there was no error to "compound." Furthermore, there was no error in how the District Court admitted evidence of the *Gabay* and *Flatow* litigation. The District Court did not deliver an "instruction" to the jury. Instead, the District Court gave the jury "certain facts that you can consider as established." (Tr. 2630). The District Court then proceeded briefly to describe the *Gabay* lawsuit and quote from Geramian's affidavit and the depositions of Geramian and Ahmadi. (Tr. 2630-31). The District Court also briefly described the *Flatow* lawsuit and stated that both lawsuits were dismissed for failing to

show that the Iranian government exercised day-to-day control over Alavi. (Tr. 2631-32). The District Court then informed the jury that other lawsuits had been brought against Alavi beginning in 2009. (*Id.*). Some of the underlying records pertaining to these facts were also independently admitted into evidence such that either party could use them to feature other facts or make additional arguments. (GX1004 (*Gabay* opinion), 1403 (Geramian affidavit), 1409 (Geramian deposition)).

The introduction of evidence in this manner is proper in a civil case. Following submission by the parties, the District Court ruled that this evidence was relevant and admissible in these proceedings. (Dkt. No. 1781; Tr. 2304-12). Its relevance, as set forth above, lay in its tendency to demonstrate how Alavi would have been unable to retain and maintain its property interests in the Partnership and the Building without concealing its partnership with Iran. The parties then tried, but were unable, to reach a stipulation concerning the facts of these prior cases. (Dkt. No. 1832).

Rather than have to call litigants or a court clerk to testify at trial, the Government requested that the Court convey certain undisputed facts to the jury pursuant to Federal Rule of Civil Procedure 56. (*Id.*). Under Rule 56, the court "may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g); *see also* Fed. R. Evid. 201(b)(2), (c)(2), and (f) (explaining that the court may "judicially notice a fact that is not subject to reasonable dispute because

it . . . can be accurately and readily determined"; that the "court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information"; and that in a civil case "the court must instruct the jury to accept the noticed fact as conclusive"). Here, the information introduced by the District Court was indisputably accurate based on the underlying records from the *Gabay* and *Flatow* cases, and because the particular facts included in the District Court's recitation were drawn from statements in the Government's 56.1 statement prepared in connection with the 2013 motions for summary judgment, which Alavi did not oppose. (*See* Dkt. No. 1832). In addition, the recitation was brief and did not attract any undue or prejudicial attention from the jury in the context of this five-week trial. This manner of conveying undisputed facts to the jury did not constitute an abuse of the District Court's discretion. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008) ("We review the District Court's determination of whether to take judicial notice of facts for abuse of discretion.").

Claimants' primary argument to the contrary is that the manner in which the District Court introduced this evidence suggested a link between Geramian and Ahmadi's false statements and the dismissals of the lawsuits, and more broadly, that the District Court "condensed years of litigation, hundreds of pages of deposition testimony, and pages of judicial opinions into a few short paragraphs." (Alavi Br. 101-02). But the whole point of the Government's request to introduce the evidence in this manner was to avoid simply dumping lengthy documents in front of the jury

and asking them to figure it out themselves. The Government sought to highlight certain portions of these documents, and properly asked the District Court to do so under Rule 56(g). The District Court did not instruct the jury about why *Gabay* and *Flatow* were decided the way they were, nor did the District Court state that the deciding courts "relied" upon Geramian's or Ahmadi's lies. Thus, the District Court did not "suggest[ ] a link," between the pieces of evidence (Alavi Br. 102); the District Court stated undisputed facts. It was the province of the parties to argue to the jury what that evidence demonstrated and what inferences should be drawn from it. Furthermore, if Claimants had wanted to feature other parts of the depositions, affidavits, or opinions in the cases, they were free to seek to do so under either Rule 56(g) or by featuring portions of the documents already in evidence. That they elected not to do so, does not render the District Court's statements of fact erroneous.

In these circumstances, the District Court did not abuse its discretion in conveying undisputed facts about the lawsuits to the jury. Moreover, any error was harmless. Because the underlying documents were in evidence, Claimants were able to correct any purportedly improper suggestion, by referencing the documents themselves. For example, to the extent Alavi felt that the jury should know that the *Gabay* opinion did not "rely" on Geramian and Ahmadi, it was free to show the opinion to the jury. In fact, Alavi relied on the statements read to the jury by the District Court for exactly the opposite purpose—to argue that Alavi really had no relationship with Iran. (Tr. 3295-96).

Accordingly, Claimants' argument about the improper "instruction" should be rejected.

### 3. The Evidence Independently Demonstrated that the Building and Partnership Were Properties Involved in Money Laundering

Separate and apart from the jury's finding that Alavi's interest in the Partnership was retained as a result of IEEPA violations, the jury also found that both the Partnership and the Building were forfeitable because they constituted property involved in money laundering. That finding was amply supported by the evidence offered at trial and was in no way "infect[ed]" (Alavi Br. 103), by the retained property theory.

The jury unequivocally found that Alavi's interests in the Partnership and the Building itself were involved in money laundering. (Alavi JA 4176-80). Notably, property "involved in" money laundering is broader than proceeds, and in no way rests upon whether, when, or in what amounts, these properties were themselves obtained or retained as a result of any crime. *See, e.g.*, *United States v. Nicolo*, 597 F. Supp. 2d 342, 347–48 (W.D.N.Y. 2009) ("The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the money laundering offense.") (citing 18 U.S.C. § 981(a)(1)(A)). In fact, Claimants do not contest that the Defendant Properties were forfeitable as properties involved in money laundering. Rather, they argue that, because the retained property theory

of forfeiture was supposedly improper, the jury's verdict regarding money laundering must be vacated. (Alavi Br. 103).

This is a non-sequitur. The jury clearly and unambiguously found that Alavi, as a result of IEEPA violations, retained or maintained its interest in the Partnership. (Alavi JA 4174). The jury also found that 11.4 percent of the Building itself was the proceeds of IEEPA violations (*id.*), representing the reinvestment of money generated by the Building's operation back into the Building itself (*see, e.g.*, Tr. at 3325; DX19). Independently, the jury found that Alavi's interest in the Partnership and the Building were forfeitable as property involved in money laundering. (Alavi JA 4177). Those properties' involvement in money laundering has nothing to do with any retained proceeds. The reinvestment of funds generated after the sanctions came into effect back into the Building to promote Alavi's continued management and concealment services to the government of Iran with and through the Building and the legal structure of the Partnership, would necessarily make the Building property involved in money laundering regardless of any property that was owned prior to 1995 and subsequently retained. There is no dispute that the Building generated hundreds of millions of dollars in newly obtained proceeds after 1995 (GX15A), or that these newly obtained funds were reinvested in the Building and its operations (GX15B), and distributed to Alavi and Assa (GX15M). Likewise, the fact that Alavi used the Partnership, and all its ordinary-seeming corporate formalities, to help conceal its relationship with Iran and to collect and send money for the benefit of

Iran made the Partnership forfeitable as property involved in money laundering irrespective of whether that Partnership interest itself was retained through IEEPA violations. Thus, once the jury found that the Government had proven a money laundering offense (*id.* at 6), there was no serious question that Alavi's interests in the Partnership and Building were forfeitable as property "involved in" that offense. *See In re 650 Fifth Ave. & Related Properties*, 777 F. Supp. 2d 529, 566 (S.D.N.Y. 2011) ("Taking those allegations as true, it would be an understatement to say that the ownership structure of the Partnership had a 'substantial connection' to the concealment of Iran's ownership and made that concealment 'less difficult or more or less free from obstruction or hindrance.'").

At bottom, Alavi's argument relies on conflating two kinds of "proceeds"—one for purposes of forfeiture and the other for purposes of money laundering. (Alavi Br. 103 ("[A] money laundering transaction cannot occur unless there is first a separate, underlying offense giving rise to criminal *proceeds*. . . . If the jury . . . had not reached a legally invalid conclusion regarding property retained as *proceeds* of an IEEPA violation, it is by no means clear that the jury would have found that a money laundering transaction occurred, let alone that the Building or the Partnership was involved in it." (emphasis added)). Proceeds obtained *or* retained as the result of sanctions violations are subject to forfeiture as IEEPA proceeds. 18 U.S.C. § 981(a)(1)(C). In the money laundering context, money or property obtained *or* retained, directly or indirectly, from specified unlawful activity that is used in a transaction to conceal its relevant characteristics,

gives rise to a money laundering offense, 18 U.S.C. § 1956(a)(1)(B)(i), and any property involved in that transaction (including non-proceeds) is subject to forfeiture. 18 U.S.C. 981(a)(1)(A). Similarly, money or property obtained *or* retained, directly or indirectly, as a result of specified unlawful activity that is used in a financial transaction that promotes the carrying on of specified unlawful activity also gives rise to a money laundering offense, 18 U.S.C. § 1956(a)(1)(A)(i), and any property involved in that transaction is subject to forfeiture.

Here, the Government proved that money laundering transactions involving proceeds obtained (rather than retained) as a result of ongoing IEEPA violations occurred when Alavi used funds derived from the Building in transactions designed to conceal their relevant characteristics and to perpetuate its criminal sanctions-violation scheme. (Tr. 3139-40). Property that was used to facilitate these money laundering transactions, including the Partnership and the Building, was then subject to forfeiture. 18 U.S.C. § 981(a)(1)(A). In other words, the jury's determination that "retained" property that Alavi possessed pre-1995 could constitute "proceeds" of IEEPA violations for purposes of IEEPA-based forfeiture, is wholly separate from its determination that the Partnership and Building are each properties involved in money laundering transactions.

The jury's verdict reflects its conclusion that the Partnership and the Building were used to facilitate money laundering transactions. The jury's verdict fur-

ther reflects the jury's conclusion that proceeds ob-
tained, and not just retained, as a result of the IEEPA
violations were used in transactions involving the
Partnership and the Building. Thus, even if there was
any error in allowing the Government to present a the-
ory of retained property to the jury—which there was
not—the jury's findings concerning property forfeita-
ble as a result of money laundering stand independent
of that theory.

Accordingly, the jury's money-laundering based
forfeiture findings should not be disturbed.

## POINT V

### Claimants Received a Fair Trial

Claimants next argue at length that they were de-
prived of a fair trial, lumping together various eviden-
tiary rulings and accusations that the District Court
showed "disdain" to some of its counsel. (Alavi Br. 104,
122). That Claimants can set forth a list of motions
they lost is no evidence of unfairness in the District
Court proceedings. It is simply a consequence of vigor-
ous and at times contentious litigation, and Claimants'
consistent efforts to preclude the jury from hearing in-
criminating, admissible evidence.

As set forth below, the District Court did not abuse
its discretion in admitting or precluding evidence at
trial. To the contrary, the District Court carefully ex-
ercised its gatekeeping function, considered extensive
written and oral arguments by all parties on nearly all
the issues presented below, permitted all parties to

make a complete record on contested issues, and delivered decisions based on the law and the record that demonstrate the District Court's careful consideration of the parties' arguments and the facts presented. After handling the case for years, and being present during the jury trial, the District Court had a thorough understanding of the facts and background of the case, and brought that experience and familiarity to bear on the evidentiary issues before it.

In addition, none of Claimants' purported errors had a material effect on the jury's verdict in the overall context of this five-week trial, and the voluminous evidence presented therein. Neither the District Court's evidentiary rulings, nor the out-of-context remarks highlighted by Claimants to demonstrate "disdain," in any way detracted from Claimants' ability to fully and vigorously present their case at trial. To the contrary, Claimants had a full and robust opportunity to present their case to the jury. Claimants' loss at trial had nothing to do with bias or lack of fairness. It was the result of extensive evidence documenting their guilt. Accordingly, Claimants' claims do not merit any relief.

## A. The District Court Did Not Abuse Its Discretion in Evidentiary Rulings

### 1. Applicable Law

This Court reviews "a district court's decision to admit evidence for abuse of discretion 'recogniz[ing] that district courts enjoy broad discretion over the admission of evidence." *United States v. Barret*, 848 F.3d 524, 531 (2d Cir. 2017) (quoting *United States v.*

*McDermott*, 245 F.3d 133, 140 (2d Cir. 2001)). "A district court has abused its discretion if its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if its decision cannot be located within the range of permissible decisions." *Id.* (quoting *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013)); *see also In re Martin-Trigona*, 760 F.2d 1334, 1344 (2d Cir. 1985) ("The receipt of evidence by the trial court lies largely within its discretion, and an evidentiary ruling will ordinarily not be disturbed unless it was 'manifestly erroneous.' ") (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)).

"[E]ven an erroneous evidentiary ruling will not lead to reversal unless affirmance would be inconsistent with substantial justice . . . We will not conclude that a substantial right was affected unless it is likely that in some material respect the factfinder's judgment was swayed by the error." *United States v. Aguiar*, 737 F.3d 251, 263 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997)).

## 2. Discussion

### a. The District Court Properly Limited Testimony Concerning Alavi's Charitable Giving at Trial

Claimants first argue that the District Court erred in precluding testimony about Alavi's charitable activities. (Alavi Br. 105). This argument is both legally wrong and substantially mischaracterizes the factual record. The District Court initially—and properly—precluded testimony about Alavi's charitable activities

from individuals who had received funds from Alavi. As Claimants' arguments on the relevance of this testimony evolved, the District Court revisited its rulings and permitted meaningful trial testimony about those charitable activities, tempered by limitations to preclude irrelevant evidence and prevent prejudice arising from impermissible considerations. In addition to ultimately allowing Claimants to introduce the testimony of charitable recipients, the District Court also permitted Claimants to introduce extensive and detailed evidence of Alavi's charitable donations through the testimony of Alavi employee Hanieh Safakamal. Claimants have identified no error in those rulings.

In its motions *in limine*, the Government sought to preclude Claimants from introducing the testimony or other evidence of individuals who had received charitable donations from Alavi. (Dkt. No. 1620 (incorporating Dkt. No. 720 at 3)). In making this request, the Government explicitly acknowledged that it was undisputed that "Alavi is a not-for-profit corporation that ran and runs a charitable organization." (Dkt. No. 720 at 3). The Government argued that testimony from witnesses who had received money from Alavi was irrelevant to the claims at issue—namely, *Claimants'* knowledge and intent—and would have a tendency to appeal improperly to the sympathy of the jury toward these charitable recipients. *See United States v. Gupta*, 747 F.3d 111, 138-39 (2d Cir. 2014) (holding that defendant's intention to contribute to charity was irrelevant to whether or not he had violated the law). In response, Claimants argued that such testimony would be relevant to show that Alavi's charitable giving was unconnected to its relationship with the government of

Iran inasmuch as these witnesses had "no relationship with the Government of Iran," and had "no basis to believe that Iran had anything to do with their receipt of support." (Dkt. No. 1671 (incorporating Dkt. No. 752 at 2)). After considering these arguments, the District Court held that it would preclude the testimony of charitable recipients "unless a particular showing of relevance is made." (Alavi JA 2737-38). In particular, the District Court held that, on its own, it was irrelevant that a donee had no knowledge of any connection between Alavi and the government of Iran, and that donee testimony would be unduly prejudicial to the Government under Rule 403 by "having the jury consider the impact their verdict might have on such activities." (Alavi JA 2738-39).

This ruling was not an abuse of the District Court's discretion. Testimony by Alavi's charitable donees had no bearing on the facts at issue during trial, namely Alavi's knowledge that Assa was owned and controlled by Bank Melli, and Alavi's relationship with the government of Iran. Whether or not a donee was aware that a donation was directed by the government of Iran is irrelevant to whether Alavi's charitable agenda was set by the government of Iran.

While it would have been within the District Court's discretion to preclude such testimony altogether, the District Court reconsidered in light of new arguments by Claimants, and, in fact, permitted Claimants to introduce donee testimony at trial. (Tr. 2490-2505, 2827-36). During the final pretrial conference, Claimants again moved to admit donee testi-

mony about the irrelevant fact that the donees them-selves were unconnected to the government of Iran. (Alavi JA 3921). In response, the District Court consid-ered Claimants' arguments and invited them to sub-mit a letter setting forth the witnesses whose testi-mony might be relevant to address particular facts or arguments that were at issue during trial, such as do-nees who worked at interfaith entities such that dona-tions to them would supposedly be at odds with the Ambassador's instructions that Alavi's donations should focus on Shiite Muslims, or donees who held be-liefs that were directly contrary to the government of Iran. (*Id.* at 85-86).

After the conference, both Claimants and the Gov-ernment submitted letters detailing their views. (Dkt. No. 1737, 1755). Claimants' letter failed to include a proffer of any witnesses that would establish that they received money despite holding views that were con-trary to the Iranian government, and failed to show that donations were made specifically to non-Shiite causes. To the contrary, Claimants asserted that they would introduce evidence of donations to interfaith and non-denominational organizations that promoted dialogue with, and services for, Shiite Muslims and others. (Dkt. No. 1737). In sum, Claimants failed to proffer any potential evidence that would show that Alavi advanced a non-Shiite agenda.

Based on this proffer, the District Court issued a revised opinion permitting Claimants to call donee witnesses from the Temple of Understanding and the Nurudeen Islamic Charity Organization in order to feature portions of Alavi's charitable activity that

might be germane to issues at trial. (Dkt. No. 1776). Claimants, however, disregarded the scope of the District Court's ruling, and, in their opening statement, made Alavi's charitable donations a centerpiece, in an apparent appeal to jurors' sympathy. (*See, e.g.*, Tr. 94 ("It supports humanitarian efforts. Its donations went to Haiti after the 2010 earthquake, the victims of Hurricane Sandy here in New York, the victims of 9/11. All of these donations and others are through United States charitable organizations."), 95 ("This misguided case was looking to wipe us off the fact of the planet . . . to end all the good works we do.")). Claimants' disregard of the District Court's orders was subsequently detailed in an order by the District Court further clarifying its position that generalized evidence about Alavi's charitable works was inadmissible. (Alavi JA 3821).

Thereafter, the District Court in fact permitted Claimants to call donee witnesses who had received charitable donations from Alavi. Thus, for example, Allison van Dyke of the Temple of Understanding testified about her organization's receipt of donations from Alavi in support of its inter-religious and multicultural educations programming. (Tr. 2490). She even testified about donations she received after 2009, following the filing of the Amended Complaint. (Tr. 2499). Faheem Kazimi, a representative of the Islamic Center of Houston, Texas, testified about the Houston Islamic Center's donations from Alavi as well as its religious gatherings, schools, and its medical clinic. (Tr. 2827). Moreover, the District Court permitted Claimants to introduce testimony concerning its charitable giving through an Alavi employee witness

Hanieh Safakamal, including testimony about the Islamic Centers, schools, universities, interfaith projects, and disaster relief, and how much money was allocated to these causes in specific years. (Tr. 2666-69, 2672-89, 2696-98, 2700-02, 2704-06). Indeed, Safakamal walked the jury through specific Alavi tax returns detailing exactly to whom it had given money, and how much. (*Id.*).

Simply put, the District Court gave Claimants more than a fair opportunity to present evidence of Alavi's charitable mission and activities. The District Court did so even after Claimants' opening statement had already (improperly) provided substantial details to the jury about Alavi's charitable mission, including the display of numerous images of school children and other groups of people whose activities were supported by Alavi—all beyond the scope of the District Court's limitations on such evidence. (Tr. 91-95 ("This next slide you will see is the Islamic Education Center of Houston, which offers programs that educate Muslims and non-Muslims alike about Islam. It has a medical clinic, a senior citizens club, gives guidance on health insurance, Medicaid, food stamps and other benefits.")).[35]

---

[35] In keeping with the District Court's ruling that Alavi's charitable activities were not at issue during trial, the District Court also instructed the Government to remove references from its summary charts to

Claimants' arguments that the District Court abused its discretion in setting reasonable limitations on the scope of (at most) marginally relevant evidence are wholly untethered to the facts and without merit. The Government never questioned that Alavi was a charity and there was no need to "counter" a different narrative. (Dkt. No. 720). The District Court permitted Claimants to call the two donee witnesses for which Claimants had established some relevance, namely, that their activities were not limited to Shiite Muslims, and precluded Claimants from calling three additional witnesses who, by Claimants' own admission, would have provided similar, cumulative testimony. (Tr. 2351 ("[Y]our Honor, I think they're six of one, half a dozen of the other.")); *see United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995) ("[A] trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence."). Thus, to the extent Claimants' "focus" on charitable donation was relevant to any issue in this case, they were permitted to offer evidence supporting that premise.[36] The District Court acted

---

Alavi's "charitable efficiency" (the amount of charitable donations it made as a percentage of its income). (Tr. 2146-47).

[36] Claimants' assertion that additional charitable donation evidence was necessary to rebut the Government's argument in rebuttal summation that "nothing happen[ed]" between 1995 and 2003 (Alavi Br. 107), is a gross mischaracterization of the record. This was obviously not an argument that Alavi literally did nothing in those eight years; rather, in context, this was an

well within its discretion in limiting the amount and scope of that evidence pursuant to Rules 401 and 403.[37]

In sum, the District Court's limitations on the presentation of evidence of Alavi's charitable donations were a wholly proper exercise of its broad discretion. Moreover, the exclusion of some evidence could not possibly have caused any prejudice in light of the detailed testimony about Alavi's charity that was in fact introduced through Safakamal. Claimants' argument that the District Court erred in "barring" testimony concerning its charitable services should be rejected.

---

argument that between 1995 and 2003, Alavi made no effort to learn whether Bank Melli still owned Assa despite claiming at trial to have been in the dark about that fact. (Tr. 3357-59). That Alavi did nothing supports the jury's determination that Alavi was never actually in the dark.

[37] The District Court also did nothing improper during the course of these witnesses' testimony. As explained further below, the District Court took an active role during the presentation of evidence by all parties in this case, including "interrupting" to ask question of nearly every witness—as the District Court is permitted to do. *See* Fed. R. Evid. 614 ("The court may examine a witness regardless of who calls the witness.").

### b. The District Court Properly Instructed the Jury that the 1989 Transaction Was Not Illegal

Claimants next argue that the District Court erred in allowing the Government to argue that the 1989 transaction in which Alavi and Assa created the Partnership and transferred the Building to the Partnership was illegal tax fraud. (Alavi Br. 107). The primary problem with Claimants' argument is that this never happened. Prior to trial, the District Court ruled that, while the Government would be permitted to offer evidence of *possible* tax violations and a subsequent investigation, the Government would not be permitted to assert that the 1989 transaction giving rise to the Partnership was "an unlawful tax scheme." (Alavi JA 2726-27). The District Court offered to give a limiting instruction and, in fact, gave an explicit instruction to that effect during trial. (Alavi JA 2727; Tr. 2632-33 ("The government has not alleged tax crimes as a basis for forfeiture. Whether or not there was a tax offense committed is not for you to decide. Moreover, entities frequently seek ways to lower their taxes, and there is nothing inherently wrong with this.")). Consistent with these instructions, the Government never argued that Alavi had committed tax fraud or orchestrated an illegal tax shelter. (*See, e.g.*, Tr. 121 (Government's request "for it to be clear for the jury that the government is not alleging some sort of tax crime here. That's not the crime at issue")). Instead, the Government simply asserted what all parties in the case agreed— that the Partnership was created to "get out of paying millions of dollars per year in taxes on the [Building's] income." (Alavi Br. 107-08). Legal or not, that was the

point of extensive discussions among Iranian governmental entities, and that was the purpose of getting rid of the Bank Melli mortgage.

The Government was properly permitted to introduce evidence and argument about *how* the partnership transaction was designed and carried out, and *why* is was designed and carried out that way. (Alavi JA 2726-27). Specifically, the Government was permitted to explain how high-level Iranian government officials and Bank Melli executives came up with a plan to have Alavi partner with Bank Melli through Assa, a shell company, to reduce Alavi's tax and mortgage liabilities while concealing from U.S. authorities that Bank Melli was Alavi's true partner. (*See, e.g.*, GX206-T (explaining that the Partnership was created in this manner to prevent Alavi from paying $3 million in taxes)). This evidence was relevant because it was highly probative of Alavi's knowledge that Bank Melli owned Assa. Moreover, the evidence clearly showed that Alavi lied to the New York courts and the New York Attorney General's Office about the transaction being arms-length and about Assa's true beneficial owner—lies that Alavi did not dispute. (GX130; Tr. 3175). This evidence was not introduced for the purpose of proving a tax crime, but for the purpose of showing Alavi's knowledge and purpose and the nature of the relationship between co-conspirators.

Claimants' arguments of error do not withstand scrutiny. First, Claimants mischaracterize the testimony of Special Agent Ennis. His testimony about the propriety of the Partnership transaction was not about

whether it was unlawful from a tax perspective. Instead, it had to do with the fact of entering into an undisclosed transaction with the government of Iran, i.e., the concealment. In fact, in the portion of the testimony omitted from Claimants' brief, Special Agent Ennis testified "that it was clearly going to be illegal *if the government—the United States government found out the ultimate ownership and control of the Assa Corp.*" (Tr. 377 (emphasis added)). Thus, consistent with the District Court's order, the Government did not present evidence that the structure of the transaction constituted an illegal tax scheme.

Given that the legality of the partnership transaction under the tax laws was not at issue and not argued to the jury, the District Court also properly precluded Claimants' proposed tax expert, as irrelevant, confusing, and misleading. (Dkt. No. 1830 at 2, 12 ("Steines's opinion as to lawfulness of the transaction is not probative of any issue in dispute in this trial.")). Furthermore, the District Court found that the proposed expert testimony would not be helpful to the jury in determining any fact in issue. (Tr. 2150-51); *see* Fed. R. Evid. 702. Finally, to the extent there was even an insinuation that the Partnership creation involved tax fraud, the District Court remedied any potential confusion with its unambiguous jury instruction. (Tr. 2632-33); *Evans v. Michigan*, 568 U.S. 313, 328 (2013) ("[A] jury is presumed to follow its instructions.") (internal quotations omitted).

In sum, the District Court properly exercised its discretion in precluding the Government from offering evidence or arguing that Alavi had engaged in tax

fraud. If there was any doubt, the District Court's limiting instruction squarely removed the issue of tax fraud from the jury's consideration. Thus, the District Court committed no error in connection with this issue.

### c. The District Court Properly Excluded Irrelevant Testimony from the Officer of a French Foundation

Claimants next argue that the District Court erred in precluding testimony from an officer of a French foundation about her communications with the French Ambassador. (Alavi Br. 109). The District Court's rejection of this remarkable request was correct and certainly did not constitute an abuse of discretion.

Claimants first identified Marie-Monique Steckel as a potential witness on March 30, 2017. The Government moved to preclude Claimants from calling Steckel for late disclosure and notice. (Dkt. No. 1620 at 1 n.1). The District Court, however, allowed Steckel to remain on Claimants' witness list and, on June 1, 2017, asked Claimants to provide a proffer of Steckel's expected testimony. (Tr. 677). Claimants' response made clear that Steckel had no first-hand knowledge relevant to any facts at issue in this case. (Dkt. No. 1802). Instead, her testimony was being offered so that Claimants could argue to the jury that, just as Steckel, the officer of a French foundation in the United States, maintained contacts with the French Ambassador to the United Nations, there was nothing untoward about Alavi's contacts with the Iranian Ambassador to the United Nations. (*Id.*). The Government opposed

the introduction of Steckel's testimony because it was irrelevant and its only purpose was to distract and confuse the jury, and the District Court agreed. (Dkt. No. 1809; Alavi JA 3965 ("It would also be improper for the jury to make an unfounded assumption that the relationship between [the French foundation] and the French government has any bearing on Alavi's relationship with Iran.")). The District Court thus properly precluded Steckel on both Rule 401 and Rule 403 grounds.

Claimants' arguments in support of Steckel's testimony are meritless. Claimants wrongly argue that Steckel's testimony was probative of the facts at trial. (Alavi Br. 110). The fact that the Government's case included allegations of meetings and communication between Alavi and the Iranian Ambassador to the United Nations, however, had nothing to do with the propriety of communications with an ambassador *per se*. Iran, not France, is under comprehensive economic sanctions. Evidence that numerous Iranian ambassadors to the United Nations exercised direction and control over Alavi is relevant to whether Claimants' operation and management of the Building and Alavi's charitable activities were intended as services to the government of Iran. (*See, e.g.*, GX624-T (reciting message from Ambassador Kharazi stating that "I [ ] with the order of [the Ayatollah] in hand, am directly responsible for the Foundation"), GX207-T (recounting Ambassador Khazaee's participating in board meeting), GX500-T (explaining that Ambassador Zarif "should always be in meetings")). Alavi's own continuous relationship with the government of Iran also undercuts arguments that Alavi believed its partner,

Assa, had become independent of Bank Melli. Similarly, the Government's comments at trial about Alavi not being an "ordinary charity" had nothing to do with the fact that Alavi communicated with an ambassador. It was because this was the *Iranian* ambassador, on the orders of the Ayatollah. It was in the same vein that the Government repeatedly argued that beneath Alavi's seemingly benign exterior, it was the partner of an Iranian-owned bank with deep connections to the highest levels of the *Iranian* government, a government that is the object of serious sanctions. (*See, e.g.*, Tr. 3037 (explaining how Alavi used its "ordinary-seeming" features to hide Iran-sanctions violations)).

By contrast, communications between a French citizen and her ambassador are irrelevant to the influence Iranian ambassadors exercised over Alavi and/or whether Alavi was unlawfully assisting the government of Iran and violating sanctions. (Alavi JA 3966 ("[C]ontacts Alavi had with government officials are not analogous to contacts the FIAF may have with French government officials."). Thus, even given Rule 401's low standard for relevance, the District Court easily concluded that the proposed testimony did not meet that threshold. (Alavi JA 3964-66). Similarly, given the lack of any probative value, the District Court also correctly concluded that evidence should be precluded under Rule 403. (Alavi JA 3966-67 ("The jury should not be confused into considering whether interactions between French officials and organizations in the U.S. are equivalent to those between Iranian officials and organizations in the U.S. (and particularly Alavi)—the two are not equivalent; they are not analogous.").

Accordingly, the District Court did not abuse its discretion in precluding Seckel's testimony after finding that it was devoid of any relevance and carried substantial potential to confuse and distract the jury.

### d. The Court Properly Precluded Claimants from Introducing Irrelevant Evidence about Agents' Investigative Techniques

Claimants next fault the District Court for precluding them from introducing certain evidence about the investigating agents' conduct in the case. (Alavi Br. 111). Once again, Claimants' treatment of the issue fails to present the full context of the District Court's rulings concerning this evidence and its efforts to police those rulings during trial. Prior to trial, Claimants moved *in limine* to introduce evidence of an agent's supposed bias and his aggressive approach to the investigation. (Dkt. No. 1617 at 9). Claimants argued that such evidence was "probative of the integrity of the Government's investigation and the veracity of the agents, who will testify at trial." (*Id.*). The Government opposed this motion as an improper attempt to put the Government on trial, and prejudice and distract the jury. (Dkt. No. 1674 at 7-8). The Government fully agreed that racial or religious animus has no place in law enforcement, but argued that that did not justify the introduction of irrelevant and prejudicial evidence at trial. Of the two justifications put forward by Claimants for the introduction of this evidence, the Government pointed out that the first—the "integrity" of the investigation—was mere rhetoric, untethered to the evidence at trial, and the second—the veracity of

testimony—was only relevant to witnesses who would be testifying at trial, whereas the agent in question was not a trial witness.[38] (*Id*.).

Accordingly, in ruling on this motion, the District Court properly held that Claimants could not introduce evidence of purported bias of a non-testifying agent. (Alavi JA 2724-25). This ruling was based on the fact that such evidence was irrelevant and that the prejudicial and distracting nature of such evidence outweighed any probative value. (*Id*.).

Yet again, however, Claimants violated the District Court's *in limine* rulings in their opening statement, forcefully arguing about the supposed bias and aggressiveness of the agents. (Tr. 115-116 (stating that case agents "were salivating at the prospect of bringing criminal charges"; "planned a blitz"; were not interested "to learn facts"; were out "to bully people"; and told people "they would be locked up")). The District Court thus properly interrupted that portion of the opening statement to briefly inform the jury that the Government's investigation was not their focus at trial. (Tr. 116). The District Court later detailed Claimants' "clear disregard" for the District Court's or-

---

[38] Claimants had ample opportunity to examine witnesses about their interactions with the FBI to determine whether their testimony was influenced by fear or threat, and to examine agents testifying about out-of-court statements concerning the circumstances under which those statements were made.

ders and further clarified the limited scope of testimony that was admissible concerning the Government's investigation. (Alavi JA 3827 ("There is no reason to question a member of the investigative team as to whether he was or was not predisposed to believe what a witness was telling him. The state of mind of the investigator is not the state of mind of the interviewee.")). Nevertheless, the District Court did subsequently give Claimants considerable leeway in inquiring into the agents' "aggressive tactics" through the cross-examination of the former case agent, George Ennis. (Tr. 565-571 (questioning Agent Ennis about agents being "aggressive"; planning to "lock them up"; planning to "threaten them with criminal charges"; and trying "to be confrontational")).

In light of the foregoing, it is clear that Claimants' complaint about not being able to argue that the agents were biased is unfounded. The District Court acted within its discretion in precluding Claimants from offering irrelevant evidence of agents' supposed bad faith. Yet, Claimants were able to make many of those arguments and and pursue many of those lines of questioning during trial. That evidence enabled Claimants to present a component of its defense, namely that the jury should not make an adverse inference from Alavi witnesses' Fifth Amendment assertions because of the purportedly aggressive nature of the Government's investigation.

In addition, the fact that the District Court asked to preview Claimants' lawyers' cross-examinations to ensure they complied with its *in limine* rulings in areas where the Claimants had previously breached

those rulings is not evidentiary error. It was a rare step resulting from Claimants' having overrun the District Court's instructions early in the trial. (Alavi JA 3827). Moreover, Claimants have not shown how the District Court's preview of portions of their examinations related to the Government's investigation prejudiced them. To the extent that the preview eliminated inadmissible testimony or sustained objections during cross-examination, it reduced prejudice to all parties. Likewise, limited interruptions of Claimants' opening statement and summation by the District Court were warranted by Claimants' arguments going beyond the District Court's permitted scope. In taking these and other limited measures to promote the fair and orderly presentation of evidence, the District Court acted well within its rights to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence." Fed. R. Evid. 611(a).

In sum, the District Court exercised appropriate discretion in precluding a substantial amount of evidence of agents' supposed bias and aggressiveness and enforcing those rulings during trial.

### e. The District Court Did Not Interfere with Alavi's Presentation of Evidence

Claimants next lodge a vague claim that the District Court improperly policed their presentation in "other ways." (Alavi Br. 112). In support of this argument, Claimants point to two events: one in which the District Court expressed concern about Claimants' treatment of pre-1995 evidence, and another in which

the District Court precluded Claimants from introducing certain testimony from Mirakhor's deposition. With respect to the former, it is clear that the District Court was simply reiterating that, in light of this Court's prior opinion, there was no question that Alavi knew of Bank Melli's ownership of Assa prior to 1995. *See In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 93-94 (2d Cir. 2016). Accordingly, the District Court, at times, reminded the parties that Claimants' pre-1995 knowledge was not in dispute in order to make sure the trial focused instead on the material factual disputes. The District Court made clear that Claimants were free argue that the pre-1995 activity was not illegal, but if they suggested it was wholly irrelevant, the District Court would instruct the jury that the evidence was admitted as relevant evidence, and the jury was free to ascribe to it whatever weight it chose. (Tr. 2980-82). The fact that the District Court reminded Claimants of this outside the presence of the jury cannot be evidentiary error. And indeed, Claimants' counsel made clear that they had no intention of making such an argument. (Tr. 2982 ("We are not going to say it's irrelevant.")).

Likewise, the fact that the District Court precluded Claimants from introducing certain portions of Mirakhor's deposition was not error. A district court has a duty to exclude inadmissible evidence regardless of whether a party objects. Fed. R. Evid. 103(d) ("To the extent practicable, the court *must* conduct a jury trial so that inadmissible evidence is not suggested to the jury *by any means*.") (emphasis added); *see also Weaver v. United States*, 374 F.2d 878, 882 (5th Cir. 1967) ("It is not only the trial judge's right but his duty

to see that only proper and relevant evidence was admitted.").[39] Contrary to Claimants' insinuations, this measure was never presented as "compensat[ion]" for anything. (Alavi Br. 113). The District Court merely exercised its function to exclude inadmissible evidence. Here, the District Court did not abuse its discretion in concluding that the proffered testimony was speculative and without foundation. (Tr. 2335-36). There can be no serious question that much of Mirakhor's testimony suffered from these defects, as he repeatedly testified about his limited involvement in Alavi's affairs and the Building. (*See, e.g.*, Mirakhor Tr. 56, 63; Tr. 2336 (District Court focusing on aspects of testimony where witness is "speculating about somebody else's state of mind")). In light of those evidentiary infirmities, the District Court did not abuse its discretion in precluding both parties from relying on inadmissible testimony. (Tr. 2337).

Claimants have also failed to show that they were harmed by not being able to rely on any particular portions of the deposition. Claimants quote one line from Mirakhor's deposition about a belief that Assa was

---

[39] Indeed, a district court's authority to preclude inadmissible evidence without objection is a premise for plain error review. *See* Fed. R. Evid. 103(e); *cf. United States v. Tillem*, 906 F.2d 814, 825 (2d Cir. 1990) ("Plain error is defined as an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object.").

owned by investors in the United Kingdom and juxtaposes that line to the District Court's general warning about the infirmities in Mirakhor's testimony. (Alavi Br. 113). That testimony, however, was not what the District Court was specifically referring to in its comments about inadmissible portions of the deposition, and, in any event, Claimants have not shown that they were precluded from relying on that particular portion of Mirakhor's testimony, or any other. To the contrary, Claimants' summation made ample use of Mirakhor's deposition, without interruption by the District Court. (*See, e.g.*, Tr. 3154, 3184-87).

In sum, Claimants have failed to raise any evidentiary errors committed by the District Court that interfered with their presentation of evidence at trial.

### f. The District Court Properly Admitted Out-of-Court Statements Against Claimants

Claimants next argue that the District Court erred in admitting out-of-court statements made by employees and representatives of Alavi and Assa. (Alavi Br. 114). Claimants' portrayal again leaves out many of the crucial details. Contrary to Claimants' presentation of these matters as rash and one-sided decisions by the District Court, the admission of this evidence followed substantial motion practice and argument that resulted in evidentiary rulings for both parties, and involved the District Court carefully supervising the portions of the Government's evidence that were ultimately admitted.

Prior to trial, both parties moved *in limine* concerning the admission of out-of-court statements by Geramian, Alavi's president from approximately 1992 until 2006; Tafti, Assa's representative in the United States from approximately 1995 until 2008; and Badr, Alavi's president from approximately 1987 until 1991. (Dkt. No. 1620 at 2 (incorporating Dkt. No. 720 at 10-13); 1671 at 1 (incorporating Dkt. No. 752)). These three witnesses were all unavailable either because they were beyond the jurisdictional reach of the District Court (Badr and Tafti), or because they had asserted their Fifth Amendment right and refused to testify (Geramian). *See* Fed. R. Evid. 804(a). However, during the course of the investigation of this case, each made statements to the FBI about Alavi's secret relationship with the government of Iran as well as the 1989 partnership transaction through which Bank Melli's interest was concealed. In its written ruling prior to trial, the District Court precluded the Government from introducing out-of-court statements by any of these three witnesses. (Alavi JA 2727-33). With respect to Badr, however, the District Court's ruling had only been based on the possibility that he might be available for trial and, accordingly, at a pre-trial conference, the Government noted its intention to re-raise the admissibility of statements by Badr if he ultimately did not appear for a deposition. (Alavi JA 3940).

Prior to trial, the Government made additional arguments concerning the admissibility of out-of-court statements by Badr and Tafti. (Dkt. No. 1741). In particular, the Government explained that Badr would be unavailable for trial and therefore the District Court

should consider whether, as an unavailable witness,
his statements against interest were admissible and,
second, the Government explained in more detail how
certain statements made by Tafti were against his in-
terest. (*Id*.). In response, the District Court recognized
that Badr was no longer available for trial and ruled
that certain statements made by him would be admis-
sible. (Alavi JA 2780-81; *see also* Dkt. No. 1800 (ex-
plaining why statements by Badr were all admissible
as either statements against interest or co-conspirator
statements)). With respect to Tafti, however, the Dis-
trict Court requested additional information from the
Government, including precisely what statements the
Government sought to offer, and whether, because of
the proffer agreement pursuant to which the state-
ments were made, the statements could expose Tafti
to criminal liability. (Alavi JA 2781-82). The Govern-
ment complied with that request and provided the Dis-
trict Court with a copy of Tafti's proffer agreement,
and the precise seven out-of-court statements by Tafti
that the Government sought to admit. (Dkt. No. 1784).
After reviewing "the proffer agreement—and the plain
criminal exposure to which it left Tafti open to—along
with the granular listing of statements that the Gov-
ernment seeks to introduce," the District Court per-
mitted the Government to introduce these identified
out-of-court statements by Tafti. (Dkt. No. 1788).[40]

---

[40] Thus, contrary to Claimants' self-pitying rheto-
ric, the District Court did not "arbitrarily reverse[] it-

Subsequently, after Claimants asked the District Court to reconsider, the District Court slightly narrowed its ruling and precluded the Government from introducing one of the statements. (Tr. 479, 522-23).

During trial, the Government introduced these statements through the testimony of Special Agents Ennis and McWilliams. (Tr. 353-80, 395-99, 529-38, 1352-56). Claimants then cross-examined the agent-witnesses about the statements. (Tr. 571-72, 594-603, 1425-26). Claimants also elicited testimony concerning additional out-of-court statements by other Alavi board members that Claimants believed would be helpful to their case, including statements by former board members Ahmadi and Hassani. (Tr. 572-78, 606-08). In sum, the District Court carefully, fairly, and properly exercised its discretion over the admissibility of the out-of-court statements. Claimants' contentions to the contrary are meritless.

### i. The District Court Did Not Abuse Its Discretion in Admitting Statements by Badr

At trial, Special Agent Ennis testified that, among other things, Badr told the FBI that: the Bonyad Mostazafan was the parent company of Alavi (Tr. 367); that, in the late 1980s or early 1990s, the Iranian Ambassador to the United Nations "made it known that he was in charge of not just the Iranian representation

_____

self." (Alavi Br. 118). The District Court requested, received and reviewed additional information and made a considered, informed decision.

of the government of Iran to the United Nations but he was in charge of all things Iran in the United States," including Alavi (Tr. 368, 379); Badr prepared secret financial reports to Bonyad Mostazafan (Tr. 371); and Bonyad Mostazafan and Bank Melli were responsible for the 1989 partnership transaction (Tr. 375).

In challenging the admission of these statements, Claimants first argue that the statements did not describe any "criminal or unlawful" conduct. (Alavi Br. 115). This argument is incorrect. Badr's statements did, in fact, expose him to civil or criminal liability and were against his "proprietary or pecuniary interest." Fed. R. Evid. 804(b)(3); *see also Gupta*, 747 F.3d at 127 ("The proffered statement [need] not have been sufficient, standing alone, to convict [the declarant] of any crime, so long as it would have been probative in a criminal case against him.") (internal quotations omitted). Plainly, telling members of the FBI that one was the president of an organization controlled by the Iranian Ambassador or that sent secret reports to the government of Iran is the kind of statement that would, at a minimum, be probative in a potential criminal case brought against him. In fact, Badr's communications explicitly reveal that he understood that the Iranian Ambassador's interactions with Alavi at the time involved "illegal instructions." (GX628-T). Likewise, Badr's statements about the 1989 transaction wherein Bank Melli's interest were concealed also tended to expose him to criminal or civil liability, for among things, fraud. As the District Court concluded, "[a] reasonable person in Badr's position would have understood that the information provided

to law enforcement could have exposed him to prose-
cution for tax violations and fraud." (Alavi JA 2780).
In addition, providing this information to the FBI ex-
posed Badr to personal and financial risks that the
government of Iran might take retaliatory action
against him. (Alavi JA 2781). Indeed, Hesami-Kiche
discussed that risk during his testimony. (Tr. 1850).
Badr himself, despite stating his intent to appear as a
witness, changed his mind and flew back to Iran, ad-
vising that he was not able to return for trial. (Dkt. No.
1778). Accordingly, the District Court did not abuse its
discretion in concluding that the statements were
against Badr's interest.

Claimants also challenge the admission of the
statements because, they claim, the District Court
"simply ignored" the second half of Rule 804(b)(3),
which, they claim requires "corroborating circum-
stances" to demonstrate the statements' trustworthi-
ness. (Alavi Br. 117). Claimants' argument disregards
the express limitation that the "second half of the Rule
804(b)(3) inquiry" applies only "in a criminal case."
Fed. R. Evid. 804(b)(3)(B); *see Davis v. Velez*, 797 F.3d
192, 204 (2d Cir. 2015) (noting that Rule 804(b)(3)(B)
"requires such special corroboration where the state-
ment against penal interest 'is offered in a *criminal*
case,' " and observing that "[t]his Court has not ruled
on whether the special corroboration requirement is
applicable in civil cases"). Moreover, while no addi-
tional corroboration was required in a civil case, even
if corroboration were required, it existed here. The fact
of "connections" between Alavi and the Iranian govern-
ment was amply supported by numerous letters and

other documents, in addition to other witness testimony. (*See, e.g.*, GX601-T, 602-T, 605-T, 624-T, 628-T; Tr. 2019-22, 2026-51). The fact that Iranian officials were involved in the 1989 transaction was corroborated by numerous exhibits and other testimony. (*See, e.g.*, GX210-T, 603-T, 604-T, 621-T, 623-T; Tr. 1807-13, 1826-35). Accordingly, Claimants' argument that Badr's statements were uncorroborated has no merit.

Claimants also argue that certain of the statements were separately inadmissible as hearsay within hearsay. (Alavi Br. 116). During trial, Claimants identified only two supposed instances of this problem, namely instances where Badr's statement included information provided to him by Mahallati and Zobeidi, other Alavi officers, that they were instructed to resign by the government of Iran. (Dkt. No. 1794). In their letter identifying this concern, Claimants did "not request any relief" (*id.*), and thus waived any objection.

The District Court nevertheless reviewed these claims and the record "line by line, paying particular attention to those portions where Special Agent Ennis discussed his 2009 meeting with Badr-Taleh." (Alavi JA 4002). The District Court concluded that these hearsay-within-hearsay statements were properly admitted as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), because they were statements in furtherance of a conspiracy between the Bonyad Mostazafan and Alavi "to conceal the government of Iran's relationship with Alavi." (Alavi JA 4009). This conclusion is undoubtedly correct. Badr testified about learning that Mahallati had been removed as Alavi's president because "Mahallati's

brother became the Iranian ambassador to the United Nations. It was then determined back in Teheran that would look like a much too close relationship between the government of Iran and the foundation to have two brothers each running the other thing." (Tr. 373). Thus, even though these statements occurred prior to the 1995 sanctions, the statements were clearly in furtherance of the earlier conspiracy to conceal Bank Melli's role in the Partnership to perpetuate, among other things, the scheme to conceal information from New York State regulators.[41]

Accordingly, the District Court did not abuse its discretion in admitting Badr's statements against interest. And, as discussed above, because Badr's statements were corroborated by documentary evidence, any error in admitting the statements was harmless.

### ii.     The District Court Did Not Abuse Its Discretion in Admitting Statements by Tafti

Claimants also argue that the District Court improperly admitted Tafti's out-of-court statements. (Alavi Br. 118). Special Agent Ennis testified that Tafti told him Assa was owned and controlled by Bank Melli and that Alavi was owned and controlled by the government of Iran. (Tr. 532-32). The first of these

---

[41] The District Court also found the other hearsay-within-hearsay statement to be admissible for the same reason. (Alavi JA 4010). Claimants to not appear to challenge that determination on appeal.

statements was utterly uncontroversial—it was stipulated to by the parties. (Tr. 351-52). The second of these statements was supported by substantial independent evidence, such as the detailed notes of the Alavi board meeting at which Iranian ambassadors asserted and exerted their control. (GX502-T). These statements concerning both Assa and Alavi were also against Tafti's interest for substantially the same reasons as Badr. Telling federal law enforcement that one's employer and its partner are controlled by the government of Iran has a significant potential to expose a person to criminal or civil liability. Like Badr, those very risks likely explain why Tafti in fact refused to enter the U.S. embassy in Dubai or otherwise come back to the United States to sit for a deposition in this case. Put simply, Tafti knew the significant exposure he faced or could face as a result of those out-of-court statements.

Claimants nevertheless argue that the statements were not against interest because they were made under the protection of a proffer agreement. (Alavi Br. 118-19). The applicable proffer letter, however, does not provide immunity, but rather more limited protections. It precludes only the use of Tafti's statements directly against him as part of the Government's case-in-chief. (Dkt. No. 1784, Ex. A). It does not, however, preclude prosecution based on evidence the Government gathers after pursuing leads from proffer-protected statements, from using the statements to oppose arguments made by counsel, or from using the statements in cross-examination. (*Id.*). Nor does it protect the statements from use in any prosecution for obstruction of justice or perjury. (*Id.*). Accordingly, even

under those circumstances, Tafti's statements were still "probative" of a criminal case against him. *Gupta*, 747 F.3d at 127.

As Claimants concede, the determination of whether a statement is against the declarant's interest must be made "in light of all the surrounding circumstances." (Alavi Br. 119 (quoting *Williamson v. United States*, 512 U.S. 594, 599 (1994)). After considering substantial submissions and arguments by the parties, including many details about the investigation that were elicited during the suppression hearing, the District Court was well-suited to make that totality of the circumstances assessment concerning the adverse interests to Tafti based on his statements to the FBI. The District Court properly concluded, and did not abuse its discretion in concluding, that in sharing details of the government of Iran's control over Assa and Alavi, Tafti exposed himself to substantial criminal and/or civil liability and that the proffer letter alone did not eliminate any adverse risks to Tafti.

Moreover, Tafti's statements were party admissions and therefore independently admissible under Federal Rule of Evidence 801(d)(2). At the time of his interview in 2008, Tafti was still Assa's representative in the United States and Assa was still Alavi's partner in the Partnership. Accordingly, even if Tafti's statements were not sufficiently adverse to his proprietary, pecuniary or legal interests, the District Court properly admitted his statements against the Partnership.

In addition, though not necessary for their admission, the substance of Tafti's statements were substantially corroborated by other trial evidence showing Iran's control over both Alavi and Assa.

### iii. The District Court Did Not Abuse Its Discretion in Admitting Statements of Alavi Accountant Hamid Firooznia

Claimants also argue that the District Court erred in admitting a recording that Hesami-Kiche made of a conversation with Hamid Firooznia, Alavi's long-time accountant. (Alavi Br. 119; *see* GX5014-T). This recording, however, was admissible as a coconspirator statement as well as for the non-hearsay purpose of demonstrating Firooznia's state of mind. Moreover, the District Court did not err in not redacting statements made by Hesami-Kiche during the recording. Those statements were necessary to understand the context of the recording, and the District Court clearly instructed the jury that Hesami-Kiche's statements were not to be considered for their truth (a fact that Claimants ignore).

Firooznia was Alavi's long-time accountant and was intimately involved in Alavi's and Assa's affairs for years. For instance, Firooznia was present at meetings in and around the creation of the Partnership where, among other things, "the status of the ASSA Company was thoroughly reviewed." (GX714-T). Firooznia was also subsequently appointed the accountant for Assa and given access to all of its infor-

mation "due to Mr. Firooznia's knowledge of the general partnership issues, the fact he is Iranian and it is easier to discuss various *financial problems* with him." (GX165-T) (emphasis added). In other words, Firooznia was well aware of Alavi's secret relationship with Bank Melli Iran.

In the recording, Firooznia discussed "the problem," i.e., Assa, and how Firooznia had spoken to Iranian Ambassador Khazaee and "told him everything." (GX5014-T). Likewise, Firooznia explained how he had written a report for the government of Iran, which, among other things, "explains all of it. What was the origin, what are the past causes of this case? What happened? Where has it gone? How did it get this way? And then what problems came, what happened? How did we get this far? And what are the solutions?" and how he was summoned to Tehran to discuss the matter. (*Id.*; *see also* GX501-T (referring to "Mr. Firouznia" and a "report")). Firooznia even used the same coded terminology of "father and mother" to refer to Bank Melli's ownership of Assa that was used in the Alavi documents that Jahedi tried to destroy. (*Compare* GX5014-T at 13-14 *with* GX28I). Firooznia also suggested ways of extricating Alavi from the Partnership, including "chang[ing] the owner of the forty to a decent owner that can be counted upon." (GX5014-T). In furtherance of the conspiracy, Firooznia described these events to Hesami-Kiche and agreed to send him a copy of the report for the same purpose. (*Id.*). These statements were relevant to Firooznia's state of mind, and thus relevant to the existence of a conspiracy to violate the IEEPA and to commit money laundering, *see United States v. Salameh*, 152 F.3d 88, 112 (2d Cir.

1998); were co-conspirator statements in furtherance of the conspiracy, *see, e.g.*, *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) ("Such statements 'need not be commands, but are admissible if they provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy.'") (quoting *United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001)); and statements-against interest.

Prior to trial, Claimants sought to preclude the Government from playing this recording on the ground that Firooznia had stopped working as Alavi's accountant approximately one-year prior. (Dkt. No. 1769). In response, the Government explained the ways in which the recording was properly admissible—to show Firooznia's knowledge and state of mind, and because Firooznia was a coconspirator in the scheme to hide Alavi's partnership with Bank Melli for years. (Dkt. No. 1774). Specifically, the fact that even Alavi's and Assa's shared accountant was well aware of Alavi's reporting to Iran and its relationship with Bank Melli through Assa is probative of the knowledge of the officers of Alavi, many of whom worked alongside Firooznia, about these facts.

The District Court explained its reasons for permitting the introduction of this recording in a written order, including its recognition that, at the time of the recording, Firooznia was still clearly involved in plotting to help Alavi "in the overall concealment of Iran's role in the partnership between Assa and Alavi." (Alavi JA 3841). Thereafter, when the recording of

Firooznia was played at trial, the District Court clearly instructed the jury to disregard Hesami-Kiche's statements or questions, as the questions were not evidence and his statements were not offered for their truth; they were offered solely to provide context. (Tr. 1989). Accordingly, the District Court acted within in discretion in admitting the full recording of Hesami-Kiche's conversation with Firooznia.

Claimants' arguments to the contrary are unpersuasive. As the District Court found, and as is clear from the conversation itself, Firooznia was undoubtedly a coconspirator at the time of the recording and the statements were in furtherance of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). During the recording, Firooznia describes his efforts to assist in concealment efforts, including bringing information and proposals to the attention of the Iranian government to resolve the risk posed by Bank Melli's involvement; he agreed to send his proposals to Hesami-Kiche for the same purpose. (Alavi JA 3841). Likewise, Claimants' argument that Firooznia's state of mind is irrelevant strains credulity. The knowledge of Bank Melli's ownership of Assa well into 2008 by Alavi's and Assa's joint accountant, is relevant to Claimants' contention that they were ignorant of those facts. Furthermore, there is also no merit to Claimants' argument that Hesami-Kiche's statements should have been redacted. Without those statements, much of what Firooznia said would not have made sense in the context of the back-and-forth and questions and answers that are part of a normal conversation. In addition, the jury was

clearly instructed about the portions of the conversa-
tion that were, and were not, evidence, and the por-
tions that were, and were not, offered for their truth.

Finally, any conceivable prejudice that Claimants
suffered as a result of the introduction of this record-
ing is minimal. In the context of this trial, Firooznia's
name came up infrequently and was not heavily relied
on by the Government as compared to the broad swath
of other incriminating evidence admitted at trial. Ac-
cordingly, any error in admitting Firooznia's state-
ments was harmless.

### g. The District Court Properly Admitted Evidence that Alavi was Instructed by the Iranian Ambassador to the United Nations

Claimants' last evidentiary complaint concerns the
District Court's admission of evidence of Alavi settling
a lawsuit at the direction of the Iranian Ambassador.
(Alavi Br. 121). This evidence, including directions by
then-Ambassador Zarif to Alavi board members to set-
tle a lawsuit brought by former Alavi president
Hussain Mahallati through the Hanif Partnership was
highly probative of the control and influence that the
government of Iran exercised over Alavi, and was fea-
tured as part of the core of the Government's allega-
tions and its case-in-chief since the filing of the
Amended Complaint. (Amended Complaint ¶¶ 78-81).
Likewise, the fact that Zarif further dictated how the
proceeds of that settlement were distributed was im-
portant evidence that he in fact controlled the settle-
ment.

Like many of the issues discussed above, the admissibility of this evidence was the topic of the parties' motions *in limine*, and was revisited during trial. (*See* Dkt. No. 1617 at 2 (incorporating Dkt. No. 716); 1674 at 16-17 (incorporating Dkt. No. 755 at 34-35); 810 at 4 (Denying motion to preclude evidence of the Hanif Settlement prior to trial in 2013)). Prior to trial, the District Court ruled that evidence of the Hanif Settlement was admissible inasmuch as it was "probative of the relationship between Alavi and Assa." (Alavi JA 2723). This was indisputably true, as the way in which the lawsuit was settled was probative of the Government's theory at trial, namely that Alavi operated, in many respects, under the direction and control of the Iranian government, and that all parties were aware of Assa's true ownership. Likewise, the District Court properly admitted the evidence of how the settlement funds were distributed thereafter because it was "probative of Zarif's participation in the settlement, it is probative of Iranian control of Alavi." (Tr. 1980).

Evidence of Zarif's influence over the actual settlement was introduced through testimony about how Ambassador Zarif had influenced Alavi's board to settle the claims brought by the Hanif Partnership. (Tr. 515-16, 574-75, 1327-29). This fact was corroborated by one of board member's Ebrahimi's journals, noting that "[t]o eliminate legal problems with Assa Company and preventing possible losses of going to the court, with consideration of Foundation's attorneys' recommendation, it was determined that the amount of $4,000,000 will be paid to the plaintiff from the joint account with Assa." (GX501-T). The evidence of the

subsequent transfer of $1.1 million from the settlement funds to Iranian officials at Zarif's direction was introduced through portions of the deposition of Modarres, the individual who had been entrusted by Ambassador Zarif to distribute the proceeds of the Hanif Settlements to a number of Iranian officials. (Tr. 2347; Modarres Tr. 17-26, 35-41; GX16A-16E (summary of accounts, including assorted checks to Iranian officials)).

Claimants' argue that the District Court's admission of evidence that Zarif controlled the distribution of the settlement funds was improper. (Alavi Br. 121). That evidence, however, was properly admitted. As explained, it was probative of Zarif's control and influence over the settlement, which was itself probative of the relationship between Alavi and the government of Iran. Thus, the District Court did not abuse its discretion in concluding that the evidence was plainly relevant. (Alavi JA 2723; Tr. 1979-80).

The District Court also acted well within its discretion in concluding that the evidence should not be precluded under Rule 403. (Alavi JA 2723-24; Tr. 1979). In particular, after "extensive oral argument," the District Court explained that this evidence was not unduly confusing to the jury in light of the fact that the evidence concerning the Hanif Partnership had taken on additional clarity during the trial. (Tr. 1979, 1983). In other words, it did not threaten to become a confusing or distracting sideshow, nor did it threaten to prejudice the jury. And of course that was true. The fact that settlement funds were distributed to Iranian officials overseas, whose names otherwise never came up

at trial, was in no way inflammatory, especially when compared to the general allegations in this case that Alavi had been controlled by the government of Iran for decades. Having presided over the weeks-long trial and years-long litigation, the District Court's assessment of the relevance and lack of prejudice of the evidence is entitled to significant deference. *See United States v. Quinones*, 511 F.3d 289, 310 (2d Cir. 2007) ("In reviewing Rule 403 challenges, we accord great deference to the district court's assessment of the relevancy and unfair prejudice of proffered evidence, mindful that it sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence.") (internal quotations omitted)).

Finally, Claimants' argument that the "prejudicial effect" of the evidence was demonstrated by the amount of time the Government devoted to it in summation (Alavi Br. 121-22), is both beside the point and incorrect. The amount of time the Government refers to admitted evidence in summation cannot possibly create prejudice within the meaning of Rule 403, which governs the admission of the evidence in the first place. In any event, Claimants' argument wrongly conflates the "amount of the time the Government spent focused on the *Hanif* litigation in its summation" with the much less significant issue of how the funds were subsequently distributed. (Alavi Br. 122). Indeed, the Government spent a substantial amount of its summation focused on the Hanif Litigation because of how probative it was of Alavi's knowledge that Assa was controlled by Bank Melli, as well as the control of Alavi by the Iranian ambassador. (*See, e.g.*, Tr. 3070-

76, 3079-81, 3098 (explaining how evidence, including GX325 and Alavi's reaction to the Hanif lawsuit as compared to its reaction to the 1995 change in Assa's straw ownership, showed that Alavi was well aware of Assa's true identity in 2003)). By contrast, the subsequent transfer of the settlement funds was mentioned only briefly in summation, without much detail, and never with any argument or suggestion that Alavi knew about how the funds were transferred. (Tr. 3121). Indeed, to the extent the amount of time the Government spent on the precise issue of the subsequent transfer is relevant to anything, it is to demonstrate that the evidence could not have swayed the jury's verdict and that any error in its admission was harmless. *See Aguiar*, 737 F.3d at 263.

Accordingly, Claimants' arguments should be rejected.

## B. The District Court Did Not Unfairly Treat Claimants at Trial

Claimants next put forth an assortment of ways in which it believes its lawyers were shown "disdain" at trial. (Alavi Br. 122). In doing so, Claimants have failed to point to any legal errors and have not demonstrated that the District Court failed to exercise fair and reasonable supervision over the entire course of these proceedings. More fundamentally, however, the matters about which Claimants complains could not have, and did not have, any conceivable, prejudicial effect on the actual trial, the jury, or the presentation of evidence. And as usual, these gripes are presented completely out of context—as if they occupied more

than brief moments within a lengthy trial—and without mention of other rulings by the District Court that were particularly accommodating to Claimants. Accordingly, Claimants' last-ditch effort to obtain a new trial based on the District Court's "extraordinary conduct" (Alavi Br. 130), should be rejected.

## 1. The District Court Did Not Misunderstand Claimants' Defense

Claimants first argue that the District Court failed to understand its defense that it was duped by Assa into believing that a bona fide transfer of ownership occurred in 1995. (Alavi Br. 123). This argument, which is based on out-of-context written and oral statements made by the District Court, is entirely misplaced. In its original grant of summary judgment, the District Court indeed found it incredible that after 1995, Alavi no longer knew Assa's true identity, and used rhetorical flourishes to make its point. *See In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2013 WL 5178677, at *2 (S.D.N.Y. Sept. 16, 2013). That conclusion, however, was not based on a misunderstanding of the facts. It was based on the overwhelming evidence that Alavi knew, and always knew, who owned Assa. Indeed, the jury also apparently found Alavi's defense unfounded, failing to find that Alavi's defense rose to defeat even a preponderance of the evidence standard.

Likewise, Claimants quote a single line by the District Court partway through trial to supposedly demonstrate the District Court's lack of understanding. (Alavi Br. 124). However, that remark was made

during an argument about a conscious-avoidance jury charge. The District Court queried about the existence of "red flags" that would justify such a charge. (Tr. 1504-05). When the District Court stated that it "had never even contemplated" this argument, it was referring to whether or not Alavi's knowledge about Assa's true ownership prior to 1995 could be considered a red flag after 1995. (*Id.*). There was simply no reason for the District Court to have contemplated that matter before it was raised in the course of the charge conference.

More importantly, however, the District Court's evaluation of Claimants' defense simply did not matter. The statements Claimants complain of on appeal were made outside the presence of the jury. Claimants had a full and fair opportunity to present and argue its case to the jury, the ultimate arbiter of facts. Claimants took over six hours in their closing arguments, ample opportunity to fully explain their defense theory and how that theory related to the evidence at trial. There simply is no indication in the record that the District Court committed error or that these discussions had any impact on the evidence presented to the jury or the jury's verdict.

### 2. The District Court Did Not Close the Courtroom

Claimants next argue that the District Court "closed the courtroom" to Muslim schoolchildren. (Alavi Br. 124). This contention is flatly false. As Claimants' brief goes on to concede, no courtroom clo-

sure ever happened. Rather, the District Court expressed concern that children enrolled in schools operating on Alavi-owned properties may have been brought into the courtroom by Claimants for the purpose of improperly attempting to garner juror sympathy, just as Claimants' opening statements included photographs of school children and health clinics, in contravention of the District Court's rulings. Accordingly, when school children then filled the gallery, the possibility of something more than coincidence seemed apparent.

The District Court therefore paused the proceedings so that, outside the presence of the jury, it could inquire of counsel, solicit the parties' views, and independently consider the matter. (Tr. 330-31 (the District Court "consulted with more than five judges on this issue and they are themselves deeply troubled by this issue")). Ultimately, however, the District Court took no steps whatsoever, other than to admonish the parties to comply with its orders.

In sum, the District Court never excluded anyone from the courtroom, or took any action that impacted Claimants' presentation of its case.

### 3. The District Court Properly Posed Questions to Witnesses

Claimants next argue that the District Court engaged in some form of misconduct by posing questions to witnesses. (Alavi Br. 126). This is a wholly unexceptional practice. *See* Fed. R. Evid. 614(b) ("The court may examine a witness regardless of who calls the witness."). Indeed, far from being "out of the blue," the

District Court exercised its discretion in asking questions of nearly every witness who testified in this case. (*See, e.g.*, Tr. 253-54 (Detective Esposito), 361-62 (Special Agent Ennis), 772-74 (Shafie), 1051 (Rahi), 1465 (Karjooravary), & 2422-23 (Murphy)). The District Court's questions were not argumentative or slanted toward one party or the other. They were prompted by the District Court's solicitation of testimony that would be relevant and useful, to clarify or amplify the record, and to satisfy its interests as the finder-of-fact in the parallel judgment-creditor proceeding.

Nevertheless, Claimants argue that the District Court's few questions to Hanieh Safakamal about Alavi's Tehran office were inappropriate. (Alavi Br. 127). These questions were not improper; they related to Safakamal's earlier testimony about properties that were owned by Alavi. Independent evidence at trial indisputably showed that Alavi had a Tehran Office in the 1990s. (*See, e.g.*, GX204-T (1992 letter to the supervisor of the "Alavi Foundation, Agency Office in Tehran")). There was thus nothing shocking or surprising about questions concerning that office. The District Court's questions related solely to what, if anything, had happened to that office. In response, Ms. Safakamal explained that she did not know and the matter ended. (Tr. 2720). The questions left no impression of additional layers of connection to the government of Iran.

The District Court's questions were also plainly relevant to the subject matter of Safakamal's testimony. Shortly before the District Court's questions, Safakamal had testified in detail about all the properties

owned by Alavi. (Tr. 2679). Safakamal had also testified that she was familiar with Alavi's tax filings, and in fact supplied all "the information to the CPA that prepared those tax returns." (Tr. 2698). Likewise, Safakamal was in charge of Alavi's "accounting software" which was used to prepare its tax returns. (Tr. 2710). In fact, Safakamal was so familiar with the tax returns, that she was able to walk the jury through Alavi's returns for multiple fiscal years. (Tr. 2699-2702, 2704, 2706). Immediately before the District Court's questions, Ms. Safakamal testified about Alavi's management fees, as reflected in its tax returns exhibits. (Tr. 2715-19). In that context, it was not inappropriate for the District Court to ask a discrete question about those tax returns, and whether the witness knew why certain property was or was not included. (Tr. 2719-20). The questioning was extremely brief, and the District Court was in no way hostile or disbelieving of the witness. There was no prejudice to Claimants from any of this exchange. And while Claimants lament that they were placed in the "untenable position" of having to object before the jury (Alavi Br. 127), that, along with the option to object outside the presence of the jury, is precisely the procedure the Rules of Evidence provide. *See* Fed. R. Evid. 614(c) ("A party may object to the court's . . . examining a witness either at that time or at the next opportunity when the jury is not present."). Claimants did neither (Tr. 2720, 2738-39), and any objection is therefore waived.

### 4. The District Court Did Not Disparage Alavi's Lawyers

Claimants' list of grievances concludes with a general complaint about being disparaged. (Alavi Br. 127). These complaints do not fairly portray the record and, again, had no impact on the trial.

First, during the direct testimony of Hesami-Kiche, the District Court permitted the witness to begin using an interpreter part way through the trial. This, after the jury had sent out a note stating: "Can you please ask judge to help me/jury. Mr. [Hesami-Kiche] is very, underlined, hard to understand." (Tr. 1842). The District Court, which had a clear view of the difficulty that the parties, the jury, and the court reporter had in comprehending Hesami-Kiche's testimony, made clear its belief that Hesami-Kiche should have used an interpreter all along. (Tr. 2011). At that time, Claimants' counsel expressed concern with the switch to an interpreter, including that it might hamper their ability to conduct cross-examination. (Tr. 2010). Claimants' counsel suggested that the need for an interpreter was "a charade." (*Id.*). The District Court disagreed with these concerns, and in particular Claimants' suggestion that the use of the interpreter was a charade. (Tr. 2011-12). Noting the difficulties the witness had been having, the District Court observed—outside the presence of a jury—that counsel's statement appeared to be tactical. There was nothing inappropriate or disparaging, let alone prejudicial in this exchange.

Claimants next take offense at the District Court's remarks that this Court had been provided an incomplete and misleading picture of discovery in the prior

appeal. (Alavi Br. 128 (citing Alavi JA 1329)). As set forth above, the District Court was absolutely correct. The full record makes clear that that Claimants had not requested discovery based on the statute-of-limitations defense until August of 2013, and its requests following remand were far broader than what was at issue during discovery. In that regard, the full scope of discovery had not been litigated during the prior appeal inasmuch as Claimants' issue presented on appeal was limited to "[w]hether the district court erred in granting, *sua sponte*, summary judgment on Claimants' statute of limitations defense." (Prior Alavi Br. 5). Accordingly, the parties' presentation of the discovery issues were curt. (*Id.* at 127; Prior Government Br. 94). In other words, the issue was not fully developed or presented on appeal. That the District Court recognized that Claimants had presented a one-sided picture of the issue is not prejudicial, it is accurate.

Claimants then complain about the District Court's remarks that they did not have a good-faith basis to object on foundation grounds to the admission of documents being offered through a witness who was copied on the documents. (Alavi Br. 128). In the very next sentence of the transcript, however, Claimants conceded that with respect to some of those documents, "I agree with you in that case it was easy for them to establish a foundation and perhaps didn't need to lodge an objection." (Tr. 2132). In other words, this was simply a colloquy—all outside the presence of the jury —about whether certain objections were necessary, during which Claimants conceded that some were not. There was no disparagement, error, or prejudice.

Claimants next take offense at the District Court's observation that they had engaged in a "scorched-earth" litigation strategy. (Alavi Br. 128). However, the fact that Claimants vigorously opposed nearly all the Government's evidence is easily reflected in the record. Claimants, as was their right, left no argument unmade and no motion unfiled, including requests for reconsideration. They continue, as is their right, to do so on appeal. (*See, e.g.*, 17-3258 Docket No. 116 (Claimants' January 10, 2018 Motion to Reconsider this Court's Denial of Alavi's Attorney's Fees); 163 (Claimants' April 13, 2018 Motion to Reconsider the Size of Alavi's Oversized Brief)). The District Court's observation of this fact is grounds for nothing.

The District Court was also well within its discretion to cut off improper questioning of Misriya Chatoo, Alavi's receptionist, about whether others, including Alavi's lawyers, had learned information about Assa. (Tr. 2811-12). The Government had earlier objected to that line of questioning, and the District Court properly precluded further questions eliciting inadmissible testimony. (Tr. 2808). Indeed, Claimants do not even suggest that there was any error in the District Court's decision to strike the questioning. Instead, they take offense at the way the District Court explained why the questioning was struck. This is not a serious basis for any relief.

In sum, Claimants have failed to demonstrate significant errors or "disparagement," let alone a pattern of such, that actually undermined the integrity of the trial. A vigorously litigated case against extremely damning evidence will tend to produce unfavorable

rulings at trial. As noted above, many of Claimants' applications and presentations at trial—including the request to call a French foundation witness and featuring slides of medical clinics in opening—were obviously improper. Other unfeatured requests were also improper, such as Claimants' efforts to seat jurors based on race and national origin, including through the use of a questionnaire, and their application to call a law professor to testify to legal conclusions about Alavi's knowledge. (Dkt. No. 1620 at 8). Claimants' recitation also fails to include favorable decisions—such as Claimants' award of eight years of attorney's fees from forfeitable property, the preclusion of various statements by Geramian, and Alavi's ability to introduce irrelevant evidence of charitable activity, including charitable donations after 2009—thereby presenting a misleading picture of the full scope of litigation over the course of a decade. Viewed in its full context, Claimants, represented by aggressive, experienced counsel, unequivocally received a fair, vigorously contested trial, presided over by a District Court that was courteous to and demanding of all parties.[42]

---

[42] In that regard, the case Claimants' cite to support their claim of "unfair judicial conduct" (Alavi Br. 129), is easily distinguishable. In *United States v. Nazzaro*, 472 F.2d 302 (2d Cir. 1973), a criminal case, this Court found unfair judicial conduct where the district court engaged in "vigorous participation" in the examination of a criminal defendant in front of the jury including "hostile interruption," behaved wholly

Claimants request for a new trial should be rejected.

## POINT VI

### The Forfeiture Is Not Constitutionally Excessive

Claimants next argue that the jury's verdict amounts to an unconstitutionally excessive penalty in violation of the Eighth Amendment. (Alavi Br. 130). To the extent, however, that the Eighth Amendment applies to some or all of the forfeitable property, the forfeiture is plainly proportional. For more than a decade, Claimants secretly provided support to the government of Iran, whose actions and policies "constitute an

––––––––––

differently in front of the jury toward Government witnesses, and engaged in "acrimonious exchanges with defense counsel, many of which occurred in the presence of the jury." *Id.* at 311-12. Indeed, in that case, the district court appeared to have been intentionally trying to discredit a defense witness in the eyes of the jury and threatened to throw defense counsel in jail. *See id.* On the other hand, this Court recognized that comments by the district court on defense counsel's "failure to comply with rulings on the scope of cross-examination" alone would have been acceptable. *See id.* All of this has no bearing on this civil forfeiture case, involving a judge who regularly engaged in brief and impartial questioning of witnesses from both sides and whose remarks about Claimants' trial strategy were all made squarely outside the presence of the jury.

unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." (Amended Complaint ¶ 7). During this time, Alavi tried to hide this relationship, regularly lied about it, and, when confronted with a grand jury subpoena seeking information about this relationship, the highest ranking member of Alavi's board snuck documents out of Alavi's office, shred them, and attempted to dump them in the trash. Through these actions, Alavi provided tens of millions of dollars to the government of Iran, and the forfeiture of property involved in these sanctions violations is not grossly disproportional.[43]

## A. Applicable Law

The Excessive Fines Clause of the Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Under 18 U.S.C. § 983(g), a claimant may petition the court to determine whether a forfeiture is grossly disproportional. 18 U.S.C. § 983(g). As this Court has noted, "[n]ot all forfeitures . . . are fines subject to the

---

[43] While the foregoing analysis focuses primarily on the Building and Alavi's Partnership interest, it is equally as applicable to the forfeited portions of all of the Defendant Properties. Claimants, however, do not challenge forfeiture of those other properties (or the 11.4 percent of the Building that was forfeited as IEEPA proceeds) as constitutionally excessive. (Alavi Br. 130-31).

Excessive Fines Clause." *von Hofe v. United States*, 492 F.3d 175, 182 (2d Cir. 2007). Thus, for example, when the forfeiture targets proceeds of a crime rather than property involved in or facilitating a crime, the property is considered "guilty property" and the Eight Amendment's ban on excessive fines does not apply. *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 731 F.3d 189, 194 (2d Cir. 2013) ("*Sum of $185,336.07*"); *see also United States v. $63,530.00 in U.S. Currency*, 781 F.3d 949, 957 (8th Cir. 2015) (citing *United States v. Alexander*, 32 F.3d 1231, 1236 (8th Cir. 1994) ("Forfeiture of proceeds cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity.")).

Where a forfeiture is punitive, a court must determine whether the forfeiture is excessive by comparing "the forfeiture to the gravity of the offense giving rise to forfeiture." 18 U.S.C. § 983(g)(2). This Court has framed this inquiry it terms of three factors: "(1) the harshness, or gross disproportionality, of the forfeiture in comparison to the gravity of the offense, giving due regard to (a) the offense committed and its relation to other criminal activity, (b) whether the claimant falls within the class of persons for whom the statute was designed, (c) the punishments available, and (d) the harm caused by the claimant's conduct; (2) the nexus between the property and the criminal offenses, including the deliberate nature of the use and the temporal and spatial extent of the use; and (3) the culpability of each claimant. *von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir. 2007).

This Court reviews "the issue of excessiveness *de novo*, bound by the district court's factual findings unless clearly erroneous." *von Hofe*, 492 F.3d at 181.

## B. Discussion

Following trial, Claimants petitioned the District Court to reduce the forfeiture under 18 U.S.C. § 983(g). (Dkt. No. 1998). The District Court denied the petition finding that property that had been civilly forfeited as criminal proceeds, for example, the Partnership, was not subject to a proportionality analysis. (Alavi JA 4198-99). The District Court further found that the forfeiture of the remainder of the property, such as the Building, which was involved in money laundering, was not grossly disproportional to the criminal activity giving rise to forfeiture. (Alavi JA 4199-4200). In particular, the District Court noted that Alavi's conduct "was the product of planned, carefully executed judgment," and that the criminal scheme "was an extremely serious one involving national security, and one that was carried out in a brazen manner for years and years." (Alavi JA 4199). These findings were amply supported by the facts and should be affirmed.[44]

---

[44] This entire analysis assumes that a corporate entity can even mount an Eighth Amendment challenge, a dubious proposition in the light of the Amendment's focus on "bail," and results that are "cruel and unusual." *See Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 (1989) (leaving open whether Eighth Amendment applies to corporations); *United States v. Chaplin's, Inc.*, 646 F.3d 846,

### 1. The Forfeiture of Offense Proceeds Was Not Punitive

Claimants' argument that the civil forfeiture of properties constituting proceeds of the offenses—that is, properties that the Claimants would not have obtained or retained but for the commission of national security crimes—fails for two reasons. First, courts have held that *in rem* forfeiture of the proceeds of crime is not punitive and not subject to proportionality analysis. Second, even if the *in rem* forfeiture of criminal proceeds were considered in part punitive, the forfeiture of proceeds is proportional because they represent property that the wrongdoer obtained or retained as the result of crime.

In *Sum of $185,336.07*, 731 F.3d 189, this Court recognized that the civil forfeiture of drug proceeds was non-punitive and not subject to an Eighth Amendment challenge. This is because the property is regarded as "guilty property," and because "the forfeiture of drug proceeds will always be directly proportional to the amount of drugs sold." *Id.* at 194 (internal quotations omitted). This Court reached that conclusion notwithstanding the Supreme Court's prior decision that property that is only involved in, or facilitates illegal drug activity is, at least in part, punitive and, therefore subject to the excessive fines analysis. *See id.* (distinguishing *Austin v. United States*, 509

---

854 (11th Cir. 2011). The Court, however, need not reach this issue because the forfeiture was in no way grossly disproportional.

U.S. 602, 622 (1993)). Following *Sum of $185,336.07*, in *United States v. Viloski*, 814 F.3d 104 (2d Cir. 2016), a case involving criminal, *in personam* forfeiture rather than civil, *in rem* forfeiture, this Court noted that *in rem* actions seeking forfeiture of proceeds are distinct from other forfeitures, explaining that the forfeiture in the case of an amount equal to the fraud proceeds that the defendant no longer possessed was subject to an excessive fines analysis because "the Government has moved not against the proceeds themselves . . . but against Viloski personally." *Id.* at 109 n.7. This Court continued to recognize that the civil forfeiture of proceeds (as opposed to facilitating property) is considered an action against the guilty property itself and is not subject to proportionality analysis. *Id.* This principle is not limited to drug-related forfeiture cases. *See United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 76 (2d Cir. 2002) (recognizing that 18 U.S.C. § 981 and 21 U.S.C. § 881 "involve[ ] the same basic principles and operate[ ] in the same way").

These cases are also not abrogated by the Supreme Court's recent decision in *Kokesh v. S.E.C.*, 137 S. Ct. 1635 (2017). (Alavi Br. 132 n.48). In *Kokesh*, the Supreme Court found that an SEC *in personam* disgorgement action was "penal" as that term is employed for statute of limitation purposes in 28 U.S.C. § 2462. *See id.* at 1643. That finding, however, was premised on the punitive nature of disgorgement including, for example, the fact that disgorgement can apply to more than the proceeds obtained or retained by the individual defendant—including, for example, the value of proceeds that had been transferred to other wrongdo-

ers. *See id.* at 1644 ("SEC disgorgement sometimes exceeds the profits gained as a result of the violation."). Civil *in rem* forfeitures, by contrast, to the extent focused on the crime proceeds themselves, are limited to a particular claimant's interest in those proceeds. Accordingly, the forfeiture of any proceeds obtained or retained by criminal conduct is subject to forfeiture irrespective of any proportionality analysis.

Moreover, even if the *in rem* forfeiture of criminal proceeds were considered punitive and subject to proportionality analysis, that forfeiture of criminal proceeds is plainly proportional. *See Sum of $185,336.07*, 731 F.3d at 194 (citing *United States v. Tilley*, 18 F.3d 295, 300 (5th Cir. 1994)); *Tilley*, 18 F.3d at 300 ("[T]he forfeiture of drug proceeds will always be directly proportional to the amount of drugs sold."). Contrary to Claimants' argument (Alavi Br. 132), there is a direct relationship between the value of the forfeited proceeds and the crime. Proceeds are properties that were only retained or obtained because the crime was committed and are necessarily proportional to the crime. Any argument to the contrary is akin to suggesting there is no relationship between the value of the contents of a purse and the crime of purse-snatching: whether the purse is empty or contains priceless jewelry, they are the proceeds of a crime and it is perfectly proportional to deprive the wrongdoer of them. The hundreds of millions of dollars that Claimants generated from the Building, resulting in the distribution of tens of millions of dollars to Alavi, in violation of our national security laws, and Alavi's ability to retain the benefits of ownership of its Partnership interest as a result of concealing its control by a rogue regime and

the world's foremost state-sponsor of terrorism, are the proceeds of those crimes. Accordingly, the value of the property obtained or retained as a result of the criminal offenses, including Alavi's interest in the Partnership, is inherently connected to the seriousness of the illegal services provided to Iran. Thus, the forfeiture of proceeds is wholly proportional.

## 2. The Forfeiture of the Building and Other Involved-In Property Was Not Constitutionally Excessive

With respect to the forfeiture of property based on its involvement in money laundering—including the Building and Alavi's Partnership interest—analysis of the *von Hofe* factors shows that the forfeiture here is proportional.

First, consideration of the harshness of the forfeiture compared to the gravity of the offense, involves an evaluation of, among other things: (1) the nature of the offense committed; (2) whether the claimant falls within the class of persons for whom the statute was designed; (3) the punishments available; and (4) the harm caused. *von Hofe*, 492 F.3d at 186. The offenses here involved national security crimes, violations of the IEEPA and the ITSR, adopted in response to unusual and extraordinary threats to the national security, foreign policy, and economy of the United States posed by the government of Iran. Exec. Order 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995); Exec. Order 12,959, 60 Fed. Reg. 24,757 (May 6, 1995); Exec. Order 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997). Accordingly, "[t]he [Iranian] embargo is primarily concerned

with a few key actions and policies at the heart of the threat posed by the Iranian government—namely, the proliferation of weapons of mass destruction, state-sponsored terrorist activity, and efforts to frustrate Middle East diplomacy." *United States v. Banki*, 685 F.3d 99, 108 (2d Cir. 2012) (citation omitted). This Court has long recognized Iran as a "state sponsor[] of terrorism." *In re Terrorist Attacks on* September *11, 2001*, 714 F.3d 109, 115 n.7 (2d Cir. 2013); *see also* Notice, Continuation of the National Emergency with Respect to Iran, 83 Fed. Reg. 11,393 (Mar. 12, 2018) (Iran's unusual and extraordinary threat to national security based on its development of ballistic missiles, support for international terrorism, and human rights abuses). "Since its inception in 1979 as a revolutionary theocracy, the Islamic Republic of Iran has declared its hostility to the United States and its allies and partners. Iran remains the world's leading state sponsor of terrorism, and provides assistance to Hezbollah, Hamas, the Taliban, al-Qa'ida, and other terrorist networks. Iran also continues to fuel sectarian violence in Iraq, and support vicious civil wars in Yemen and Syria. It commits grievous human rights abuses, and arbitrarily detains foreigners, including United States citizens, on spurious charges without due process of law. There is no doubt that Iran previously attempted to bolster its revolutionary aims through the pursuit of nuclear weapons and that Iran's uranium enrichment program continues to give it the capability to reconstitute its weapons-grade uranium program if it so chooses." Ceasing U.S. Participation in the JCPOA

and Taking Additional Action to Counter Iran's Ma-
lign Influence and Deny Iran All Paths to a Nuclear
Weapon, 2018 WL 2112428 (May 8, 2018).

The fact that Alavi itself did not engage in terror-
ism is beside the point. (Alavi Br. 134). Through its de-
liberate and continuing conduct, it knowingly provided
support to a state sponsor of terrorism and a regime
that poses a persistent, grave threat to global stability
and U.S. national security. As the District Court
found, "the evidence amply demonstrated that the con-
duct at issue in this trial was the product of planned,
carefully executed judgment: Claimants were aware of
Iranian interest, ownership and control, and they pro-
ceeded to conduct themselves in a way designed to
maximize protections for Iran, in the face of clear and
well-understood laws that made those actions unlaw-
ful." (Alavi JA 4199).

Claimants' further contention that there was no
"particularized harm" (Alavi Br. 134), is both incor-
rect, and, given the nature and purpose of the sanc-
tions, also besides the point. First, there was particu-
larized harm in the form of Claimants' provision of
tens of millions of dollars to Bank Melli, an Iranian
government-owned bank that was designated in 2007
by OFAC because of Bank Melli's providing financial
support to entities involved in Iran's nuclear and bal-
listic missile programs. U.S. Dep't Treasury, *Fact
Sheet: Designation of Iranian Entities and Individuals
for Proliferation Activities and Support for Terrorism*
(Oct. 11, 2007), *available at* https://www.treasury.gov/
press-center/press-releases/Pages/hp644.aspx. Moreo-

ver, sanctions violations go to the core of national se-
curity interests and violations involving tens of mil-
lions of dollars call for the most severe form of sanc-
tion, even in the criminal context. (Alavi JA 4199 ("The
record evidence leaves no doubt that the offense at is-
sue was an extremely serious one involving national
security . . . .")). In that regard, Alavi's conduct can in
no way be sensibly analogized to the cases it cites, in-
cluding *Bajakajian* and *von Hofe*, which involved cur-
rency reporting and marijuana cultivation, respec-
tively. *See United States v. Bajakajian*, 524 U.S. 321,
324 (1998); *von Hofe*, 492 F.3d at 180. And by inten-
tionally secreting tens of millions of dollars to a hostile
foreign regime, Alavi's conduct is squarely the type of
conduct the sanctions law was enacted to contravene.

The forfeiture is also in line with the potential
criminal penalties that Alavi would face for the con-
duct proven at trial. Indeed, the money laundering
statute provides that the maximum fine may be "twice
the value of the property involved in the transaction."
18 U.S.C. § 1956(a)(1). Thus, because the jury found
that the Building was involved in money laundering,
the criminal code would authorize a fine against
Claimants for *double* the value of the Building.[45]

---

[45] Claimants' argument that the forfeiture grossly
exceeds what would be recommended under the Sen-
tencing Guidelines if this were a criminal sentence is
also misplaced. (Alavi Br. 135 n.49). First, because the
Partnership existed "primarily for a criminal purpose,"
namely, to conceal the Iranian government's owner-
ship interest in the Building and manage the Building

Alavi's attempted analogy to deferred prosecution agreements between the DOJ and various financial institutions is not analogous and unpersuasive. (Alavi

––––––––––

on its behalf, the recommended fine would be "an amount . . . sufficient to divest the organization of all its net assets." U.S.S.G. § 8C1.1. Accordingly, a criminal fine against the Partnership would properly include the entire value of the Building. Second, even if that section did not apply, the appropriate fine under the Guidelines would be approximately $163 to $326 million, calculated as follows: Because Claimants were able to obtain and retain rental proceeds of approximately $102 million as a result of their criminal activity (*see* GX15A, 15B), that amount serves as the "pecuniary gain" from the offense, and therefore the base fine. *See* U.S.S.G. § 8C2.4(a)(2). Under U.S.S.G. §§ 8C2.5(a) and (e), Claimants have a culpability score of eight; a base of five plus a three-point enhancement for obstruction. Accordingly, pursuant to U.S.S.G. § 8C2.6, the multiplier is 1.6 to 3.2, yielding a fine range of approximately $163 million to $326 million. *See* U.S.S.G. § 8C2.7. In other words, forfeiting Alavi's 60 percent interest in the Partnership or the Building, worth approximately $360 million (*see* Alavi Br. 136 (characterizing the value of the Building as "in excess of $600 million")), is substantially similar to the high end of the recommended Guidelines range. *See also* U.S.S.G. § 8C2.9 (recommending disgorgement of "any gain to the organization from the offense" that is not otherwise included within the other aspects of sentencing).

Br. 136-37). For one thing, these settlements represent exercises of prosecutorial discretion in resolving criminal investigations. Those resolutions represent consideration of numerous factors, including extensive cooperation with the investigations by the financial institutions and the adoption of significant remedial actions to address past criminal behavior and prevent future violations, including the voluntary adoption of monitorships. Moreover, the banks agreed to voluntarily pay very substantial monetary penalties, ranging from the hundreds of millions of dollars to billions of dollars, representing the amount of the funds involved in the sanctions violations. The financial institutions involved in the bank settlements are also very different entities than Claimants: they involved large financial entities, independent of the government of Iran, with broad lines of business around the world, only limited aspects of which were involved in sanctions violations. By contrast, the record here demonstrates that the Partnership was created for the singular purpose of owning and managing the Building and for concealing Iran's interests therein. (*See, e.g.*, GX125). Relatedly, while the bank settlements involved transactions conducted by third-parties for the benefit of Iran, this case involved a direct criminal conspiracy with the government of Iran, including the direct participation of the country's highest official, the Ayatollah. (*See, e.g.*, GX601-T). Accordingly, agreements with banks arising out of corporate criminal violations cannot serve as a meaningful benchmark in a case involving claims of forfeiture against property that was involved in the concealment of the ownership of an American

commercial tower for the government of Iran for over a decade.

The fact that the forfeiture judgment may cause Alavi to cease its operations is speculative, probably incorrect, and irrelevant. While this Court recognized in *Viloski*, that a court could consider the impact of a forfeiture on an individual's ability to make a living, *see Viloski*, 814 F.3d at 111, that holding has no bearing on a corporate entity like Alavi. Alavi is not a person with a need to make a living. It is a corporate entity whose main function was to distribute funds obtained from its Partnership income. Now that that Partnership has been forfeited, those funds are simply no longer available as a source of funding for Alavi. At the same time, there is no dispute that Alavi remains free to continue its charitable mission in whatever legal ways in deems appropriate, including through other ways of raising and spending money, just like any other charitable organization.

The other *van Hofe* factors not addressed by Alavi also show the proportionality of the forfeiture. For example, the nexus between the Partnership and the Building and the illegal crimes is self-evident. The forfeited assets enabled Alavi to conceal the government of Iran's interest and generate financial income for Iran. Likewise, Claimants are highly culpable. Alavi's and the Partnership's lengthy and substantial culpability in the crimes at issue, as reflected in the overwhelming evidence against them at trial, seriously undermines any claim that the forfeiture is disproportional.

Accordingly, the District Court properly denied Alavi's petition to reduce the forfeiture as excessive.[46]

## POINT VII

### The Interests of Justice Would Not Be Served by Reassignment to a Different Judge in the Event of a Remand

Claimants' final argument is that this case should be reassigned on remand. (Alavi Br. 138). Their request for this unusual remedy is unwarranted. In advancing this argument, Claimants rely on the District Court's decisions during trial as well as its supposedly "disparaging" view of Claimants' counsel to argue that this 10 year-old case with its record of millions of documents, thousands of docket entries, numerous judicial opinions, multiple hearings, multiple appeals, complicated parallel judgment creditor proceedings, and extensive trial record should be reassigned to a judge who has no familiarity with the case. Claimants have failed to put forth concerns meriting reassignment, and in the context of this case, any potential benefits would be far outweighed by the costs of reassignment.

––––––––––

[46] The District Court also did not commit any error in failing to hold an evidentiary hearing. Having sat through weeks of trial, and days of hearings, of this matter, the District Court had a more than sufficient basis upon which to make the necessary findings of fact to deny Claimants' petition.

## A. Applicable Law

"Remanding a case to a different judge is a serious request rarely made and rarely granted." *United States v. Singh*, 877 F.3d 107, 122 (2d Cir. 2017) (quoting *United States v. Awadallah*, 436 F.3d 125, 135 (2d Cir. 2006)). This Court "will grant a request for reassignment on remand only in 'unusual circumstances.'" *Singh*, 877 F.3d at 122 (quoting *United States v. Brennan*, 395 F.3d 59, 75 (2d Cir. 2005)). To determine whether such extraordinary relief is called for, the Court considers the factors set forth in *United States v. Robin*, 553 F.2d 8 (2d Cir. 1977), namely "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* at 10.

## B. Discussion

The three factors set forth by this Court do not come close to weighing in favor of reassignment. The District Court has not shown that it is incapable of leaving aside previously-held views of findings determine to be erroneous. For instance, the District Court took this Court's finding that—contrary to what it had found on summary judgment—there were genuine issues of fact about Alavi's knowledge after 1995, and incorporated that into its ruling further denying the

Government's motion for summary judgment with respect to imputed knowledge. (Dkt. No. 1461). The District Court also did not disregard this Court's instructions concerning the statute of limitations or suppression. To the contrary, it took this Court's directive seriously, received extensive submissions on the statute of limitations, and held a four-day suppression hearing. There were no errors in the District Court's rulings following remand, but even if there were, there is no reason to think the District Court would be unable to accept them and continue judging.

Second, there is no need to preserve the appearance of impartiality. As set forth above, the fact that the District Court disagreed with Claimants and, at times, commented on its trial strategy outside the presence of the jury, do not give rise to an appearance of partiality. *See Liteky v. United States*, 510 U.S. 540, 551 (1994) ("The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant . . . 'Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions.'" (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943))). After presiding over this case for years, the District Court could well maintain opinions about the parties, without there being any concern with its ability to oversee the case impartially, and fairly apply the law to the facts. Likewise, the fact that the District Court ruled against Claimants on certain issues cannot and should not factor into this decision. *See id.* at 555 ("[J]udicial rulings alone almost never constitute a valid basis for a bias

or partiality motion."). Moreover, as in the analogous context of recusal, the appearance of impartiality against an attorney alone should be given little, if any, weight. *See United States v. Helmsley*, 760 F. Supp. 338, 342 (S.D.N.Y. 1991) (Walker, Circuit Judge, sitting by designation) ("[C]ourts have drawn a sharp distinction between alleged hostility between judge and party and alleged hostility between judge and attorney." (collecting cases)). Thus, this case does not meet the unusual circumstances required to justify reassignment.

Finally, reassignment would cause extraordinary waste and inefficiency in the context of this case. The case has been vigorously litigated for a decade and has generated a record that could take years to become fully versed in. In addition, the forfeiture action is closely related to the private judgment creditor action, which has a parallel and equally complex record that should continue to be considered in parallel. Even if there were some merit to Claimants' arguments about reassignment, they cannot justify the inordinate difficulty that would be involved in transferring this case to a new judge. It would in no way assist in bringing this case "to an expeditious and equitable conclusion." *Id.*; *see also United States v. Campo*, 140 F.3d 415, 420 (2d Cir. 1998) (justifying reassignment where it will not "entail waste and duplication out of proportion to any gain in preserving the appearance of fairness").

Accordingly, Claimants' request to have this case reassigned in the event of a remand should be denied.[47]

\* \* \*

For the foregoing reasons, the forfeiture judgment against Claimants should be affirmed.

## Section II—Assa Issues

Though all of Assa's interests in the Defendant Properties were found forfeitable by summary judgment five years ago, Assa never sought a certification of appealability and effectively sat on the sidelines for the remaining summary judgment proceedings, the prior appeal, and the entire trial.

Following entry of final judgment, Assa raises essentially four arguments. First, Assa argues that the District Court erred by *sua sponte* dismissing its statute-of-limitations defense in the course of granting the Government's motion for summary judgment. Second, Assa argues that the District Court lacked subject-matter jurisdiction under the FSIA. Third, Assa argues that the District Court erred in granting summary judgment. Finally, Assa contends that the Dis-

---

[47] It is a matter of public record that the District Court judge intends to step down from the bench at the end of this year. Should, for that reason, the District Court decide to reassign the case, that should be for the District Court to determine.

trict Court erred by not staying the forfeiture proceedings entirely. For the reasons discussed below, all four challenges are without merit.

## POINT I

### Assa Was Not Prejudiced by the District Court's Failure to Provide Assa Notice Prior to Entering Summary Judgment Against Assa's Affirmative Defense

Assa first argues, relying on this Court's prior decision, that the District Court erred by entering partial summary judgment dismissing Assa's statute-of-limitations defense without advance notice as required by Rule 56(f) of the Federal Rules of Civil Procedure. (Assa Br. 14-17; *see also* Dkt. No. 182 at 24; *In re 650 Fifth Ave.*, 830 F.3d at 96-97).

The District Court's grant of summary judgment as to Assa's statute-of-limitations defense was procedurally erroneous under Rule 56(f) and this Court's prior decision with respect to Alavi's and the Partnership's statute-of-limitations defense. But this procedural error was harmless because it did not prevent Assa from presenting evidence in support of its affirmative defense, and on appeal Assa has not identified *any* evidence raising a material issue of fact supporting the defense.

### A. Applicable Law

A District Court may grant summary judgment *sua sponte* "[a]fter giving notice and a reasonable time to respond" and "after identifying for the parties material

facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f); *see also Celotex Corp.*, 477 U.S. at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.").

"[I]t is not necessarily reversible error in our Circuit for a district court to grant summary judgment against the moving party without notice or opportunity to defend" so long as "the facts before the district court were fully developed so that the moving party suffered no procedural prejudice." *See Bridgeway v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000); *see also In re 650 Fifth Ave.*, 830 F.3d at 96-97. A party is not prejudiced if "the party had no additional evidence to bring" to oppose the entry of summary judgment. *Bridgeway Corp.*, 201 F.3d at 140. If the party "cannot plausibly claim that, had it been given notice of the district court's consideration of summary judgment against it, it would have brought forth additional evidence, the district court's failure to give notice is harmless and a remand is futile." *Id.*

## B. Discussion

In the District Court, the Government moved for partial summary judgment as to the forfeitability of Assa's interests in the Defendant properties (Dkt. No. 681, 686-89; 806), which Assa opposed. (Dkt. No. 762-65). In its opposition, Assa argued, in part, its statute-of-limitations defense as a basis for denying the Government's motion with respect to certain funds on deposit in Assa's bank accounts, erroneously asserting

that 18 U.S.C. § 984 (which permits the Government to treat cash on deposit in an account as identical to any forfeitable proceeds deposited in that account within one year of their deposit) operated as an independent one-year statute of limitations. (Dkt. No. 762 at 15-16).

On appeal, Assa points to no evidence that it would have brought forth had Assa had notice of the District Court's intention to grant summary judgment dismissing its defense, nor to any evidence creating a genuine issue with respect to any of the facts the District Court found undisputed. Assa refers to the fact that an OFAC representative deposition was held after Assa's opposition papers were filed (Assa Br. 15), but (a) Assa never moved to adjourn the summary judgment briefing in light of the OFAC deposition, and (b) even on appeal, Assa points to no testimony from that deposition that would even arguably support its statute-of-limitations defense. (*Id.*).

Instead, Assa relies solely on the same erroneous reading of 18 U.S.C. § 984, on which it relied in the proceedings below. (Assa Br. 16). In other words, Assa *still* does not contend that any part of the action to forfeit Assa's interests in the Defendant Properties was untimely under the five-year statute of limitations established by 19 U.S.C. § 1621, but argues only that forfeiture claims against cash on deposit in Assa's accounts had to be brought within one year of their deposit. That argument is without merit.

Section 984 does not establish a separate cause of action for forfeiture, nor does it create any statute of limitations. *See* 18 U.S.C. § 984. That provision merely

relaxes the requirement of tracing bank account funds to forfeitable proceeds. *See* 18 U.S.C. § 984; *see also United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 158-59 (3d Cir. 2003). The Government's claims, however, did not rely on Section 984; the claims alleged that Assa's cash was derived from proceeds traceable to violations of the IEEPA and money laundering transactions and did not rely on Section 984's relaxed tracing provisions. Because Assa (1) has pointed to no evidence that it would have called to the District Court's attention, had it had the required notice; (2) has not contended that the Government's forfeiture claims were untimely under 19 U.S.C. § 1921; (3) has not disputed the timeliness of the forfeiture claims against its interests in the Building and the Partnership; and (4) merely advances a plainly erroneous interpretation of Section 984, it has failed utterly to show any possible prejudice from the procedural error below. Remand would therefore be futile, and the District Court's grant of summary judgment dismissing Assa's defense should be affirmed.[48]

---

[48] For all the reasons set forth above with respect to the Alavi and Partnership Claimants' statute-of-limitations defense, the action also was indisputably timely under 19 U.S.C. § 1921, including the fact that there were independent criminal violations giving rise to forfeiture after 2004. *See* Section 1.1.B *supra*. Assa also asserts conclusorily that the matter should be remanded in order for it to take additional discovery, in an attempt to develop evidence that would show a material issue with respect to its defense. (Assa Br. 9-11,

## POINT II

## The District Court Had Subject Matter Jurisdiction over this Action

Assa argues that the District Court lacked subject matter jurisdiction over the forfeiture action because Assa, as an entity owned and controlled by Bank Melli, an Iranian government-owned bank, is entitled to sovereign immunity under the FSIA. (Assa Br. 17-22).

Assa's attempt to challenge subject matter jurisdiction is baseless, because the FSIA does not by its terms apply to this forfeiture action. Accordingly, Assa's challenge should be denied.

———————

15). Assa's characterization of the record is incorrect. As discussed further below, Assa and the other claimants were permitted to take, and did take, document discovery and depositions from OFAC; the District Court limited that discovery on the basis of properly invoked privileges; and Assa never challenged the District Court's finding that those privileges applied on the basis that the privileged material was relevant to a statute-of-limitations defense. Thus, Assa waived the issue below and has identified no timely, preserved discovery requests that it would be entitled to pursue on remand; in fact, it has none. Accordingly, Assa's failure to point to any evidence showing a genuine issue of material fact is fatal to its appeal.

## A. Applicable Law

"[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Permanent Mission of India to the United Nations v. City of New York*, 561 U.S. 193, 196 (2007) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)). "Under the FSIA, a foreign state is presumptively immune from suit unless a specific exception applies." *Id.* (citing 28 U.S.C. § 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)).

The Supreme Court described the history of foreign sovereign immunity and the purpose of the FSIA in *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983). "For more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country." *Id.* at 486. Courts based immunity decisions principally on recommendations by the State Department, giving rise to problems of consistency of application and inviting political pressure from foreign governments. *See id.* at 487-88. "In 1976, Congress passed the Foreign Sovereign Immunities Act in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process.'" *Id.* at 488 (quoting H.R. Rep. No. 94-1487, p. 7 (1976), reprinted in 1976 U.S. Code Cong. & Ad. News 6604 (the "House Report")).

The FSIA adopts the "restrictive theory" of sovereign immunity, restricting the application of the doctrine to a foreign sovereign's public activities but not

its commercial activities. *See id*. at 487-88. As described in the House Report, the restrictive theory reflects concerns arising out of private suits directly against foreign sovereigns or foreign government-owned businesses:

> American citizens are increasingly coming into contact with foreign states and entities owned by foreign states. These interactions arise in a variety of circumstances, and they call into question whether our citizens will have access to the courts in order to resolve ordinary legal disputes. . . At present, there are no comprehensive provisions in our law available to inform parties when they can have recourse to the courts to assert a legal claim against a foreign state. Unlike other legal systems, U.S. law does not afford plaintiffs and their counsel with a means to commence a suit that is specifically addressed to foreign state defendants. It does not provide firm standards as to when a foreign state may validly assert the defense of sovereign immunity; and, in the event a plaintiff should obtain a final judgment against a foreign state or one of its trading companies, our law does not provide the plaintiff with any means to obtain satisfaction of that judgment through execution against ordinary commercial assets.

House Report at 6-7. Thus, the FSIA governs (1) suits *against* foreign sovereigns and (2) actions to *enforce judgments* obtained against foreign sovereigns. *Id*.; *see also* 28 U.S.C. §§ 1330(a) ("The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action *against a foreign state* . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607" (emphasis added)), 1604 ("*a foreign sovereign* shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 and 1607" (emphasis added)), 1609 ("the property in the United States of a foreign state shall be immune *from attachment[,] arrest and execution* except as provided in sections 1610 and 1611" (emphasis added)).

## B. Discussion

Assa's claim that the District Court lacked subject matter jurisdiction is wrong. The FSIA does not apply to this forfeiture action because it is neither a suit against Assa, nor a suit to enforce a judgment against Assa. The District Court's jurisdiction here was not based on 28 U.S.C. § 1330, the provision of FSIA that confers federal subject matter jurisdiction over suits against foreign states, but on 28 U.S.C. §§ 1345 and 1355. Section 1345 provides: "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." 28 U.S.C. § 1345. Section 1355(a)

provides: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress." 28 U.S.C. § 1355(a).

Thus, Assa's contention that subject matter jurisdiction exists only under the FSIA is wrong. Section 1330 does not apply because this forfeiture action is not a "nonjury civil action against a foreign state." 28 U.S.C. § 1330(a). In fact, it is not a nonjury civil action against anyone. It is a *jury* action against *property* located in the United States.

Assa's attempt to expand the scope of the FSIA to bar forfeiture actions is inconsistent with the plain language of the statute and has no basis in its structure, history, or purpose. Assa argues that the FSIA was intended to eliminate *in rem* jurisdiction in favor of *in personam* jurisdiction over foreign states (Assa Br. 18), but this contention is inaccurate. In support of its argument, Assa cites a series of inapposite cases. For example, Assa relies on cases that describe pre-FSIA procedural practice for private litigants to attempt to obtain personal jurisdiction over foreign states by first attaching property owned by the foreign state and located in the United States. (Assa Br. 21); *see, e.g., Geveke & Co. Int'l v. Kompania Di Awa I Elektrisidat Di Korsou N.V.*, 482 F. Supp. 660, 662 (S.D.N.Y. 1979) ("Prior to the enactment of the Immunities Act a common method of obtaining jurisdiction over foreign states had been to attach their property in the United States (precisely as was done

here)."); *see also* House Rep. at 26-27 ("Attachments for jurisdictional purposes have been criticized as involving U.S. courts in litigation not involving any significant U.S. interest or jurisdictional contacts, apart from the fortuitous presence of property in the jurisdiction. Such cases frequently require the application of foreign law to events which occur entirely abroad. Such attachments can also give rise to serious friction in United States' foreign relations.").[49] Civil forfeiture, however, has nothing to do with attachments or with obtaining personal jurisdiction over any party. The elimination by the FSIA of this former procedure for obtaining personal jurisdiction through attachment has no more to do with civil forfeiture than does FSIA's elimination of diversity jurisdiction as a basis for subject matter jurisdiction over a foreign state. *See Argentine Republic*, 488 U.S. at 437 n.5.

Indeed, the concerns that led to the FSIA simply do not apply to this action. As explained in the House Report, Congress was concerned about the invitation for diplomatic pressure on the State Department and issues and uncertainties facing private litigants dealing with foreign states. *See* House Report at 7-9. The

---

[49] Another case Assa cites, *Strategic Lien Acquisitions LLC v. Republic of Zaire*, 344 F. Supp. 2d 145 (D.D.C. 2004), stands for the unexceptional proposition that Section 1330 cannot be the basis of jurisdiction for an *in rem* claim, because Section 1330 only relates to *in personam* claims. Here, as discussed, jurisdiction for this *in rem* claim was not based on Section 1330.

House Report does not discuss forfeiture actions brought by the United States at all. *See generally* House Report. To the extent Congress was concerned about "serious friction in United States' foreign relations" caused by the method of using attachment of property fortuitously located in the United States to obtain personal jurisdiction over the foreign state, that concern does not pertain to the U.S. government's enforcement of the criminal laws through civil forfeiture. Congress expressly conferred jurisdiction over suits brought by the federal government and suits brought to enforce the forfeiture laws. 28 U.S.C. §§ 1345, 1355. Congress also granted the President the authority to declare national emergencies with respect to threats to our national security and to take steps to address those national emergencies. 50 U.S.C. §§ 1701 *et seq*. The President has repeatedly declared a national emergency with respect to the government of Iran and its actions and policies. *See, e.g.*, Exec. Order 12,613, 52 Fed. Reg. 41,940 (Oct. 30, 1987); Exec. Order 12,957, 60 Fed. Reg. 14,615 (Mar. 17, 1995); Exec. Order 12,959, 60 Fed. Reg. 24,757 (May 9, 1995); Exec. Order 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997). These executive orders and implementing regulations, *see* 31 C.F.R. Part 560, broadly prohibit U.S. persons from providing or exporting any goods or services to Iran or the government of Iran, shutting that country out of the United States' economy and financial system. A civil forfeiture action brought by the Executive branch based on knowing violations of these national security controls to forfeit the proceeds of these violations and property involved in the laundering of those

proceeds is well outside the scope of Congressional concern about private litigants' inadvertently impacting foreign relations.

Thus, given the "well established jurisprudence that strongly disfavors preemption of federal statutory law by another federal statute absent express manifestations of a preemptive intent," *United States v. Gen. Dynamics Corp.*, 19 F.3d 770, 774 (2d Cir. 1994), there is simply no basis to claim that the FSIA preempted, *sub silentio*, Sections 1345 and 1355 as proper bases for subject matter jurisdiction. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

Accordingly, the FSIA has no application to this forfeiture matter, and Assa's claim that the District Court lacked subject matter jurisdiction should be rejected.[50]

---

[50] Indeed, adopting Assa's argument would effectively condone the bizarre "heads I win, tails you lose" litigation strategy it pursued here. Assa defended its claim in this proceeding by disclaiming that it was owned by the government of Iran. To the extent that defense was successful, they would have won. According to their argument on appeal, to the extent that defense was unsuccessful, they win anyway. That illogical result is at odds not only with basic common sense,

## POINT III

### The District Court's Discovery Orders Were Within Its Discretion

Assa next challenges a number of the District Court's discovery orders. (Assa Br. 22-31). These challenges, however, mischaracterize the record, ignore Assa's own failure to seek the relief below, and broadly fail to recognize the fair consequences that rightly attached from Assa's own discovery failures—including *every single* Assa witness's refusal to appear for depositions. Indeed, the District Court would have been well within its discretion to impose even more severe sanctions on Assa for this blatant and willful conduct, as the Government and other parties requested, but the District Court opted to impose less than the most severe sanctions available to it. Accordingly, none of the claims constitute error, let alone abuses of the District Court's discretion.

### A. Relevant Facts

On or about April 1, 2010, Assa filed two claims in this action. (Dkt. No. 120, 121). In its claims, Assa asserted that Tafti was the director of Assa Limited and

─────────

but also the FSIA itself, which makes clear that any foreign state that participates in a judicial proceeding waives its protection. *See Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 743 (7th Cir. 2007) ("Failing to raise sovereign immunity and then participating fully in a court proceeding amount to an implied waiver of immunity.").

the President of Assa Corp. (*Id*.). Assa filed an answer to the Amended Complaint on or about June 15, 2011. (Dkt. No. 182). In its answer, Assa asserted that Shakeri and Aghamiri were the owners of Assa Limited. (*Id*.). On or about April 5, 2013, the Government noticed depositions for Shakeri, Aghamiri, and Tafti (the "Assa Representatives"). (Dkt. No. 606). Over the next few months, the Assa Representatives failed to appear for depositions due to their purported difficulty obtaining visas. (*Id*.).

On June 27, 2013, Assa requested permission from the District Court for the Assa Representatives to be deposed in Dubai on July 29, 30, and 31, 2013, outside the close of fact discovery. (*Id*.). The District Court granted Assa's request, permitting the depositions to proceed on those dates. (*Id*.). Consistent with Assa's request and the District Court's order, the Government (as well as counsel for Alavi and for the judgment creditor groups) made arrangements to take the depositions at the U.S. Consulate in Dubai. In response to additional delays by Assa, on July 22, 2013, the District Court ordered that the "Assa witnesses shall be deposed at the U.S. Consulate in Dubai on the dates scheduled. Failure to appear may result in sanctions pursuant to Rule 37, including striking of pleadings." (*Id*.).

On July 26, 2013, Assa was still providing conflicting information about whether the Assa Representatives would sit for depositions. (*Id*.). On July 29, 2013, after counsel for all parties had traveled to Dubai and arrangements were made for stenographers and translators to be present, Shakeri and Tafti entered the U.S.

Consulate briefly to meet with Assa's attorneys and promptly left without sitting for depositions. (*Id.*). Aghamiri never appeared at all. (*Id.*). On September 4 and October 23, 2013, the District Court imposed sanctions on Assa, denying the Government's request to strike Assa's pleadings, but requiring Assa to pay the "reasonable expenses and costs associated with the Dubai depositions," and finding that an adverse-inference instruction would be given to the jury with respect to Assa's witnesses' failure to appear. (Dkt. No. 796 at 20; 994). The District Court also found that, because Shakeri had refused to be deposed, his declaration in opposition to summary judgment was inadmissible and could not be considered. (Dkt. No. 865 at 34).

## B.  Applicable Law

The applicable law and standard of review with respect to a district court's management of discovery is set forth above. *See* Section 1.1.A.2 *supra.*

Federal Rule of Civil Procedure 37(b) provides that "[i]f a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, . . . the court . . . may issue further just orders," including, inter alia, "striking pleadings in whole or in part," and "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(iii) & (vi). Additionally, the district court may impose sanctions pursuant to Federal Rule of Civil Procedure 37(d) if "a party or a party's officer, director, or managing agent" fails to appear for that person's deposition. Fed. R. Civ. P. 37(d)(1)(A)(i). The types of sanctions available for a violation for Rule

37(d) "include any of the orders listed in Rule 37(b)(2)(A)(i)–(vi)." Fed. R. Civ. P. 37(d)(3).

This Court generally will not consider a claim raised for the first time on appeal. *See Sniado*, 378 F.3d at 213. While this Court has discretion to consider waived arguments, it does so rarely, such as "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Id.* This waiver applies to unpreserved discovery issues. *See Valenti v. Penn Mut. Life Ins. Co.*, 511 F. App'x 57, 58 (2d Cir. 2013) ("On appeal, Valenti raises a host of discovery issues that were not properly raised below . . . and that have not been preserved for appeal to this Court. We decline to exercise our discretion to review these unpreserved discovery issues.").

## C. Discussion

Assa argues that the District Court abused its discretion by (1) striking Shakeri's declaration submitted in connection with Assa's opposition to summary judgment, following Shakeri's (and Aghamiri's and Tafti's) refusal to appear for deposition (Assa Br. 22-25); (2) purportedly drawing adverse factual inferences against Assa in connection with granting summary judgment as a discovery sanction (Assa Br. 25-27); (3) declining to impose sanctions against the Government for various reasons, including providing a trial witness list after a court-imposed pretrial deadline (but still more than three months in advance of trial) (Assa Br. 27-29); (4) failing to compel OFAC to produce cer-

tain records (which the District Court found were subject to the law enforcement privilege) (Assa Br. 29-31); and (5) limiting the scope of OFAC deposition testimony in light of its law enforcement privilege findings (Assa Br. 31-32). None of these complaints have any merit.

## 1. The District Court Appropriately Disregarded Shakeri's Declaration

Assa first argues that the District Court improperly disregarded Shakeri's declaration in granting summary judgment. (Assa Br. 22-25); *see In re 650 Fifth Ave.*, 2013 WL 5178677, at *15 & n.27. However, it was plainly within the District Court's permissible discretion to decline to consider allegations in a declaration submitted by a purported principal of a party who willfully refused to appear to be deposed, thereby depriving the parties of any opportunity to confront and cross-examine him. Shakeri's refusal to be deposed followed extensive discussions among the parties and with the District Court about arranging for overseas depositions, including the parties' travel to the U.A.E. for those depositions, and the District Court's warning that sanctions would be imposed if Assa's witnesses failed to appear. (Dkt. No. 586, 605). Assa's attempt to have Shakeri levy allegations in an effort to oppose summary judgment while depriving all parties of any opportunity to test his testimony is simply outrageous. And Assa's complaint that this sanction was "*sua sponte*" is misplaced. The Government asked the District Court to impose more severe sanctions: striking Assa's answer and claim, which also would have been within the District Court's discretion to do. That the

District Court imposed less severe sanctions under Rule 37—precluding Shakeri from testifying at trial, finding that adverse inferences were available, and precluding Shakeri from offering a declaration to oppose summary judgment—does not make the relief *sua sponte*; it simply makes the sanction less onerous. (Dkt. No. 796, 831).[51] Neither the District Court's choice of sanction, nor its decision to disregard Shakeri's untested and untestable allegations, constitutes an abuse of discretion. *See Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 734 (2d Cir. 1987) ("A district court's choice of sanction should not be disturbed on appeal unless that choice constitutes an abuse of discretion.").

## 2. The District Court Did Not Rely on Any Adverse Inferences

Assa next complains that the District Court erred on summary judgment by drawing adverse inferences against Assa rather than drawing all reasonable inferences in Assa's favor. (Assa Br. 25-27). But Assa is wrong: despite the District Court's statement that it *could* draw adverse inferences against Assa, *see In re 650 Fifth Ave.*, 2013 WL 5178677, at *15, the District Court did not in fact rely on any adverse inferences in finding no triable issue of fact as to the forfeitability of

---

[51] Because the District Court precluded Shakeri from testifying, Assa cannot rely on cases suggesting that material relied upon at summary judgment need not be admissible if the evidence will presented in admissible form at trial. (Assa Br. 24).

Assa's interests. Indeed, the District Court expressly observed:

> The Court may, but does not even find it necessary to, draw an adverse inference as to what either Shakeri or Aghmeri would say about how they came to be owners, whether they are "real owners" or merely nominal owners, and whether they are acting in on behalf of the government of Iran. Nor need the Court rely on the adverse inference it could draw from the fact that Assa's only employee, Tafti, also refused to be deposed. The evidence alone—apart from such inferences—is such that no rational juror could come to a contrary conclusion.

*Id.* at *22. Since the District Court did not actually draw any adverse inferences against Assa, Assa's complaints about such purported inferences are meritless.[52]

---

[52] As this Court previously noted, while it was error for the District Court to suggest that it could draw an adverse inference at summary judgment, that error was harmless, because "the lack of testimony from those witnesses meant that there was no record evidence to dispute the overwhelming evidence of Bank Melli's post-1995 control of Assa." *In re 650 Fifth Ave.*, 830 F.3d at 93 n.25. The same is true here.

### 3. The District Court Did Not Err In Not Imposing Sanctions Against the Government

Assa contends that the District Court abused its discretion by failing to impose sanctions against the Government for its failure to provide a trial witness list by the District Court's pre-trial deadline, but which the Government in fact provided four months before the scheduled trial date. (Assa Br. 27-29; *see* Dkt. No. 455, 470). By way of background, the District Court's discovery and pretrial orders included an order, among other things, that the Government "disclose the identity of any witnesses it plans to call at trial no later than April 1, 2013." (Dkt. No. 348). As the Government explained to the District Court, the Government understood this order to require that the identities of the witnesses be disclosed through the production of documents and other discovery—i.e., any potential witness identified in discovery produced after April 1, 2013 could not be called as a trial witness —but did not understand the order to alter the pretrial disclosure of witness lists under Federal Rule of Civil Procedure 26(a)(3)(B), which provides for the exchange of witness lists among all parties 30 days before trial, rather than a single party being required to provide its witness list five months prior to trial. (*See* Dkt. No. 453). The Government thereafter produced a comprehensive list of potential witnesses on May 16, 2013, and a narrower list of likely witnesses on May 21, 2013, more than three months prior to the trial date. (Dkt. No. 455, 470). These lists were in addition to the Government's responses to interrogatories and document discovery.

The District Court carefully considered and rejected Assa's request for sanctions. (Dkt. No. 511). In particular, the District Court observed that, in exercising its discretion to preclude witnesses, it should consider "the explanation for the failure to name the witness, the importance of the testimony of the witness, the need for time to prepare to meet the testimony and the possibility of a continuance," as well as "the prejudice to the party inconvenienced." (*Id.* at 4 (citing *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988)). Given that the Government's failure to provide a witness list was not willful, was promptly cured, and provided nearly four months' notice to the other parties of the Government's anticipated witnesses (an obligation not made reciprocal on the other parties), and the fact that preclusion of all Government witnesses would prevent the Government from making its case, the District Court certainly was within its discretion not to impose the severe sanctions Assa sought. (Dkt. No. 511 at 5-6). Furthermore, the District Court granted Assa, at Assa's discretion, the ability to schedule eight additional depositions following the close of discovery, and granted a brief adjournment of the trial. The District Court's choice of sanction was not an abuse of discretion, and Assa's complaints should be rejected.

### 4. The District Court Correctly Denied Assa's Request for Additional OFAC Discovery

Assa next argues that the District Court should have compelled the production of additional OFAC records. (Assa Br. 29-31). The Government produced

OFAC's non-privileged records with respect to the designations of Bank Melli and Assa. (Dkt. No. 640). The District Court, after reviewing the documents withheld *in camera*, properly found that the remaining records were subject to law enforcement privilege in accordance with *In re the City of New York*, 607 F.3d 923. (Dkt. No. 757 at 4-8).

Once a court determines that the law enforcement privilege applies, there is a strong presumption against lifting the privilege. *In re the City of New York*, 607 F.3d at 945. "To rebut that presumption, the party seeking disclosure must show (1) that its suit is non-frivolous and brought in good faith, (2) that the information sought is not available through other discovery or from other sources, and (3) that the information sought is important to the party's case." *Id.* (internal quotation marks and brackets omitted). "With respect to the importance of the information sought, . . . a '*compelling* need' is required." *Id.* Assa failed (and continues to fail) to articulate any basis to believe those privileged records are relevant, much less a compelling need for those documents.

On appeal, Assa argues that the privileged OFAC records were necessary for Assa to explore its statute-of-limitations and unspecified "other" defenses. (Assa Br. 31). The fatal flaw with Assa's argument is that it never argued to the District Court that OFAC records or testimony were relevant to its statute-of-limitations defense. (Dkt. No. 551 at 5-8; 631). Accordingly, any claim that the records were necessary for such a defense is waived, and this Court should decline to hear it.

Rather, in the District Court, Assa argued only that records concerning OFAC's decision to designate Assa as an SDN were relevant to OFAC's designation determination. (*Id.*). Thus, Assa's discovery efforts were more relevant to a prospective challenge to OFAC's administrative action than to the instant forfeiture action, in which the Government never intended to offer evidence of OFAC's designation of Assa. (*See, e.g.*, Dkt. No. 644). The District Court therefore did not abuse its discretion in not requiring the Government to produce records protected by the law enforcement privilege.

Assa's final argument regarding the District Court's order recognizing the same law enforcement privileges with respect to OFAC's deposition testimony fails for the same reasons. (Assa Br. 31-32). Assa never argued that the OFAC deposition testimony was relevant to its statute-of-limitations defense or any other defense, received OFAC's non-privileged documents concerning its Bank Melli and Assa designations, identifies no particular questions it posed to the OFAC representative that were improperly denied, and offers no basis for this Court to conclude that the District Court abused its discretion in enforcing its correct decision with respect to the law enforcement privilege.[53] (*See* Dkt No. 774).

-----

[53] Assa claims that there is "no legally valid basis for" the District Court to have limited the scope of discovery. (Assa Br. 31). This, of course, is simply not true. *See* Fed. R. Civ. P. 30(d)(3)(B) & 26(c)(1).

Accordingly, none of Assa's discovery complaints have any merit and should be denied.

## POINT IV

### Summary Judgment Against Assa Was Correctly Entered

Assa argues that the District Court erred in finding no triable issue of fact with respect to Bank Melli's ownership and control of Assa continuously from its inception, and that Assa's interests in the Building, the Partnership, and funds it received from the Partnership all were subject to forfeiture. (Assa Br. 32-61).

This Court already has found that there was no genuine issue of fact with respect to Bank Melli's ownership of Assa. Notwithstanding Alavi's vigorous arguments, and viewing the same summary judgment record, this Court found no difficulty concluding that "the record evidence convincingly demonstrates that Bank Melli, and therefore the Government of Iran, continued to control Assa after 1995, and admits no genuine issue of triable fact on that question." *In re 650 Fifth Ave.*, 830 F.3d at 93. Assa's appeal simply rehashes the same arguments that this Court already has found unpersuasive and its contentions should be readily rejected.

### A. Applicable Law

The legal standards and standard of review (1) applicable to motions for summary judgment, and (2) concerning forfeiture of property obtained or retained

through IEEPA violations, are set forth above. *See* Sections 1.1.B.2.b, 1.4.B *supra*.

## B. Discussion

Assa raises a laundry list of complaints with the District Court's summary judgment decision, which this Court already has affirmed with respect to Bank Melli's continuous ownership and control of Assa. Assa's list of unsupported generalizations and misrepresentations of the record should be rejected.[54]

### 1. Bank Melli's Continued Control of Assa

Assa argues that that the District Court erred by placing the burden on Assa to show a triable issue of fact with respect to the unlawful conduct giving rise to forfeiture. (Assa Br. 43). In support, it cites a portion of the District Court's opinion in which it stated that, "[i]n order to avoid forfeiture of assets for this violation, Claimants thus bear the burden of raising a triable issue as to their *lack* of knowledge or lack of willful blindness with respect to the unlawful conduct (*i.e.*,

---

[54] Even if Assa truly were owned and controlled by Shakeri and Aghamiri, it is undisputed that they are Iranian nationals residing in Iran, and accordingly services to Assa for the benefit of Shakeri and Aghamiri would also be prohibited exports of services to Iran. *See* 31 C.F.R. §§ 560.204, 410(a). But because the record evidence is undisputable that Bank Melli in fact controlled and owned Assa, services to and by Assa were supplied and exported both to Iran and to the government of Iran.

money laundering and IEEPA violations.[)]" (*Id.*). This statement, however, was a correct recitation of the burden-shifting nature of summary judgment. Once the moving party comes forward with evidence establishing the matter subject to summary judgment, "[t]o defeat summary judgment . . . nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, . . . and they may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 553. Furthermore, as the District Court made clear, it was discussing the standard as it relates to any "innocent owner" defense to forfeiture. *See In re 650 Fifth Ave.*, 2013 WL 5178677, at *18. In these circumstances, the absence of facts supporting the defense fail to give rise to a disputed issue of material fact. *See Giammettei*, 34 F.3d at 54-55. The District Court correctly applied the summary judgment standards.

Assa also argues that the District Court deferred to OFAC's designation of Assa as an agency of Bank Melli (Assa Br. 36-39) and that the "designation of Assa Corp. and Assa Limited . . . were the sole basis for the Government's entire case." (*Id.* at 43). Both assertions are patently false, as this Court's careful consideration of the record concerning Bank Melli's ownership of Assa shows. *See In re 650 Fifth Ave.*, 830 F.3d at 89-93. The District Court similarly considered the unrefuted evidence of Bank Melli's continuous ownership of Assa. *See In re 650 Fifth*, 2013 WL 5178677, at *6-16, 22-23. The District Court noted that, notwithstanding the two years that had passed (at that time) since OFAC had designated Assa, Assa had failed to

contest the designation, *id.* at *23, supporting an inference that the designation warranted deference. Indeed, the District Court expressly noted, immediately before referring to OFAC's designation, that "[t]he evidence alone . . . is such that no rational juror could come to a contrary conclusion." *Id.* at *22. This Court agreed. *See In re 650 Fifth Ave.*, 830 F.3d at 91. In light of the extensive factual record discussed by the District Court, and considered by this Court, it is plain that the District Court did not defer to OFAC's determination in deciding the summary judgment motion.

Assa also contends that the District Court failed to determine wither Assa "provided services *specifically intended* for Iran," citing 31 C.F.R. § 560.204. (Assa Br. 46). Assa misstates the law. The Government alleged that Assa's interests were the proceeds of violations of the IEEPA and property involved in, and traceable to property involved in, laundering IEEPA proceeds. The IEEPA violations include the "exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any . . . services to Iran or the Government of Iran." 31 C.F.R. § 560.204. The benefit of services performed anywhere in the world on behalf of the government of Iran are presumed to be received in Iran. 31 C.F.R. § 560.410(b). Because Bank Melli is part of the government of Iran and Bank Melli owns and controls Assa, services provided to Assa are by definition services exported to the government of Iran. Thus, these provisions do not require that services be "specifically intended for Iran." Assa's cited language is derived from a separate provision of Section 560.204

that applies to the export of goods, services, or technology to a third country *other than* Iran, if they are intended specifically for re-export to Iran or the government of Iran. *See* 31 C.F.R. § 560.24. That provision of Section 560.204 is not implicated here. But even if it were, the evidence is unrefuted that services provided to Assa were intended specifically for Iran because Tafti and the Bank Melli personnel exercising control over Assa knew that Assa was owned by Bank Melli and services provided to Assa in any country were intended specifically for Iran and the government of Iran.

Assa raises a host of additional miscellaneous complaints, including that the District Court erred in (1) relying on notes from Alavi's corporate secretary, Ebrahimi, in journals he maintained about Alavi board meetings and notes of Alavi's October 2007 meeting with the Iranian Ambassador to the U.N., Mohammad Khazaee (Assa Br. 32-33); (2) relying on a June 1994 Bank Melli letter (Assa Br. 33); (3) relying on Tafti's emails from an account maintained by Microsoft, which Assa characterizes as unauthenticated and incomprehensible (Assa Br. 33-35); (4) relying on Alavi's documents to determine facts adverse to Assa (Assa Br. 35-36); and (5) ruling on summary judgment when discovery remained outstanding (Assa Br. 40-43). All are meritless.

With respect to records of Alavi's board meetings and instructions from the Iranian Ambassador (Assa Br. 32-33), that evidence was not necessary to the conclusion that Bank Melli controlled Assa. Those records are relevant to Alavi's knowledge of that fact—and, as

discussed above, they strongly demonstrate, along with other evidence, that Alavi did know. But as discussed by this Court and the District Court, ample other evidence shows Bank Melli's ownership and control of Assa throughout the time period.

With respect to the June 1994 letter (Assa Br. 33), Assa's complaint misses the point. The June 1994 letter was part of a series of internal Bank Melli communications about its ownership of Assa and concerns Bank Melli had about the discovery of that fact. (GX151-T); *see In re 650 Fifth Ave.*, 2013 WL 5178677, at *12; *In re 650 Fifth Ave.*, 830 F.3d at 79, 91-92. This letter was relevant to Bank Melli's ownership of Assa prior to 1995 and, along with other evidence, shows the motivation for Bank Melli transferring Assa to straw owners in 1995.

With respect to Assa's complaints about Tafti's emails (Assa Br. 33-35), Assa's arguments are refuted by the record. First, the emails were properly authenticated by an FBI Special Agent personally familiar with the investigation and were translated by FBI Farsi linguists. This Court already has found that the District Court's determinations about document authenticity and translations were within its discretion. *See In re 650 Fifth Ave.*, 830 F.3d at 76 n.3.[55] Assa had ample opportunity in discovery to investigate the authenticity and translation of Tafti's emails, and failed

---

[55] For the same reasons, Assa's other complaints about the District Court's reliance on documents in the record (Assa Br. 35-36), are without merit.

to identify any in opposing summary judgment. That the emails were obtained from Microsoft rather than from Assa itself (Assa Br. 33), is of course irrelevant to their authenticity and probity. In fact, these emails were received as evidence at the later trial. (GX34-68).

Assa's flimsy attempt to construe the emails as supporting Shakeri and Aghamiri's true ownership of Assa rather than their straw ownership is unsupported by the record, and already has been rejected by this Court. *See In re 650 Fifth Ave.*, 830 F.3d at 92. As this Court observed: "Claimants suggest that Bank Melli was merely an intermediary between Assa and the record shareholders. But that hypothesis is a speculative one given the lack of evidence that Shakeri and Aghamiri ever exercised any control over Assa, participated in any of its decisions, or received any income therefrom." *Id.* Indeed, Tafti and Bank Melli discussed changing Shakeri and Aghamiri as the Assa shareholders because of their Iranian nationality, and pretending that other individuals were the directors of the company. (GX37-T, 38-T, 39-T, 46-T, 60-T); *see In re 650 Fifth Ave.*, 830 F.3d at 81-82, 92.

The same is true of Assa's contention that the District Court disregarded its corporate records and other evidence of Shakeri's and Aghamiri's nominal ownership. (Assa Br. 44-46). This Court has already found, based on this same record, that Shakeri and Aghamiri's nominal ownership was no bar to summary judgment given: (1) the absence of *any* evidence of their true ownership or control of Assa; (2) Bank Melli's history of using straw and shell owners to conceal its control; (3) evidence concerning Bank Melli's

motivation for transferring Assa to new straw owners (i.e., the Iranian sanctions); and (4) Shakeri and Aghamiri's receipt of the Assa interest without paying for it. *In re 650 Fifth Ave.*, 830 F.3d at 92 (finding no genuine issue of triable fact that "that Shakeri and Aghamiri were not *bona fide* owners of, and never exercised control over, Assa").[56] Accordingly, Assa's rehashed arguments, which were already made by Alavi and rejected by this Court, provide no basis to disturb the District Court's conclusion.

Finally, with respect to Assa's contention that summary judgment was granted while discovery purportedly remained outstanding (Assa Br. 40-43), Assa fails to identify any discovery it obtained after filing its opposition to summary judgment that would have created a triable issue of material fact. Assa again argues that it was seeking statute-of-limitations discovery, but as discussed above, Assa never argued that any discovery it sought was relevant to its statute-of-limitations defense. With respect to the OFAC deposition that was held after Assa filed its opposition, as discussed above, Assa never argued that any OFAC testimony or records was relevant to the statute of limitations. Assa argued only that the basis of OFAC's designation of Assa was relevant, and OFAC produced

---

[56] Shakeri's declaration, which the District Court was within its discretion to disregard in light of Shakeri's willful refusal to attend his deposition, does not contradict any of the record evidence. Indeed, Shakeri describes no purchase price for his nominal acquisition of a 50 percent ownership of Assa.

non-privileged records relating to Assa's designation. Assa cannot claim that the District Court erred by failing to consider arguments Assa never raised, *see Sniado*, 378 F.3d at 213, and this argument too should be rejected by this Court.

Accordingly, the District Court, and this Court previously, correctly determined that there were no genuine issues of material fact related to Assa's ownership and control by the government of Iran. Summary judgment was therefore appropriate.

### 2. Forfeitability of Assa's Interests in the Defendant Properties

Assa also argues that there were triable issues of fact with respect to whether its interests in the Defendant Properties were traceable to the IEEPA and money laundering offenses. (Assa Br. 47-61). Assa argues that the District Court erred in concluding that Assa's interest in the Partnership was the proceeds of IEEPA violations (Assa Br. 52-54), that Assa's bank accounts were the proceeds of IEEPA violations (Assa Br. 54-55), and that Assa's interests in the Defendant Properties were traceable to property involved in money laundering. (Assa Br. 58-60). Assa has advanced no material fact, however, that would give rise to a genuine dispute as to whether any of these properties are forfeitable as property obtained and retained from criminal activity or were traceable to property involved in money laundering, and accordingly its arguments are without merit.

### a.   Assa's Interest in the Partnership Constitutes IEEPA Proceeds

As the summary judgment record demonstrated, while Assa acquired its interest in the Partnership years before 1995, it undoubtedly retained that interest through its concealment services to the government of Iran up until the filing of this case. As set forth above, this Court has already found that Assa was indisputably a front for Bank Melli. It follows then that Assa unequivocally provided illegal concealment services for the government of Iran in connection with its involvement in the Partnership and its ownership of the Building. Absent these services, the District Court properly found that there can be no real question that all of its "assets would long ago have ceased to be owned by Assa." *In re 650 Fifth Ave.*, 2013 WL 5178677, at *28.

These losses would have inevitably ensued for the same reasons discussed above with respect to Alavi's and the Partnership's arguments. As the District Court accurately noted, had Assa's true owner been revealed, it would have been stripped of its assets through civil litigation and government enforcement actions. Moreover, absent Assa's concealment, governmental enforcement actions, such as a designation by OFAC, would have completely divested Assa of any of the benefits of ownership of its assets, including its interest in the Partnership. Indeed, the certainty of the OFAC designation and the subsequent blocking of assets is demonstrated by their actual occurrence following the publication of the Government's case. Under

Executive Order 13382 and its implementing regula-
tions, it is unlawful to have any dealings in, or to
transfer, pay, export, or withdraw, blocked property.
Exec. Order 13,382, 70 Fed. Reg. 38,267 (June 28,
2005); 31 C.F.R. § 544.201. Accordingly, the effect of
the unlawful concealment services was to allow Bank
Melli to enjoy the economic benefits of ownership, of
which it otherwise would have been totally deprived as
a result of the sanctions, and that economic value—
i.e., the Partnership interests—is thus retained pro-
ceeds of the offenses. Separately, as discussed above,
Assa retained its interest in the Partnership as a re-
sult of continuing IEEPA violations that enabled the
Partnership to have continuing economic viability.

The District Court arrived at its conclusion that
"there is no triable issue of fact" that the IEEPA viola-
tions enabled Assa to retain its Partnership interest
after an exhaustive review the extensive factual record
before it. *See In re 650 Fifth Ave.*, 2013 WL 5178677,
at *6-16, *28. Assa puts forth no evidence to question
any of these facts, but instead challenges the legal ba-
sis for forfeiture of retained property. (Assa Br. 47
("[T]he District Court conducted no legally-valid anal-
ysis."), 53 (arguing that the retained property theory
"was the wrong test")). However, as discussed, the Dis-
trict Court's analysis for retained proceeds is legally
correct. *See Torres*, 703 F.3d at 200. Accordingly, as
the District Court correctly found, there was no genu-
ine issue of material fact that the Assa's Partnership
interest was forfeitable as proceeds of its IEEPA viola-
tions.

### b.    The Funds in Assa's Bank Accounts Constitute IEEPA Proceeds

There is also no genuine question that the funds in Assa's bank accounts are forfeitable as IEEPA proceeds. As the District Court recognized, "it is undisputed that Assa obtained them solely as a result of its ownership interest in and the revenue generated by the Building." *In re 650 Fifth Ave.*, 2013 WL 5178677, at *28. Indeed, Assa cited no facts in the District Court —nor has it advanced any on appeal—that funds in its bank accounts were derived from sources other than the Building and the Partnership. In other words, they are unquestionably the proceeds of the IEEPA violations involved in managing the Building and concealing Bank Melli's interest therein.

Assa's only basis to contest this conclusion is its erroneous argument that the Government may only forfeit funds deposited into the account within a year. (Assa Br. 55). As set forth above, however, this argument rests upon a faulty understanding of 18 U.S.C § 984. In that regard, inasmuch as virtually all of Assa's revenue came from the Building and the Partnership, Section 984's suspension of tracing requirements is not even necessary to render the funds in Assa's bank accounts subject to forfeiture. Accordingly, there is triable issue of fact that the bank accounts constitute proceeds of IEEPA violations.

### c.    Assa's Property Was Involved in Money Laundering

Finally, Assa wrongly asserts that there is a triable issue of fact as to whether its property was involved in

money laundering. As set forth above, *see* Section 1.4.C.3 *supra*, the scope of forfeiture for property involved in money laundering is substantially broader than mere proceeds and includes any property involved in, used to commit, or used to facilitate the money laundering offense. In arguing that there is some genuine issue of material fact on this issue, Assa asserts, without any factual support, that there is some question as to whether Assa had the requisite "intent to promote IEEPA violations or to conceal the nature and source of the alleged unlawful proceeds." (Assa Br. 58-59). Assa then quotes generalized caselaw about how summary judgment is "generally" inappropriate where intent or state of mind is at issue. (Assa Br. 59).

Here, however, it is undisputed that very purpose of Assa was to allow Bank Melli to secretly maintain an interest in New York real estate. *In re 650 Fifth Ave.*, 2013 WL 5178677, at *7. And each time the Partnership sent Assa income derived from the Building, and each time Assa sent those funds overseas for the benefit of Bank Melli, they "engaged in promotion money laundering." *Id.* at *32. Furthermore, as the District Court noted, it is undisputed that proceeds from the Building were used to improve the Building. *Id.* at *33. As a result, the Partnership "cleans[ed]" the proceeds of unlawful activity by re-investing it into the Building in order to generate more unlawful proceeds. *Id.* As the District Court found, that also constituted promotional money laundering. Furthermore, the District Court found that, as a front company for the government of Iran, Assa's property was "involved in" concealment money laundering, namely, the concealment

of the source, ownership or control of the unlawful proceeds. *See id.* at \*33-34.

Assa argues, however, that, because the Partnership was formed prior to 1995, there is a triable issue of fact with respect to its intent to commit money laundering. (Assa Br. 59). This, however, is far from the relevant issue. Whatever the original intent in forming the Partnership (which, here, was to disguise the government of Iran's ownership and control of the Building), after 1995 there is no question that the purpose of the financial transactions involving IEEPA proceeds, by, through, and to Assa—a front for Bank Melli—and involving the Building, was to promote the IEEPA violations and conceal the location, ownership and control of the proceeds. Assa points to nothing in the record to suggest that there is any material issue in this regard. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."). And here, it is particularly difficult for Assa to point to any other evidence of intent in light of its own principles' failure to sit for depositions.

In sum, the undisputed evidence about the formation of Assa and its partnership with Alavi leaves no triable issue that Assa engaged in money laundering transactions involving the Building and other Defendant Properties, rendering them subject to forfeiture.

## POINT V

### The District Court Did Not Abuse Its Discretion in Declining to Stay the Forfeiture Action

Assa's final argument is that the District Court abused its discretion by not staying the forfeiture action until the statute of limitations had run on all criminal offenses arising out of Alavi's and Bank Melli's partnership. (Assa Br. 61-63). This argument is baseless.

### A. Relevant Facts

Shortly after Judge Holwell—who was then presiding over this action—denied Alavi's, the Partnership's, and Assa's motions to dismiss the Amended Complaint (Dkt. No. 163), Assa moved to stay this forfeiture action entirely until the conclusion of any related criminal investigation or the running of all applicable criminal statutes of limitations.[57] In a careful, 30-page

---

[57] The longest applicable criminal statute of limitations is ten years pursuant to 18 U.S.C. §§ 1341, 1343, 1344 and 18 U.S.C. § 3292(2). *See, e.g., United States v. Zarrab*, No. 15 Cr. 867 (RMB), 2016 WL 6820737, at *11-14 (S.D.N.Y. Oct. 17, 2016) (upholding bank fraud charge relating to deceiving U.S. banks with respect to providing financial services to Iran and the government of Iran). That statute of limitations would not begin to run with respect to a bank fraud conspiracy until the last overt act in furtherance of the conspiracy, which, given Assa's principals' continuing

written decision, Judge Holwell denied that motion, finding, among other things, that the stay provisions in 18 U.S.C. § 981(g)(2) do not apply, because the claimant, Assa, is a corporate entity with no Fifth Amendment right against self-incrimination, and Assa's officers and employees, who do have a Fifth Amendment right, are not claimants in this case. (Dkt. No. 206 at 10-11). Accordingly, the District Court held that "[r]ather than a choice [between waiving their Fifth Amendment rights or being unable to pursue their claim], Claimants are faced with a problem: their employees may assert their Fifth Amendment privilege rather than testify on their behalf." (*Id.* at 11). While acknowledging those burdens, the District Court also found that "[t]he government and the public have strong interests in avoiding any delay in taking possession of the defendant properties—interests that. . . are particularly strong in the IEEPA context." (*Id.* at 20). Balancing these factors, the District Court denied the requested stay.

## B. Applicable Law

Title 18, United States Code, Section 981(g), provides two circumstances in which civil forfeiture proceedings brought under Section 981 shall be stayed. First, a civil forfeiture proceeding shall be stayed at the request of the Government where "the court determines that civil discovery will adversely affect the abil-

─────────

efforts to conceal Bank Melli's role, could post-date the filing of the Complaint.

ity of the Government to conduct a related criminal investigation or the prosecution of a related criminal case." 18 U.S.C. § 981(g)(1). Second, a civil forfeiture proceeding shall be stayed at the request of a claimant where (A) "the claimant is the subject of a related criminal investigation or case"; (B) "the claimant has standing to assert a claim in the civil forfeiture proceeding"; and (C) "continuation of the forfeiture proceeding will burden the right of the claimant against self-incrimination in the related criminal investigation or case." 18 U.S.C. § 981(g)(2).

An individual can invoke his or her Fifth Amendment right against self-incrimination to avoid providing testimony "that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Co.*, 542 U.S. 177, 190 (2004) (internal quotation marks omitted) (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)). Corporate entities have no right against self-incrimination. *See Bellis v. United States*, 417 U.S. 85, 89-90 (1974); *In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155, 157-58 (2d Cir. 2010).

This Court has observed that "the Constitution . . . does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings . . . . Nevertheless, a court may decide in its discretion to stay civil proceedings . . . 'when the interests of justice seem . . . to require such action.'" *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986) (quoting *SEC v. Dresser Indus.*, 628 F.2d 1368, 1372 (D.C. Cir. 1980) (en banc)) (alterations in original). "The decision whether to

grant such a stay rests in the discretion of the district court." *Fendi Adele S.R.L. v. Ashley Reed Trading*, 06 Civ. 0243 (JES) (MHD), 2006 WL 2585612, *2 (S.D.N.Y. Sept. 8, 2006). But "[e]ven where there are parallel criminal and civil proceedings, a defendant has no constitutional right to a stay pending the outcome of a related case." *CFTC v. A.S. Templeton Group*, 297 F. Supp. 2d 531, 534 (E.D.N.Y. 2003).

Courts consider several factors in determining whether a stay is appropriate, including: "1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest." *Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1138 (S.D.N.Y. 1995) (footnotes omitted). Nevertheless, "[a] stay of the civil case . . . is an extraordinary remedy, *id.* at 1139, and "[c]ourts . . . have generally refused to stay a civil proceeding where the defendant has not been indicted but is under criminal investigation" *Travelers Cas. & Sur. Co. v. Vanderbilt Group*, 01 Civ. 7927 (DLC), 01 Civ. 10695 (DLC), 2002 WL 844345, at *2 (S.D.N.Y. May 2, 2002); *see also A.S. Templeton Group*, 297 F. Supp. 2d at 534 ("Pre-indictment requests for a stay of civil proceedings are generally denied."); *In re Par Pharm., Inc. Sec. Litig.*, 133 F.R.D. 12, 13-14 (S.D.N.Y. 1990) ("The weight of authority in this Circuit indicates that courts

. . . will deny a stay of the civil proceeding where no indictment has issued.").

This Court reviews a district court's stay determination for abuse of discretion. *Kashi*, 790 F.2d at 1057.

## C. Discussion

Judge Holwell's thorough and carefully considered decision to deny Assa's stay request was within his discretion and should not be disturbed on appeal. The District Court considered numerous factors, including: (1) the commonality between the criminal investigation and the forfeiture action (Dkt. No. 206 at 9-10); (2) the fact that the claimants in the forfeiture action had no Fifth Amendment privilege (*id.* at 10-11); (3) the burden on Assa to the extent its employees asserted their Fifth Amendment rights (*id.* at 11-17); (4) the fact that neither Assa nor any of its employees had been indicted (*id.* at 14-17); (5) the fact that the Government did not bring the forfeiture action solely for the purpose of obtaining evidence for a criminal prosecution (*id.* at 26); and (6) the Government's and public's strong interest in the proper enforcement of the forfeiture laws and international sanctions (*id.* at 19-20, 23-25). The District Court thereafter denied Assa's request "to stay an action to forfeit property allegedly owned by a nation that poses a national security threat to the United States until the government decides whether or not to indict or immunize persons who are not party to and have no interest in this action on the ground that those persons may assert rights that [Assa] cannot." (*Id.* at 25). This considered decision was not an abuse of the District Court's discretion.

Indeed, Assa's only contention on appeal is that small legal entities should be treated differently from large corporations for Fifth Amendment purposes. (Assa Br. 62-63). But Judge Holwell already was aware of the asserted nature of Assa: both Assa's contention that it had only two individual nominal owners; and the Government's contention that Assa in fact was owned by Bank Melli. (Dkt. No. 206 at 10 n.1). The District Court's decision not to give that factor dispositive weight is not an abuse of discretion.

The considerations militating against a stay have gotten only stronger since Assa's 2011 motion. Now, more than seven years later, the parties have engaged in years' worth of discovery; the Government has produced voluminous declassified investigative materials and sensitive investigative information about the identities of the agents involved in the investigation, the identities of individuals who have been interviewed, and the information that they provided, including a confidential source; FBI agents and a confidential source have been deposed and have testified publicly at trial; summary judgment motions have been made and ruled on; and a five-week jury trial has been held on the forfeitability of Alavi's and the Partnership's interests. A final judgment has been entered. To stay the proceedings now would waste all of these efforts, frustrate the strong public interest in a resolution of this action, and would frustrate the interests of victims of Iranian-state-sponsored terrorism in obtaining recovery for their injuries. And a stay would have no readily discernable end, since individual criminal liability for sanctions-related bank fraud offenses come with a 10-year statute of limitations from the last overt act in

furtherance of the conspiracy, and various actions of Assa even in the course of this litigation could be considered overt acts.

Accordingly, the District Court's denial of a stay was within its discretion at the time it was entered, and the considerations supporting that denial have grown stronger over time. Assa's request should be denied.

* * *

For the foregoing reasons, the forfeiture judgment against Assa should be affirmed.

## Section III—Maryland IEC Issues

### POINT I

### The District Court Properly Dismissed the IEC's Ownership Claims as Time-Barred

The IEC argues that its claim to ownership of certain Maryland properties was timely. While recognizing that its initial claim in December 2009 comprised "a claim as longtime tenant/occupant," the IEC argues that its subsequent supplementation to include ownership claims was timely based on court orders, its initial claim, or other equitable principles. (IEC Br. 15-21). None of these claims have merit.

### A.   Relevant Facts

Shortly after the Government filed this civil forfeiture action, a number of entities filed claims asserting ownership or other interests in the subject properties pursuant to 18 U.S.C. § 983(a)(4) and Federal Rules of

Civil Procedure, Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions ("Rule G"). This included claims by Islamic education centers operating at Alavi-owned properties asserting leasehold or other occupancy interests. (Dkt No. 53, 63).

On or about December 16, 2009, the IEC filed such a claim. (IEC A. 18). In that claim, the IEC purported to be a "tenant/occupant" of the Alavi Real Properties located at 7917 Montrose Road and 8100 Jeb Stuart Road in Potomac, Maryland (the "Maryland Properties"). (IEC A. 19). The IEC further claimed to have a written occupancy agreement with Alavi for the properties. (*Id*.). Accordingly, the IEC asserted a "possessory interest in the property." (IEC A. 20). The Government disavowed any claim to forfeit leaseholds or other occupancy interests in the subject properties, to the extent they existed. (Dkt. No. 2001; IEC A. 5-6).

On or about October 2, 2013, after substantial litigation including motions to dismiss, document discovery, depositions, and motions for summary judgment had occurred, the IEC for the first time asserted an ownership interest in the Maryland Properties. (IEC A. 142). On October 21, 2013, the IEC filed a "Second Verified Supplemental Statement of Interest." (IEC A. 159, 167). In that supplemental claim, the IEC claimed to be an "innocent owner" of the Maryland Properties through a constructive trust based on Alavi's supposedly holding the property in trust for the IEC. (*Id*.). In subsequent filings in 2017, the IEC attempted to augment its constructive trust claim to allege that Alavi had been paid $2 million by an IEC

member to reimburse Alavi for the purchase price of the Maryland Properties approximately 32 years ago, but that Alavi had fraudulently failed to inform the IEC of that fact and transfer title to the IEC. (Dkt. No. 1914, 2012).

On the Government's motion, the District Court dismissed the IEC's claim to its purported leasehold interest as moot based on the Government's disclaimer of any intent to forfeit it, and dismissed the remainder of the claim. (IEC A. 5-6 & n.5). In particular, the District Court found that any bases that were added to the IEC's claim in 2013 were not timely filed and would, therefore, subvert the filing requirements of Rule G. (*Id.*). The District Court also noted that the IEC's theory of constructive trust was not supported by sufficient facts and was at odds with the IEC's position until that point supporting Alavi's continued interest in the property. (*Id.*; *compare* IEC A. 18-25 *with* IEC A. 159-63).

## B.   Applicable Law

"In order to contest a governmental forfeiture action, claimants must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution as required for any action brought in federal court." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999). Statutory standing refers to a claimant's compliance with the requirements of 18 U.S.C. § 983(a)(4) and Rule G(5)(a)(ii)(B). To meet these requirements, a claimant asserting an interest in defendant property must file its claim "no later than 60 days after the first

day of publication on an official internet government forfeiture site." Rule G(5)(a)(ii)(B). The Rule provides that the Government may move to strike a claim or answer "for failing to comply with Rule G(5)." Rule G(8)(c)(i)(A).

"Strict compliance" with the procedural rules governing forfeiture actions "is typically required." *United States v. Amiel*, 995 F.2d 367, 371 (2d Cir. 1993). The timeliness requirement, in particular, serves a "critical purpose," namely "forcing claimants to come forward as quickly as possible after the initiation of forfeiture proceedings, so that the court may hear all interested parties and resolve the dispute without delay." *United States v. $417,143.48, Four Hundred Seventeen Thousand, One Hundred Forty-Three Dollars & Forty-Eight Cents*, 682 F. App'x 17, 19 (2d Cir. 2017) ("*$417,143.48*") (internal quotation marks omitted) (quoting *United States v. $487,825.00 in U.S. Currency*, 484 F.3d 662, 664 (3d Cir. 2007)). "That purpose would be thwarted if claimants came to view the strictures of Rule G as mere suggestions rather than as rules that will presumptively be enforced." *Id.* at 19-20. A claimant who fails to comply with Rule G lacks statutory standing to challenge the forfeiture. *See Cambio Exacto, S.A.*, 166 F.3d at 526.

"[A] court has discretion in appropriate circumstances to depart from the strict compliance standard." *Amiel*, 995 F.2d at 371. In determining whether to exercise such discretion, district courts generally consider:

> [T]he time the claimant became aware of the seizure, whether the Government encouraged the delay, the reasons proffered for the delay, whether the claimant had advised the court and the Government of his interest in defendant before the claim deadline, whether the Government would be prejudiced by allowing the late filing, the sufficiency of the answer in meeting the basic requirements of a verified claim, and whether the claimant timely petitioned for an enlargement of time.

*United States v. $125,938.62*, 370 F.3d 1325, 1329 (11th Cir. 2004) (internal quotation marks omitted). District courts should also consider "the amount seized." *Id.*

This Court reviews "legal determinations made by a district court adjudicating a civil forfeiture action, such as whether a claimant has statutory standing to contest a forfeiture action, *de novo*," *$417,143.48*, 682 F. App'x at 18, and a district court's denial of leave to file an untimely claim for abuse of discretion, *see Cambio Exacto, S.A.*, 166 F.3d at 529; *$417,143.48*, 682 F. App'x at 19 ("But while these factors might support the notion that it would have been reasonable for the district court to grant Dominguez's motion, they do nothing to establish that the district court abused its discretion.").

## C. Discussion

As the District Court properly found, the IEC's claims for anything other than a possible leasehold interest were untimely. (IEC A. 6 n.5). Following the filing of the Amended Complaint, the Government commenced publication of the forfeiture on its website on December 1, 2009, and ran the publication for 30 consecutive days. (IEC A. 4). Accordingly, all parties had until January 31, 2010 to file their claims. The only claims filed by the IEC during that time asserted an occupancy interest in the Maryland Properties. (IEC A. 18-26). The IEC's attempts, over three years later, to add ownership claims based on an alleged constructive trust were rightfully denied for failing to conform to Rule G's requirements.

### 1. There Was No Court Order Extending the Time to File Claims

The IEC argues that its 2013 claim should nevertheless have been considered because of the District Court's October 29, 2013 order requiring that "all innocent owner submissions shall be filed by Friday, November 22, 2013." (IEC A. 29). However, the District Court's order concerned the schedule for motion practice on outstanding innocent owner claims and was not an invitation to file new and untimely claims.

Specifically, one week prior, on October 21, 2013, while the Government's motion for summary judgment was *sub judice*, the IEC had submitted an opposition to that summary judgment motion based on its purported status as an innocent owner—a theory it had simultaneously first asserted in its supplemental

claim the same day. (IEC A. 159, 167). Thus, the first paragraph of the District Court's October 29 order simply put that claim on hold until the District Court finished deciding the Government's summary judgment motion with respect to forfeiture. (IEC A. 29).

The second paragraph of the District Court's October 29 order was also not an invitation for untimely claims. Instead, that order was a clarification of the District Court's October 28, 2013 order that set a schedule for the filing of summary judgment motions by any claimant seeking to assert an innocent owner defense to forfeiture. (Dkt. No. 1003). Through that order, the District Court was simply setting a schedule for claimants to file motions for summary judgment on any previously-asserted innocent owner defenses. (IEC A. 29). The order never gave the IEC, or anyone else, permission to file wholly new, untimely innocent owner claims in 2013.

## 2. The IEC's Supplemental Claim Does Not Relate Back to Its Original Claim

The IEC also asserts that, even if its 2013 supplemental claim was untimely that claim should "relate back" to its timely claim in December 2009, because "the claims included enough plausible facts for the trial court to acknowledge Maryland-IEC's significant interest on those properties" and that "the original Maryland-IEC claims provided the essential facts required to make a claim." (IEC Br. 17). In support of this argument, the IEC cites to three broad assertions contained in the initial claim, namely that "IEC has a

vested interest in the Properties"; "IEC has made significant improvements to the Properties"; and "IEC has paid the bills and expenses associated with the operation and upkeep of the Properties." (*Id.*).

The IEC's initial claim, however, does not set forth the basic facts that formed the basis for its subsequent claim for constructive trust (either its 2013 or 2017 version). The initial claim makes no mention of any ownership interest, equitable or otherwise; the purported loan to purchase the property; Alavi's purported repayment of that loan; IEC member Dr. Yazdi's alleged intention to reimburse Alavi; or Alavi's alleged intention to return ownership of the property to the IEC. (*Compare* IEC A. 19-24 *with* IEC Br. 7-11). Without these facts, the IEC's original claim could not possibly have put anyone on notice of its theory of constructive trust. To the contrary, the IEC's initial timely claim plainly asserts that the IEC has a "possessory interest" in the property, and that the IEC and Alavi have a "written Agreement for the usage of the Properties." (IEC A. 19-20). Because the IEC's supplemental claims in 2013 are not based on the same facts and circumstances set forth in the IEC's 2009 claim, it cannot be viewed as relating back to that claim. *Cf.* Fed. R. Civ. P. 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."); *Rosenberg v. Martin*, 478 F.2d 520, 526-27 (2d Cir. 1973) (noting that the Rule 15(c) relation back test deals with "adequacy of notice" and that "the inquiry in a determination of whether a claim

should relate back will focus on the notice given by the general fact situation set forth in the original pleading").

### 3. The IEC Should Not Have Been Permitted to Depart from Strict Compliance with Rule G

The IEC also claims that the District Court should have allowed it to file late claims based on "excusable neglect." (IEC Br. 18-19). As an initial matter, the IEC failed to make this request in the District Court, and it should not be permitted to rely on the argument on appeal. This argument is also without merit.

The only argument that the IEC puts forth in support of this claim is that its 2013 claim of constructive trust was based on "new information not available earlier." (IEC Br. 20). The IEC points to no new information whatsoever that supports its first untimely "constructive trust" claim made in 2013. Thus, the IEC's neglect in not including its 2013 ownership claim in its 2009 filing is hardly excusable. Nor is there any credible basis to conclude that the 2017 claim, based on the purported $2 million payment, was based on previously unavailable information. First, the IEC fails to explain why it is that they could not learn this information—that their own community member had allegedly pledged to pay, and then paid, $2 million to Alavi—earlier. Although the IEC claims that Shafie first acknowledged that Alavi received the $2 million from Mr. Yazdi in 2014, they proffer no explanation as to why they could not learn that "a distinguished member" of their own community had sent the $2 million to

Alavi (within the same year as the original purchase), thereby triggering their purported rights to the property, anytime in the intervening 32 years. Nor do they explain why they did not bring this information to the District Court's attention until 2017. Accordingly, the IEC has not put forth a legitimate factual basis for the reason for its delay.

In addition, the other pertinent factors cited by the IEC tend to favor dismissal of the IEC's claim.[58] The IEC was aware of this action in 2009 and never even

---

[58] The IEC cites a Fourth Circuit case, which articulates the following relevant factors: "when the claimant became aware of the seizure, whether the claimant was properly served, whether the government would be prejudiced, whether the government encouraged the delay or misguided the claimant, whether the claimant informed the government and the court of his interest before the deadline, whether the claimant had expended resources preparing for trial, the claimant's good faith, the claimant's health problems, whether the government has complied with procedural rules, and whether the claimant was acting *pro se*." *United States v. Borromeo*, 945 F.2d 750, 753 (4th Cir. 1991). Even assuming those are the relevant factors applicable in this Circuit, *compare United States v. Four Hundred Seventeen Thousand, One Hundred Forty-Three Dollars & Forty-Eight Cents ($417,143.48)*, No. 13-CV-5567 MKB, 2015 WL 5178121, at *9 (E.D.N.Y. Sept. 2, 2015), they do not render the District Court's decision an abuse of discretion.

mentioned the potential of an ownership claim to the District Court until 2013. That claim was based on no new information. The IEC also never asked the District Court to enlarge its time to file its new claim—on the basis of "new" information or for any other reason—but instead simply proceeded as if the claim had been properly pleaded all along. In addition, there was significant prejudice to the Government in not raising this claim of constructive trust until 2013, after the close of discovery and significant motion practice. The facts set forth by the IEC would have led the Government to seek discovery concerning the actors and circumstances in Alavi's supposed fraud on the IEC. The IEC, however, did not raise this theory until 2017, well after the close of discovery.

The IEC's argument to the contrary—that the District Court held its claim in abeyance and thereby prevented it from engaging in discovery—is simply incorrect. The District Court did not hold the IEC's submissions in abeyance until October 2013, following the close of over two years of discovery, and after summary judgment motions had been fully briefed. (IEC A. 29). Accordingly, to the extent this Court considers the IEC's "excusable neglect" argument, the District Court's decision not to consider IEC's out-of-time claim, was not an abuse of discretion.

## POINT II

## The District Court Properly Denied the IEC's Claim Based on Constructive Trust

The IEC also argues that the District Court erred in not letting it pursue its claim of innocent ownership

based on constructive trust. (IEC Br. 21-22). However, as the District Court found, the IEC's supplemental claim in 2013, and as augmented in 2017, fails to establish constructive trust in any event, and it was correctly dismissed on the merits. (IEC A. 6).

## A. Applicable Law

"Litigants have statutory standing to oppose forfeiture in a civil *in rem* proceeding commenced by the government if they 'claim[ ] an interest in the seized property[,] . . . asserting [that] interest in the property in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims.'" *United States v. Technodyne LLC*, 753 F.3d 368, 380 (2d Cir. 2014) (quoting 18 U.S.C. § 983(a)(4)(A)). A Government motion to strike a claim for lack of standing may be "presented as a motion for judgment on the pleadings . . . or by summary judgment." Rule G(8)(c)(ii)(B). This Court reviews legal determinations of standing *de novo. Cambio Exacto, S.A.*, 166 F.3d 522 at 526.

Under Maryland law, a constructive trust "is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it." *Wimmer v. Wimmer*, 287 Md. 663, 668 (1980). However, "a grantee will not be considered a trustee ex maleficio merely because he fails to carry out an agreement. Where there is no actual or constructive fraud at the time of the conveyance, and no undue influence, the mere fact that the grantee agreed to hold [ ] land in trust for a specified purpose, or to reconvey it to the

grantor or a designated person, will not" create a constructive trust. *Grimes v. Grimes*, 184 Md. 59, 62, 40 A.2d 58, 60 (1944). In addition, the applicable "statute of limitations will be applied" by analogy to law to the creation of a constructive trust. *Villarreal v. Glacken*, 63 Md. App. 114, 128 (1985). Maryland law imposes a three-year statute of limitations for civil actions, which can be tolled if the cause of action was "kept from a party by the fraud of an adverse party." Md. Code Ann., Cts. & Jud. Proc. §§ 5-101, 5-203.

## B. Discussion

The IEC's 2017 version of its constructive-trust claim boils down the allegation that Alavi should have deeded the Maryland properties to the IEC after it purportedly was paid $2 million by a prominent IEC member. (IEC Br. 22). However, this claim, on its face, does not meet the conditions necessary to establish a constructive trust. Most importantly, neither the IEC's supplemental claim nor its brief on appeal actually assert that Alavi had agreed to return title to the IEC. (IEC A. 159-63; IEC Br. 9-13). To the contrary, the IEC's brief suggests that the intention of the parties was always for Alavi to maintain title to the properties, with a "'Waqf' designation of the properties for the IEC community [to] continue in perpetuity."[59] (IEC

---

[59] As the IEC's claim explains, "Waqf" is a principle of Islamic law whereby property is set aside and designated for the benefit of others. (*See* Dkt. No. 992-5).

A. 162; *see also* IEC A. 160-61 ("The Mostazafan Foundation simply paid off the existing bank loan and, as a non-profit organization, took title to [the property] and agreed to hold title in trust for the benefit of IEC and the community in perpetuity . . . .")). Accordingly, as the District Court found, this course of conduct lacks the "evidence of wrongdoing" (IEC Br. 22)—certainly "at the time of the conveyance," *Grimes*, 184 Md. at 62 —necessary to give rise to a constructive trust. (IEC A. 6 n.6).

Moreover, even if Alavi had agreed to transfer the property, the mere failure to reconvey property to a grantor does not give rise to an equitable remedy. Instead, there must be some showing of fraud or unjust circumstances, none of which is alleged here. Further, even if Alavi's failure to promptly deed back the property was somehow fraudulent or improper, a court would not impose a constructive trust where, as here, the analogous statute of limitations at law had run. The events that the IEC allege give rise to the constructive trust occurred approximately 32 years before its claim was brought. During that time, the IEC has taken no actions consistent with the belief that it should hold title to the Maryland property. To the contrary, the IEC has at all times acted consistent with the understanding and belief that Alavi was the rightful legal owner of the property, including by signing a "written Agreement for the usage of the Properties." (IEC A. 19). Furthermore, the IEC does not explain why it could not have discovered the relevant facts "through the exercise of due diligence," *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131 (2011) (internal quotation marks omitted)—including through a

member of its own community who purportedly paid the $2 million and/or his family—at any time in those 32 years. For these reasons, the IEC's claim for equitable relief after 32 years was properly denied.

* * *

For the foregoing reasons, the forfeiture judgment striking the IEC's claim should be affirmed.

## Section IV—Levin Creditors Issues

## The District Court Properly Dismissed the Levin Creditors' Claim

The Levin Creditors argue that the District Court wrongly dismissed their February 2015 claim to the distribution of forfeited property. (Levin Br. 17; Levin A. 243). This argument has no merit. The Levin Creditors failed to file a timely claim in the forfeiture action and lack statutory standing to contest the forfeiture and their claim was properly dismissed. The "notwithstanding clause" of the TRIA, Pub. L. No. 107–297, 116 Stat. 2322 (2002), codified at 28 U.S.C. § 1610 note, does not automatically trump the Government's substantive right to forfeiture, and even assuming, *arguendo*, that it did, it does not provide an excuse for the complete failure to comply with Rule G's procedural strictures.

## A. Relevant Facts

Following the filing of the forfeiture action, a number of claims or notices were filed by judgment creditors holding judgments against the government of Iran based on acts of violence and terror perpetrated by, or

with the support of, the government of Iran, who also were seeking to execute those judgments against the Defendant Properties under the TRIA. (*See, e.g.*, Dkt. No. 74, 77, 82, 84, 85, 98, 99, 100, 101, 110, 127, 128). On April 14, 2014, the Government entered into a settlement agreement with most of these judgment creditors providing for a pro rata distribution of any forfeited assets to the victims. (Levin A. 119, 459).

The Levin Creditors obtained a judgment under section 1605(a)(7) of the FSIA against the government of Iran in 2007, and registered that judgment in the Southern District of New York in 2009. (Levin A. 243-44). The Levin Judgment Creditors did not file an action to execute that judgment against any of the Defendant Properties or obtain an attachment, and have not obtained a judgment against Alavi, Assa, or the Partnership.

On or about February 4, 2015, over a year into the pendency of the first appeal in this case and nearly a year after the Government had settled with almost all of the judgment creditors who had appeared in this action, the Levin Creditors filed a "Claim to any Distribution of Forfeited Properties in Lieu of Notice of Claim under Rule G." (Levin A. 243). In their filing, the Levin Creditors asserted that they had "decided not to file verified claims contesting the forfeiture action pursuant to" the rules governing forfeiture proceedings based on supposed representations by the Government of its intent to distribute the forfeitable property to "victims of terrorism." (Levin A. 246). The claim contended "that the Levins will be seeking part

of any distribution of such properties as victims of terrorism and judgment creditors of Iran who possess specific pre-forfeiture interests." (*Id.*). The Levin Creditors' basis for asserting such an interest in the subject properties was their judgment under the FSIA as well as under section 201 of the TRIA, which allows certain FSIA-judgment creditors to execute against the blocked assets of a terrorist party. (Levin A. 245-46).

The District Court granted the Government's motion to dismiss the Levin Creditors' claim on a number of grounds. (Levin A. 445-47). First, the District Court found that the Levin Creditors failed to file a claim that comported with the requirements under Rule G. (Levin A. 445-46). Second, the District Court found that the Levin Creditors' claim was untimely, having been filed years after the claims period had run. (Levin A. 446). Finally, the District Court held that, even if the claim were timely, the Levin Creditors were, at best, unsecured judgment creditors who lacked standing to contest the forfeiture of specific property. (Levin A. 446-47).

## B.  Applicable Law

### 1.  Forfeiture Claims and Statutory Standing

As set forth above, a claimant must have statutory standing to contest a forfeiture. To reiterate, Rule G(5) provides the procedures that must be followed by any person asserting an interest in forfeitable property and "[s]trict compliance with" Rule G is "typically required." *Amiel*, 995 F.2d at 371. However, "a court has discretion in appropriate circumstances to depart from the strict compliance standard" with Rule G. *Id.*

Procedural rules may also, at times, be excused under the doctrine of equitable estoppel. "The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 802 (2d Cir. 2014) (internal quotations omitted). Equitable estoppel usually also requires a showing by the party invoking it that due diligence was exercised in pursuing the action. *See Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) ("Under New York law . . . Due diligence on the part of the plaintiff in bringing [an] action . . . is an essential element of equitable relief.") (internal quotations omitted).

As also set forth above, a claimant must have constitutional standing to contest a forfeiture. This requires that claimants demonstrate an ownership interest in the "particular asset or particular funds" to be forfeited. *United States v. Schwimmer*, 968 F.2d 1570, 1581 (2d Cir. 1992); *United States v. Real Prop. Located at 5208 Los Franciscos Way, Los Angeles, Cal.*, 385 F.3d 1187, 1191 (9th Cir. 2004) (noting that Article III standing "turns upon whether the claimant has a sufficient interest in the property to create a case or controversy"). A general creditor, by contrast, lacks

standing and does not have a sufficient interest in particular assets to challenge their forfeiture. *Schwimmer*, 968 F.2d at 1581; *DSI Assocs. LLC v. United States*, 496 F.3d 175, 184 (2d Cir. 2007).

When the Government forfeits property, the United States' ownership in that property "vest[s] in the United States upon commission of the act giving rise to forfeiture under this section." 18 U.S.C. § 981(f). This retroactive vesting is commonly referred to as the relation-back doctrine. *See, e.g.*, *United States v. Daugerdas*, 892 F.3d 545, 548 (2d Cir. 2018)

Under 18 U.S.C. § 981(e), the Attorney General is permitted to retain forfeited property or transfer such property to other parties, including to restore the funds "to any victim of the offense giving rise to forfeiture." 18 U.S.C. § 981(e)(6). Neither potential claimants nor any other party, however, can require the Attorney General to restore the funds to victims, or dispose of the funds in any other particular manner. *See United States v. Pescatore*, 637 F.3d 128, 137 (2d Cir. 2011).

### 2. The Terrorism Risk Insurance Act

The TRIA provides that:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including

> the blocked assets of any agency or in-
> strumentality of that terrorist party)
> shall be subject to execution or attach-
> ment in aid of execution in order to sat-
> isfy such judgment to the extent of any
> compensatory damages for which such
> terrorist party has been adjudged liable.

28 U.S.C. § 1610 note. Section 1605(a)(7) of the FSIA was replaced in or about 2008 with section 1605A, which provides that a "foreign state shall not be im- mune from the jurisdiction of courts of the United States . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, air- craft sabotage, hostage taking, or the provision of ma- terial support or resources for such an act. . . ." 28 U.S.C. § 1605A(a)(1).

Under the TRIA, a plaintiff can execute only against assets that are "assets of," i.e., property be- longing to, the terrorist party. *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014). The ownership interests that exist in any particular property, however, are determined by reference to the independent property laws, such as state law, that de- termine ownership interests. *Id.* If and when property subject to the TRIA no longer belongs to a terrorist party, that property is no longer available for execu- tion under the TRIA. *Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003) (holding that formerly blocked Iraqi assets that had been confiscated by the President under law and

transferred to the Department of the Treasury were no longer subject to execution under the TRIA).

## C. Discussion

### 1. The Levin Creditors Lack Statutory Standing Based on Their Failure to File a Claim

The Levin Creditors assert that "they have decided not to file verified claims" but "that is not the only way that a claim can be made for the Blocked Assets of Iran." (Levin Br. 17). This is incorrect. Title 18, United States Code, Section 983, and Rule G provide the exclusive means for obtaining statutory standing to contest a forfeiture. The Levin Creditors do not put forth any authority for alternate means of contesting a forfeiture, nor could they. The statutory scheme is clear and straightforward and the Levin Creditors failed to comply with it in at least four ways: the claim itself does not purport to be a claim (Levin A. 243); the claim was untimely (*see* Rule G(5)(a)(ii)(B)); the claim was not signed under penalty of perjury (*see* Rule G(5)(a)(i)(C)); and the Claim was not followed by an answer or motion under Rule 12 (*see* Rule G(5)(b)).

Even if the Levin Creditors' filing were construed as a claim, it fails to establish constitutional standing. The Levin Creditors' filing simply recounts the Levin Creditors' judgment against Iran, the Iranian Ministry of Information and Security ("MOIS"), and the Iranian Revolutionary Guard Corps ("IRGC"). (Levin A. 243). There is no allegation of a specific property interest in any specific funds or assets. Accordingly, the Levin

Creditors are no better than a general unsecured creditor of Iran, and do not have a sufficiently particularized interest in the forfeitable property to establish their standing to proceed. *See Schwimmer*, 968 F.2d at 1581. Accordingly, their claim was properly dismissed and they were denied further opportunity to contest the forfeiture.[60]

The fact that the Levin Creditors' filing in 2015 contained "the essential facts required in order to make a claim against the Blocked Assets" (Levin Br. 19), is of no moment. For the purposes of establishing an interest in a forfeiture proceeding, the filing itself was non-compliant with Rule G, thus failing to establish statutory standing, and, on its face, fails to establish constitutional standing. Similarly, the fact that the Government entered into a stipulation to distribute forfeiture proceeds to other judgment creditors has absolutely no bearing on the validity of the Levin Creditors' claim. (Levin Br. 20; Levin A. 119). The Government agreed to a settlement with numerous other judgment creditors who had filed claims by April of 2014. This was a voluntary settlement with parties to the case—most of whom had filed claims over four years earlier and had participated actively in the motion practice and two years of discovery that preceded the settlement. The Levin Creditors provide no meaningful explanation why they, by contrast, failed to

---

[60] Indeed, the Levin Creditors are worse than general unsecured creditors of Iran insofar as they have not asserted an interest in Iran's property, but in forfeited property that no longer belongs to Iran.

learn of this action until, at earliest in the 2013-2014 time-period when they claim to have contacted the U.S. Marshals.

Accordingly, because the Levin Creditors did not file a proper claim under Rule G, and, in any event, their claim was untimely, the District Court correctly dismissed their forfeiture claim.

## 2. The TRIA Does Not Preempt Compliance with Rule G

The Levin Creditors further argue that they should be excused from complying with the rules governing forfeiture based on the TRIA's "notwithstanding clause." (Levin Br. 24). The Levin Creditors assert that this "notwithstanding" provision "supersedes *all other laws including any forfeiture action.*" (*Id.* (emphasis added)). This overbroad reading of the statute should be rejected.

As an initial matter, the Levin Creditors' argument about the TRIA's "notwithstanding" clause is irrelevant, because their purported claim is not even against the property of Alavi, Assa, or the Partnership, but is against the distribution of forfeited assets—that is, properties that may be obtained by, and owned by, the Government. Once the assets are forfeited to the Government, that interest vests no later than the filing of the Amended Complaint, under the relation back doctrine. *See* 18 U.S.C. § 981(f). Thus, those assets were no longer assets "of" of a terrorist organization, and subject to the TRIA, when the Levin Creditors' TRIA claim was filed.

Moreover, even if the Levin Creditors' claims were construed as being made against the Defendant Properties, the TRIA would not assist them. The TRIA's "notwithstanding" clause should not work like "legal kryptonite." *See United States v. Holy Land Found. for Relief & Dev.*, 493 F.3d 469, 478 (5th Cir. 2007). Instead, it "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override *conflicting* provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). In other words, a "notwithstanding" clause comes into play to resolve conflicting legal principles that dictate irreconcilable legal outcomes. It does not, however, lay waste to all other statutes that might have some *effect* within the realm of the operative statute.

Statutory context also does not support the Levin Creditors' expansive interpretation of the "notwithstanding" clause. Here, the fact that the TRIA deals with "blocked assets of a terrorist party," strongly suggests that the focus of the TRIA's "notwithstanding" clause is on other legal mechanisms within the FSIA that interfere with law concerning blocked assets, such as presidential waivers, *see Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 86 (2009) ("Congress placed the 'notwithstanding' clause in § 201(a) to eliminate the effect of any Presidential waiver issued under [the FSIA] prior to the date of the TRIA's enactment."), not the completely extraneous forfeiture laws that operate upon any proceeds of criminal activity, whether or not blocked, and regardless of to whom they belong.

In fact, the Levin Creditor's claim that "[a]s TRIA preempts any other law which would prevent a TRIA judgment holder from collecting on blocked assets of an agency and instrumentality of Iran, the technical requirements of the general forfeiture statute must be trumped by TRIA" (Levin Br. 25), is squarely at odds with this Court's precedent. For example, in *Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003), plaintiffs argued—on the strength of the TRIA's "notwithstanding" clause—that the President was barred from using authority granted by IEEPA to confiscate blocked Iraqi assets and "vest[ ] title to those assets in the United States Department of the Treasury." *Smith*, 346 F. 3d at 266-67. This Court, however, rejected that argument finding no conflict between the TRIA and the President's confiscation authority, even though use of that authority had the effect of rendering the assets unavailable to the plaintiffs for execution under the TRIA. *Id.* at 271-72; *see also Elahi*, 556 U.S. at 385-86 (holding that a waiver of rights to claim assets under the TRIA prevents execution against those assets under Section 201(a) despite "notwithstanding" clause). Similarly here, the effect of the Government's forfeiture judgment and the relation-back doctrine is to render the Defendant Properties unavailable for execution under the TRIA.

The Fifth Circuit adopted a similar approach in the criminal forfeiture context in *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 687 (5th Cir. 2013) ("*Holy Land*"). *Holy Land* involved a criminal prosecution against an organization found to be operating as a fund-raising organ for Hamas in the

United States, which resulted in, among other things, the forfeiture of over $12 million in Holy Land's assets. Like here, various judgment creditors sought to establish priority over the Government's forfeiture through the parallel mechanism in criminal forfeiture for the filing of claims, namely, a petition under 21 U.S.C. § 853(n). *Id.* at 682. After the Fifth Circuit found that the judgment creditors were not innocent owners, it rejected these creditors' arguments that the TRIA trumped the Government's forfeiture, noting that the TRIA's "notwithstanding" clause only trumps other laws that actually conflict with TRIA and the forfeiture laws did not pose such a conflict. *See id.* at 687-88. In so holding, the Fifth Circuit specifically rejected the judgment creditors' argument that the TRIA overrides "all statutes that, *by their purpose or effect*, shield assets from attachment or execution." *Id.* at 688. Instead, the Fifth Circuit found that because of forfeiture, Holy Land's assets had merely "been rendered inaccessible to judgment creditors as a result of the operation of another statute." *Id.* at 689. For these reasons, the TRIA's notwithstanding clause has no bearing on the federal forfeiture statutes that convey ownership rights to the Government, and certainly it has no effect on the procedural rules that the govern how an individual asserts rights to property in a forfeiture proceeding.

The Levin Creditors' reference to the Seventh Circuit's opinion in *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607 (7th Cir. 2015), does not support their arguments. In *O'Brien*, it was undisputed that the "Appellees filed their initial

claims [ ] sixty days after the United States commenced its forfeiture action," and that they amended those claims seven months later after obtaining permission to amend from the District Court. *Id.* at 619. That is a far cry from the five years it took the Levin Creditors to file a document—that did not even purport to be a claim—in this case. Furthermore, the judgment creditors in *O'Brien* did not obtain their final TRIA judgment until a year *after* the civil forfeiture case was brought. *Id.* at 613. Accordingly, it was reasonable for the District Court there to find "that justice required that the court grant Appellees leave to amend." *Id.* at 619. Here, by contrast, the Levin Creditors had a final judgment in 2007, two years *before* the forfeiture action, and have provided no reasonable explanation for their failure to file a claim. Accordingly, the Levin Creditors cannot rely on the TRIA to establish statutory standing, and even if their filing were to be construed as a claim, it was properly dismissed.

### 3. There Is No Equitable Basis to Prevent the Government from Moving to Dismiss

The Levin Creditors further argue that even if they never filed a claim, or filed an untimely one, such noncompliance should have been excused on a discretionary basis, estoppel, or other equitable considerations. (Levin Br. 29).

The Levin Creditors have failed to demonstrate any equitable principle that entitles them to take priority over the Government in the forfeited property. While the Levin Creditors point to the inclusion of other judgment creditors in the settlement, that fact undermines

rather than supports their argument. The Levin Creditors, unlike most of the other judgment creditors, were not part of discovery and motion practice in this case. The Levin Creditors, unlike the other judgment creditors, were not involved in carefully negotiating a settlement agreement and distribution terms among 20 groups of parties consisting of hundreds of individual claimants. In other words, in terms of their participation in this case, the Levin Creditors are not similarly situated to the other judgment creditors with whom the Government settled. Indeed, the Government did not allow or settle *any* claims by *any* creditors who, like the Levin Creditors, filed their claim post-settlement. And this is for good reason: the Government has already committed to distributing the forfeiture proceeds to a group of judgment creditors pursuant to the settlement. The Government cannot unilaterally divert part of the forfeiture proceeds to the Levin Creditors or anyone given its commitments under the existing settlement agreement. Thus, contrary to the Levin Creditors' assertions, the Levin Creditors are differently situated from the settling creditors, and their belated claim does prejudice the Government.

The Levin Creditors have also not explained why, despite holding a $28 million judgment against Iran, they failed to take notice of this forfeiture case for over four years. Moreover, their actions upon learning of it in 2013 were insufficient. Aside from purporting to have had a conversation with an unidentified person in the U.S. Marshal's Office, neither the Levin Creditors, nor their attorneys did anything to investigate how to file a forfeiture claim. Common sense dictates that the Levin Creditors, and their lawyers, should

have engaged in some meaningful diligence or research to ensure that they were properly preserving their claim. In any event, that conversation cannot possibly explain the Levin Creditors' failure to exercise diligence in the four years proceeding it.

Finally, the Levin Creditors' argument that "the Government's own published rules allow claims to be made at the time of collection of any forfeited assets," and their reliance on various Federal regulations and Department of Justice publications is misplaced. (Levin Br. 13). The authorities cited in those sections relate to petitions for remission and mitigation. Remission and mitigation are processes for distributing forfeited assets by the Government pursuant to its broad authority to dispose of forfeited assets under law. *See* 18 U.S.C. § 981(e). Those processes, however, have no bearing on contesting a forfeiture or filing an innocent owner claim under 18 U.S.C. § 983(d), and the procedures that must be filed under Rule G to do so.

Accordingly, the District Court did not abuse its discretion in not allowing the Levin Creditors to file an untimely claim. *See Cambio Exacto, S.A.*, 166 F.3d at 529; *$417,143.48*, 682 F. App'x at 19.

* * *

For the foregoing reasons, the forfeiture judgment striking the Levin Creditors' claim should be affirmed.

## CONCLUSION

**The forfeiture judgment should be affirmed.**

Dated:    New York, New York
            August 31, 2018

                      Respectfully submitted,

                      GEOFFREY S. BERMAN,
                      *United States Attorney for the*
                      *Southern District of New York,*
                      *Attorney for Defendant-Appellee.*

MICHAEL D. LOCKARD,
DANIEL M. TRACER,
DANIEL B. TEHRANI,
    *Assistant United States Attorneys,*
          *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

On July 30, 2018, this Court issued an order permitting the Government to file a consolidated brief of no more than 85,000 words. As measured by the word processing system used to prepare this brief, there are 76,842 words in this brief.

GEOFFREY S. BERMAN,
*United States Attorney for the*
*Southern District of New York*

By: DANIEL B. TEHRANI,
*Assistant United States Attorney*